# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MOHAWK INDUSTRIES, INC., JEFFREY S. LORBERBAUM, FRANK H. BOYKIN, GLENN R. LANDAU, and WILLIAM CHRISTOPHER WELLBORN,<br><br>Defendants. | Civ. A. No. _____<br><br><u>COMPLAINT – CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u><br><br>**ECF CASE** |

Plaintiff Public Employees' Retirement System of Mississippi ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Mohawk Industries, Inc. ("Mohawk" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media

reports concerning Mohawk; and (d) other public information regarding the Company.

## **INTRODUCTION**

1.     This securities class action is brought on behalf of all persons or entities that purchased shares of Mohawk's common stock between April 28, 2017 and July 25, 2019, inclusive (the "Class Period").  The claims asserted herein are alleged against Mohawk and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.     Mohawk is a global manufacturer of flooring products.  The Company conducts its business through three segments: Global Ceramic, Flooring North America ("Flooring NA"), and Flooring Rest of World ("Flooring ROW").  The Global Ceramic segment offers a range of ceramic and porcelain tile and natural stone products.  The Flooring NA segment offers floor covering product lines, including carpets, rugs, laminate, hardwood flooring, sheet vinyl, and luxury vinyl tile.  The Flooring ROW segment offers laminate, sheet vinyl, carpet, hardwood flooring, and luxury vinyl tile.

3.     The Company's traditional product offerings include ceramic, stone, laminate, carpet, wood, and vinyl flooring (the "Conventional Flooring Products").

2

Mohawk markets and distributes its products under various brands which it sells through independent distributors, home improvement centers, retailers, and wholesalers.

4.     Over the past several years, consumers around the world have increasingly opted to use a new flooring material, Luxury Vinyl Tile ("LVT"), as an alternative to more traditional floor coverings.  LVT is a luxury vinyl product that is designed to look like wood, stone, or ceramic tile.  LVT is waterproof, less costly to install than the traditional flooring products, and lasts longer than more traditional flooring products.  LVT is predominantly manufactured in and exported from China, where manufactures swiftly ramped up LVT production capacity and led the pace on LVT product innovation.

5.     Indeed, during the Class Period, Mohawk's CEO described the rapid growth in U.S. consumer demand for LVT as the biggest change in the flooring industry since carpet in the 1960s.  In just five years, LVT has gone from being a relatively unknown product to comprising approximately 15% of all flooring sales in the U.S.  As consumer demand for LVT has grown, however, it has siphoned growth away from Mohawk's Conventional Flooring Products—a market in which the Company has historically dominated the industry.

6.     While Mohawk's competitors entered into direct distribution deals with

3

Chinese manufacturers to capitalize on the growing LVT market, Mohawk took a different approach by investing in LVT production plants and growing its LVT business through the acquisition of IVC Group ("IVC"), an LVT manufacturer with operations in Europe and the U.S., in a deal worth $1.2 billion that closed on June 15, 2015.  However, prior to and during the Class Period, Mohawk struggled to grow its LVT business and keep up with consumer demand for LVT products because of the Company's LVT "capacity restraints" and other production issues.  As rapid growth in demand for LVT cannibalized sales of Mohawk's Conventional Flooring Products, the Company was left scrambling to prop up sales of its Conventional Flooring Products.  As a result, Defendants engaged in a scheme to "channel stuff" its Conventional Flooring Products—that is, they induced their distributors to take on surpluses of Conventional Flooring Products that were vastly greater than demand—in an effort to make Mohawk's sales growth and financial performance appear far better than they were.

7.     Two important metrics investors considered in assessing the Company's financial performance were: Days Sales Outstanding ("DSO") and Days in Inventory (or Inventory Days) ("DII").  Mohawk recognizes revenue once its products are received by its customers.  If the Company did not collect cash at the time of sale, the amount owed is also reflected on the Company's balance sheet as

accounts receivable.  DSO represents the average number of days that it takes Mohawk to collect payment after a sale has been made.  This metric is significant because a high DSO indicates that Mohawk is taking longer to collect money from its accounts receivable and generate cash flow and could signal that its customers already have a high volume of inventory that they aren't quickly selling through to end users.  DII is a ratio that measures the average number of days that Mohawk holds its inventory before selling it to its customers.  This metric is significant because a high DII indicates that Mohawk has been manufacturing quantities of products that its customers have been unwilling or unable to purchase.  A similar ratio related to DII is "inventory turnover," which refers to the number of times Mohawk is able to sell its inventory over a particular time period.  In general, a higher inventory turnover ratio is preferred because it indicates a greater generation of sales for Mohawk.

8.  The Class Period begins on April 28, 2017, when Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2017.  During the call, Defendant Lorberbaum touted the "growing demand" for certain Mohawk Conventional Flooring Products and that the Company's investments in making "more differentiated products" and "innovative new products" were a driving factor in Mohawk's sales growth.  During

the call, Defendant Boykin told investors that the Company's DSO had increased to 54.9 days compared to 52.3 days the prior year, purportedly as a result of "channel mix." The Company's then-CFO also reported increased inventories, with DII increasing to 110 days compared to 107 days the prior year, and attributed the increase to "geographic expansion and product growth."

9. Throughout the Class Period, Defendants continued making false and misleading statements about the Company's sales growth and demand for its Conventional Flooring Products. Despite the Company's accounts receivable and inventory levels increasing during the Class Period, Defendants assuaged investor concerns by misleading them to believe that those increases were the result of external factors like rising raw material costs and inflation. But in reality, Mohawk was engaging in channel-stuffing to artificially inflate its sales and revenues. Defendants failed to disclose that Mohawk was stuffing its distribution channels with Conventional Flooring Products, which made the Company's sales growth and financial performance appear far better than they were. As a result of these misrepresentations, shares of Mohawk's common stock traded at artificially inflated prices during the Class Period.

10. On July 25, 2018, after the market closed, the Company reported disappointing financial results for the second quarter of 2018, with earnings that

were well below both Wall Street estimates and the Company's previous guidance range.  The following morning, in a conference call with analysts and investors, Mohawk also disclosed deteriorating margins which it attributed, in part, to significant production cuts the Company imposed to normalize inventory. Specifically, the Company revealed that it "produced less [Conventional Flooring Products] than [it] sold to reduce inventory."  Similarly, Mohawk also revealed that it "reduced [its] production volumes more than [the Company] had thought" and that the Company "came into the year with higher inventories than [it] wanted to have." These disclosures caused the Company's stock price to decline from $217.37 per share to $179.31 per share, or over 17%.

11.    Then, on October 25, 2018, after the market closed, the Company reported sales and earnings for the third quarter of 2018 that substantially missed analysts' estimates and the Company's previous guidance range, with sales growth in all segments lower than estimates.  Company executives attributed Mohawk's poor financial results, in part, to further manufacturing reductions that were required during the period to control inventory buildup.  On this news, the Company's stock price fell nearly 24%, from $151.07 per share to $115.03 per share.

12.    On July 25, 2019, after the market closed, Mohawk reported that sales in its Flooring NA segment were down 7% and revealed that the Company was again

7

reducing production to control inventory levels and match its supply with customer demand. The Company also revealed that increased competition and excess inventory had impacted its financial results, particularly in its Global Ceramic segment. The Company announced that "lower demand" for certain Conventional Flooring Products created excess inventory which impacted the Company's sales and margins. The Company further revealed that there was a "big buildup in inventory in ceramic" in the sales channel, which had negatively impacted the Company's sales. Accordingly, the Company provided a weak earnings forecast for the third quarter of 2019, which was well below analysts' estimates. As a result of these disclosures, the price of Mohawk's stock dropped from $156.36 per share to $128.84 per share, or nearly 18%.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Mohawk maintains its headquarters

in Calhoun, Georgia, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.    Plaintiff

15.    Plaintiff Public Employees' Retirement System of Mississippi is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi.  Plaintiff is responsible for the retirement income of employees of the State, including current and retired employees of the State's public-school districts, municipalities, counties, community colleges, state universities, libraries and water districts.  Plaintiff provides benefits to over 75,000 retirees, manages over $28 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current public employees.  As indicated on the certification submitted herewith, Plaintiff purchased Mohawk

common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.    Defendants**

16.    Defendant Mohawk is a global manufacturer of flooring products. Mohawk markets and distributes its products under various brands which it sells through independent distributors, home centers, retailers, and wholesalers. Incorporated in Delaware, the Company maintains its corporate headquarters at 160 South Industrial Blvd., Calhoun, Georgia.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "MHK."  As of July 31, 2019, Mohawk had over 72 million shares of common stock outstanding, owned by hundreds or thousands of investors

17.    Defendant Jeffrey S. Lorberbaum ("Lorberbaum") is, and was at all relevant times, Chief Executive Officer of Mohawk, as well as Chairman of the Company's Board of Directors.

18.    Defendant Frank H. Boykin ("Boykin") served as Mohawk's Executive Vice President of Finance and Chief Financial Officer from January 2005 until April 2019.

19.    Defendant William Christopher Wellborn ("Wellborn") is, and was at all relevant times, President and Chief Operating Officer of Mohawk, as well as a

member of the Company's Board of Directors.

20.     Defendant Glenn R. Landau ("Landau") has served as Mohawk's Executive Vice President and Chief Financial Officer since April 2019.

21.     Defendants Lorberbaum, Boykin, Wellborn, and Landau are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Mohawk, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

22.     During the past several years, the flooring industry has seen a rapid and significant shift in consumer demand for a new flooring material, Luxury Vinyl Tile,

or LVT, as an alternative to Conventional Flooring Products.  LVT is predominantly manufactured in and exported from China, where manufacturers swiftly ramped up LVT production capacity and product innovation.

23.     While Mohawk's competitors entered distribution deals directly with Chinese manufacturers to capitalize on the growing LVT trend, Mohawk took a different approach by investing in LVT production plants and growing its LVT business through the acquisition of IVC.  However, prior to and during the Class Period, Mohawk struggled to grow its LVT business and keep up with consumer demand for the product because of its LVT "capacity restraints" and other production issues.  The shift in consumer demand for LVT has been significant for Mohawk, because as consumer demand for LVT has grown, it has siphoned growth away from Mohawk's Conventional Flooring Products, in which the Company has historically dominated the industry.  Thus, as rapid growth in demand for LVT cannibalized sales of the Company's Conventional Flooring Products, Mohawk was left scrambling to recover so that its sales growth did not decline.  As a result, Defendants engaged in a scheme to stuff its channel with Conventional Flooring Products in order to make Mohawk's sales growth and financial performance appear far better than they were.

24.     As a result of this scheme, during the Class Period, Mohawk reported

record revenues, attributing its strong financial performance to a growing demand for certain Conventional Flooring Products, investments in new and differentiated products, and the "exceptional execution" of its businesses.  At the same time, to alleviate investor concerns regarding the Company's increasing accounts receivable and rising inventory levels, Defendants repeatedly misled investors by blaming the increases on external factors such as a changing mix in customers, higher raw material costs and inflation.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

25.    The Class Period begins on April 28, 2017, when Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2017.  During the call, Defendant Lorberbaum touted the "growing demand" for certain Mohawk Conventional Flooring Products and that the Company's investments in making "more differentiated products" and "innovative new products" were a driving factor in Mohawk's revenue growth. During the call, Defendant Boykin told investors that the Company's DSO had increased to 54.9 days compared to 52.3 days the prior year, primarily as a result of "channel mix."  Defendant Boykin also reported increased inventories, with DII increasing to 110 days compared to 107 days the prior year, and attributed the increase to "geographic expansion and product growth."

13

26.    The statements set forth above in ¶25 were materially false and misleading.   In truth, Defendants engaged in deceptive and unsustainable sales practices to mask declining customer demand for its Conventional Flooring Products.   The Company's revenue growth was not attributable to product differentiation and innovation or growing demand for Conventional Flooring Products, but rather due to unsustainable channel stuffing of Conventional Flooring Products.   Mohawk's increasing accounts receivable was not the result of channel mix and its increasing inventories was not the result of product growth and expansion, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.

27.    On July 28, 2017, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2017. During the conference call, Defendant Lorberbaum stated that "[Mohawk's] businesses continued their exceptional execution, with sales growth of 6%." Defendant Wellborn touted the "increased demand" for certain Mohawk Conventional Flooring Products, and Defendant Lorberbaum stated that the Company was "fueling [its] growth around the globe with significant investments to extend [its] product portfolio and penetrate new markets."  Defendant Wellborn also stated that the Company was "growing [its] sales with unique merchandising and

promotions to optimize each channel" for certain Mohawk Conventional Flooring Products.  During the call, Defendant Boykin reported an increase in the Company's receivables and reported that DSO had increased to 55 days compared to 54 days the prior year "due to the changing mix in our customers in the quarter."  In addition, Defendant Boykin told investors that the Company's inventories had increased, with DII at 109 days compared to 105 days the previous year, and he attributed the increase to "raw material inflation and more sourced product needed to support [its] LVT, ceramic and countertop businesses."  In response to an analyst's question regarding the Company's significant growth in inventories, Defendant Lorberbaum replied that the growth was the result of increasing material costs, the Company increasing the number of sourced products to support its new businesses, and a U.S. economy that was not as robust as expected.

28.    The statements set forth above in ¶27 were materially false and misleading.  In truth, Defendants engaged in deceptive and unsustainable sales practices to mask declining customer demand for its Conventional Flooring Products.  The Company's revenue growth was not attributable to exceptional execution, unique merchandising and promotions, or growing demand for Conventional Flooring Products, but rather due to unsustainable channel stuffing of Conventional Flooring Products.  Mohawk's increasing accounts receivable was not

the result of a changing mix of customers and its increasing inventories was not the result of raw material inflation and more sourced product, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.

29.    On October 27, 2017, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the third quarter of 2017. During the call, Defendant Lorberbaum touted the "increasing demand" for certain Mohawk Conventional Flooring Products and that the Company's investments to "enhance[] [its] product offering with unique designs and differentiated features" and introduce "new product[s]" were a driving factor in Mohawk's sales growth. During the call, Defendant Boykin again reported increased inventory levels and again attributed the increase to "raw material inflation and source product growth."

30.    The statements set forth above in ¶29 were materially false and misleading.  In truth, Defendants engaged in deceptive and unsustainable sales practices to mask declining customer demand for its Conventional Flooring Products.  The Company's revenue growth was not attributable to product differentiation and innovation or growing demand for Conventional Flooring Products, but rather due to unsustainable channel stuffing of Conventional Flooring Products.  Mohawk's increasing inventories was not the result of raw material

inflation and source product growth, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.

31.     On February 9, 2018, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter of 2017. During the call, Defendant Wellborn touted the "increasing demand" for certain Mohawk Conventional Flooring Products, and Defendant Lorberbaum stated that the Company's investments to add "new products" and to "differentiat[e] [its existing] products" were a driving factor in its sales growth.  In addition, Defendant Wellborn stated that "[o]ur high-styled offerings, consumer brands, franchised and owned retail stores and efficient operations give us a significant competitive advantage" and that the Company was "operating at full capacity and [] expanding [its] production to satisfy the growing demand and increase [its] market share." During the call, Defendant Boykin reported the Company's inventories had increased, with DII at 119, and he attributed the increase to "higher raw material cost, ramp-up of new products and backwards integration."  Similarly, in direct response to an analyst's question, Defendant Lorberbaum attributed the rising inventory levels to an "increase in raw material prices before the selling price have gotten through and continuing," as well as to some "backward integration" the

Company has done.

32.    The statements set forth above in ¶31 were materially false and misleading.  In truth, Defendants engaged in deceptive and unsustainable sales practices to mask declining customer demand for its Conventional Flooring Products.  The Company's revenue growth was not attributable to product differentiation and innovation or growing demand for Conventional Flooring Products, but rather due to unsustainable channel stuffing of Conventional Flooring Products.  Mohawk's increasing inventories was not the result of increasing raw material prices and the Company's backward integration, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.  As a result of Mohawk's channel stuffing, the Company was not enjoying a "competitive advantage."

33.    On April 27, 2018, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2018. During the call, Defendant Boykin stated that the Company's "[i]nventory turns continue to be impacted by increasing inflation and our backwards integration." During the call, Defendant Lorberbaum also stated that the Company "anticipate[d] higher growth rates in all segments" throughout the rest of the year.

34.    The statements set forth above in ¶33 were materially false and

misleading.   In truth, Defendants engaged in deceptive and unsustainable sales practices to mask declining customer demand for its Conventional Flooring Products.  Mohawk's increasing inventories was not the result of increasing inflation or the Company's backward integration, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.   As a result of the Company's channel stuffing, Defendants knew that Mohawk's growth rate was unsustainable.

## THE TRUTH EMERGES

35.    On July 25, 2018, after the market closed, the Company reported disappointing financial results for the second quarter of 2018, with earnings that were well below both Wall Street estimates and the Company's previous guidance range.   These shortfalls were driven by Mohawk's efforts to "produce[] less [Conventional Flooring Products] than [it] sold to reduce inventory."   Similarly, Mohawk disclosed that it "reduced [its] production volumes more than [the Company] had thought" and acknowledged that the Company "came into the year with higher inventories than [it] wanted to have."   The Company's efforts to reduce inventories signaled that its sales channels were stuffed with more product than it was able to sell through.   These disclosures caused the Company's stock price to decline from $217.37 per share to $179.31 per share, or over 17%, on unusually high

trading volume.

36.    Despite these disclosures, Mohawk continued to misrepresent the demand for its Conventional Flooring Products and sales growth, as well as the reasons for rising inventory levels.  Specifically, during the second quarter 2018 earnings call, Defendant Boykin blamed the Company's increasing inventory levels on "[i]nflation [that] negatively impacted the calculation."

37.    The statements set forth above in ¶36 were materially false and misleading.  In truth, Defendants engaged in deceptive and unsustainable sales practices to mask declining customer demand for its Conventional Flooring Products.  Mohawk's increasing inventories was not the result of increasing inflation, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.

38.    Then, on October 25, 2018, after the market closed, the Company reported sales and earnings for the third quarter of 2018 that substantially missed analysts' estimates and fell well below the Company's previous guidance range, with sales growth in all segments falling below estimates.  Mohawk attributed its poor financial results, in part, to manufacturing reductions that were required to control inventory buildup.  In particular, Defendant Wellborn stated that "[t]o improve our inventory turns, we are presently manufacturing fewer units than we are selling,

which is negatively impacting our costs."  As a result of these disclosures, the Company's stock price plummeted nearly 24%, from $151.07 per share to $115.03 per share, on unusually high trading volume.

39.     However, the Company continued to misrepresent the demand for its Conventional Flooring Products and sales growth and the reasons for rising inventory levels.  In particular, on October 26, 2018, during the third quarter 2018 earnings call, Defendant Boykin again blamed the Company's increasing inventory levels on "[i]nflation and backwards integration [that] negatively impacted the calculations."  In addition, in response to an analyst's question regarding the Company's rising inventories, Defendant Lorberbaum misled investors to believe it was the result of raw material inflation by stating that "inventory turns get worse because the raw materials have increased."  During the call, Defendant Boykin assured investors that inventories would "go down in the fourth quarter" and the Company would "see improvement in [its] inventory turns" into the next year.

40.     Similarly, on April 26, 2019, during the first quarter 2019 earnings call, Defendant Landau attributed the Company's increasing inventory levels to "the ramp up of new plants, acquisitions and higher raw material costs."  In addition, in response to an analyst's question regarding the Company's rising inventories, Defendant Lorberbaum stated that the Company's "inventories in the ongoing

businesses were kept under control with lower production rates."

41.    The statements set forth above in ¶¶39-40 were materially false and misleading.   In truth, Defendants engaged in deceptive and unsustainable sales practices to mask declining customer demand for its Conventional Flooring Products.   Mohawk's increasing inventories was not the result of higher raw materials costs or new plants and acquisitions, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.   In reality, the Company's inventories were not "under control," but rather bloated with too much product as a result of Mohawk channel stuffing its distributors with Conventional Flooring Products, which caused the Company's customers to significantly reduce their orders for Conventional Flooring Products.

42.    Then, on July 25, 2019, after the market closed, Mohawk revealed that sales in its Flooring NA segment were down 7% year-over-year, and that it was again reducing production to control inventory levels and match its supply with customer demand.   The Company also revealed that increased competition and excess inventory had impacted its financial results, particularly in its Global Ceramic segment.   The Company announced that "lower demand" for certain Conventional Flooring Products created excess inventory which impacted the Company's sales and margins.   The Company also disclosed that there was a "big buildup in inventory

in ceramic" in the sales channel, which had negatively impacted the Company's sales. Accordingly, the Company gave a weak earnings forecast for the third quarter of 2019, which was well below analysts' estimates. As a result of these disclosures, the price of Mohawk's stock dropped from $156.36 per share to $128.84 per share, or nearly 18%, on unusually high trading volume.

43.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## LOSS CAUSATION

44.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Mohawk's common stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Mohawk's stock fell precipitously as the prior artificial inflation came out of the price over time. As a result of their purchases of Mohawk's stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

45.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of Mohawk during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Mohawk and their families and affiliates.

46.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of July 31, 2019, Mohawk had over 72 million shares of common stock outstanding, owned by hundreds or thousands of investors.

47.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Mohawk common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

48.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

49.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

50.     A class action is superior to other available methods for the fair and

efficient adjudication of this controversy.   Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

51.    Mohawk's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

52.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Mohawk who knew that the statement was false.   None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

53.    At all relevant times, the market for Mohawk's common stock was an

efficient market for the following reasons, among others:

(a)     Mohawk common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Mohawk filed periodic public reports with the SEC and NYSE;

(c)     Mohawk regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Mohawk was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for Mohawk common stock promptly digested current information regarding Mohawk from all publicly available sources and reflected such information in the price of Mohawk common stock.  Under these circumstances, all purchasers of Mohawk common stock during the Class Period suffered similar injury through their purchase of Mohawk common

stock at artificially inflated prices and the presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding their efforts to stuff the Company's sales channels with Conventional Flooring Products which artificially inflated revenue—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Company's ability to sell its products to customers, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged

herein; and (ii) cause Plaintiff and other members of the Class to purchase Mohawk common stock at artificially inflated prices.

58.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Mohawk common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

59.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

60.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.    Defendants had actual knowledge of the misrepresentations and

omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Mohawk's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

62. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mohawk's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Mohawk's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

63. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

64. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## <u>COUNT II</u>

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

65. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Mohawk within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Mohawk, the Individual Defendants had the power and ability to control the actions of Mohawk and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

67.     WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.      As to the claims set forth under the Securities Act, awarding

rescission or a recessionary measure of damages; and

E.      Awarding such equitable/injunctive or other further relief as the

Court may deem just and proper.

## JURY DEMAND

68.      Plaintiff demands a trial by jury.

DATED: January 3, 2020                /s/ H. Lamar Mixson
                                                   H. Lamar Mixson
                                                   Georgia Bar No. 514012
 Amanda Kay Seals
 Georgia Bar No. 502720
 **BONDURANT MIXSON &**
   **ELMORE, LLP**
 1201 West Peachtree Street NW
 Suite 3900
 Atlanta, GA 30309
 Telephone: (404) 881-4100
 Facsimile: (404) 881-4111
 mixson@bmelaw.com
 seals@bmelaw.com

 *Liaison Counsel for Plaintiff*


 Avi Josefson, *pro hac vice* forthcoming
 Michael D. Blatchley, *pro hac vice*
 forthcoming
 **BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
 1251 Avenue of the Americas
 New York, NY 10020
 Telephone: (212) 554-1400

Facsimile:  (212) 554-1444
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiff*