# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, individually and on behalf of all others similarly situated,

    Plaintiff,

  v.

MOHAWK INDUSTRIES, INC. and JEFFREY S. LORBERBAUM

    Defendants.

Civ. A. No. 4:20-cv-00005-ELR

<u>COMPLAINT – CLASS ACTION</u>

<u>JURY TRIAL DEMANDED</u>

**ECF CASE**

## CONSOLIDATED CLASS ACTION COMPLAINT
## <u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................1

II.   JURISDICTION AND VENUE.....................................................13

III.  THE PARTIES ..............................................................................14

      A.    Lead Plaintiff....................................................................14

      B.    Defendants........................................................................15

IV.   SUMMARY OF THE FRAUD .....................................................16

      A.    Mohawk's Background and Operations.............................16

      B.    Mohawk Dominates the U.S. Market for Conventional Flooring
            Products, Reporting Record Sales Growth and Causing Market
            Expectations to Skyrocket.................................................19

      C.    LVT Becomes an Attractive Alternative to Conventional
            Flooring Products .............................................................22

            1.    LVT Takes the Flooring Industry By Storm............................22

            2.    Mohawk Purchases an LVT Manufacturer ..............................25

      D.    During the Class Period, Defendants Continue to Report Record
            Sales, Notwithstanding LVT's Rising Popularity..............................27

      E.    Defendants Also Continue to Report Record Margins During
            the Class Period ................................................................31

      F.    Defendants Attribute Their Record Results to Legitimate,
            Proper Business Practices..................................................34

      G.    Defendants Continue to Tell Investors During the Class Period
            That Mohawk Is Selling All the Products It Is Producing and,
            As a Result, Is "Capacity Constrained" .............................36

i

H.    Mohawk's Reported Inventory Levels Grow and the Time Needed to Turn That Inventory Lengthens ..........................................40

I.    Unknown to Investors During the Class Period, Mohawk Fabricated Revenues at the End of Each Quarter and Misstated the True Reasons for the Surge in the Company's Inventory ............44

    1.    Defendants' Saturday Scheme to Inflate Sales ........................45

        a.    Overview of the Scheme.................................................46

        b.    Mohawk Senior Executives Orchestrate the Scheme.....52

        c.    The Scheme Involved Every Distribution Center in the Flooring North America Segment ............................56

        d.    Mohawk's Executive Leadership Team Received Regular Reports Reflecting Results of the Saturday Scheme.........................................................................60

        e.    The Saturday Scheme Violated Mohawk's Stated Revenue Policies and GAAP .........................................66

    2.    The True Reasons For Mohawk's Ballooning Inventory Levels ..................................................................................67

        a.    Mohawk Hid Unsalable "Scrap" LVT in Its Inventories .....................................................................69

        b.    Defendants Were Aware That Mohawk's Domestically Produced LVT Was Defective .................76

        c.    The Domestically Produced LVT That Did Make Its Way to Customers Caused High Rates of Returns and Decreased Demand .........................................................79

        d.    Mohawk Overproduces Products to Inflate Profit Margins ........................................................................88

    3.    Mohawk Terminates Its President of Flooring North America,

Yet Does Not Disclose to Investors the Fraudulent Schemes ..94

J.   Investors Suffer Losses As the Truth Emerges .................................100

1.   Mohawk Announces Disappointing Q2 2018 Earnings .........100

2.   Mohawk Announces Disappointing Q3 2018 Results............103

3.   Mohawk Announces Disastrous Results for Q2 2019............106

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..........................................................108

A.   Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2017.....................................111

B.   Defendants' Materially False and Misleading Statements and Omissions During the Second Quarter of 2017 ...............................118

C.   Defendants' Materially False and Misleading Statements and Omissions During the Third Quarter of 2017 ...................................125

D.   Defendants' Materially False and Misleading Statements and Omissions During the Fourth Quarter of 2017 ...............................132

E.   Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2018.....................................138

F.   Defendants' Materially False and Misleading Statements and Omissions During the Second Quarter of 2018 ...............................143

G.   Defendants' Materially False and Misleading Statements and Omissions During The Third Quarter 2018 .....................................145

H.   Defendants' Materially False and Misleading Statements and Omissions During The Fourth Quarter 2018 ...................................147

I.   Defendants' Materially False and Misleading Statements and Omissions During The First Quarter of 2019 ...................................155

iii

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ....................................161

VII.    LOSS CAUSATION ................................................................179

VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR.......................181

IX.     PRESUMPTION OF RELIANCE ...............................................183

X.      CLASS ACTION ALLEGATIONS .............................................185

XI.     CLAIMS FOR RELIEF.............................................................187

        COUNT I For Violations of Section 10(b) of the Exchange Act and
            SEC Rule 10b-5 Promulgated Thereunder (Against All
            Defendants) .......................................................................187

        COUNT II For Violations of Section 20(a) of the Exchange Act
            Against Lorberbaum.........................................................191

XII.    PRAYER FOR RELIEF ...........................................................192

XIII.   JURY DEMAND....................................................................193

Lead Plaintiff Public Employees' Retirement System of Mississippi ("Lead Plaintiff"), by and through its counsel, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of itself and all persons or entities, except Defendants and their affiliates, who purchased or otherwise acquired the publicly traded common stock of Mohawk Industries, Inc. ("Mohawk" or the "Company") between April 28, 2017 and July 25, 2019, inclusive (the "Class Period"), and were damaged thereby.

## I.   <u>INTRODUCTION</u>

1.   This action concerns Mohawk's fraudulent scheme to fabricate revenues through fictitious "sales" of products that were not delivered to customers and to conceal from investors the true reasons for the Company's ballooning inventory.  When the truth was finally revealed to investors through a series of partial disclosures beginning in July 2018, the price of Mohawk common stock plunged, wiping out $7.4 billion in shareholder value.

2.   Throughout the Class Period, and unknown to investors, at the end of each financial quarter, employees in Mohawk's North American distribution centers were instructed to load goods on Company trucks on Fridays and pretend to deliver the goods on Saturdays to customers they knew were closed for deliveries and, thus, not there to accept or reject them (the "Saturday Scheme").  Mohawk would

1

nevertheless book the revenue from these "sales" as soon as the products were put on Mohawk's trucks.  Eventually, many employees stopped even pretending to deliver the products and simply scanned them as having been delivered and recorded the "sales" without the products ever leaving the Company's warehouses.

3.     Although these practices allowed Mohawk to report supposedly "record" sales and achieve various financial metrics highlighted by Wall Street, they also violated generally accepted accounting principles and the Company's own publicly avowed sales revenue-recognition policy.  But even the Saturday Scheme— as brazen as it was—could not by itself conceal the true extent of the business problems facing Mohawk during the Class Period.

4.     Defendants also made repeated false statements to misrepresent and conceal the truth behind the Company's rising inventory levels and slowing inventory turnover.  Defendants attributed these developments to such things as "geographic expansion" and "rising raw material costs."  In reality, however, Mohawk's bloated inventory resulted from both a conscious scheme to overproduce inventory in order to report higher operating margins and from a glut of unsalable products caused by systemic flaws in Mohawk's production lines.

5.     As described below, Defendants conceived of their fraudulent schemes in order to conceal the negative impact that increasing competition and a

2

fundamental shift in the flooring products business was having on the Company. Defendants' scheme, and their many false statements and omissions in support of it, allowed them to misrepresent and conceal from investors (i) the true reasons for the Company's supposedly record sales and margins, (ii) the true reasons for the Company's ballooning inventory levels, and (iii) the rampant manufacturing problems that were creating huge stockpiles of unsalable, defective goods that the Company nonetheless carried on its books as "first quality" inventory.

6.     Mohawk is the world's largest manufacturer of conventional flooring products, like carpet, tile, stone, and wood ("Conventional Flooring Products"). The Company conducts business in three segments, with its Flooring North America segment the largest by far.

7.     Leading up to the start of the Class Period, Mohawk's stock price soared, as the Company reported record earnings for eleven consecutive quarters. Mohawk's dominance of the market for Conventional Flooring Products fueled that growth. But, by the start of the Class Period, a potential threat to Mohawk's market dominance was looming, as Luxury Vinyl Tile ("LVT"), a relatively new flooring option, emerged as an attractive alternative to Conventional Flooring Products.

8.     LVT is a resilient flooring product designed to look like wood, stone, or ceramic tile. LVT is waterproof and wears better than wood, stone, or ceramic

tile.  It is also easier, and hence cheaper, to install.  LVT thus offers home and business owners more bang for their buck—the same or similar aesthetic as wood, stone, or tile, but at a much lower cost while being much easier to maintain.  That combination caused demand for LVT to skyrocket.

9.     The surge in demand for LVT was so great that it represented almost 60% of the total resilient flooring market by 2017 and helped turn resilient flooring into the largest flooring category in the United States.  The Company's Chief Executive Officer, Defendant Jeffrey Lorberbaum, described the rise of LVT as the biggest change in flooring since carpet in the 1960s, noting that it had grown faster than anything he had seen in his 40 years in the industry.

10.     As demand for LVT swelled, demand for Mohawk's Conventional Flooring Products weakened, and Mohawk had to figure out how to obtain sources of LVT in order to meet the changing demands of the marketplace.  One option was to establish relationships with reliable, cost-effective producers (most of whom were in China) that were already producing and supplying LVT.  The other option was to attempt to acquire the means to manufacture the products itself.  Mohawk's two principal competitors in the U.S. (Shaw Industries and Armstrong Flooring) chose the first option and quickly procured reliable sources of LVT.  Mohawk chose the second option, paying $1.2 billion to acquire a Belgian LVT manufacturer (IVC

4

Group) with a new manufacturing plant in Dalton, Georgia (the "U.S. LVT Plant"). Defendants promised that the U.S. LVT Plant would quickly come online and enable Mohawk to meet the soaring domestic demand for LVT. Unfortunately, those promises proved hollow.

11.     A little over eighteen months after Mohawk acquired the U.S. LVT Plant, the Company was falling further and further behind its competitors in the still-burgeoning market for LVT flooring. Shaw, for example, had increased its share of the LVT market from almost zero to nearly 30% in less than 2 years. Mohawk, by comparison, had captured only 12% of the LVT market.

12.     Rather than admit it had blundered in attempting to meet domestic LVT demand through Mohawk-manufactured products, the Company offered excuses for its struggles, coupled with assurances that things would soon be better. Defendants routinely blamed "capacity constraints," claiming (falsely) that Mohawk was selling all the LVT it was currently manufacturing and would be able to sell even more when it was able to increase production capacity. But the undisclosed truth was that the Company's efforts to increase domestic production were hamstrung by serious problems with production lines at the U.S. LVT Plant, which caused the lines to consistently produce huge volumes of defective "scrap" LVT that could not be sold to customers.

13.     Mohawk's former Senior Vice President of Sales for the Builder and Multifamily division, one of Mohawk's most senior executives and a member of the Company's Executive Leadership Team, recounted that approximately 50% of the LVT the Company produced during the Class Period was unsalable scrap.  The quality was so poor, in fact, that he forbade his 125-person salesforce from selling it.  That salesforce was responsible for all large-scale builders in North America and generated roughly $1 billion in annual revenue—20% of Mohawk's Flooring North America total revenues.

14.     When Defendant Lorberbaum asked the former executive why his team was not selling the Company's domestically produced LVT, the executive told him point blank: "we don't make it any good" and "you cannot sell it in our arena because it would not work."  Even though the scrap LVT was unsalable and was specifically coded in the Company's computers as not to be sold, Mohawk nonetheless carried the product in its publicly reported inventory as "first quality" for the express purpose of hiding the ongoing production problems and avoiding the negative financial implications writing down that inventory would cause.

15.     By the beginning of the Class Period, losing LVT market share to competitors was not Mohawk's only problem.  The emergence of LVT was also eroding demand for Mohawk's Conventional Flooring Products, especially in the

Flooring North America segment.  In 2017 alone, the U.S. market for LVT grew more than 20%, while the entire U.S. flooring market grew only 4%.  Defendant Lorberbaum admitted that LVT had "grown faster than anything that I've seen in my 40 years of history."

16.  Against this backdrop, many analysts covering Mohawk questioned whether the Company would be able to continue its string of record quarterly sales. The Company provided a resounding affirmative response to those questions at the start of the Class Period when it reported that it had achieved the highest first-quarter sales in the Company's history in the first quarter of 2017.  Defendants attributed much of that success to the Flooring North America segment, which accounted for approximately 42% of Mohawk's total sales.

17.  Mohawk reported similarly spectacular results for each of the remaining quarters in 2017, again crediting Flooring North America for driving those results.  Analysts were impressed, with many continuing to maintain their "Buy" or "Outperform" ratings on Mohawk's stock.  One even gushed, "All cylinders firing!"  This investor enthusiasm drove the Company's stock price to an all-time high in late November 2017.

18.  Unbeknownst to investors and the market, however, the Company had "achieved" these results through an unsustainable fraudulent scheme.  As referenced

above, and confirmed by numerous former Mohawk employees, at the end of each fiscal quarter, Company executives instructed employees in the Company's distribution centers to load Company trucks with millions of pounds of flooring products that were not ordered for delivery to customers until the next quarter or quarters. Employees would load the trucks on Friday as if "delivery" would occur on Saturday, knowing full-well that there would be no one to accept or reject the premature deliveries because the businesses were closed for deliveries on Saturdays.

19.     Mohawk would nonetheless recognize the "sales" revenue as soon as the fake "delivery" attempt occurred, i.e., as soon as it was loaded on the Company's trucks. This sales revenue recognition helped make reported sales for the current quarter appear much better than they actually were. According to one former distribution center manager, who called the scheme the "biggest sham ever," over time the scheme became even more brazen, with many employees simply scanning the product as if it were being loaded on the truck without physically loading the product. Employees would walk around scanning the product out on the Friday before the quarter-end and then scan it back in after the quarter closed. Mohawk would then use these "sales" to boast to investors about its "record sales."

20.     Several former employees explained that reports reflecting the results of this Saturday Scheme were sent directly to Mohawk's executive leadership team,

including Defendant Lorberbaum and Brian Carson, the President of Flooring North America.  These reports showed huge end-of-quarter spikes in "sales" followed by huge returns in the beginning of the next quarter, making the scheme as plain as day. Other reports compiled each quarter specifically showed how many orders were pushed out and the total amount of product shipped prematurely, particularly failed deliveries, on the last Saturday of the quarter.  These reports were sent to Mohawk's senior executives who would meet with Defendant Lorberbaum.

21.    The Saturday Scheme was not the only tool Defendants used to deceptively burnish Mohawk's results.  The Company also had begun overproducing products in order to drive down per-unit costs and artificially boost "operating margins"—metrics on which investors were focused.  For much of the Class Period, Brian Carson, the President of Flooring North America, bore ultimate responsibility for the profits and losses of the segment and provided the Company's headquarters with the financial information about Flooring North America that was ultimately incorporated in Mohawk's public filings and other statements to investors.

22.    Former employees confirmed that Mohawk was producing goods that it knew would not sell to artificially boost its margins.  One former member of the executive leadership team described it thusly: "For LVT and carpet, they would make 400,000 yard runs even if they only needed 100,000.  Then they would just

9

put the extra 300,000 in inventory." Continuing, he explained, "[t]hen you have the short-term benefit of your production cost going down, but you have a long-term problem because that inventory is going to bite you in the ass." That is precisely what happened.

23. The former member of Mohawk's executive leadership team confronted Lorberbaum about Carson's various schemes in September 2018. During an intense exchange with Lorberbaum, the former executive told him that "Carson is destroying your company and screwing with your finances." When the former executive went to Lorberbaum's office to continue the conversation, he found Carson already there.

24. After telling the former executive to sit down, Lorberbaum looked at the former executive and said "what is wrong with this f---ing idiot [Carson]. Every damn number he gives me is wrong, and he makes up bullsh-- every time I ask him." Within a week, Lorberbaum launched an investigation into Carson's schemes and, when the investigation concluded, Carson was terminated. Yet Lorberbaum spun his departure as a resignation to pursue other opportunities and continued to keep Carson's fraudulent schemes—which he unquestionably now knew about—hidden from investors. Even more troubling, Lorberbaum allowed these schemes to continue unabated.

25.     Meanwhile, as a result of Carson's schemes, the Company's reported inventories swelled and turnover slowed.   Analysts took note, and questioned Defendants about those worrisome trends.   Defendants offered assorted explanations, from geographic expansion and new-product ramp-up, to rising raw material costs.   As Defendants knew, those explanations were misleading and omitted material facts.   In truth, inventory was building because of the Company's intentional overproduction to goose margins and the flood of unsalable LVT— caused by the rampant design flaws in the U.S. LVT Plant—that the Company refused to write down.

26.     The truth about Mohawk's sales and worsening inventory problems began to come to light in July 2018, when the Company announced that it had missed its earnings guidance and analysts' consensus estimates for the second quarter of 2018 because of "lower sales than we anticipated."   Defendants also admitted for the first time that far from being "capacity constrained," as previously represented, the Company's warehouses were so filled with excess inventory that it had been forced to slow production to try to allow demand to catch up, causing a significant decrease in its margins.   Defendants also admitted that manufacturing problems had caused shutdowns, lower production rates, and new product inefficiencies.

27.     Though Defendants took great pains to assure investors that this was a

11

temporary blip that would soon pass, shocked investors reacted swiftly to this news, driving Mohawk's stock price down more than 18% and wiping out almost $3 billion in shareholder value in a single day.  Unfortunately for investors, the problems were not temporary (as Defendants knew), and the news soon worsened.

28.     The next quarter, the third quarter of 2018, saw Mohawk once again announce disappointing results and excess inventory.  Defendants admitted that the Company had been forced to continue to cut back on production to address the mounting inventory levels and slowing turnover.  In response, Mohawk's stock price plunged an additional 24%, erasing another $2.6 billion in shareholder value.

29.     Analysts, too, were stunned by the news; their reaction was exemplified by a report entitled, *"Floored! Coverage Closed,"* which expressed that "[t]here is no getting around that Q3 was a disaster for Mohawk" and that "calling it a disaster is being kind."   The same report exclaimed that analysts were "completely blindsided" by the news and wondered "what happens if they can't sell all of that inventory?"

30.     Undaunted, Defendants continued to insist that the Company had put these "temporary" problems behind them and would return to producing the kind of results investors and analysts had come to expect.  Among other things, Defendants assured investors that Mohawk's problems rightsizing the inventory were over and

the Company would "be increasing the production rates to match sales going through the year." Defendants' assurances worked—at least temporarily. But investors would soon learn that the Company's inventory was far from rightsized and its production problems far from over.

31.    Investors finally learned the truth when, in July 2019, the Company announced terrible results for the second quarter of 2019. Mohawk admitted that it continued to have excess inventory issues that would require "taking actions" to "manage our inventory" and "improve sales." They also were forced to admit that the problems would persist and, consequently, lowered their forward-looking financial guidance to account for continued "excess inventories" and "reduced production." Mohawk's stock price sank an additional 18% on the news.

32.    All totaled, the serial revelations of Defendants' fraud wiped out $7.4 billion in shareholder value.

## II.    **JURISDICTION AND VENUE**

33.    This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

34.    This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

35.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).   At all relevant times, Mohawk has conducted business in this District and has maintained its headquarters in this District.   In addition, many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

36.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of national securities exchanges.

## III.    **THE PARTIES**

### A.    **Lead Plaintiff**

37.    Lead Plaintiff Public Employees' Retirement System of Mississippi is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi.   Lead Plaintiff is responsible for the retirement income of employees of the State, including current and retired employees of the State's public-school districts, municipalities, counties, community colleges, state universities, libraries and water districts.   Lead Plaintiff provides benefits to over 75,000 retirees, manages over $33 billion in assets for its beneficiaries, and is

responsible for providing retirement benefits to more than 250,000 current public employees.  As set forth on the certification previously filed with the Court (ECF No. 1-1), Lead Plaintiff purchased Mohawk common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B.  **Defendants**

38.    Defendant Mohawk is a manufacturer of floor covering products, including carpet, rugs, hardwood flooring, laminates, sheet laminates, tile, and ceramic.  Mohawk sells its flooring products to distributors, wholesalers, and retailers, including big-box stores like Sherwin Williams and Floor & Décor. Mohawk's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MHK."  As of July 31, 2019, Mohawk had over 72 million shares of common stock outstanding, which were owned by many thousands of investors.

39.    Defendant Jeffrey S. Lorberbaum ("Lorberbaum") is Mohawk's Chief Executive Officer.  He has been the CEO of the Company since January 2001 and the Chairman of its Board of Directors since May 2004.  Defendant Lorberbaum signed and certified the purported accuracy of the Company's quarterly and annual SEC filings throughout the Class Period.  During the Class Period, Lorberbaum also regularly spoke to investors and securities analysts regarding the Company and its

financial results, professing to know what he was speaking about.

## IV.   SUMMARY OF THE FRAUD

### A.   Mohawk's Background and Operations

40.   Mohawk is the world's largest manufacturer of flooring products, historically dominating the industry in developing and distributing conventional flooring products like wood, stone, tile, ceramics, laminate, and carpet ("Conventional Flooring Products").

41.   Mohawk operates primarily as a duopoly in the United States Conventional Flooring Products industry, leading most market categories along with its largest competitor, Shaw Industries, followed by a host of smaller players like Armstrong Flooring and others with under $1 billion in annual sales.

42.   The United States is by far Mohawk's largest market and the most important driver of Mohawk's financial success.  During the Class Period, the Company reported annual worldwide net sales ranging between $9.5 billion to $10 billion.  Approximately 42% of those sales were reported in Mohawk's largest reporting segment, the Flooring North America segment.  The Flooring North America segment includes most Conventional Flooring Products and all LVT sold in the United States.  Mohawk reported approximately $4.0 billion in annual net sales for Flooring North America.

16

43.     Brian Carson ("Carson") was Mohawk's President of Flooring North America from 2012 until he was fired, effective immediately, on November 12, 2018.  As Carson has publicly stated, including on his personal LinkedIn profile, he had "Full P&L [profit and loss] ownership" over Mohawk's entire North American business in his role as President of Flooring North America.  He oversaw all of Mohawk's 42 plants and 41 distribution centers in North America.  He regularly solicited customers for Mohawk, engaged in sales activities for Mohawk, and managed the Flooring North America segment of Mohawk, while also participating on Mohawk's world-wide leadership team.

44.     As explained by Former Employee ("FE") 1, who was on the Executive Leadership Team with Carson and is discussed in more detail below (*see* ¶163), Carson personally presented the financial information for Flooring North America to Lorberbaum and the other corporate-level executives on a monthly and sometimes weekly basis.[1]  FE1 further explained that Carson made personal presentations about the Flooring North America financials to Mohawk's Board of Directors on a quarterly basis.  Mohawk identified Carson in its public filings with the SEC as one

---

[1] For ease of comprehension and readability, the Complaint uses the pronoun 'he' and possessive 'his' in connection with the Former Employees.  However, this convention is not meant to identify the actual gender of any of the Former Employees.

of the Company's eight "executive officers," "executive employees," and "key employees" who served at the discretion of Mohawk's Board of Directors.[2]

45.     During the Class Period, Carson furnished, approved and personally certified each quarter the purported accuracy of the information about Mohawk's Flooring North America segment that was provided to investors during quarterly conference calls and incorporated in Mohawk's consolidated financial statements and SEC filings.  Indeed, each fiscal quarter, Mohawk required the President of Flooring North America to sign a statement verifying that the information provided in the Company's disclosures to investors relating to the division was truthful and accurate in accordance with the requirements of the Sarbanes Oxley Act ("SOX").  As confirmed by FE2, Mohawk's long-time Vice President of Finance (Commercial and International) and a member of the SOX accounting staff, Carson signed a document attesting to the purported accuracy of the financials for the Flooring North

---

[2] *See* General Release and Separation Agreement, dated as of November 12, 2018, by and between Brian Carson and Mohawk Carpet, LLC (Incorporated by reference to Exhibit 10.21 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2018.).  Mohawk's senior management team included Lorberbaum, W. Christopher Wellborn as President and Chief Operating Officer, Frank Boykin as Chief Financial Officer, and the heads of the three reporting segments, including Carson.

America segment on a quarterly basis.[3]

46.     Mohawk's customers for its Conventional Flooring Products and LVT include retailers, distributors, builders, commercial contractors, and home centers like Floor & Décor, Home Depot, and Sherwin Williams.  Mohawk distributes the products to its Flooring North America customers from its distribution centers on Mohawk-owned trucks.

**B.     Mohawk Dominates the U.S. Market for Conventional Flooring Products, Reporting Record Sales Growth and Causing Market Expectations to Skyrocket**

47.     Mohawk's story used to be one of growth.  In 2000, Mohawk was predominantly a soft floor covering company, with carpets comprising roughly 95% of its revenue.  By 2014, Mohawk expanded to a $7.8 billion business, with less than half of that from carpet.  Two years later, Mohawk ranked second in the industry in market share for carpets, first in ceramic and stone, and first in laminates.  Mohawk's dramatic expansion made it the dominant seller of Conventional Flooring Products.

48.     Investors expected Mohawk to use that dominance to capture huge upswings in future demand for flooring products.  For example, Macquarie Capital

_____

[3] FE2 was Mohawk's Vice President of Finance (Commercial and International), from July 2006 to November 2017.  He was a member of Mohawk's SOX accounting staff during the Class Period.

(USA) Inc. issued a "Remodeling Manifesto" in 2016 forecasting "prolonged robust" growth in residential repair and remodeling, with Mohawk a "favorite" pick to have the "most exposure" for this upside.  UBS similarly reported throughout 2016 that Mohawk's "future growth opportunities" made it the "Top Pick" because it was "among the best positioned companies as the recovery in the housing market continues and repair and remodel expenditures improve."

49.     Mohawk assured the market that it was primed to meet these expectations.  Indeed, Mohawk consistently exceeded its own sales records, reaching "the highest net sales for any quarter in the company's history" in the first quarter of 2016.[4]  Evercore ISI described these results, and specifically Mohawk's Flooring North America's profitability, as "above anything witnessed this century."  By the end of 2016, the Company's revenues rose to "an all-time high" of $9 billion for the year, with the Company recording a record-high earnings-per-share ("EPS").[5] Mohawk likewise achieved in 2016 the "the highest fourth-quarter results in the Company's history" for operating margins.

50.     Defendants credited the Company's record performance in 2016 to the

---

[4] Press Release, "Mohawk Industries Reports Record 1st Quarter Earnings" (May 5, 2016).
[5] Press Release, "Mohawk Industries Reports Record Q4 And Full Year Results" (February 9, 2017).

"aggressive growth strategy [it] began in 2013," which they claimed had driven Mohawk's sales increase by 12% during that time.[6]  Between 2013 and the end of 2016, Mohawk rose 131 spots on *Forbes* Fortune 500's list of the largest companies by total revenue, and shot up to 12th in profit growth on the Fortune 500 list.

51.    Analysts cheered Mohawk's ability to provide consistent growth and rising margins and continued to promote the stock each time Mohawk stayed on its growth trajectory.  For example, on February 26, 2016, analysts at RBC Capital Markets issued a report rating Mohawk's stock an "outperform," stating, "All Cylinders Firing!" and "MHK remains one of our top investment ideas because of the company's consistent ability to deliver sustained earnings growth."  By the start of 2017, Evercore ISI reported that Mohawk "is the emerging growth story in the sector," pointing out that Mohawk had "exceeded consensus [forecasts] in 20 of the last 21 quarters."

52.    As Mohawk continued to report record sales and earnings growth and exceed investors' expectations quarter after quarter, the Company's stock price soared commensurately, rising from just over $100 per share at the beginning of 2013 to over $230 per share at the start of the Class Period in early 2017.

---

[6] February 10, 2017 Fourth Quarter 2016 Earnings Call.

53.     Analysts were keenly focused on whether Mohawk would be able to sustain its sales growth during 2017.   Evercore ISI, for example, while calling Mohawk's sales growth in 2016 "breathtaking," pondered whether the "aggressive nature" of its strategy "may well cause the machine to breakdown" in 2017.   And MKM Partners wrote in an April 13, 2017 report that, while Mohawk "remains one of our favorite stocks," "the biggest focus" will be whether Mohawk's 2016 "momentum in topline growth [is] sustainable into early 2017."

54.     Defendants responded to those concerns by repeatedly telling the market to expect its growth to continue in 2017.   On Mohawk's earnings call at the start of 2017, for example, Lorberbaum boasted that "Mohawk is in the best position in the Company's history" and told investors and analysts to expect that Mohawk's "2017 sales will grow similarly to last year [2016]."   Analysts accepted those assurances and reiterated their "Buy" ratings for Mohawk's stock.

### C.     LVT Becomes an Attractive Alternative to Conventional Flooring Products

#### 1.     LVT Takes the Flooring Industry By Storm

55.     The demand for LVT in the United States has skyrocketed over the last several years.   LVT offers an attractive alternative to Conventional Flooring Products because it is designed to look like wood, stone, or ceramic tile, but offers superior performance and features.   It is made of material that is flexible and clicks

into place, making it easier and therefore cheaper to install.

56.     In 2006, the resilient flooring category, only 5% of which was LVT sales, was a $1.9 billion market that captured only 7.5% of the total U.S. flooring market.[7] Nearly 80% of it was manufactured in the United States.  By 2016, as a result of growing demand for LVT, the resilient category surged to a $3.2 billion market, capturing 14.2% of the total U.S. flooring market, with 59% of the category's sales from LVT.

57.     By 2017, LVT helped make resilient flooring the largest hard surface flooring category in the U.S.  While demand was soaring, LVT was increasingly produced overseas, with domestic production dropping to 41%.

58.     The flourishing demand for LVT was eroding the market for Conventional Flooring Products that had once provided a sturdy foundation for Mohawk's and the industry's revenue growth.  Indeed, while the entire U.S. flooring industry grew by just 4% in 2017, industry-wide LVT sales grew more than 20%.[8] And, by 2018, while the entire U.S. flooring industry had grown an additional 5.1%, LVT had exploded at a rate of 47.6% in sales volume, as depicted by the below chart:

---

[7] Beth Miller, "LVT and Rigid LVT Market Report: The category is all-in with LVT, rigid and flexible – Feb 2018," *Floor Daily* (April 23, 2020).
[8] Stifel Offers Analysis of Mohawk and Industry in 2017, Floor Daily (March 13, 2018).

TABLE 2

# U.S. floor covering market sales volume

(IN MILLIONS OF SQUARE FEET)

| Product Sector | 2014 | 2015 | 2016ᴿ | 2017ᴿ | 2018ᴾ | Percent Change |
|---|---|---|---|---|---|---|
| Carpet & area rugs | 11,363ᴿ | 11,288ᴿ | 11,438 | 11,495 | 11,459 | -0.3% |
| Hardwood flooring | 1,708ᴿ | 1,862ᴿ | 1,797 | 1,809 | 1,714 | -5.3% |
| Ceramic floor & wall tile | 2,641ᴿ | 2,814ᴿ | 3,042 | 3,209 | 3,426 | 6.8% |
| Laminate flooring | 1,001ᴿ | 1,010 | 1,008 | 1,040 | 1,002 | -3.7% |
| Luxury vinyl tile (LVT)¹ | 1,001ᴿ | 1,177 | 1,495 | 1,850 | 2,730 | 47.6% |
| Vinyl sheet & floor tile² | 2,359ᴿ | 2,200ᴿ | 2,503 | 2,639 | 2,853 | 8.1% |
| Other resilient flooring³ | 229ᴿ | 244ᴿ | 278 | 281 | 287 | 2.1% |
| Stone flooring⁴ | 295 | 312 | 324 | 335 | 347 | 3.6% |
| Total Sales | 20,597ᴿ | 20,907ᴿ | 21,885 | 22,658 | 23,818 | 5.1% |

R= Revised
P = Preliminary

Source: Catalina Research

1 LVT includes WPC and hybrid floors if the flooring is primarily made of vinyl
2 Other vinyl tile includes VCT and other vinyl tile not classified as LVT
3 Cork, linoleum, non-vinyl plastics and rubber
4 Natural stone. Excludes manufactured and engineered stone

59.    As Conventional Flooring Products saw a retraction or modest increase over the same time period, industry commentators called LVT growth the "savior and wrecking ball, all at once."  In 2018, Lowe's and Home Depot both reset their flooring departments to take space from Conventional Flooring Products and expand space for LVT.

60.    Defendant Lorberbaum aptly described LVT's rapid growth as the biggest change in the flooring industry since carpet in the 1960s, explaining that LVT "has grown faster than anything that I've seen in my 40 years of history."[9]

---

[9] February 9, 2018 Fourth Quarter 2017 Earnings Call.

### 2.    Mohawk Purchases an LVT Manufacturer

61.    Contrary to its vast success in selling Conventional Flooring Products, Mohawk struggled to capture market share for LVT.  When demand for LVT began to boom, Mohawk's competitors, Shaw and Armstrong, moved quickly to establish reliable and cost-effective manufacturing sources for LVT internationally.  Mohawk went a different route, choosing to purchase a domestic LVT manufacturer.

62.    In June 2015, Mohawk spent $1.2 billion to purchase IVC Group ("IVC"), an LVT manufacturer with an LVT plant in Belgium and the U.S. LVT Plant.  When Mohawk's acquisition of IVC was announced, Carson said in a June 17, 2015 interview on *FloorDaily.net* that Mohawk would bring its superior distribution channel and "logistics capabilities" to bolster IVC's LVT manufacturing expertise.  Carson championed the combination of IVC's superior manufacturing capabilities and Mohawk's world class distribution as Mohawk's golden ticket to LVT market share.

63.    Carson continued to tout the Company's production capabilities publicly.  For example, in an April 21, 2016 interview, Carson stated that the "Dalton LVT plant … will be operating at full capacity by the end of 2016."  He added that "[t]his major investment to expand our U.S. LVT production will meet increased demand for our unique products and enhance Mohawk's position as the global leader

25

in LVT, the world's fastest growing flooring category."

64.    By the end of 2016, Carson recapped Mohawk's purported progress in meeting these goals, telling *Floor Covering Weekly*, "I'm extremely pleased with the progress our resilient team has made.  Since the acquisition in mid-2015, we have completed a state-of-the-art, fully integrated LVT plant, and we have broken ground on a new facility that will make both rigid and flexible LVT."

65.    Likewise, Lorberbaum told investors during conference calls that the Company's U.S. LVT Plant would "be one of the world's largest, most efficient production lines" and would enable the Company to "take some share from the Chinese [imports]."  Defendants' assurances could not have been more wrong.

66.    Despite these public statements, Mohawk began falling further behind its competitors, who had aggressively sourced cost-efficient LVT.  Shaw, for example—which had zero market share before entering the LVT market at the end of 2015—shot to the top spot in 2017, capturing almost 30% of U.S. LVT sales. Armstrong, whose size pales in comparison to Mohawk and Shaw, had grabbed over 13% of domestic LVT sales.  Mohawk, the world's largest conventional flooring company, had meanwhile captured only 12% of LVT sales.

67.    Mohawk blamed its struggles to grow its LVT business on a lack of production capacity, with Lorberbaum claiming on a November 4, 2016 earnings

26

call that the Company was "constrained by our present capacities" in LVT, which he explained meant that Mohawk was ***"currently selling all of our LVT we are manufacturing, even as we continue to increase our production capacity."*** Defendants assured investors that the new capacity would lead to even greater sales.

68.     Analysts bought that explanation.  Gabelli & Co., for example, wrote on November 7, 2016 that for LVT sold under the Flooring North America banner, Mohawk was ***"selling everything they produce."***  And on March 20, 2017, Barclays wrote that it anticipated "positive revenue and earnings revisions over the next two years as it becomes clear that [Mohawk] is successfully ramping the new capacity."

### D.     During the Class Period, Defendants Continue to Report Record Sales, Notwithstanding LVT's Rising Popularity

69.     Leading up to the Class Period, the main question on analysts' minds remained whether Mohawk could continue its phenomenal growth despite the growing popularity of LVT.  MKM Partners, for example, wrote ahead of Mohawk's first quarter 2017 earnings call that the biggest question "during earnings will be whether the [second half 2016] momentum in topline growth was sustainable into early 2017."

70.     Mohawk answered that question with a resounding "yes" by announcing on an April 28, 2017 earnings call, the first day of the Class Period, that Mohawk had set yet another record for quarterly sales.  Defendant Lorberbaum

boasted that Company-wide quarterly net sales had topped $2.2 billion, a "first quarter record" that represented an increase of "approximately 4%" over the prior year's first quarter (which also was a record).  Defendants pointed to the Flooring North America segment as a big driver of these record sales.  Lorberbaum highlighted how Flooring North America's sales—which already accounted for more than 40% of Mohawk's overall business—were "outpacing" the growth of all other segments.  Lorberbaum trumpeted that sales from the "Flooring North America segment increased 4%" from the prior year's first quarter.

71.     The next quarter, on July 28, 2017, Mohawk once again reported "an all-time new record" for Company-wide quarterly sales.  Lorberbaum announced that "Mohawk's performance continued at a record level, generating the highest sales … in the company's history," "with sales growth of 6%" to a remarkable $2.45 billion for the second quarter of 2017.  Lorberbaum once again announced that the Flooring North America segment also grew 6%, rising to $1.04 billion in net sales for the second quarter.

72.     These record-breaking results supposedly continued the entire year, as the Company's reported net sales continued to climb each quarter of 2017 by high single digits.  Defendants reported that Mohawk's results set a new quarterly "record" every single quarter of 2017, as "revenues rose to an all-time high of $9.5

billion" for the full year of 2017, "a 6% increase" over the prior year.  The Company similarly highlighted that Flooring North America revenues continued apace as well, growing each quarter during 2017 and expanding to support approximately 42% of the Company's overall record sales figures.

73.     Analysts credited these representations and responded positively when Mohawk announced its record-breaking quarterly results.   For example, MKM Partners issued a report titled "2Q17 Review: Consistent; Solid Execution; Remains a Favorite Name."   In that report, MKM Partners reiterated its "BUY" rating for Mohawk's stock and raised its price target from $255 to $286 per share "given MHK's continued strong earnings growth."   Evercore ISI likewise reiterated its "Outperform" rating for Mohawk's stock on November 9, 2017, maintaining its target price of $320 and calling Mohawk a "top pick due to its best-in class track record."   RBC Capital Markets similarly reiterated its "Outperform" rating for the Company, raising its price target from $267 to $291 and concluding, "All cylinders firing!"

74.     Mohawk needed to continue to achieve these "record sales" to meet analysts' expectations and avoid a decline in its stock price.  Each quarter, securities analysts publish their own individual earnings and other financial forecasts, from which a "consensus" expectation is calculated that averages the multiple analysts'

forecasts.  Despite its supposed "record sales" throughout 2017, Mohawk barely met or exceeded securities analysts' consensus expectations, including their estimates for the Company's EPS.

75.    For example, during the first quarter of 2017, as a result of its first quarter "record sales," Mohawk reported an EPS of $2.72—*the precise consensus EPS forecasted by analysts*.  During the third quarter of 2017, Mohawk's record sales enabled it to record an EPS of $3.75, which beat consensus expectations *by a mere penny*.  And in the second and fourth quarters of 2017, Mohawk edged out the consensus EPS expectations *by roughly a dime in each quarter*.

76.    Mohawk's supposed "record sales" also enabled it to meet analysts' revenue expectations.  For example, during the second quarter of 2017, Mohawk reported revenues of $2.453 billion, which beat consensus expectations by *one-fifth of one percent* (i.e., $4.8 million); during the fourth quarter of 2017, Mohawk reported revenues of $2.369 billion, which beat consensus expectations by just *less than one-fifth of one percent* (i.e., $4.6 million).

77.    Analysts applauded each quarter that Mohawk met or exceeded analysts' consensus forecasts.  For example, in an April 28, 2017 report, analysts for SunTrust Robinson Humphrey wrote "Results Summary and 2Q17 Guidance.  MHK reported adjusted 1Q17 EPS of $2.72, in-line with the Street consensus," before

raising its target price from $248 to $260.  Analysts from J.P. Morgan wrote in a July 28, 2017 report that "2Q results were solid and above Street expectations," before raising its price target from $242 to $250.

78.    Analysts for MKM Partners kept this pattern going in an October 26, 2017 report, writing that "Mohawk reported 3Q17 EPS of $3.75" versus "consensus of $3.74."  The next quarter, following Mohawk's announcement of its financial results for the fourth quarter of 2017, analysts for Jeffries once again noted that Mohawk's reported EPS was "ahead of consensus."  And again, the following quarter, analysts for Jeffries once again reported that Mohawk's reported EPS of $3.01 was "ahead of consensus ($3.00)."

79.    As discussed below (*see* ¶¶109-56), unknown to investors, Mohawk was employing a brazen fraudulent scheme to report its "record sales" and meet analysts' expectations each quarter.

### E.    Defendants Also Continue to Report Record Margins During the Class Period

80.    Throughout the Class Period, Mohawk's investors closely tracked the Company's reported "margins," which are important measures of how efficiently the Company is managing its core business.  Companies with higher margins than their competitors generally are more attractive and less risky to investors than companies with lower margins because more of their sales revenue drops to the

bottom line.  Thus, for companies with higher margins, there is more room for error if sales decline and greater upside when sales increase.

81.    With that in mind, Defendants repeatedly touted the Company's "increasing margins" and reported "record" margins throughout much of the Class Period.  For example, in a press release issued after the market closed on April 27, 2017, Lorberbaum told investors that "[o]ur operating margin for the quarter rose to 12.4%, a 110 basis point improvement over the prior year and the highest first quarter result in the company's history."  And the same day, Lorberbaum stated that "[b]oth our operating income and margin were first quarter records."  In the next quarter, on July 28, 2017, Defendants again touted that Mohawk's operating margin "was up 60 basis points over last year."

82.    Defendants further impressed upon analysts and investors that these Company-wide margin improvements were driven by legitimate business practices and products sold under the Flooring North America segment.  For example, on April 28, 2017, Lorberbaum stated that "[t]he continued improvement of our LVT manufacturing process is increasing our capacity and margins."  On the same call, when asked "what role carpet played in the margin in the quarter," Lorberbaum said, "it would be hard to drive the margins up dramatically ... and leave out such a large part of our business."  Again, on October 27, 2017, Lorberbaum represented to

investors that "[o]ur new product introductions improved our average selling prices and margins, and our process innovations and investments in manufacturing technology improved our cost."

83.     Analysts took note of Mohawk's rising margins, particularly those for Flooring North America.  For example, a Credit Suisse analyst pointed out during an investor call on July 28, 2017 that "Flooring North America margins have really improved nicely as we've moved through the year."  Looking back at all of 2017, a J.P. Morgan Chase analyst noted that for Flooring North America, Mohawk "continue[d] to do fantastic there in terms of year-over-year margin improvement with the fourth quarter again up strongly year-over-year and a lot of that driven by productivity."  Analysts for Wells Fargo similarly noted on July 27, 2017 that "[i]t's really the margin performance that piques our interest," singling out the "solid incremental operating margins in" Flooring North America, which were up 24%. Analysts for Wells Fargo also noted at the close of 2017 that "MHK's adjusted EPS beat expectations as North America continued its unprecedented margin performance."

84.     Unknown to investors, however, Mohawk and its Flooring North America segment achieved their supposed record margins by intentionally over-producing products to artificially inflate margins and refusing to write off huge

volumes of scrap LVT that was coded not to be sold to customers.

### F.  Defendants Attribute Their Record
   ### Results to Legitimate, Proper Business Practices

85.    Throughout the Class Period, Mohawk assured investors that it achieved its "record sales" and "record margins" through legitimate, proper means. Defendants continuously touted that they were "doing the right things to make the business grow" and that they were using "the same strategy [they had] been using" to provide results over the previous 5 years.  For the full year of 2017, Lorberbaum attributed their record results to "the unique strategy that combined the best features of a large, well-run public company, a private acquisition firm and a venture capital group."

86.    Defendant Lorberbaum doubled down on these assurances during the Class Period, stating during Mohawk's earning call for the third quarter of 2017 that Mohawk's success had been, and would continue to be, reliable and sustainable. Looking into 2018, Lorberbaum reminded investors that Mohawk, and specifically he and his executive team, had "a long history of outperforming the market," with a "growth rate for sales of 9%."  He reiterated that Mohawk's "strong management and balance sheet" would ensure that Mohawk would continue to grow and outperform the market.

87.    Defendants buttressed these statements with repeated, specific

34

representations that traditional business acumen drove Mohawk's continuous revenue growth and margin improvement in its Flooring North America segment. In each quarterly report filed with the SEC, Defendants told the market that Mohawk's increase in net sales in the Flooring North America segment was primarily attributable to *"higher sales volume"* and *"the favorable net impact of price and product mix,"* leading investors to believe that Mohawk achieved its financial success through Defendants' mastery of selling more of the right products at the right price—and certainly not through a fraudulent scheme designed to meet analysts' consensus forecasts.

88.    Defendants' Class Period assurances had their desired effect, as analysts continued to recommend the stock to investors and praise the Company's management.  Barclays, for example, called Mohawk a "Top Pick" on April 28, 2017, opining that there was "a sturdy floor under the stock" and maintaining its rating of Overweight due to the promised "sustainable productivity gains."  Analysts for Evercore ISI likewise reiterated that Mohawk was a top pick, writing on April 30, 2017, that "[w]ithin the quarter, [Mohawk's] fundamentals remain sound" and "MHK remains our Top Pick as key elements of the story remain intact for the remainder of the year, including accelerating [year-over-year] sales growth over the next three quarters."  By this point, Mohawk's stock price had risen to $235—a 22%

35

increase in just twelve months.

### G. Defendants Continue to Tell Investors During the Class Period That Mohawk Is Selling All the Products It Is Producing and, As a Result, Is "Capacity Constrained"

89.     To assuage concerns that Mohawk would be unable to continue its record sales growth and record margins, Defendants repeatedly told investors that the Company was selling all the product it made and that it would have sold ***even more*** if its production facilities had been able to produce more product, i.e., had more production capacity.   Defendants claimed that when those "capacity constraints" were lifted, sales would continue to climb at or above the same rate.

90.     For example, during an investor call on April 28, 2017, Lorberbaum said that as "we've discussed over multiple calls, many of our production facilities are running at or near capacity."  Lorberbaum further represented that "[w]e have said that [in] some of our product categories we've been limited by capacity."  And in a press release issued after the market closed on October 27, 2017, Lorberbaum reiterated that Defendants "expect[ed] higher sales with the relief of some of our capacity constraints, enabling us to expand our market position."  Defendants further represented during a call with analysts and investors for the same quarter that, for Flooring North America, "capacity limitations in laminate, LVT and some residential carpet categories constrained our sales."

36

91.    Analysts vigilantly focused on these "capacity limitations" that purportedly impeded sales in the Flooring North America segment, asking probing questions about them during Mohawk's earnings calls throughout the Class Period. For example, during the third quarter 2017 earnings call, an analyst at Roe Equity Research pressed Defendants about the production limitations "in the North American hard surface business." Lorberbaum responded bluntly, stating, ***"It means that we have sold all of the laminate that we could make without putting in new capacity, which is just getting started up …. With LVT, we increased the capacity of our LVT through productivity initiatives, so we were selling all of it we could have."***

92.    As analysts homed in on Flooring North America's supposed capacity limitations, Defendants repeatedly deflected concerns, assuring analysts and investors that they had successfully ramped up capacity in the U.S. LVT Plant to bolster sales and capture more U.S. market share for LVT. For example, when a SunTrust analyst asked on Mohawk's call with investors and analysts for the third quarter of 2017 whether the Company was "full on capacity in the United States and flexible LVT," Lorberbaum reiterated that "we were but … we've made changes in the manufacturing and increased the capacity of LVT" in the U.S. LVT Plant.

93.    Analysts embraced Defendants' representations that Mohawk was

37

selling everything it could manufacture and that increased capacity coming online would spur further growth.  For example, on March 20, 2017, Barclays predicted "positive revenue and earnings revisions over the next two years as it becomes clear that [Mohawk] is successfully ramping the new capacity" that "should lead to an acceleration of [Mohawk's] organic growth in 2018."  Barclays also credited Mohawk's assurances regarding its capacity constraints, commenting "[w]e continue to expect accelerating volume growth rates this year as new capacity ramps."  In its July 31, 2017 report, Gabelli & Co.—who previously stated its understanding that Mohawk was increasing capacity for LVT because it was "selling everything they produce[d]"—highlighted that "capacity investments should help generate" additional sales and that "[a]s new capacity comes on line, MHK is well positioned to continue to achieve high levels of organic growth and drive further margin expansion."  SunTrust analysts also bought Defendants' explanation, writing in an October 27, 2017 report that sales had slowed for LVT due to "filled up capacity" and that the Company just needed to "manufacture more LVT to alleviate this issue."

94.    In addition to claiming that Mohawk was selling everything it produced, Defendants also stressed to investors that its U.S. LVT Plant was manufacturing high quality and competitive LVT that was being well accepted by

customers.  For example, Defendants claimed throughout the Class Period that Mohawk's LVT sales were expanding "as a result of our leading design and performance attributes."  Lorberbaum stated that, "[o]ur LVT and laminate sales outpaced our other hard surfaces, with our distribution expanding as a result of our leading design and performance attributes."  He also claimed that ***"[w]ith their superior design and performance, our flexible, rigid and commercial LVT collections are being well accepted across all channels."***

95.   As detailed fully below (*see* ¶¶157-217), Defendants' statements that Mohawk was selling all the LVT product that it was manufacturing and just needed to make more of the same products to meet demand were false and misleading.  So too were Defendants' statements that Mohawk's LVT products were being well accepted in the market because of their supposedly superior design and performance. In truth, Mohawk's efforts to produce LVT were riddled with problems, including inherent design and process flaws in the U.S. LVT Plant, resulting in huge volumes of defective LVT in inventory that were unsalable to customers.  In addition, the LVT being manufactured in the U.S. LVT Plant that ***did*** make its way to customers had huge returns and claim rates, meaning that far from "well accepted," customers were dissatisfied and returning the domestically produced LVT products.

**H.    Mohawk's Reported Inventory Levels Grow and
the Time Needed to Turn That Inventory Lengthens**

96.    At the same time Mohawk was telling investors that it was selling everything it was producing, and that capacity constraints were preventing it from meeting additional untapped demand, its inventory was increasing and the time that the inventory sat before being sold—i.e., the "turnover"—lengthened.  Analysts began to ask why the Company was reporting increasing inventories and slowing inventory turnover, while at the same time reporting "record sales" and telling the market that it was selling everything it had produced.  Instead of disclosing the truth, Defendants made several false and misleading statements to minimize concerns.

97.    By way of background, investors and analysts assess the total dollar amount of inventory sitting on a company's balance sheet as well as how many days on average the company's inventory is held before being sold to customers, known as Days in Inventory (or "DII").  The measure is significant because a high DII may indicate slowing sales or poor inventory management.  Thus, in general, a low DII is preferred, evidencing that inventories are selling quickly.  On the other hand, a high DII could signal that inventories are stockpiling and not driving sales revenue.

98.    During the Class Period, Mohawk's reported inventories increased each quarter, as reflected by this chart:



99.     As Mohawk's inventory continued to climb, Mohawk's DII continued to rise as well, with inventory sitting on the Company's balance sheet for longer and longer periods before being sold.  At the beginning of the Class Period, Mohawk's DII was 110 days and climbed steadily, shooting as high as 128 days before the end of the Class Period.

100.    When questioned about these worrisome trends during the Class Period, Defendants concealed the truth.  They repeatedly offered various justifications, sometimes blaming rising "raw material costs," while at other times claiming inventory was growing to support "geographic expansion."  In the first quarter of 2017, for example, Mohawk assured investors that the rise in inventory and increase in DII was the result of "geographic expansion and product growth."

101.   In the second quarter of 2017, following another marked increase in inventory and DII, Defendants similarly blamed "raw material inflation and more sourced product needed to support our LVT, ceramic and countertop businesses." And when a Roe Equity Research analyst specifically questioned what was driving Mohawk's "inventory growth in the [second] quarter [of 2017]," Lorberbaum pointed to "chasing demand," "material costs" that "flows into inventory," and the "U.S. economy."

102.   Each successive quarter during the Class Period, the same pattern repeated, with the Company explaining away climbing inventories and increasing DII with benign explanations such as "raw material inflation" and "increasing inflation and our backwards integration."

103.   As analysts tried to understand the seeming disconnect between Mohawk's rising inventories and slowing turnover in the face of purported capacity constraints, decreased production, and surging demand, they pressed Defendants for answers.  On Mohawk's October 26, 2018 earnings call, for example, an Evercore ISI analyst pointed out that "[Mohawk's] inventory seems to be continuing to build." The analyst specifically asked Lorberbaum to help the market "understand or break down" the "overall inventory number," directly questioning Lorberbaum as to whether there was "a buildup of LVT."  In response, Lorberbaum again blamed "raw

42

material inflation" for both rising "inventory dollars" and worsening "inventory turns," claiming that the worsening inventory turns were a short-lived issue that would be resolved by the fourth quarter.

104.   Yet, during the fourth quarter of 2018, inventories once again increased, to $2.288 billion, 31% higher than just eight quarters earlier.  DII likewise increased to 128 days, a 20% increase during this same period.  This time, the Company attributed the dramatic increases to "inflation" and a "prebuy" ahead of a Chinese tariff.  And when inventory levels rose yet again the next quarter, Defendants blamed "ramp up of new plants, acquisitions and higher raw material costs."

105.   Analysts accepted Defendants' assurances that rising inventory levels were not a concern.  For example, analysts from Evercore ISI, in their April 30, 2017 report, repeated Mohawk's claim that "inventory issues" were "temporary" and reiterated an "outperform" rating for Mohawk's stock, accepting Mohawk management's "bottom line" representations that Mohawk was "fundamental[ly] strong and [its] story remains intact."   Likewise, after Defendants claimed that inventories rose in the second quarter of 2017 because "more sourced product [was] needed to support our LVT, ceramic and countertop businesses," analysts from Wells Fargo accepted Defendants' assurances that the rising inventories were actually helpful, stating in their July 28, 2017 report that Mohawk had "built

43

inventory back up today" after North America "capacity constraints."

106.   Unfortunately for investors, as discussed further below (*see* ¶¶157-217), Defendants' explanations for its rising inventories and increasing DII were false, misleading, and omitted material facts.   In truth, inventories and DII were continuing to rise because Mohawk was overproducing product beyond customer demand in order to falsely increase margins and was drowning in unsalable carpet and scrap-rate LVT that the Company improperly refused to write off.

## I.   Unknown to Investors During the Class Period, Mohawk Fabricated Revenues at the End of Each Quarter and Misstated the True Reasons for the Surge in the Company's Inventory

107.   Numerous former Mohawk employees have chronicled how Defendants cheated each quarter to achieve their "record sales" and satisfy analysts' revenue and EPS expectations through a carefully orchestrated scheme.   These former employees further have pinpointed the two real reasons the Company's inventories were swelling and turnover slowing: a glut of unsalable scrap LVT and rampant overproduction to inflate margins that left Mohawk products languishing in the Company's warehouses.

108.   These former employees' accounts make plain that not only was the Company not selling all the LVT it was producing—as Defendants falsely claimed repeatedly during the Class Period—but, rather, customers were returning

44

Mohawk's defective LVT product in droves, the salesforce responsible for all of Mohawk's large-scale builder sales in North America was not even trying to sell the Company's domestically produced LVT because it was so defective, and distributors and retailers were refusing to carry the products.  As discussed further below, Defendants' false and misleading statements kept these facts well hidden.

### 1. Defendants' Saturday Scheme to Inflate Sales

109.  While Mohawk was reporting record sales quarter after quarter and driving up its stock price, Defendants concealed that these results were achieved through a fraud that one former employee described as "the biggest sham ever."  At the end of each quarter the scheme was executed, Mohawk and its top executives instructed the Company's distribution centers to load their trucks with all items ordered by customers at any time—even though the agreed-upon delivery dates were in future quarters.  As soon as the items were loaded on its trucks, Mohawk would auto-generate invoices for customers' accounts and recognize a "sale" in the current quarter, even though delivery of the product was not completed.

110.  Numerous former employees explained that Mohawk chose the last Saturday of each quarter to make these purported "deliveries" precisely because customers were not open to reject the unwanted delivery on Saturdays.  The Company's scheme allowed Mohawk to recognize these failed "delivery attempts"

as "sales" dollars in the current quarter even though the product never changed hands to a customer, in violation of generally accepted accounting principles ("GAAP") and Mohawk's revenue-recognition policies.

### a.   Overview of the Scheme

111.   Numerous witnesses across Mohawk's organization have consistently described the Company's Saturday Scheme in meticulous detail.  For example, FE3, who worked as a Manager at Mohawk's West Hampton, New Jersey distribution center from February 2017 to July 2019, described how Dan Flowers, Vice President of Logistics, and Mathew Witte, Vice President of Delivery Operations, ordered the managers at Mohawk's distribution centers across the country—both during national conference calls and in emails—to load as much product as they could onto their trucks for the last Saturday of the quarter, so that the Company could recognize the sales in the quarter and hit its revenue targets.[10]  Witte reported directly to Flowers,

---

[10] FE3 was the distribution center manager of Mohawk's West Hampton, NJ facility from February 2017 to July 2019.  The West Hampton distribution center was responsible for delivery of all products to customers in Western Pennsylvania, Philadelphia, Central and South New Jersey.  The distribution center would receive order shipments from the central distribution facilities in Georgia and would make the actual deliveries to customers.  FE3 reported to FE4, the Regional Operations Manager, who reported to Mathew Witte, Vice President of Warehouse and Delivery Operations, who reported to Dan Flowers, VP of Logistics at Mohawk, who reported directly to Brian Carson.  FE3 was responsible for the day to day operations of the facility.

and Flowers directly to Carson.

112.   FE3 explained that Mohawk's distribution centers would fill the Company's trucks with product on the last Friday night of the quarter and then, on Saturday, would be unable to deliver any of the product because customers were not open to accept deliveries on Saturdays.  The distribution centers would then just bring the product back and scan it back into the warehouse as a return in the new quarter.  FE3 stated that this practice was in place when he joined the Company in February 2017.  He called the scheme "the biggest sham ever."

113.   FE3 further recounted how the process of fake deliveries and "bogus orders" weighed on his labor costs.  He explained how he and his employees were disgruntled because they had to load trucks with product, only for the trucks to sit there or to be driven around the block and then brought back.  He said that the labor to put the product onto the trucks for deliveries, and then the work to return all the product in the following weeks after the quarter had closed, put a strain on him and his employees.  He stated that "[t]he week after the end of a quarter would bury us in returns for all these fake deliveries."  In the beginning of each new quarter, FE3 would have to devote a lot of his and his employees' labor hours to "scanning all the orders back in, processing returns, and storing [the returned product]."

114.   FE3 and other distribution center managers pleaded with Flowers and

47

Witte that it did not make sense to engage in the scheme.  FE3 explained that when those complaints fell on deaf ears, the distribution center employees eventually just scanned the products as if they went onto the truck, generating a "sale," but did not even actually load the product onto the truck or attempt a "delivery."  FE3 further explained that the distribution center employees would then just walk around the center scanning the product out on Friday and then scan it back in when the new quarter started.  This tactic made sense because, as FE3 explained, putting the product onto the truck and attempting a delivery on a Saturday for customers that were not open to accept delivery on Saturday was "pointless."

115.   FE3 explained that his distribution center alone invoiced sixty to eighty orders on the last Saturday of each quarter.  He explained that these figures were just from his one facility and that all the distribution centers across the country were engaged in the quarter-end scheme.  He knew that every distribution center was involved because all the distribution managers were given the same instruction from Flowers and Witte during conference calls and in emails.  He also knew because, after a quarter would end, Flowers would send an email to all the distribution managers thanking them for their involvement.  FE3 reported, ***"Every route had it. It was always mandatory."***

116.   FE3 also detailed how this scheme affected sales.  He explained that

once the distribution center employees scanned the product on Friday night, Mohawk would automatically invoice the customers and count all these dollars as sales, even though the deliveries were not completed.  FE3 confirmed that the whole point of feigning shipment on Saturdays was that no one was open to accept deliveries on Saturdays.  As a result, the invoice would sit open and be counted in the quarter, and then the returns would come in after the books had closed for the quarter.  He explained that ***"[d]epending on the customer, the same order could get scanned out multiple times in these fake deliveries."***  He and his colleagues used to say that the Company was "cooking the books."

117.   FE4, a Regional Operations Manager at Mohawk from 2016 until July 2019, corroborated FE3's account.[11]   FE4 recalled that at the ***"quarter end, the directive was to deliver on Saturdays, which we [otherwise] never do.  Ninety percent of the stores are closed.  So, we'd load trucks up, then bring [the product] right back.  They'd add all of that money to the financials at the quarter end to***

---

[11] From 2016 until he left the Company in July 2019, FE4 was the Regional Operations Manager for Mohawk for the Northeast and mid-Atlantic regions.  He was responsible for all transportation and logistics in these regions and managed five warehouses in Massachusetts, Maryland, New Jersey, and Pennsylvania, totaling approximately 125 employees.  FE4 reported to Mathew Witte, Vice President of Warehouse and Delivery Operations at Mohawk.  FE4 worked for Mohawk for over twenty years.

***boost them up.***"  FE4 confirmed that this scheme occurred regularly and that the purpose of the practice was to boost the quarterly numbers.

118.   FE4 confirmed that over 90% of the product loaded onto the trucks was returned without being delivered.  He recounted how they often made the premature Saturday delivery attempts to the same customers repeatedly, even though Mohawk employees knew those customers would not accept the delivery since the customer had not accepted the premature delivery attempt on previous Saturdays in previous quarters.

119.   Similarly, FE5, who oversaw sales from the U.S. LVT Plant to Mohawk's East Coast and Canadian distributors, explained that it was common practice at the end of the quarter for Mohawk employees to load trailers full of product that was not yet wanted by its distributors.[12]  These trailers were then pulled into Mohawk's parking lot, where they would sit the last Saturday of the quarter. FE5 explained that the sales from the products placed on the truck were recognized on the Company's books as soon as the Company's trailers were pulled away from

---

[12] FE5 was a Division Manager who started working for IVC in November 2015. IVC was the LVT manufacturer that was acquired by Mohawk in January 2016.  He worked with Mohawk until February 2019 overseeing the sales teams focused on distributors in the East Coast and Canada divisions.  He reported to Jim Chepalis, Director of Distribution Sales at Mohawk's IVC, who in turn reported to Paul Murfin, Senior Vice President of Distribution at Mohawk.

the loading dock and placed into the Company's empty parking lot.

120.   FE5 confirmed that the whole point of engaging in this practice on the last Saturday of the quarter was to recognize sales to distributors in the current quarter.   FE5 heard complaints about this practice from his distributor customers who were prematurely invoiced, including during 2017.   Major Mohawk distributors subjected to this practice and from whom he heard complaints included Apollo Distributing Company in New Jersey; New England Floor Supply in Connecticut; and JJ Haines & Company in Maryland.

121.   FE6, a Logistics Business Analyst responsible for conducting analyses and drafting reports on logistics and shipping costs, confirmed that while he was at Mohawk, the same customers repeatedly appeared on Saturday push route lists to have orders prematurely pushed out to them at the end of the quarter regardless of the contractual delivery date.[13]   He was told that any orders capable of being shipped on the Saturday would be done, regardless of the expected delivery date.   FE6 likewise explained that the Saturday pushes were "heavily enforced" by senior management and corroborated the purpose of the Company's practice: ***"to show our***

---

[13] FE6 was a Logistics Business Analyst at Mohawk from January 2019 until April 2020.   FE6 reported to Chris Senjem, a Senior Delivery Operations Manager at Mohawk who reported to Witte.   FE6 was primarily responsible for conducting analyses and drafting reports concerning Mohawk's logistics and shipping costs.

*sales numbers were higher or better than they really were because we knew our sales were down."*

122.   FE6 added that the purpose of the Saturday pushes was to artificially increase revenue to show investors.  He knew this purpose because he attended meetings in which Witte explained the reason the Company was doing the Saturday end-of-quarter delivery attempts.  FE6 explained that Saturday was selected because, as he was told by Witte, *"it was so we could bill them and so we can report the sales on those orders whether they were delivered or not."*

### b.   Mohawk Senior Executives Orchestrate the Scheme

123.   Mohawk employees were directed to engage in this scheme by the Company's top executives, including Carson's direct reports, Company Vice Presidents Flowers and Witte.

124.   FE3 stated that instructions to engage in the scheme were contained in emails from Flowers and Witte and conveyed by them during conference calls with all the Company's distribution managers.  FE3 confirmed that Witte instructed all the distribution center managers to engage in the Saturday end-of-quarter practice, citing the need to hit financial metrics: "*Absolutely, we were all told to do it, throughout the whole country …. We're down on our quarter number and we have to make them.  We were told we had to make sure it got out.  We'd have twenty*

*stops on a truck for Saturday deliveries and we made maybe one of them, or none. That was the norm.  No one took deliveries on a Saturday.  This was the directive to all of us from [Witte]."*

125.   Likewise, FE3 explained that, to coerce participation in the scheme, "[Flowers] would say, '[w]e're not making our numbers this quarter'" and would also send threatening emails.  FE3 further explained that the threat coming from Flowers and Witte was that, if they did not engage in the scheme, their jobs could be at risk.  FE3 stated that "I had multiple conversations with [FE4 and Witte] voicing my concerns" about the end-of-quarter Saturday product delivery attempts.  FE3 continued, *"I told them that I don't even load my stuff out.  We just scan it without moving anything because there was no point.  Nothing ever got delivered anyways. It was all fake."*

126.   FE4 confirmed that Witte and Flowers would tell Mohawk's employees on conference calls and in emails that they had to engage in the scheme so that Mohawk could meet its quarterly financial targets.  FE4 stated, *"It was about meeting financial expectations at the end of the quarter for shareholders.  There was no other reason to do it and no one was shy about saying it.  That's what we were all told."*  FE4 said that he attended conference calls where this was stated in 2017, 2018, and 2019, and he saw Flowers participating in email threads in 2017,

53

2018, and 2019 where this was the stated goal of the scheme. The sole reason for these end-of-quarter conference calls was to instruct the distribution centers to engage in the end-of-quarter push to inflate Mohawk's financials.

127.   Employees in the distribution centers complied with these directives out of fear of losing their jobs. According to FE4, "[T]he feeling from a lot of people in the company was that if you don't do it, you're not going to have a job. It was tenuous then. There was a lot of push back from people at first, but eventually everybody stopped questioning it. We were afraid for our jobs." Like FE3, FE4 too raised concerns about the scheme with his boss at the time, Joe Zasaitis, Senior Director of Operations at Mohawk from 1987 until 2017, but Mohawk continued the scheme. As FE4 explained, ***"We all realized what this was. This is fixing the numbers. Everyone knew that ninety percent of [the end-of-quarter delivery attempts] were going to be coming back. It was just pushing bigger numbers up at the end of quarters."***

128.   FE7, a Distribution and Plant Manager who oversaw Mohawk's Dalton distribution centers that distributed all the vinyl sheet and LVT products nationwide across the various sales organizations and reported to Jeremy Tatum—Mohawk's Director of Operations, Distribution, & Logistics, who in turn reported to Flowers—

said that Flowers even coined a term for the scheme.[14]   FE7 explained that "[Flowers] borrowed one of Donald Trump's terms," instructing all of the distribution managers to "Drain the Swamp" at the end of the quarter for every possible order, knowing full-well that almost all of the product would end up coming back.   FE7 said that both Tatum and Flowers were explicit in their conference calls and emails that this was being done to ***"make [Mohawk's] numbers at the end of the quarter."***

129.   FE7 corroborated that Flowers and Tatum issued orders to "drain the swamp," mostly during conference calls with the distribution managers.   Indeed, FE7 said that Flowers had analysts review the orders in Mohawk's system to find orders to "ship" prematurely at the end of the quarter, even though the agreed-upon ship dates noted in the system were months away.   FE7 said that the distribution managers were directed to include ***"every order in the system"*** on the Saturday before the quarter's close, even though it was well-known that customers were not open on Saturdays so the product could not be delivered.

---

[14] FE7 was a Distribution and Plant Manager at Mohawk from April 2014 until November 2019.   FE7 reported to Jeremy Tatum, Mohawk's Director of Operations, Distribution, & Logistics who in turn reported to Dan Flowers, Vice President of Logistics at Mohawk.   FE7 was responsible for managing Mohawk's IVC facilities in Dalton, where Mohawk manufactured LVT products and he oversaw approximately 100 employees.   His group was the second largest distributor of LVT.

130.   FE3 detailed how Mohawk's mills would ensure that the distribution centers had an abundance of product for the last Saturday of the quarter.  FE3 reported that towards the end of the quarter, the mills would crank out a bunch of products for the distribution centers.  He said that the distribution centers would then receive these ramped-up supplies of product every night towards the end of the quarter.  As he explained it, the mills increased their production of these products at quarter's end *"just so [Mohawk] could juice their numbers.  They would boost their production numbers and sales numbers and we were left with all of these fake deliveries."*

c.   **The Scheme Involved Every Distribution Center in the Flooring North America Segment**

131.   Numerous witnesses have described that the Saturday Scheme involved millions of pounds of product, customers of all sizes, and every product available in the warehouses, including both Conventional Flooring Products and LVT.  Numerous witnesses also have explained that Mohawk employed the scheme universally across the country.

132.   As FE3 explained, the scheme occurred throughout the United States, and every distribution manager was expected by his or her superiors to carry it out.  FE4 likewise reported that the Saturday Scheme occurred across the country.  And FE7, whose distribution center delivered throughout the entire country, also

explained that every distribution manager across the country was ordered to participate in the Saturday Scheme.

133.   As for the amount of product the Company pretended to deliver on the last Saturday of each quarter for the entire United States, FE4 stated, "[y]ou're talking four to five million pounds of product every time across the country.  We would tally up purported routes, stops, and weight on spreadsheets and would discuss them in calls and emails.  All of that stuff would get invoiced overnight on the Fridays."  FE6 and FE7 also confirmed that the scheme resulted in millions of pounds of fake shipments on the last Saturday of each quarter.  FE6, who compiled the reports for senior executives tallying up the amount of product the Company pretended to move during the scheme, likewise explained that the scheme often resulted in up to four to five million pounds of product.

134.   Numerous witnesses, including FE3 and FE4, have further explained how Mohawk's Saturday Scheme was inflicted on all its customers, regardless of size or product category.  FE4 stated that ***"[t]here could be a hundred customers or more [each time].  It was everything.  It didn't matter the size of the company.  It was just whatever product we had in the shop.  We always delivered to the same accounts.  These are long standing relationships.  These were customers ordering from us on a regular basis.  It didn't matter.  We did this to everyone."***  FE3

57

similarly stated that Mohawk subjected everybody to the scheme, specifically recalling that the scheme was used on, among others, Sherwin Williams and Floor & Décor multiple times while he was employed at Mohawk.

135.  Like FE4, FE3 confirmed that the fake deliveries included all the products in his geographic area, including vinyl, LVT, ceramics, wood, and carpet. FE7 reiterated that this practice was "across the board," involving virtually every customer, large and small, and every product line Mohawk had.  Also, like FE3, FE7 stated that one of Mohawk's customers, Sherwin Williams, was subjected to this practice over a half dozen times between April 2017 and July 2019 and refused premature delivery each time for between 80,000 and 160,000 pounds of product (the equivalent of multiple truckloads).

136.  Mohawk utilized the Saturday Scheme to inflate its sales in every quarter of the Class Period, except when the Company temporarily abandoned the scheme in the second and third quarters of 2018.  FE8, who was a Senior Manager of Distribution Operations at Mohawk from May 2017 to September 2019, explained that Mohawk conducted its Saturday quarter-end practice in every quarter during the Class Period prior to the second quarter of 2018.[15]  But in both the second and third

---

[15] FE8 was a Senior Manager of Distribution Operations at Mohawk from May 2017 until September 2019.  In that role, FE8 was responsible for managing the three main

quarters of 2018, FE8 explained, Mohawk did not engage in the Saturday quarter-end practice.  Rather, during those two quarters, FE8 explained, Witte and Flowers instructed that the Company was not going to engage in the Saturday quarter-end practice because the Company was so far away from making its numbers: *"we knew we were going to miss our numbers, so there was no point."*

137.   History corroborates FE8's account.  In the second and third quarters of 2018, when the Company did not execute the Saturday Scheme, the Company fell substantially short of the market's consensus expectations.  As reflected below, the Company utilized the Saturday Scheme in the other quarters, providing the necessary boost for the Company to barely meet or beat analysts' consensus earnings-per-share expectations:

---

carpet distribution centers in Georgia.  Prior to this role, FE8 worked for Mohawk as a Regional Operations Manager from 2017 until May 2019.



d.   **Mohawk's Executive Leadership Team Received Regular Reports Reflecting Results of the Saturday Scheme**

138.   Several former Mohawk employees confirmed that reports containing the results of the Saturday Scheme were sent directly to Mohawk's executive leadership, including Lorberbaum and Carson.   For example, FE9, a former Operations Analyst who worked in Mohawk's Finance IT doing the majority of the sales reporting at Mohawk's corporate headquarters from June 2018 to March 2020, reported that he was tasked with verifying data in sales reports that Mohawk's system would auto-generate to be sent to Mohawk's leadership, including Defendant

Lorberbaum and Carson, via email in PDF and excel formats.[16]  He explained that he learned through these reports that a spike of orders were invoiced on the final day of the quarter and that Mohawk recognized revenue when products were shipped, even though not delivered.

139.   FE9 explained that he was responsible for verifying "master reports" that went to Defendant Lorberbaum and others in the most senior leadership positions every business day.  He explained that the master report rolled up the figures from all divisions and showed the end-of-quarter spikes.  FE9 reported that other individuals in senior leadership positions responsible for Mohawk's finances also received these master reports as well as additional daily reports.

140.   Specifically, FE9 detailed that each division received daily reports via email, with senior leadership receiving detailed breakdowns for their division, as well as anyone who had responsibility over the division's finances.  For the North American divisions, FE9 said that Carson was on the distribution list for the daily reports.  He explained that both the master report and daily reports were pulled from

---

[16] FE9 worked at Mohawk from March 2014 to March 2020 in a variety of roles. From June 2017 to June 2018 he was assigned to IVC.  From June 2018 to March 2020 he was assigned to Finance IT at corporate headquarters.  While at IVC, he reported to Amanda Clear Haynes, who reported to Paul Murfin.  While in Finance IT, he reported to Nathan Forrester, who reported to Yatkwai Kee.

a program nicknamed Webby, which was a data warehouse and SQL portal that allowed Mohawk to keep historical information on daily sales data for years.

141.  FE9 confirmed that the daily reports showed daily sales—counted when an order was shipped (even if not delivered)—as well as daily, month-to-date, quarter-to-date, and year-over-year variance.  He also confirmed that these reports showed a noticeable uptick on the last day of a quarter across the majority of product lines, including the dollar values for each day.

142.  FE9 became responsible for these reports in June 2018 and recalls managers referring to the reports as far back as 2015.  He also received these daily divisional reports as early as June 2017, when he was assigned to IVC (the entity that Mohawk purchased to obtain the U.S. LVT Plant).  When FE9 first moved into his corporate position and saw upticks in sales on the last day of the quarter, he asked his boss, Business Process Specialist, Nathan Forrester, about them and whether he needed to hold or re-evaluate the numbers.  Forrester told him that the Company was trying to recognize sales at the end of the quarter, and they did not want to re-evaluate the numbers.

143.  FE10, who was a Director of Claims and Customer Care for Mohawk's Pergo laminate business, reported that Lorberbaum also received "executive dashboard packets" that were put together by the financial group and delivered to

the corporate executive suite at 10:00 or 11:00 a.m. every day during, leading up to, and throughout his tenure.[17]

144.   FE10, who produced some of the claims data information included in these executive packets, explained that the packets contained critical business data about each division, like orders, claims, and returns.   He also recalled that the corporate executives were particularly attuned to these reports, as they would ask about anomalies "like returns being really high."   FE10 said that the quarter-end sales spike and the resulting returns in the next quarter would be detectible from the materials in the executive dashboard packets.

145.   In addition, FE6 described reports that went to additional high-level executives showing the results of the scheme.   For example, FE6 described how he made reports each Saturday at the end of every quarter for senior leadership on the scope of the scheme, detailing how many orders were sent out and the total volume of product unsuccessfully "shipped" prematurely.

146.   Specifically, FE6 explained how, during the course of the day on the last Saturday of the quarter throughout his tenure, he would manually compile

---

[17] FE10 worked for Mohawk from 2013 until August 2018.   He was a Director of Claims and Customer Care over the Pergo flooring business and was appointed briefly as the Director of Customer Excellence for the laminate and LVT facilities. He reported to Amanda Clear Haynes who reported to Carson.

statistics about the orders being pushed out in the scheme, including the number of orders "shipped" to customers prematurely, the total weight being shipped, and the amount of orders marked for reshipment because the delivery was unsuccessful.

147.   FE6 stated that he would send these reports as PDF files via email to various members of Mohawk's senior leadership, including Witte, Flowers, David Toney, Mohawk's then Senior Vice President of Supply Chain for Flooring North America, and the President of Flooring North America (who was Paul De Cock, after Carson was fired on November 12, 2018, as discussed below, *see* ¶¶226-27).  FE6 further explained that he provided reports to both Toney and De Cock, who participated in executive meetings with Lorberbaum.

148.   FE6 further explained that there were multiple times when his boss, Chris Senjem, a Senior Delivery Operations Manager, ordered him to send his reports twice on the last Saturday of the quarter—one report was to be sent around noon and another report at the end of the day—because the executives were so closely monitoring the Saturday quarter-end activity.  FE6 recounted how Witte and De Cock sometimes responded to his emails, attaching the reports, with a message, ***"We got five million pounds out on Saturday, that was going to help us hit our numbers."***

149.   FE6 further explained that the first page of the Saturday reports that he

64

sent to the Company's executives summarized the product shipped, including its total weight.  The reports FE6 generated also dedicated an entire page to the number of "reshipments," i.e., deliveries that were unsuccessful and returned to the warehouses.   Through FE6's access to Mohawk's financial data and his conversations with Witte about the Saturday Scheme, FE6 understood that the invoices generated during the unsuccessful Saturday "delivery" attempts were held open and the revenue from the invoice was counted in the closed quarter, even though the product was not delivered and had to be reshipped on the date that the customer originally anticipated delivery.  FE6 was told by Witte repeatedly during his tenure that boosting sales was the specific purpose of the Saturday quarter-end activity: ***"I was told it was so we could bill [customers] and so [Mohawk] [could] report the sales on those orders whether they were delivered or not."***

150.  FE6 understood that, before he joined Mohawk, two of his former Mohawk colleagues provided the data on the Saturday pushes to management.  FE6 further explained that the information contained in his Saturday reports was all contained in, and derived from, a platform called "RoadNet," which sat on an Oracle server and was connected into a PowerBI program and kept on AS400, a system accessible to everyone in the Company.

65

### e.   The Saturday Scheme Violated Mohawk's Stated Revenue Policies and GAAP

151.   Besides being inherently deceitful, Mohawk's Saturday Scheme also directly contravened the Company's stated sales revenue-recognition policies, as well as GAAP.  Under GAAP, specifically Accounting Standards Codification 605 (*see* ASC 605-10-25-99) and Accounting Standards Codification 606 (*see* ASC 606), sales revenue may only be recognized when "delivery has occurred."

152.   In purported accordance with this mandate, Defendants told the market throughout the Class Period that Mohawk recognized sales revenue only after the product was in the hands of customers.  For example, in Mohawk's annual report for 2017 filed with the SEC on Form 10-K on February 28, 2018, Mohawk explained that sales revenue is recognized when "delivery has occurred":

> Revenues, which are recorded net of taxes collected from customers, are recognized when there is persuasive evidence of an arrangement, ***delivery has occurred***, the price has been fixed or is determinable, and collectability can be reasonably assured.

153.   Mohawk reiterated its purported adherence to this rule in its quarterly report filed with the SEC on Form 10-Q on May 4, 2018, and every quarterly and annual report filed thereafter:

> The Company recognizes revenues when it satisfies performance obligations ***as evidenced by the transfer of control of promised goods to customers***, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods ….

66

154.   In violation of these stated accounting policies, Mohawk engaged in the Saturday Scheme, recognizing sales revenue on the last Saturday of the quarter even though delivery had not occurred and control had not transferred to the customer.

155.   The Company's utilization of the Saturday Scheme further violated Mohawk's publicly stated policies on "ethics" and "corporate conduct."   In the Company's published "Standards of Conduct and Ethics for Employees, Officers, and Directors of Mohawk Industries, Inc.," Mohawk assured investors that its officers would "not authorize or permit the use of … an accounting treatment if the effect is to distort or conceal Mohawk's true financial condition."   Going further, Mohawk represented that its executives would not "distort or conceal Mohawk's true financial condition," *even if* a "particular accounting treatment for one or more of Mohawk's operations may be permitted under applicable accounting standards."

156.   As detailed above (*see* ¶¶109-56), Defendants engaged in the Saturday Scheme precisely to distort and conceal Mohawk's true financial condition.   Their scheme not only violated the Company's stated policies in their corporate filings, but also violated the accounting rules and the securities laws.

### 2.    The True Reasons For Mohawk's Ballooning Inventory Levels

157.   In addition to misleading investors about their "record sales," Mohawk also misrepresented the true reasons why the Company's inventories were growing

and its inventory turnover was slowing during the Class Period.

158.   As discussed above (*see* ¶¶96-106), Mohawk's reported inventories swelled and inventory turnover slowed during the Class Period.  Defendants offered investors various explanations for these developments, ranging from "geographic expansion and product growth" to increasing "material costs" to "ramp-up of new products."  Unbeknownst to investors, these explanations were highly misleading, as they omitted the actual reasons for the rising inventory and slowing turnover.

159.   The true reasons for Mohawk's excessive inventory levels were twofold.  *First*, at the direction of Brian Carson, President of Flooring North America, Mohawk improperly carried in its reported inventory enormous quantities of domestically produced unsalable "scrap" LVT, even though the scrap was coded in the Company's computers as not to be shipped to customers.  Carrying that scrap LVT in inventory—rather than writing it down as GAAP requires—bloated the Company's inventory, while allowing the Company to hide from investors the rampant quality-control problems plaguing the Company's attempts to compete in the burgeoning LVT market.  It also led to under-reporting of the Company's cost of sales and, as a result, inflated the Company's margins and net income.

160.   *Second*, to further inflate profits and margins, Carson ordered Mohawk's factories to perform overly long production runs that caused production

to far outstrip demand.  By overproducing product, Mohawk was able to artificially drive down the cost to manufacture each product by spreading the Company's fixed manufacturing costs across more products.  The effect was to artificially reduce the Company's cost of sales, which in turn inflated the Company's margins.  The downside of this scheme was that, as a result of the overproduction, inventory levels grew and the time needed to turn that inventory lengthened.

161.   Taken all together, Mohawk's inability to sell a large percentage of its domestically produced LVT (which Mohawk retained in inventories on Mohawk's balance sheet) and Mohawk's continual overproduction of LVT and other products to artificially inflate margins were the real culprits fueling the Company's worsening inventory metrics.

### a.   Mohawk Hid Unsalable "Scrap" LVT in Its Inventories

162.   Mohawk's scheme to hide its huge and growing volume of unsalable scrap LVT has been confirmed by numerous witnesses—including, most notably, FE1, a former high-ranking executive of the Company during the Class Period.

163.   FE1 was the Senior Vice President of Sales for the Builder and Multifamily division at Mohawk from February 2013 until October 2019.  In that capacity, he was the head of Mohawk's Builder and Multifamily division, which was responsible for sales to all large-scale builders across North America, accounting for

approximately 20%, or $1 billion, of Mohawk's annual Flooring North America revenue.   As part of his duties, FE1 had responsibility over the Builder and Multifamily division's salesforce of 125 people.   FE1 was a member of Mohawk's Executive Leadership Team ("ELT"), a group comprised of senior executives from sales, finance, and manufacturing led by Carson.[18]

164.   FE1 reported that instead of marking unsalable LVT as "scrap," which would have required the Company to take charges to its cost of sales and thereby decrease its margins, Carson decided to mark the unsalable LVT as "first quality" and keep it in inventory, but scan a code over it to denote to Mohawk employees that it should not be released to customers.   FE1 explained that Carson and his immediate report, Gary Lanser, Chief Operating Officer of Flooring North America, began this practice in April 2017.   FE1 explained, ***"They put it all in inventory which is what caused [Mohawk's inventory numbers] to swell because they wouldn't release it for sale."***

---

[18] FE1 was the Senior Vice President of Sales for the Builder and Multifamily division at Mohawk from February 2013 to October 2019.   FE1 reported to Tom Lape, President of Residential Sales at Mohawk who retired in 2020 but remains at Mohawk as a consultant.  Lape reported to Brian Carson, President of Flooring North America.  FE1 was also authorized to speak on behalf of Mohawk and was quoted in articles published for the public in industry publications during the Class Period, including Floor Trends Magazine and Floor Covering Weekly.

165.   FE1 added, *"[t]hat's why vinyl inventory jumped up the way it did.  It was all off quality put in the system as first quality with a code over top of it so it never shipped out."*  FE1 reported that his team scrubbed the system looking for the "do not ship code," with one of FE1's reports assigned specifically to look at the data to ensure the materials identified with this code were not shipped.

166.   FE1 explained that several people on the accounting side came to him and said, *"'You're not going to believe what's happening … what Carson is making us do.'"*  These people included Scott Taylor, Mohawk's Senior Controller, and Mike Riley, Mohawk's Director of Finance.   Among other things, the accountants brought up to him that LVT inventory that was off quality was being scanned into the warehouse as first quality, with an extra code over it to denote that it should not be released to customers.

167.   The magnitude of these falsely marked products was enormous.  FE1 explained that in 2017 through the end of 2018, *"[f]ifty percent of what they were making was scrap."*  He continued, stating that Mohawk's "stock should've been $130 per share, not the $285 it was.  This was a big cause of that."  FE1 reported that Mohawk siloed into warehouses the unsalable, off-quality scrap LVT falsely carried as "first quality."  FE1 explained that he physically went to warehouses Mohawk had to rent to store all of this off-quality LVT product.  FE1 explained that

Mohawk rented these warehouses for the sole purpose of storing the unsalable LVT, recounting, *"We were renting warehouses to stick it in.  We had LVT all over."*

168.   FE5 confirmed that by 2016, Mohawk was placing unsalable LVT in warehouses in Dalton near the U.S. LVT Plant.  FE5 described how the warehouses were filled with pallet upon pallet of large, sixty-four cubic foot boxes that were packed to capacity with scrap LVT.

169.   It was no secret at Mohawk why the Company was producing so much unsalable scrap LVT: Mohawk's domestic LVT production lines were flawed from inception, unreliable, and not capable of consistently producing products to the desired specifications.  FE11, Senior Vice President of Product Development at Mohawk from January 2017 to March 2019, explained that it was well known within the Company that the LVT production line was, as he put it, "fatally screwed up."[19]

170.   FE11 explained that there were inherent flaws in Mohawk's domestic manufacturing process for LVT that persisted from the time he joined Mohawk in

---

[19] FE11 was the Senior Vice President of Product Development at Mohawk from January 2017 to March 2019, primarily responsible for product development and management within the LVT and laminate space.  Prior to working at Mohawk, FE11 worked for 14 years as a Director and Vice President of commercial hard surface business at a flooring manufacturer.  FE11 was also authorized to speak on behalf of Mohawk and was quoted in articles published for the public in industry publications during the Class Period, including Floor Covering Weekly and Floor Trends Magazine.

January 2017 to the time he left in March 2019.  FE11 said that, when he first arrived at Mohawk, he was told that the Company had invested a substantial sum of money acquiring IVC and its U.S. LVT Plant.  But as he explained, once FE11 saw the state of affairs at Mohawk's LVT manufacturing facilities, "I was aghast.  I thought what am I getting myself into?  This is a nightmare."  FE1 corroborated that the LVT line "never ran well.  From the day it started out it didn't run properly."

171.   FE5, a Division Manager who began at IVC in November 2015 and worked for Mohawk until February 2019 overseeing the East Coast and Canada sales division for Mohawk's domestic LVT products, said the domestic LVT manufacturing problems were apparent as early as May 2016, with the very first production of LVT from Mohawk's U.S. LVT Plant.  FE5 explained that, when the product from this first production was sent to distributors, Mohawk received complaints about defects in the LVT.  FE5 added that these same manufacturing problems, and the resultant defects in the LVT, persisted until at least February 2019, when he left the Company.

172.   FE12, a Regional Distribution Sales Manager who originally started at IVC in February 2013 and then worked for Mohawk selling to major LVT distributors in the Southeast until February 2019, also confirmed that a high

percentage of the LVT produced throughout 2017 and 2018 was not salable.[20]

Specifically, FE12 said that ***more than 50%*** of the product being produced out of

the U.S. LVT Plant was defective.  He recounted how he and other sales managers

would do quarterly tours of the U.S. LVT Plant where ***"[i]t would be difficult to***

***walk through.  There were pallets of bad material all over."***  FE12 recalled such a

tour that he participated in during the summer of 2018.

173.   FE12 confirmed that within six months after the initial orders began to

go out to Mohawk's distributors from the U.S. LVT Plant, "it was determined that

most of what went out was defective.  We went out and inspected material and ended

up having to take most of it back."  FE12 explained that by early 2017, from the

initial orders of the domestically produced LVT, there was a substantial number of

complaints from customers about the defective product.  "It was a massive problem.

There were a lot of complaints," FE12 recounted.

174.   The flaws in Mohawk's LVT-production line's design led to the

production of LVT products having serious defects.  FE5 explained that the locking

mechanism in the LVT pieces, which allowed the product to be applied without

---

[20] FE12 was a Regional Distribution Sales Manager who began working for IVC and
then worked for Mohawk once IVC was acquired in 2015.  FE12 left Mohawk in
February 2019.  FE12 was responsible for sales to major LVT distributors in the
Southeast region of the United States.

adhesive over the floor, would come apart after installation. FE11 similarly explained that, from the time he arrived in January 2017 until the time he left in March 2019, Mohawk's U.S. LVT Plant's press had myriad problems, including gauge issues that caused inconsistency in the thickness of LVT produced. FE11 explained that the line also had issues that made it problematic to click the LVT pieces together; there would be visible height differences among LVT pieces that were supposed to be uniform in height.

175. FE7 likewise confirmed that there were serious manufacturing and quality issues with LVT products at the U.S. LVT Plant. FE7 further explained that manufacturing issues continued throughout 2017, 2018, and 2019, and remained when he left the Company in November 2019. He also said there were numerous quality issues, including thickness variation. FE7 repeatedly brought his concerns about the amount of LVT scrap up to Tatum and Flowers, but nothing was ever done.

176. FE5 described how Mohawk performed audit tests each day of finished LVT product made in the U.S. LVT Plant. At 2:00 p.m. each day, employees would test the LVT product manufactured for sale within the previous 24 hours from two or three different production runs. They would lay out pieces of LVT in the middle of the factory floor and try to install the manufactured LVT product. FE5 was at the U.S. LVT Plant and observed such audits during three or four occasions in the latter

half of 2017.  FE5 stated that, in the audits that he personally witnessed, *50% to 75% of the LVT product tested from the U.S. LVT Plant had manufacturing defects.*

### b.   Defendants Were Aware That Mohawk's Domestically Produced LVT Was Defective

177.   Lorberbaum was well aware of the serious problems with Mohawk's domestic LVT production lines.  For example, in the summer of 2018, Lorberbaum visited the U.S. LVT Plant in Georgia to discuss the LVT production occurring there.

178.   FE11, who worked at the U.S. LVT Plant, explained that, when Lorberbaum arrived, FE11 was in the office of John Sommers, a Senior Vice President at Mohawk, and they were discussing the different LVT product being produced at the U.S. LVT Plant.  FE11 explained that it became abundantly clear that the formats were not optimized for the equipment and therefore were generating a much higher rate of waste.  It was at that time that Lorberbaum entered Sommers' office, sat down, and asked what they were working on.  FE11 and Sommers showed Lorberbaum, and Lorberbaum said, "This is stupid.  Why would we do this?"  It was at that point that they called Paul Murfin, then Senior Vice President of Distribution at Mohawk, into Sommers' office.  FE11 reported that Murfin told Lorberbaum that Murfin had approved the designs and that it became clear that the lines were not optimized to produce the selected product designs.

179.   FE11 also discussed these issues with Carson when he first arrived at

Mohawk.  FE11 explained that in or about January 2017, shortly after he joined Mohawk, FE11 attended a Surfaces Trade Show with Carson and Murfin.  During the trade show, Carson stated to Murfin that he was getting reports from the field that "the dogs don't like the dog food we're making."  FE11 explained to Carson that Mohawk was competing against products that were far superior to the products Mohawk was making, and that retailers and consumers preferred their competitors' products.

180.  FE11 also reported that starting in January 2017, the production leadership in Dalton tried to convince Carson to supplement Mohawk's domestic production from sourced material because Mohawk did not have the equipment to compete with the features of the LVT imported from China.  He explained, "the line was not good," and "[i]t wasn't capable of producing the type of product consumers were expecting."

181.  Having spent $1.2 billion to purchase IVC and the U.S. LVT Plant and having highly publicized that purchase to investors, Lorberbaum and Carson were, of course, closely watching Mohawk's production from the U.S. LVT Plant, and concerned by the manufacturing deficiencies.  In fact, FE11 noted, Lorberbaum changed FE11's boss—the person overseeing Mohawk's domestic LVT production—five times in FE11's two years with the Company.

77

182.   FE12 likewise understood that Carson and Lorberbaum knew of the domestic LVT manufacturing issues and the high rate of defects in the product. FE12 recounted that he had conference calls with Murfin once every month or two months during which Murfin would reference meetings he had with Carson and Lorberbaum about why Mohawk was losing millions of dollars.  Murfin would say that "Mohawk was putting so much pressure on him because the numbers weren't good and because we were losing so much market share of LVT."  FE12 further explained that "Paul [Murfin] was open with [FE12 and others] that he had to explain [to Carson and Lorberbaum] why the issues were happening, so there's no way they [Carson and Lorberbaum] didn't know."

183.   FE5 explained that Carson was also fully aware of Mohawk's domestic LVT production problems, as evidenced by statements he made at Mohawk's internal annual sales meetings on the Monday before the annual industry Surfaces Trade Show in Las Vegas in both January 2017 and January 2018.  FE5 explained that, during these January 2017 and January 2018 sales meetings, Carson spoke to Mohawk's IVC salespeople, marketing, product management, design teams, and installation teams.  FE5 reported that, during these presentations, Carson made statements that made clear that he was fully aware of the problems plaguing Mohawk's domestic LVT production, including statements that he knew the years

78

were tough, that there were lots of issues with LVT, and that he appreciated everyone working through the manufacturing issues.

### c. The Domestically Produced LVT That Did Make Its Way to Customers Caused High Rates of Returns and Decreased Demand

184.   As explained above, throughout 2017 and through the end of 2018, approximately half of the LVT made at the U.S. LVT Plant was scrap and coded not to be shipped.   And even on the LVT that *was* shipped, FE1 explained, Mohawk received complaints.   Indeed, the rate of returns and "claim rates" for the LVT manufactured from the U.S. LVT Plant was particularly high.   As FE1 explained, ***"Eighty percent of the time, LVT stuff [that was] shipped [from the U.S. LVT Plant] was coming back because the customer refused to take it."*** FE11 likewise explained that the claim rate for Mohawk's U.S. made LVT sold to specialty retail was more than twice as high than for the LVT product made in China.

185.   Similarly, FE5, who oversaw sales to Mohawk's East Coast and Canadian distributors, explained that Mohawk's own distributors eventually stopped carrying Mohawk's LVT entirely because the amount of defective Mohawk LVT being sent to them was so high and resulted in so many claims.   FE5 explained that distributors chose to stop carrying Mohawk's LVT products and instead sell products from other manufacturers to avoid the returns that Mohawk's LVT was

generating.

186.   For example, FE5 recalled that, starting in 2016, one of the distributors he provided with LVT product, Abraham Linc out of West Virginia, reported that retailers were returning 25% to 50% of the Mohawk LVT they had purchased because the product they received was defective.   Abraham Linc was the fourth largest IVC distributor.   Mohawk made several attempts to replace the defective product provided to Abraham Linc, but with no success.   As FE5 explained, the new LVT provided to Abraham Linc was no better than the product it had sent back. These problems persisted and, in or about early 2019, Abraham Linc discontinued carrying Mohawk's LVT products.

187.   FE5 explained that Mohawk's other distributors all over the U.S. experienced similar results.   These distributors, FE5 noted, included New England Floor Supply in Connecticut; Apollo Distributing in New Jersey; JJ Haines in Maryland, who was the largest IVC distributor in the country; Gilford Johnson in Indiana; All Tile in Illinois; and T&L Distributing out of Texas.   FE5 explained that each of these distributors reported that between 25% to 50% of the Mohawk LVT they received was defective.   This defective product was regularly being returned to Mohawk.   For example, FE5 explained that, between March and June of 2017, one of his customers, JJ Haines, returned 25 truckloads of defective LVT, with each

truckload carrying 24 pallets.

188.   FE5 further described how retailers stopped carrying Mohawk's LVT products due to the high percentage of defective product they received and the resulting customer claims Mohawk's LVT was generating.  FE5 explained that Mohawk conducted an audit of retail LVT displays to see how much additional product could go into the displays, and through this process he learned that 50% of retail displays had been removed by retailers by the end of 2018.  FE5 said this indicated that customers had lost confidence in Mohawk's LVT product and that retailers lost interest in selling it.

189.   FE5 explained that he learned firsthand about Mohawk's defective LVT from, among other things, regular meetings and phone calls with his distributor customers.  FE5 also attended national meetings where these issues were discussed with representatives from Mohawk's distributors.

190.   FE12, who managed Mohawk's relationship with JJ Haines, one of IVC's largest distributors, recounted that over 50% of the product being produced from the Company's U.S. LVT Plant and sent to distributors was defective—which he knew because he and his peers were sent to the distributors to inspect the product and then send reports back to the Company's Calhoun office revealing what they found.  FE12 said that the field inspections began in 2017 and that he spent several

days in JJ Haines' warehouses inspecting one carton of LVT for each pallet sent by Mohawk.  He said the defect rate in these audits was very high and resulted in removing entire batches of LVT from the field.  FE12 explained that every one of Mohawk's distributors was complaining about the defective LVT: ***"I don't think we had any that were not [complaining].   Everyone who took product [was] complaining about it.  Everybody got bad material across the country."***

191.  Mohawk's inability to reliably produce quality LVT products negatively impacted the Company's sales, including through distributors.  FE5 explained that, as a consequence of the defective LVT being produced, Mohawk experienced a significant decline in its sales of LVT through distributors.  FE5 explained that the drop off in Mohawk's LVT sales volume through distributors started in May 2016 and continued throughout 2017 and 2018.  FE5 recounted that from January 2016 to February 2019, there was a ***60% to 70% reduction of sales volume*** of LVT through Mohawk's distributors.

192.  FE12 similarly explained that the volume of sales through distributors throughout 2017 dropped by 60% due to the defective LVT.  FE12 recalled specifically that, by the time he left Mohawk in February 2019, JJ Haines' purchases from Mohawk had declined by 50% or more.  He further recalled that "[the customers] lost all confidence in the product line.  [In terms of buying product from

2016 to 2018,] it went to almost nothing.  It completely died.  It was so bad that before I left, they were considering not producing any LVT product with the IVC brand because that brand was so tainted."

193.   As a result of the defective LVT being sent into the marketplace, lasting damage was done to Mohawk's relationships with its distributors and customers. FE12 explained that "Mohawk lost a lot of money and their distributors lost a ton of money removing bad material and rebuilding relationships with customers .… I left [Mohawk] in February 2019 and that feeling was still rampant.  At that time [Mohawk's customers] were still very unhappy."

194.   Not surprisingly, the substantial decline in sales of domestically produced LVT raised concerns internally at Mohawk, including from the Company's executives.  Throughout 2017 and 2018, FE5 spoke to Paul Murfin, President of IVC U.S. and Mohawk Resilient and then Senior Vice President of Distribution at Mohawk, every two to three weeks about issues experienced in the field.  During these calls, FE5 spoke with Murfin directly about the LVT issues in the U.S. LVT Plant and the drop off in demand for domestically produced LVT.

195.   FE5 explained that Lorberbaum's statement to investors at the start of the Class Period on April 28, 2017 that the Company's LVT was being "well accepted across all channels" was not accurate.  To the contrary, FE5 explained that

the Company's domestically produced LVT product was not being well accepted across the channels and the quality of the LVT produced was not good.  FE12 further added that it was well known by Carson and Lorberbaum that Mohawk's LVT product was not being well accepted and that there were serious defect issues.

196.   The defective LVT that did reach customers also caused Mohawk to lose additional sales on other product lines throughout the Class Period because the cancellation of orders for LVT radiated to other product lines.  As FE1 explained, large companies generally make orders for all their required products from one company; thus, when the customers became frustrated with the quality of Mohawk's LVT and cancelled their orders, they cancelled their orders for all Mohawk products across the board.  FE1 described how his division lost opportunities to grow the business by approximately fifteen percent as a result of large customer losses between April 2017 and July 2019.  He recalled specific customer losses, including Lennar Homes (the second largest home building corporation in the U.S.), Pulte Homes (the third largest home building corporation in the U.S.), Dixie Buildings, Ready Builders Inc., and Impact Builders Corporation.

197.   Around late 2017 or early 2018, FE1 learned of the scheme to falsely label the "off quality" LVT product as first quality.  As soon as he learned of the scheme, he instructed his entire 125-person sales team not to sell Mohawk's

domestically manufactured LVT.

198.  That instruction impacted a massive chunk of Mohawk's annual revenues, as FE1's division accounted for approximately 20%, or $1 billion, of Flooring North America annual revenue.  As FE1 explained, the division that he oversaw was responsible for more than half of the vinyl sold by Mohawk and was "the growth engine for the company."

199.  FE5 corroborated FE1's account.  He explained that FE1 told him that FE1's sales group would not sell Mohawk's domestically produced LVT.  As FE1 explained to FE5 when they were both in the IVC offices, FE1 was losing too much credibility by selling Mohawk's domestically produced LVT due to the high percentage of defective LVT product.  FE12 also corroborated that FE1's group stopped selling domestic LVT because of the poor quality; FE12 recalled being told about FE1's decision from a Mohawk sales manager.

200.  In April 2018, Lorberbaum confronted FE1 about the instruction not to sell Mohawk's domestically manufactured LVT.  FE1 explained to Lorberbaum that his division refused to sell Mohawk's domestically manufactured LVT because the U.S. LVT Plant could not make first rate LVT.  FE1 told Lorberbaum that "we don't make it any good" and "you cannot sell it in our arena because it would not work."  He explained to Lorberbaum that if his team sold the Company's inferior

85

domestically produced LVT, Mohawk and his division would end up paying three times the sales amount in shipping, labor, and returns when customers returned the product.  FE1 further told Lorberbaum that everyone in his division agreed that shipping Mohawk's poor-quality domestic LVT would cause the division to lose half of its customers.  FE1 explained that "[Lorberbaum] knew that I knew what I was talking about."

201.   The volume of off-quality LVT significantly threatened Mohawk's margins as claims for refunds from customers who had unwittingly purchased defective LVT began pouring into the Company during the Class Period.  Rather than come clean about the problem, Mohawk engaged in a further cover-up.  FE1 explained that, in order to conceal the manufacturing problems, in early 2017, the Company began a strategy of categorically denying all claims.  FE1 explained, ***"Just like an insurance company, they'd deny, deny, deny until someone gets a lawyer involved …. The claims people were told to deny everything."***

202.   The claim-denial strategy was so stringent that it resulted in the denial of meritorious claims even when a Mohawk sales representative internally advocated for the customer.  For example, FE13, a Sales Representative in Mississippi who worked for Mohawk for over 20 years, recalled a situation in which the Company had denied an obviously legitimate customer claim for six months before finally

paying the claim only after the customer got an attorney involved.[21]   Clearly, as described by FE1 and FE13, Mohawk's strategy was to deny any and all claims until the customer threatened legal action.

203.   FE1 confirmed that the claim-denial strategy was another way that Mohawk artificially inflated its reported revenues: ***"If you carry that [claim denial strategy] on for six or eight months or longer, your revenue numbers are inflated. When you have to finally [start accepting claims], it's one more piece of the world that comes crashing down."*** Without the strategy of denying every claim for shoddy domestically produced LVT, Mohawk's revenues would have been much lower.  As FE1 explained, "The domestic LVT was killing our profitability.  The claim rate was unbelievable.  And then we would hide that by pushing the return numbers down and denying the claims, making that seem better."

204.   Carson's scheme of mismarking scrap LVT as "inventory" also impacted the Company's turnover of inventory, i.e., the speed with which it sold the LVT product contained in its inventory.  On this subject, when asked if Carson's LVT scheme contributed to the Company's reported slow inventory turns, FE1 said, "Absolutely."  As FE1 explained, notwithstanding the deficiencies in its product, the

---

[21] FE13 worked as a Sales Representative, and briefly as a District Manager, at Mohawk for 20 years, from 1998 to February 2018.

U.S. LVT Plant was still making product, and Mohawk was putting all the scrap LVT into "inventory," but coding it as "unsalable."  This caused the Company's inventory to swell because the scrap LVT could not be released for sale.

### d.    Mohawk Overproduces Products to Inflate Profit Margins

205.   At the same time Mohawk's warehouses were filled with unsalable "scrap" LVT, the Company was also intentionally overproducing multiple products, including LVT and carpet, that would end up sitting in its warehouses and on its balance sheet.  Carson ordered Mohawk's manufacturing plants to ramp up production to levels divorced from demand for the Company's products in an effort to drive per-unit costs down and thereby artificially increase the Company's margins, metrics on which analysts were keenly focused.

206.   As FE1 explained, starting in April 2017, Carson ordered Mohawk's production facilities to perform unnecessarily long production "runs" in order to lower the per-unit cost of production, even though there was insufficient demand for the finished products.  FE1 explained how, "[f]or LVT and carpet, they would make 400,000 yard runs even if they only needed 100,000.  Then they would just put the extra 300,000 in inventory."

207.   FE14, a Quality Specialist at one of Mohawk's largest warehouses— located in Dalton—confirmed that between April 2017 and when FE14 left Mohawk

in March 2018, the Company regularly ran the carpet lines for an incredibly long time and had excess carpet as a result.[22]  FE14 knew about the overproduction of the carpet lines because his job responsibilities included quality control of the machines and their output.

208.  As part of this quality control, FE14 would get a report showing how much each machine was slated to produce in a day or night, how much was to be produced in total, and how many hours that required of each machine.  FE14 described how employees working overtime for these long runs had concerns about where to put the excess product.  FE14 recalled that there would be neither space available to store the product nor trucks available to pick it up, resulting in carpet continuing to pile up.  Eventually, over the course of 2017 to 2018, Mohawk built additional warehouses to store the product because the distribution centers were too full.

209.  FE8, a Senior Manager of Distribution Operations at Mohawk from May 2017 to September 2019, further explained that Mohawk was producing a high number of carpet rolls knowing there was no demand for the excess.  He explained that the overproduction was in addition to a substantial amount of carpet that had

_____

[22] FE14 worked for Mohawk from November 2014 to March 2018 as a Quality Specialist.

been sitting for years.  He recounted that in Mohawk's three large carpet distribution centers, there was enough old, excess inventory on the books to fill up six million square feet of warehouse space.  He estimated that 30% of the carpet housed in the existing warehouses had been sitting there for longer than a year, which caused it to get creases and other damage, making it unusable.  FE8 explained that his center, which was the main carpet center, was moving a couple trucks worth of carpet that had sat for at least two years every day to DRD, another Mohawk facility.  The bulk of the DRD facility, he explained, was being filled up with carpet that had not moved in one or two years, or even longer.

210.   The same was true for LVT.  FE7 was the manager of Mohawk's IVC distribution plants in Dalton, had approximately 100 employees under him, and distributed all vinyl sheeting and LVT products nationwide, across the various sales organization.  He explained that there was never a "capacity constraint" in terms of LVT.  Indeed, one of FE7's duties was to provide an LVT inventory report every Monday morning to Tatum, Mohawk's Director of Operations, Distribution, & Logistics, and Flowers.  The report consisted of a spreadsheet with a column listing the amount of inventory per product.  The columns went back three years and showed that inventory grew every week.  He complained to Flowers about the amount of excess inventory and that there was nowhere to store it.

211.  FE7 explained that, in 2017 and 2018 alone, one of Mohawk's large distribution centers, GHB, spent $5 million in racking projects to make sure all the LVT could fit.  There was never any concern about a lack of LVT inventory; to the contrary, Mohawk had too much inventory.  FE7 explained that, in 2018, there was a drive completed to unload 109 trailers Mohawk had rented to store scrap LVT into rented warehouses to store it instead.  The first warehouse was located off 11th Avenue in Dalton (which housed 150,000 to 200,000 square feet of scrap product); and the second was on Goodwill Drive (which housed up to 100,000 square feet of scrap).  FE7 explained that both warehouses were full when he left the Company in November 2019.  FE7 explained that he had regular discussions with Tatum about the amount of scrap that was being stored, including discussions that occurred while they were walking through the warehouses.

212.  For LVT specifically, FE7 explained that, in 2015, Mohawk had thirty-six million square feet of LVT inventory and by the time he left in November 2019, it had over ninety million square feet in inventory.  He said by 2017 the LVT excess buildup in storage was growing rapidly and there was no place to put it.  FE7 explained that he was having weekly meetings with Andrew Kearton, VP of Distribution, Flowers, and Tatum about where to store the excess LVT inventory.  In addition to these meetings, every Monday he would send inventory reports to

Tatum and Kearton providing exact amounts of LVT products being stored.  FE7 characterized the volume of stored LVT product as "insane."

213.   FE7 explained that, in April 2017, there were no constraints on LVT capacity and the amount of LVT in the stockpile was growing.  FE7 further explained that it would be inaccurate for Mohawk to state in July 2017 that the Company was capacity constrained in their ability to sell LVT.   FE7 further explained that Defendant Lorberbaum's statement on October 26, 2017 that the Company had capacity "constraints in laminate, LVT and some of our residential carpet" was inaccurate.  As FE7 noted, Mohawk's inventory problem—i.e., having too much inventory—kept getting worse throughout 2017.

214.   FE1 explained that the Company's overproduction—even of unsalable scrap—provided the short-term benefit of lowering per-unit manufacturing costs and boosting margins in the current quarter but led to excessive inventory in the long term.  As FE1 described it, *"you have the short-term benefit of your production cost going down, but you have a long-term problem because that inventory is going to bite you in the ass."*

215.   The effect of the scheme was to artificially reduce Mohawk's reported cost of sales and inflate its profits and margins, which were significantly higher than its competitors in the flooring industry.  FE1 contrasted Mohawk with its main

competitor, Shaw, who, he explained, reported net income as a percentage of sales, i.e., operating margins, of between 6% and 8%, while Mohawk was reporting net income as a percentage of sales between 14% and 16%.

216.  FE1 explained, "You can't go from net operating margins of four percent … to sixteen percent when Shaw, a great company, is running half that. We all knew what was happening."  FE1 explained that "[Carson would] run the plants harder despite not having sales demand for it in order to drive costs of production down."  This allowed Mohawk to, as FE1 explained, "capture all of that short-term gain and then roll the rest into inventory."  FE1 confirmed that it was exactly because of this scheme that Mohawk's "inventory was going up the way it did."

217.  When asked if other people on the ELT recognized that Carson was doing improper things, FE1 explained that all the members did (with the exception of Lanser, who was involved in the improper schemes).  He explained, "***We all knew they were cooking the books.  This wasn't just risky decisions.*** We knew what he was doing we couldn't cover up …. [B]ut it kept going on and on, the stock kept going up and up, and then it all fell apart. ***We just lied about the numbers and the stock went up.***"

### 3. Mohawk Terminates Its President of Flooring North America, Yet Does Not Disclose to Investors the Fraudulent Schemes

218.   As described above, FE1 specifically told Lorberbaum that Mohawk's domestic LVT production was riddled with defects and mechanical issues and that its LVT finished product was so inferior and substandard that FE1's sales team would not sell it.  Not long after that, FE1 confronted Lorberbaum about Carson's malfeasance.  FE1 reported that he called a meeting with Lorberbaum in September 2018, at which he confronted Lorberbaum about Carson.

219.   FE1 explained that, during the September 2018 meeting, he had an intense exchange with Lorberbaum about what Carson was doing to the Company. FE1 told Lorberbaum that ***"Carson is destroying your company and screwing with your finances."*** FE1 stated, ***"I told him that 'Carson is destroying your company and it's going to get even worse.'*** I told him that 'I care more about Mohawk than I need what you pay me and that's why I'm telling you.'"

220.   FE1 knew that Mohawk's reported financials were wrong because he had learned of the improprieties that Carson was engaged in, including during the ELT meetings that Carson ran.  In addition, he had been told, beginning in January or February of 2017, by employees in Mohawk's accounting department, including Scott Taylor and Mike Riley, what Carson was instructing them to do.

94

221.   After their first meeting, Lorberbaum called FE1 back to his office the same day.  When FE1 went to Lorberbaum's office to tell him more about Carson's schemes, Lorberbaum already had Carson in his office and was confronting Carson about the Company's numbers.  When FE1 walked into the office, Lorberbaum told him that ***"Carson is lying every time he opens his mouth."***

222.   Next, FE1 described how Lorberbaum told him to sit.  Lorberbaum then looked at FE1 and said, ***"what is wrong with this f---ing idiot [Carson]? Every damn number he gives me is wrong, and he makes up bullsh-- every time I ask him."***  FE1 then described how, after Lorberbaum yelled at Carson for twenty minutes, [Carson] left.  Then, FE1 got up to leave too.  But Lorberbaum told FE1 to remain in his office.  As FE1 remained with Lorberbaum over the following hour, FE1 stated that "Carson [was] blowing up my phone asking me what I'm telling Jeff [Lorberbaum]."  FE1 showed Lorberbaum the texts he received from Carson, and Lorberbaum said in response, "he can't fire you. I own this company.  Tell me what he's doing."

223.   In response, FE1 told Lorberbaum ***"he is cooking the books"*** and ***"your company is broken. The numbers are wrong."***  Continuing, FE1 emphasized, "You're about to lose your company. You're taking a company that's too big to fail and you're going to fail it."  Lorberbaum looked back at FE1, as FE1 told him "to

start looking in every bucket and talk to every one of the ELT [the Executive Leadership Team]."

224.   FE1 said that "Jeff [Lorberbaum] said he would look into it." According to FE1, within a week of their meeting, Lorberbaum started an investigation into Carson's scheme and interviewed everyone on the Executive Leadership Team.  The Company's Chief Financial Officer, and his team, also participated in the internal investigation.

225.   The enormity of Carson's scheme and its financial impact was quickly evident to Lorberbaum if it wasn't known before.  FE1 recounted how three or four weeks after his September 2018 meeting with Lorberbaum, Lorberbaum spoke with FE1 again and admitted, ***"I just don't know how I missed it."***

226.   FE1 confirmed that Lorberbaum fired Carson as a result of the investigation, as well as Gary Lanser, Chief Operating Officer of Flooring North America.  Mohawk announced Carson's departure the day after it became effective. There were no statements about Carson's contributions or any positive statements at all, even though Carson had been with the Company for 12 years and had been the President of the Flooring North America during the Company's string of "record sales" each quarter of 2017.

227.   But Lorberbaum was not honest with investors about these earth-

96

shattering discoveries (if, indeed, this was the first time Lorberbaum learned of them).  At Lorberbaum's direction, Mohawk simply issued a public press release on November 13, 2018 announcing that "Brian Carson, former president of the Company's Flooring North America segment, will leave the Company on November 12, 2018 to pursue other interests."

228.   This bare-bones announcement stood in stark contrast to Mohawk's typical practice of thanking departing executives.[23]  It also fell far short of disclosing the truth: that multiple prior years of Mohawk's financial statements and other public statements were false and misleading.

229.   Lorberbaum and Mohawk decided to sweep all of it under the rug.  To ensure his silence, Carson was given a substantial severance package to leave quietly, receiving an entire year's compensation in an all-cash payment of $1,000,000, with the express requirement that he never publicly disclose any confidential information from his time at Mohawk and that he "cooperate with Mohawk's representatives in connection with any actual or threatened litigation

---

[23] *See, e.g.*, Press Release, "Mohawk Industries Announces Executive Succession" (December 13, 2011) ("I am grateful for the many years of leadership that Frank and Harold have contributed to the Company, and I am pleased that they will provide ongoing guidance and drive initiatives within our business,' Lorberbaum said."); Press Release, *Mohawk promotes Meadows, Lape to retire*, FLOOR COVERING WEEKLY (April 9, 2019).

and/or administrative proceeding(s) in which [he] is potentially a witness."  FE1 accurately described this severance package as a million-dollar payment to leave for "cooking the books."

230.  Not only did Lorberbaum and Mohawk continue to conceal the fraudulent practices and fail to correct Mohawk's misleading financial statements upon which investors relied, but they also took no corrective action to stop the widespread fraudulent practices throughout the Company.  As confirmed by multiple former employees, Lorberbaum and Mohawk continued to perform the Saturday Scheme, overrun the production lines, and carry in its reported inventory damaged product and scrap LVT.

231.  FE6 confirmed that Mohawk continued the Saturday push at the end of every quarter during his tenure from January 2019 and into 2020—long after Carson was fired.  As discussed above, FE6 said that "across the entire United States … every single quarter [he] was there," invoices generated during unsuccessful deliveries were held open, and that revenue was counted for the quarter.  He also confirmed that every quarter he was there, he manually compiled his Saturday push reports and sent them to Carson's replacement, Paul De Cock, who would sometimes respond to FE6's email attaching the Saturday push report with a reply of "good job" and this is "going to help us hit our numbers."

98

232.   Like FE6, FE7 also reported that he could not remember a quarter at the end of 2018 or in 2019—after Carson left—in which he and his fellow distribution managers were not instructed to "drain the swamp" to "make the numbers at the end of the quarter."

233.   Mohawk also kept the overproduction scheme alive after Lorberbaum fired Carson.  FE8 confirmed that in the last six months that he worked on the carpet side of the business—which was after Carson was fired—Mohawk continued to overproduce carpet rolls that Mohawk knew for certain had no backorders.  He likewise confirmed that during this same period, Mohawk "just knew they had the raw materials and the machines, and they could prop up their balance sheet by building up inventory."  FE8 reported that despite the huge amounts of "old, excess [carpet] inventory on the books" that "had been sitting on the books for two or three years," Mohawk "wouldn't let us write it off the books because it was propping up the balance sheet."

234.   Mohawk also continued to overproduce LVT, including low-quality and scrap LVT that sat in Mohawk's inventories.  FE7 described that the two warehouses that Mohawk rented for the specific purpose of storing scrap LVT (as discussed above, *see* ¶211) were full when he left in November 2019.

235.   FE8 also reported that Mohawk continued overproduction on the LVT

side of the business after Carson was fired.  He summarized that he and his fellow distribution managers joked, "You could print money by making inventory. Why would you stop producing product if it could just sit in inventory and prop up your balance sheet and make up for sales? Even if the quality was awful, they were never going to stop it."

236.   And that is exactly why Lorberbaum and Mohawk continued these schemes and continued to conceal from investors (for as long as they could) the true reasons that inventories were continuing to swell while turnover continued to slow in the face of Mohawk's purported record sales and professed ability to sell everything it produced.

### J.   <u>Investors Suffer Losses As the Truth Emerges</u>

237.   Defendants could not conceal forever the true reasons for Mohawk's reported record-breaking quarterly sales and margins, rising inventory, and slowing turnover.  The truth came out gradually through a series of disclosures, each of which revealed new information related to the Defendants' false statements.

### 1.   <u>Mohawk Announces Disappointing Q2 2018 Earnings</u>

238.   The truth began to emerge on July 26, 2018, when the Company announced that "[o]ur results fell short of our expectations, and we are taking actions to improve the performance of our U.S. businesses."  Specifically, after a string of

record quarterly profits and meeting or beating Company guidance and analysts' expectations, the Company revealed a substantial EPS miss from its own guidance and consensus estimates, which Defendants attributed, in part, to "lower sales than we anticipated."  Defendants also revealed that margins were "down."

239.   Mohawk reported EPS of $3.51, way below the Company's guidance ($3.89-3.98) and analysts' consensus estimate ($3.90).  Mohawk also substantially lowered its guidance for third quarter 2018 EPS to $3.54-3.64, almost 20% lower than analysts' consensus estimates of $4.28.

240.   The Company also revealed that, contrary to its prior representations that it was selling out of product and was capacity constrained, the Company's warehouses were full of excess inventory, requiring Mohawk to begin to "produce[] less than [it] sold to reduce inventory."  Defendants also disclosed, for the first time, significant manufacturing issues, including "manufacturing shutdowns," a "lower production rate," and "new product inefficiencies," in Flooring North America. Finally, Lorberbaum also revealed that Mohawk was required to increase sourcing of LVT from outside of the U.S.

241.   The Company's July 26, 2018 disclosures stunned investors and analysts, who had been consistently assured of record-breaking sales and appropriately managed inventory levels.  Analysts at Pacific Square Research

questioned the accuracy of Mohawk's disclosures, cautioning investors in a July 30, 2018 analyst report that ***"there is a disconnect between [Mohawk's] financial models and what is really happening in the business."*** The same analysts warned investors that their forensic review of Mohawk's historic financials ***"suggests a very long trend of stretching a little bit more each quarter to meet numbers."*** Analysts at J.P. Morgan similarly cautioned in their July 30, 2018 report that investors should "remain on the sidelines" and not purchase Mohawk's stock following the Company's July 26, 2018 disclosures.

242.   Following the Company's July 26, 2018 disclosures, Mohawk's stock price fell by 18%—a decline of $38.06 per share—erasing $2.76 billion in shareholder value in a single trading day.  A total of 7.36 million shares of Mohawk common stock traded on July 26, 2018, an increase of 271% above trading volume from the prior session.

243.   The July 26, 2018 disclosure, however, did not reveal the full extent of the fraud.  Defendants made additional false statements designed to mislead investors regarding the true nature and extent of the problems facing Mohawk. When asked during the July 26, 2018 investor conference call, "what happened" to cause the substantial miss, Lorberbaum did not fully reveal that the lower sales resulted from temporarily discontinuing the Saturday Scheme, the rampant problems

plaguing LVT production and sales, and the volume of unsalable scrap that was bloating inventory.

244.   Instead, Lorberbaum falsely assured investors that the Company's negative quarter was a temporary blip, and that the Company's "ramping up" of LVT production domestically would drive future sales.  Analysts accepted Mohawk and Lorberbaum's assurances, believing that the growth story would continue.  For example, Evercore ISI reported that "the company's challenges are transient in nature," and analysts at Jeffries maintained their "Buy" rating for Mohawk, calling the difficulties "largely transitory."

### 2.   Mohawk Announces Disappointing Q3 2018 Results

245.   On October 26, 2018, Defendants disclosed that the issues partially disclosed in the second quarter had persisted.  On that quarter's conference call, Lorberbaum stated that "[s]ales growth in all segments was lower than our estimates" and that "[a]dditional manufacturing reductions were required during the [quarter] to control inventory."  Lorberbaum further provided damning details about the Company's struggle to produce LVT product in the U.S. LVT Plant, including "physical mechanical failures" and "software problems."

246.   Lorberbaum also revealed a significant step down in margins for Flooring North America, with operating margin falling to single digits, which

Defendants attributed in part to "lower than expected production." Along with these revelations, the Company once again announced much lower EPS guidance for the fourth quarter of 2018. Defendants provided fourth quarter EPS guidance of $2.45 to $2.60, much lower than analysts' consensus expectation of $3.51 EPS.

247. Investors and analysts were surprised by the Company's revelations. For example, in its October 29, 2018 report titled "*Floored! Coverage Closed*," analysts at Pacific Square Research explained that *"[t]here is no getting around that Q3 was a disaster for Mohawk"* and *"calling it a disaster is being kind."* They further explained that analysts were *"completely blindsided"* by the revelation of poor sales, questioning, *"what happens if they can't sell all of that inventory?"* Analysts at Wells Fargo similarly explained in their October 26, 2018 report that *"[w]e have grown increasingly wary of the [Mohawk] story,"* noting that the Company's quarterly results were *"truly surprising."*

248. Analysts also connected the falling production rates to falling margins, with Credit Suisse reporting that "[t]he underperformance was driven by lower than expected profitability as the adj. EBIT margin was ~105bps below our model a ~$0.29 hit to results" and that this miss reflected, in part, "inventory right-sizing."

249. Mohawk's stock price again dropped precipitously following the Company's revelations on October 26, 2018. Indeed, within less than twenty-four

hours, Mohawk's stock price toppled an additional 24%, a drop of $36.04 per share, erasing $2.6 billion more in shareholder value. A total of 9.6 million shares of Mohawk common stock traded on October 26, 2018, an increase of 440% above trading volume in the prior trading session.

250. Defendants continued, nevertheless, to conceal the truth from investors. Defendants still did not fully reveal that the lower sales and sizable forecast miss resulted from temporarily discontinuing the Saturday Scheme, the rampant problems plaguing LVT production and sales, and the volume of unsalable scrap that was bloating inventory. Instead, Defendants again assured investors that the problems were temporary, claiming (falsely) during the October 26, 2018 earnings call that the manufacturing issues that interfered with Mohawk's LVT production capabilities first developed "in the quarter."

251. Then, during the February 8, 2019 earnings call, Lorberbaum assured investors that the Company's' inventory rightsizing was complete and that Mohawk would now "be increasing the production rates to match sales going through the year." Once again, on a call with analysts and investors on April 26, 2019, Defendants assured investors that the Company's excess inventory issue was "behind us" and that Mohawk would match "production with the demand for the most part, going forward."

252.   Defendants' misrepresentations and omissions had their desired impact. Analysts at Jefferies, for example, issued a report on February 11, 2019 stating that Mohawk's excess inventory would "dissipate" shortly.   And SunTrust Robinson Humphrey analysts stated in a May 14, 2019 report that Mohawk's production was now expected to "equal sales," and that the Company's inventory correction "should stop drag."   In the same report, the analysts also accepted Defendants' excuses for the inventory buildup, writing that "inventory levels look more elevated" than they actually were "due to inflation, some build-up to smooth out start-up actions, and acquisitions."

### 3.   Mohawk Announces Disastrous Results for Q2 2019

253.   Defendants' continued representations were soon shown to be false.  On July 26, 2019, the Company disclosed that, contrary to Defendants' recent assurances, the Company's difficulties reducing inventory were far from over, and that it still had excess inventories that necessitated "taking actions" to "manage our inventory" and "improve sales," especially in Flooring North America, which had a 7% year-over-year decline in sales and more than a 4% year-over-year decline in operating margin.   Defendants also finally revealed that the inventory issues and lower sales volume were expected to continue, slashing third quarter guidance and noting that the guidance accounted for "excess inventories" and "reduced

production," as well as "lower volume and margins" and "increased competition." The Company further admitted that "most of the benefit of the different actions" the Company was taking would not be seen until the following year.

254.  Mohawk's stock price again dropped precipitously following these latest disclosures, falling another 18%, a decline of $27.52 per share, and erasing another $2 billion in shareholder value.  A total of 4.4 million shares of Mohawk common stock traded on July 26, 2019, an increase of 338% above trading volume in the prior session.

255.  The same analysts who previously had accepted Defendants' assurances that the issues would resolve quickly, now downgraded the Company. For example, Evercore ISI issued a report on July 26, 2019, lowering its target price for the Company's shares, and pointing to the fact that "[i]nventory levels have been a significant area of concern for investors over the last several quarters and will persist, as days in inventory rose once again."  J.P. Morgan similarly issued a report on July 29, 2019, stating that "older headwinds, including … reduced production, have persisted if not worsened near term."

256.  After years of supposedly beating the odds in a perpetual growth cycle, SunTrust Robinson Humphrey summed up the market's sentiment: ***"[T]his latest blow pushes [Mohawk's] name back to the starting line."***

257.   All told, as the truth gradually leaked out into the marketplace through a series of partial disclosures, investors lost $7.4 billion in market value.  To this day, the price of Mohawk's stock has never recovered.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

258.   Defendants made numerous false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  In addition to the statements identified above, the materially false and misleading statements and omissions include:

259.   *First*, Defendants misleadingly reported record quarterly sales and attributed them to specific, legitimate factors, without disclosing that the Saturday Scheme had artificially inflated its reported quarterly sales.  *See* ¶¶109-56.

260.   *Second,* Defendants misleadingly told investors that Mohawk was "selling all of [LVT] we could have" and was therefore "capacity constrained" without disclosing that, in reality (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was marked not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT until

Mohawk's entire Builder and Multifamily division refused to sell it (*see* ¶¶184; 197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); and (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184).

261.   *Third*, Defendants misleadingly told investors that Mohawk's rising inventory and increasing days-in-inventory were attributable to factors like inflation and geographic expansion, without disclosing that its inventory was rising and turnover slowing because (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT until Mohawk's entire Builder and Multifamily division refused to sell it (*see* ¶184; 197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high

than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (vii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

262. *Fourth*, Defendants misleadingly told investors that Mohawk's LVT product had "superior design and performance" and was "being well accepted across all channels" when, in reality, (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was so defective it could not be sold to customers (*see* ¶¶164-68); (ii) approximately 50% of the Company's U.S.-made LVT was unsalable scrap coded not to be sold (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, Mohawk's Builder and Multifamily division customers were refusing to accept the Company's U.S.-made LVT (*see* ¶184); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); and (vi) the claim rates for Mohawk's

U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184).

263.   *Finally*, Defendants misleadingly reported record quarterly margins and attributed them to specific, legitimate factors, without disclosing that, in reality, Mohawk achieved those margins through intentional overproduction of goods for the specific purpose of artificially lowering the per unit cost of production to drive up margins and refusal to write off huge volumes of scrap LVT that was coded not to be sold to customers.  *See* ¶¶164-68; 205-17.

### A.   Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2017

264.   The Class Period begins on April 28, 2017.  On that day, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the first quarter of 2017 (the "First Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day before (the "First Quarter 2017 Press Release").  During the First Quarter 2017 Investor Call, Lorberbaum and Boykin spoke on behalf of Mohawk.

265.   During the First Quarter 2017 Investor Call and in the First Quarter 2017 Press Release, Mohawk touted its "record" sales, with Lorberbaum beginning the First Quarter 2017 Investor Call by stating that "[i]n the first quarter, Mohawk

sales rose approximately 4% … to a first quarter record of $2.2 billion." In both the First Quarter 2017 Investor Call and First Quarter 2017 Press Release, Lorberbaum also reported that "[d]uring the quarter, sales in our Flooring North America segment increased 4%."

266.   In its May 5, 2017 quarterly report for the period ending May 5, 2017 (the "First Quarter 2017 10-Q"), signed by Lorberbaum and filed with the SEC, Mohawk also reported that "[n]et sales for the three months ended April 1, 2017 were $2,220.6 million." The Company additionally reported in the First Quarter 2017 10-Q that Flooring North America's "[n]et sales increased $33.1 million, or 3.7%, to $939.5 million."

267.   Defendants' statements identified in paragraphs 265 and 266 were false, misleading, and omitted material facts. Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme. During the First Quarter of 2017, Mohawk and its senior executives engaged in a scheme on the last Saturday of the quarter designed to artificially inflate its reported sales. *See* ¶¶109-56. Mohawk pretended to ship orders for products with agreed-upon delivery dates in future quarters and then improperly recognize the revenue from those phony "sales" even though the product was never delivered in the quarter. *See* ¶¶111-22. Numerous witnesses have explained that the scheme involved phony shipments of four to five

million pounds of product every quarter, was done nationwide, was done to every customer, and involved every product type, including LVT and Conventional Flooring Products. *See* ¶¶131-35.  Key Mohawk executives internally admitted that the purpose of the scheme—which violated both GAAP and the Company's publicly avowed sales revenue recognition policy—was to manufacture false revenues in order to meet Company EPS guidance and analyst consensus estimates. *See* ¶¶124-26; 151-56.

268.   In the First Quarter 2017 10-Q, Defendants also misled investors by attributing the Company's "record" net sales to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $50 million, or 2%, and the favorable net impact of price and product mix of approximately $16 million."  They similarly attributed their net sales in the Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $28 million, or 3%, and the favorable net impact of price and product mix of approximately $5 million."  During First Quarter 2017 Investor Call, Defendant Lorberbaum further misleadingly attributed the Company's record sales to "doing the right things to make the business grow" and using "the same strategy [they had] been using" to provide results over the previous 5 years.

269.   Defendants' statements in paragraph 268, were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  Having chosen to discuss the reasons for Mohawk's supposedly record sales, Defendants were required to inform investors that the Company had achieved its "record sales" through the Saturday Scheme, which was designed for the specific purpose of inflating sales and meeting investor expectations.  *See* ¶¶109-56.  Their failure to do so rendered their statements false and misleading.

270.   During the First Quarter 2017 Investor Call, Lorberbaum also misled investors by attributing the Company's "first quarter record" operating margin of 12.4%, up 110 basis points over the prior year, to legitimate business factors, including "volume, mix and productivity."  Defendants likewise attributed the "improvement" in gross margin of 20.8%, which was up 110 basis points, to "productivity of $36 million, volume of $14 million and price/mix of $10 million."  Lorberbaum further attributed the rise in margins to capital investments, reporting that "the capital investments are to increase our product innovation, which allows us to make more differentiated products, which allows us to participate in higher-margin premium categories."

271.   Defendants likewise told investors during the First Quarter 2017

Investor Call that the "improvement" in the Flooring North America segment's operating income margin of 10.1%, up 140 basis points, "was supported by productivity of $13 million and volume of $5 million."  Defendants also touted particular products that improved the margins in Flooring North America, with Lorberbaum stating that "[t]he continued improvement of our LVT manufacturing process is increasing our capacity and margins."  When asked "what role carpet played in the margin in the quarter," Lorberbaum said, "it would be hard to drive the margins up dramatically ... and leave out such a large part of our business."

272.  Defendants' statements identified in paragraphs 270 and 271 were false, misleading, and omitted material facts because Mohawk's reported margins were artificially inflated by the Saturday Scheme and the scheme to overrun the production lines.  Having chosen to discuss the reasons for Mohawk's "first quarter record" margins and margin "improvement," Defendants were required to inform investors that the Company had achieved those margins through intentional overproduction of goods for the specific purpose of artificially lowering the per unit cost of production to drive up margins and refusal to write off huge volumes of scrap LVT that was coded not to be sold to customers.  *See* ¶¶164-68; 205-17.  Their failure to do so rendered their statements false and misleading.

273.  During the First Quarter 2017 Investor Call, Lorberbaum further stated

that, "[w]ith their superior design and performance, our flexible, rigid and commercial LVT collections are being well accepted across all channels." That statement was false, misleading, and omitted material facts. It was misleading for Defendants to tout the "superior design and performance" of Mohawk's LVT product and represent that it was "being well accepted across all channels" without disclosing that, in reality: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was so defective it could not be sold to customers (*see* ¶¶164-68); (ii) approximately 50% of the Company's U.S.-made LVT was unsalable scrap coded not to be sold (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, Mohawk's Builder and Multifamily division customers were refusing to accept the Company's U.S.-made LVT (*see* ¶184); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); and (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184).

274.    During the First Quarter 2017 Investor Call, Defendants also stated that the Company's rising inventories and slow inventory turnover were attributable to "geographic expansion and product growth."

275.    Defendants' statement identified in paragraph 274 was false,

116

misleading, and omitted material facts.  It was false and misleading for Defendants to discuss the reasons for Mohawk's rising inventories and slowing inventory turnover, and to attribute them to "geographic expansion and product growth," without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT (*see* ¶184); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (viii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for

117

longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

**B.     Defendants' Materially False and Misleading
         Statements and Omissions During the Second Quarter of 2017**

276.   On July 28, 2017, Mohawk hosted a conference call with investors to discuss its financial results for the second quarter of 2017 (the "Second Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Second Quarter 2017 Press Release").  During the Second Quarter 2017 Investor Call, Lorberbaum, Boykin, and Mohawk's President and Chief Operating Officer, William Christopher Wellborn, spoke on behalf of Mohawk.

277.   During the Second Quarter 2017 Investor Call and in the Second Quarter 2017 Press Release, Mohawk touted its "record" sales, with Lorberbaum stating during the Second Quarter 2017 Investor Call that "[i]n the second quarter, Mohawk's performance continued at a record level, generating the highest sales … in the company's history" and that "[o]ur businesses continued their exceptional execution, with sales growth of 6% as reported and 8% on a constant days and currency basis."  Defendants further stated during the Second Quarter 2017 Investor Call that "net sales of $2,453,000,000 were an all-time new record, growing 6% as reported and 8% using constant days and foreign exchange."  Likewise, the Second

Quarter 2017 Press Release quoted Lorberbaum as stating that "[d]uring the period, Mohawk delivered record results, generating the highest sales … in the company's history."  In addition, in both the Second Quarter 2017 Investor Call and Second Quarter 2017 Press Release, Lorberbaum highlighted that "[d]uring the quarter, our Flooring North America Segment's sales increased 6%."

278.   Mohawk reported these same sales figures in its August 4, 2017 quarterly report for the second quarter period ending July 1, 2017 (the "Second Quarter 2017 10-Q"), signed by Lorberbaum and filed with the SEC, which reported that "[n]et sales for the three months ended July 1, 2017 were $2,453.0 million, reflecting an increase of $142.7 million, or 6.2%, from the $2,310.3 million reported for the three months ended July 2, 2016."  The Second Quarter 2017 10-Q further reported that, for Flooring North America, "[n]et sales increased $ $59.6 million, or 6.1%, to $1,040.3 million for the three months ended July 1, 2017, compared to $980.7 million for the three months ended July 2, 2016."

279.   Defendants' statements identified in paragraphs 277 and 278 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  During the Second Quarter of 2017, Mohawk and its senior executives engaged in a scheme on the last Saturday of the quarter designed to artificially inflate its reported sales.  *See* ¶¶109-56.

119

Mohawk pretended to ship orders for products with agreed-upon delivery dates in future quarters and then improperly recognize the revenue from those phony "sales" even though the product was never delivered in the quarter. *See* ¶¶111-22. Numerous witnesses have explained that the scheme involved phony shipments of four to five million pounds of product every quarter, was done nationwide, was done to every customer, and involved every product type, including LVT and Conventional Flooring Products. *See* ¶¶131-35. Key Mohawk executives internally admitted that the purpose of the scheme—which violated both GAAP and the Company's publicly avowed sales revenue recognition policy—was to manufacture false revenues in order to meet Company EPS guidance and analyst consensus estimates. *See* ¶¶124-26; 151-56.

280. In the Second Quarter 2017 10-Q, Mohawk also misled investors by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $109 million, or 5%, … and sales volume attributable to acquisitions of approximately $48 million" and "[a]lso contributing to the increase in sales was the favorable net impact of price and product mix." They similarly attributed the increase in net sales in the Flooring North America segment solely to legitimate business factors, reporting that the "increase [in sales] was primarily attributable to

higher sales volume of approximately $39 million, or 4%, and the favorable net impact of price and product mix of approximately $21 million, or 2%."

281.   Defendants' statements identified in paragraph 280 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  Having chosen to discuss the reasons for Mohawk's supposedly record sales, Defendants were required to inform investors that the Company had achieved its "record sales" through the Saturday Scheme, which was designed for the specific purpose of inflating sales and meeting investor expectations.  *See* ¶¶109-56.  Their failure to do so rendered their statements false and misleading.

282.   During the Second Quarter 2017 Investor Call, Defendants also misled investors by attributing the 60 basis-point year-over-year "improvement" in the Company's operating margin to "$20 million of price/mix and $12 million of productivity."

283.   Defendants' statements identified in paragraph 282 were false, misleading, and omitted material facts because Mohawk's reported margins were artificially inflated by the Saturday Scheme and the scheme to overrun the production lines.  Having chosen to discuss the reasons for Mohawk's margin "improvement," Defendants were required to inform investors that the Company had

achieved those margins through intentional overproduction of goods for the specific purpose of artificially lowering the per unit cost of production to drive up margins and refusal to write off huge volumes of scrap LVT that was coded not to be sold to customers.  *See* ¶¶164-68; 205-17.  Their failure to do so rendered their statements false and misleading.

284.   During the Second Quarter 2017 Investor Call, Defendants also misleadingly stated that the Company's rising inventory and slow inventory turnover were attributable to "raw material inflation and more sourced product needed to support our LVT, ceramic and countertop businesses."  Specifically, Mohawk stated that "[o]ur inventories were $1,866,000,000, with the inventory days at 109 days for the year.  It increased from 105 last year due to raw material inflation and more sourced product needed to support our LVT, ceramic and countertop businesses."

285.   Defendants' statements identified in paragraph 284 were false, misleading, and omitted material facts.  It was false and misleading for Defendants to discuss the reasons for Mohawk's rising inventories and slowing inventory turnover, and to attribute them to "geographic expansion and product growth," without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's

U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT (*see* ¶184); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (viii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

286.   During the Second Quarter 2017 Investor Call, analyst Laura Allyson Champine of Roe Equity Research raised concerns that Mohawk's "inventory growth in the quarter was pretty significant."  In response, Lorberbaum attributed the rise in inventory to "chasing demand," explaining:

It's really made up of a few pieces. First is right. As the material costs go up, all of that flows into inventory immediately as the prices go up. The second is that as we're building our businesses in different places, we're importing products for LVT, ceramic and countertops, so those inventories are going up. And then finally, the U.S. economy was not quite as robust as we were expecting.

287. Lorberbaum's statements identified in paragraph 286 were false, misleading, and omitted material facts. It was false and misleading for Lorberbaum to discuss the purported reasons for Mohawk's rising inventories and slowing inventory turnover, and to attribute them to "material costs go[ing] up," "building our businesses in different places," "importing products," and the "U.S. economy," without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT (*see* ¶184); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the

124

Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (vii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

### C. Defendants' Materially False and Misleading Statements and Omissions During the Third Quarter of 2017

288.   On October 27, 2017, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the third quarter of 2017 (the "Third Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Third Quarter 2017 Press Release").  During the Third Quarter 2017 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

289.   During the Third Quarter 2017 Investor Call and in the Third Quarter 2017 Press Release, Mohawk once again touted its "record" results, with Lorberbaum stating that "Mohawk delivered record earnings and EPS with sales growing approximately 7%."  In the Third Quarter 2017 Press Release, the Company further reported that "[n]et sales for the third quarter of 2017 were $2.4 billion, up

7% in the quarter and 5% on a constant days and currency basis."  In the Third Quarter 2017 Press Release, Lorberbaum stated that, "[d]uring the quarter, our Flooring North America segment's sales increased 2% as reported."

290.   Mohawk reported these same sales figures in its November 3, 2017 quarterly report for the third quarter period ending September 30, 2017 (the "Third Quarter 2017 10-Q"), signed by Lorberbaum and filed with the SEC, reporting that "[n]et sales for the three months ended September 30, 2017 were $2,448.5 million, reflecting an increase of $154.4 million, or 6.7%."  The Third Quarter 2017 10-Q further stated that Flooring North America's "[n]et sales increased $23.2 million, or 2.3%, to $1,031.8 million for the three months ended September 30, 2017."

291.   Defendants' statements identified in paragraphs 289 and 290 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  During the Third Quarter of 2017, Mohawk and its senior executives engaged in a scheme on the last Saturday of the quarter designed to artificially inflate its reported sales.  *See* ¶¶109-56.  Mohawk pretended to ship orders for products with agreed-upon delivery dates in future quarters and then improperly recognize the revenue from those phony "sales" even though the product was never delivered in the quarter.  *See* ¶¶111-22.  Numerous witnesses have explained that the scheme involved phony shipments of four to five

126

million pounds of product every quarter, was done nationwide, was done to every customer, and involved every product type, including LVT and Conventional Flooring Products. *See* ¶¶131-35.  Key Mohawk executives internally admitted that the purpose of the scheme—which violated both GAAP and the Company's publicly avowed sales revenue recognition policy—was to manufacture false revenues in order to meet Company EPS guidance and analyst consensus estimates. *See* ¶¶124-26; 151-56.

292.  Mohawk also misled investors in the Third Quarter 2017 10-Q by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $42 million, or 2%" and "the favorable net impact of price and product mix of approximately $73 million, or 3%, and the net impact of favorable foreign exchange rates of approximately $40 million, or 2%."  They similarly misleadingly attributed the increase in net sales in the critical Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to the favorable net impact of price and product mix of approximately $41 million, or 4%."

293.  Defendants' statements identified in paragraph 292 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were

artificially inflated by the Saturday Scheme.  Having chosen to discuss the reasons for Mohawk's supposedly record sales, Defendants were required to inform investors that the Company had achieved its "record sales" through the Saturday Scheme, which was designed for the specific purpose of inflating sales and meeting investor expectations.  *See* ¶¶109-56.  Their failure to do so rendered their statements false and misleading.

294.   During the Third Quarter 2017 Investor Call, Defendants also misled investors by attributing the Company's improved gross margin of 32% to "$63 million of price/mix and $40 million of productivity" and the Company's improved "operating margin" of 16.2% to "$62 million of price/mix and $49 million of productivity."  Lorberbaum likewise told investors in the Third Quarter 2017 Press Release that for the Flooring North America segment, "[o]ur new product introductions improved our average selling prices and margins, and our process innovations and investments in manufacturing technology improved our cost."

295.   Defendants' statements identified in paragraph 294 were false, misleading, and omitted material facts because Mohawk's reported margins were artificially inflated by the Saturday Scheme and the scheme to overrun the production lines.  Having chosen to discuss the reasons for Mohawk's margin improvement, Defendants were required to inform investors that the Company had

achieved those margins through intentional overproduction of goods for the specific purpose of artificially lowering the per unit cost of production to drive up margins and refusal to write off huge volumes of scrap LVT that was coded not to be sold to customers. *See* ¶¶164-68; 205-17. Their failure to do so rendered their statements false and misleading.

296. During the Third Quarter 2017 Investor Call, Lorberbaum told investors that "we expect higher sales with the relief of some of our capacity constraints, enabling us to expand our market position." Defendants likewise stated that for Flooring North America, "Capacity limitations in laminate, LVT and some residential carpet categories constrained our sales."

297. When an analyst asked Lorberbaum during Third Quarter 2017 Investor Call what "production limitations" meant for Flooring North America hard surfaces, he explained that it meant Mohawk was selling all of the product it could produce: "It means that we have sold all of the laminate that we could make without putting in new capacity, which is just getting started up …. With LVT, we increased the capacity of our LVT through productivity initiatives, so we were selling all of it we could have." Lorberbaum once more confirmed that "we had constraints in laminate, LVT and some of our residential carpet" in Flooring North America.

298. Defendants' statements identified in paragraphs 296 and 297 were

false, misleading, and omitted material facts. It was false and misleading for Defendants to state that "relief of some of our capacity constraints" would expand sales, that Mohawk was "selling all of [the LVT] we could have," and that "capacity limitations in … LVT and some residential carpet categories constrained our sales" when, in reality: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT (*see* ¶184); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (vii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the

carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

299.   During the Third Quarter 2017 Investor Call, Defendants also represented that the Company's rising inventory and slowing inventory turnover were attributable to "raw material inflation and source product growth." Specifically, Defendants stated that "[o]ur inventories ended the quarter at $1,911,000,000.  We had 112 days of inventory on hand, with raw material inflation and source product growth impacting the days."

300.   Defendants' statement identified in paragraph 299 was false, misleading, and omitted material facts.  It was false and misleading for Defendants to discuss the reasons for Mohawk's rising inventories and slowing inventory turnover, and to attribute them solely to "raw material inflation and source product growth" without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT (*see* ¶184); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v)

Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (vii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

### D.   Defendants' Materially False and Misleading Statements and Omissions During the Fourth Quarter of 2017

301.   On February 9, 2018, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the fourth quarter of 2017 (the "Fourth Quarter 2017 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Fourth Quarter 2017 Press Release").  During the Fourth Quarter 2017 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

302.   During the Fourth Quarter 2017 Investor Call, Mohawk touted its

"record" sales, with Lorberbaum reporting that Mohawk "recorded our best results for the period with sales of $2.4 billion, up 8.5% over the prior year."  In the Fourth Quarter 2017 Press Release, Lorberbaum further told investors that "[d]uring the quarter, [Mohawk's] Flooring North America Segment's sales increased 3% as reported."

303.  Mohawk reported these same sales figures in its February 28, 2018 annual report for the fourth quarter period and full year 2017 (the "2017 10-K"), signed by Lorberbaum and filed with the SEC, which reported that "[n]et sales for 2017 were $9,491.3 million, reflecting an increase of $532.2 million, or 5.9%."  The 2017 10-K also reported that, for Flooring North America, "[n]et sales increased $145.1 million, or 3.8%, to $4,010.9 million for 2017, compared to $3,865.7 million for 2016."

304.  Defendants' statements identified in paragraphs 302 and 303 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  During the Fourth Quarter of 2017, Mohawk and its senior executives engaged in a scheme on the last Saturday of the quarter designed to artificially inflate its reported sales.  *See* ¶¶109-56. Mohawk pretended to ship orders for products with agreed-upon delivery dates in future quarters and then improperly recognize the revenue from those phony "sales"

even though the product was never delivered in the quarter. *See* ¶¶111-22. Numerous witnesses have explained that the scheme involved phony shipments of four to five million pounds of product every quarter, was done nationwide, was done to every customer, and involved every product type, including LVT and Conventional Flooring Products. *See* ¶¶131-35. Key Mohawk executives internally admitted that the purpose of the scheme—which violated both GAAP and the Company's publicly avowed sales revenue recognition policy—was to manufacture false revenues in order to meet Company EPS guidance and analyst consensus estimates. *See* ¶¶124-26; 151-56.

305. In the 2017 10-K, Mohawk also misled investors by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volume of approximately $245 million, or 3%, … the favorable net impact of price and product mix of approximately $218 million, or 2%, and the favorable impact of foreign exchange rates of approximately $69 million, or 1%." They also misleadingly attributed Mohawk's net sales in the Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase [in sales] was primarily attributable to higher sales volumes of approximately $39 million, or 1%, and the favorable net impact of price and product mix of $105 million, or 3%."

306.   Lorberbaum again misleadingly attributed Mohawk's increase in sales solely to legitimate business factors during the Fourth Quarter 2017 Investor Call. Specifically, Lorberbaum stated on the Fourth Quarter 2017 Investor Call that "[o]ver the past 3 years, our strategies of adding new products, increasing our capacities and acquiring new businesses have led to an expanded earnings …. Our 2017 results reflect the impact of these strategies …."  He further attributed the success for 2017 to "the unique strategy that combined the best features of a large, well-run public company, a private acquisition firm and a venture capital group."  In response to an analyst inquiry about the "tangible drivers" for Mohawk's business, he stated that:

> Let's see. I think the biggest piece, which wasn't a surprise, we knew there was going to be some pull-forward of sales due to price increases. There's the balancing of the pricing versus the cost and the flow-through and how they actually show up in the fourth quarter. There's the FX rates that changed on us, out of our control within there. In general, the business levels were about what we thought they'd be when we went into them. And we think we have reasonable estimates for the first quarter, given all that's going on.

307.   Defendants' statements identified in paragraphs 305 and 306 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  Having chosen to discuss the reasons for Mohawk's supposedly record sales, Defendants were required to inform

investors that the Company had achieved its "record sales" through the Saturday Scheme, which was designed for the specific purpose of inflating sales and meeting investor expectations. *See* ¶¶109-56. Their failure to do so rendered their statements false and misleading.

308.   During the Fourth Quarter 2017 Investor Call, Defendants also misled investors by attributing the Company's improvement in gross margin of 31.8% to "price/mix and productivity." Defendants likewise told investors that the Flooring North America segment's operating margin of 16.7%, up 160 basis points, "improved" as a result of "positive price/mix of $21 million and productivity of $22 million."

309.   Defendants' statements identified in paragraph 308 were false, misleading, and omitted material facts because Mohawk's reported margins were artificially inflated by the Saturday Scheme and the scheme to overrun the production lines. Having chosen to discuss the reasons for Mohawk's margin improvement, Defendants were required to inform investors that the Company had achieved those margins through intentional overproduction of goods for the specific purpose of artificially lowering the per unit cost of production to drive up margins and refusal to write off huge volumes of scrap LVT that was coded not to be sold to customers. *See* ¶¶164-68; 205-17. Their failure to do so rendered their statements

false and misleading.

310.   During the Fourth Quarter 2017 Investor Call, Defendants also stated that the Company's rising inventory and slowing inventory turnover were attributable to "higher raw material cost, ramp-up of new products and backwards integration."   Specifically, Defendants stated that "[o]ur inventories were $1,949,000,000 with inventory days at 119 days.  Inventories have been impacted by higher raw material cost, ramp-up of new products and backwards integration."

311.  Defendants' statements identified in paragraph 310 were false, misleading, and omitted material facts.  It was false and misleading for Defendants to discuss the reasons for Mohawk's increased inventory and slowing inventory turnover and solely attribute them to "higher raw material cost, ramp-up of new products and backwards integration" without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT (*see* ¶184); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's

LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (vii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

### E.   Defendants' Materially False and Misleading Statements and Omissions During the First Quarter of 2018

312.   On April 27, 2018, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the first quarter of 2018 (the "First Quarter 2018 Investor Call"), as well as to discuss the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "First Quarter 2018 Press Release").   During the First Quarter 2018 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

313.   In the First Quarter 2018 Press Release, Defendants stated that "[n]et sales for the first quarter of 2018 were $2.4 billion, up 9% in the quarter and 4% on

a constant currency basis."  Lorberbaum repeated these sales numbers during the First Quarter 2018 Investor Call, stating that "[i]n the first quarter, we generated sales of $2.4 billion, up 9% over the prior year."  In the First Quarter 2018 Press Release, Lorberbaum also told investors that "[d]uring the quarter, our Flooring North America Segment's sales increased 1%."  Defendants also asserted during the First Quarter 2018 Investor Call that "[i]n the Flooring North America segment, sales were $950 million compared to $939 million in 2017 with good growth in residential carpet and LVT."

314.   Mohawk reported these same sales figures in its May 4, 2018 quarterly report for the first quarter period ending March 31, 2018 (the "First Quarter 2018 10-Q"), signed by Lorberbaum and filed with the SEC, which reported that "[n]et sales for the three months ended March 31, 2018 were $2,412.2 million, reflecting an increase of $191.6 million, or 8.6%."  The Company further reported that, for Flooring North America "[n]et sales increased $10.9 million, or 1.2%, to $950.4 million."

315.   Defendants' statements identified in paragraphs 313 and 314 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  During the First Quarter of 2018, Mohawk and its senior executives engaged in a scheme on the last Saturday of the

quarter designed to artificially inflate its reported sales. *See* ¶¶109-56. Mohawk pretended to ship orders for products with agreed-upon delivery dates in future quarters and then improperly recognize the revenue from those phony "sales" even though the product was never delivered in the quarter. *See* ¶¶111-22. Numerous witnesses have explained that the scheme involved phony shipments of four to five million pounds of product every quarter, was done nationwide, was done to every customer, and involved every product type, including LVT and Conventional Flooring Products. *See* ¶¶131-35. Key Mohawk executives internally admitted that the purpose of the scheme—which violated both GAAP and the Company's publicly avowed sales revenue recognition policy—was to manufacture false revenues in order to meet Company EPS guidance and analyst consensus estimates. *See* ¶¶124-26; 151-56.

316.   In the First Quarter 2018 10-Q, the Company also misled investors by attributing its quarterly net sales solely to legitimate business factors, stating that "[t]he increase [in sales] was attributable to higher sales volume of approximately $57 million, or 2%" and "[a]lso contributing to the increase in sales was the net impact of favorable foreign exchange rates of approximately $99 million, or 4% and the favorable net impact of price and product mix of approximately $36 million, or 2%." Defendants also misleadingly attributed Mohawk's quarterly net sales in its

critical Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase of $11 million was primarily attributable to the favorable net impact of price and product mix and higher sales volume."

317. Defendants' statements identified in paragraph 316 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  Having chosen to discuss the reasons for Mohawk's sales, Defendants were required to inform investors that the Company had achieved its sales through the Saturday Scheme, which was designed for the specific purpose of inflating sales and meeting investor expectations.  *See* ¶¶109-56.  Their failure to do so rendered their statements false and misleading.

318. During the First Quarter 2018 Investor Call, Defendants also represented that the Company's rising inventories and slow inventory turnover were attributable to "increasing inflation and our backwards integration."  Specifically, Defendants stated, "Inventories were $2,045,000,000 with inventory days at 116 days, which improved over the fourth quarter. Inventory turns continue to be impacted by increasing inflation and our backwards integration."

319. Defendants' statement identified in paragraph 318 was false, misleading, and omitted material facts.  It was false and misleading for Defendants to discuss the reasons for Mohawk's increased inventories and slow inventory

turnover and attribute them to "increasing inflation and our backwards integration" without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue, refused to sell Mohawk's domestically manufactured LVT (*see* ¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (viii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them

unsalable (*see* ¶¶205-09).

**F.     Defendants' Materially False and Misleading
         Statements and Omissions During the Second Quarter of 2018**

320.    On July 26, 2018, Mohawk hosted a conference call with investors to discuss its financial results for the second quarter of 2018 (the "Second Quarter 2018 Investor Call") and the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Second Quarter 2018 Press Release").  During the Second Quarter 2018 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

321.    On the Second Quarter 2018 Investor Call, Defendants stated that "[d]uring the period, our U.S. LVT sales growth was limited by capacity constraints."

322.    Defendants' statement identified in paragraph 321 was false, misleading, and omitted material facts.  It was false and misleading for Lorberbaum to state that "our U.S. LVT sales growth was limited by capacity constraints" when, in reality: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue,

refused to sell Mohawk's domestically manufactured LVT (*see* ¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶185-87); and (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184).

323.   During the Second Quarter 2018 Investor Call, Defendants further stated that the Company's rising inventories and slow inventory turnover were attributable to "inflation negatively impact[ing] the [inventory days] calculation."

324.   Defendants' statement identified in paragraph 323 was false, misleading, and omitted material facts.  It was false and misleading for Defendants to discuss the reasons for Mohawk's increased inventory and slowing turnover and attribute them to "inflation" without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue, refused to sell Mohawk's domestically manufactured LVT (*see*

¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (viii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

### G.   Defendants' Materially False and Misleading Statements and Omissions During The Third Quarter 2018

325.   On October 26, 2018, Mohawk hosted a conference call with investors to discuss its financial results for the third quarter of 2018 (the "Third Quarter 2018 Investor Call").  During the Third Quarter 2018 Investor Call, Lorberbaum, Boykin, and Wellborn spoke on behalf of Mohawk.

326.   During the Third Quarter 2018 Investor Call, an analyst at Evercore ISI asked Lorberbaum to "help us understand or break down what we see in the overall

inventory number because it still seems kind of high."  In response, Lorberbaum attributed the Company's level of inventory to "raw material inflation," stating that the inventory turns got "worse because the raw materials have increased, and it's showing up in the inventory dollars, in addition to having nothing to do with the units as the prices go up."

327.  During that same investor call, Defendants also stated that the Company's rising inventories and slow inventory turnover were attributable to "inflation and backwards integration."

328.  Defendants' statements identified in paragraphs 326 and 327 were false, misleading, and omitted material facts.  It was false and misleading for Defendants to discuss the reasons for Mohawk's increased inventories and slow inventory turnover and attribute them to "raw material inflation"  and "inflation and backwards integration"  without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue, refused to sell Mohawk's domestically manufactured LVT (*see*

146

¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (viii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

## H.   Defendants' Materially False and Misleading Statements and Omissions During The Fourth Quarter 2018

329.   On February 8, 2019, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the fourth quarter of 2018 (the "Fourth Quarter 2018 Investor Call") and the press release that it filed with the SEC on Form 8-K after the market closed the day earlier (the "Fourth Quarter 2018 Press Release").

330.   During the Fourth Quarter 2018 Investor Call, Defendants stated that

"[n]et sales for the quarter were $2,449,000,000 and grew 3% as reported, with the legacy business up almost 1% on a constant exchange rate basis."  Lorberbaum repeated these sales numbers during the Fourth Quarter 2018 Investor Call, stating that "[w]e generated sales of $2.4 billion, up 3% as reported or 5% on a constant currency."  In the Fourth Quarter 2018 Press Release, Defendants also told investors that "[n]et sales for the fourth quarter of 2018 were $2.45 billion, up 3% in the quarter and 5% on a constant currency basis."  Defendants also asserted during the Fourth Quarter 2018 Investor Call that "[i]n the fourth quarter, our Flooring North America segment sales were approximately $974 million, decreasing about 3%."

331.   Mohawk reported these same sales figures in its February 28, 2019 annual report for the fiscal year ending December 31, 2018 (the "2018 10-K"), signed by Lorberbaum and filed with the SEC, which reported that "[n]et sales for 2018 were $9,983.6 million, reflecting an increase of $492.3 million, or 5.2%, from the $9,491.3 million reported for 2017."  The Company further reported that, for Flooring North America "[n]et sales increased $18.3 million, or 0.5%, to $4,029.1 million for 2018, compared to $4,010.9 million for 2017."

332.   Defendants' statements identified in paragraphs 330 and 331 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  During the Fourth Quarter of

148

2018, Mohawk and its senior executives engaged in a scheme on the last Saturday of the quarter designed to artificially inflate its reported sales. *See* ¶¶109-56. Mohawk pretended to ship orders for products with agreed-upon delivery dates in future quarters and then improperly recognize the revenue from those phony "sales" even though the product was never delivered in the quarter. *See* ¶¶111-22. Numerous witnesses have explained that the scheme involved phony shipments of four to five million pounds of product every quarter, was done nationwide, was done to every customer, and involved every product type, including LVT and Conventional Flooring Products. *See* ¶¶131-35. Key Mohawk executives internally admitted that the purpose of the scheme—which violated both GAAP and the Company's publicly avowed sales revenue recognition policy—was to manufacture false revenues in order to meet Company EPS guidance and analyst consensus estimates. *See* ¶¶124-26; 151-56.

333. In the 2018 10-K, Mohawk also misled investors by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to higher sales volume of approximately $297 million, or 3%, which includes sales volumes attributable to acquisitions of approximately $229 million and legacy sales volumes of approximately $68 million, the favorable net impact of price and product mix of approximately $111 million, or 1%, and the

149

favorable net impact of foreign exchange rates of approximately $85 million, or 1%." They also misleadingly attributed Mohawk's net sales in the Flooring North America segment solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to the favorable net impact of price and product mix of $51 million, or 1%."

334. Defendants' statements identified in paragraph 333 were false, misleading, and omitted material facts. Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme. Having chosen to discuss the reasons for Mohawk's sales, Defendants were required to inform investors that the Company had achieved its sales through the Saturday Scheme, which was designed for the specific purpose of inflating sales and meeting investor expectations. *See* ¶¶109-56. Their failure to do so rendered their statements false and misleading.

335. During the Fourth Quarter 2018 Investor Call, Defendants attempted to downplay the Company's mounting inventory and rising DII, claiming that "[o]ur inventory was up $340 million from the fourth quarter of last year, with 70% of the increase from new businesses and acquisitions and 30% of the increase from Chinese prebuy and inflation."

336. Defendants' statement identified in paragraph 335 was false, misleading, and omitted material facts. It was false and misleading for Mohawk to

150

discuss the reasons for its increased inventories and attribute the increase to "new businesses and acquisitions" and "Chinese prebuy and inflation" without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue, refused to sell Mohawk's domestically manufactured LVT (*see* ¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (viii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for

longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

337.   When analysts continued to inquire about rising inventories on the Fourth Quarter 2018 Investor Call, Defendant Lorberbaum comforted investors about the purported reasons for the increased revenues, including in the following exchange:

> Analyst (Michael Glaser Dahl, RBC Capital Markets, LLC): The first question, I wanted to go back to the discussion around the inventory. And notwithstanding the uncertainty about whether or not tariffs go into effect at 25% in March, just focused specifically at what's played out over the last couple of months. Yes, you mentioned the Chinese prebuy. Part of that is around the Lunar New Year. Part, presumably for you guys and also maybe your competitors, is really that—to also getting that in ahead of the tariffs. Can you just discuss what you're seeing in terms of both competitor inventory levels and channel inventory levels from your customers in LVT?
>
> Jeffrey S. Lorberbaum: I can't speak for my competitors because I have no idea. ***But we are raising the inventories for all the reasons you just went through.*** In some cases, we're buying it ahead because of the pricing. In some cases, we're buying it ahead because of the increases. And in some cases, we're buying it ahead to expand our business and footprint and brands we're selling under in each cases. ***So it's all of the above.*** I would imagine the rest of the world is doing the same thing.

338.   Lorberbaum's statements identified in paragraph 337 were false, misleading, and omitted material facts.  It was false and misleading for Lorberbaum to identify the purported reasons for Mohawk's increased inventories and attribute

them solely to "Chinese prebuy," getting ahead of price increases, and expanding the Company's business, footprint, and brands without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue, refused to sell Mohawk's domestically manufactured LVT (*see* ¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184), and (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17).

339.   During the Fourth Quarter 2018 Investor Call, analysts also inquired about rising LVT inventories.  In response, Lorberbaum assured investors about the

purported reasons for the increased LVT inventories, including in the following exchange:

> Analyst (Stephen Kim, Evercore ISI): So then my second question relates to inventory. I think you mentioned that you're sort of building -- the stuff that you're making in LVT, the new LVT line is going into inventory right now ….

> Jeffrey S. Lorberbaum: First is that, I assume you know that the Chinese have a down period in the first of the year, so you have to prebuy ahead of it. The second is we are expecting our sales to go up, so we're building inventories for those product categories before we have any sales. And you have to build enough so you can satisfy the customers. Third is the inventory is also going into all these new businesses we go keep talking about. When you start them up, you put in all the raw materials, the inventories and you're building new products before the sales in those too, so the inventories are all there.

340. Lorberbaum's statements purporting to identify the reasons for Mohawk's LVT inventory levels in paragraph 339 were false, misleading, and omitted material facts.  It was false and misleading for Lorberbaum to identify the purported reasons for Mohawk's increased LVT inventory levels and attribute them solely to "Chinese prebuy," "inflation," and the other purported reasons provided, without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire

154

Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue, refused to sell Mohawk's domestically manufactured LVT (*see* ¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184), and (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17).

## I.    Defendants' Materially False and Misleading Statements and Omissions During The First Quarter of 2019

341.    On April 26, 2019, Mohawk hosted a conference call with investors to discuss the status of its business and its financial results for the first quarter of 2019 (the "First Quarter 2019 Investor Call") and the press release that it filed with the SEC on Form 8-K after the market closed on April 25, 2019 (the "First Quarter 2019 Press Release").  During the First Quarter 2019 Investor Call, Lorberbaum, Boykin (who was now a Senior Consultant), Wellborn, and Mohawk's new Chief Financial Officer, Glenn R. Landau spoke on behalf of Mohawk.

342.   During the First Quarter 2019 Investor Call, Lorberbaum stated that "[w]e delivered sales of $2.4 billion, up 1% as reported and up 6% on a constant exchange and days basis."  In the First Quarter 2019 Press Release, Defendants also told investors that "[n]et sales for the first quarter of 2019 were $2.44 billion, up 1% in the quarter and 6% on a constant currency and days basis."  Defendants also asserted during the First Quarter 2019 Investor Call that "[i]n the Flooring North America segment, sales of $922 million decreased year-over-year by 3% on an as-reported basis or 1.4% on a daily rate."

343.   Mohawk reported these same sales figures in its May 3, 2019 annual report for the fiscal year ending March 30, 2019 (the "First Quarter 2019 10-Q"), signed by Lorberbaum and filed with the SEC, which reported that "[n]et sales for the three months ended March 30, 2019 were $2,442.5 million, reflecting an increase of $30.3 million, or 1.3%, from the $2,412.2 million reported for the three months ended March 31, 2018."  The Company further reported that, for Flooring North America "[n]et sales decrease d $28.4 million, or 3.0%, to $922.0 million for the three months ended March 30, 2019, compared to $950.4 million for the three months ended March 31, 2018."

344.   Defendants' statements identified in paragraphs 342 and 343 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures

156

were artificially inflated by the Saturday Scheme.  During the First Quarter of 2019, Mohawk and its senior executives engaged in a scheme on the last Saturday of the quarter designed to artificially inflate its reported sales.  *See* ¶¶109-56.  Mohawk pretended to ship orders for products with agreed-upon delivery dates in future quarters and then improperly recognize the revenue from those phony "sales" even though the product was never delivered in the quarter.  *See* ¶¶111-22.  Numerous witnesses have explained that the scheme involved phony shipments of four to five million pounds of product every quarter, was done nationwide, was done to every customer, and involved every product type, including LVT and Conventional Flooring Products.  *See* ¶¶131-35.  Key Mohawk executives internally admitted that the purpose of the scheme—which violated both GAAP and the Company's publicly avowed sales revenue recognition policy—was to manufacture false revenues in order to meet Company EPS guidance and analyst consensus estimates.  *See* ¶¶124-26; 151-56.

345.   In the First Quarter 2019 10-Q, Mohawk also misled investors by attributing its quarterly net sales solely to legitimate business factors, reporting that "[t]he increase was primarily attributable to higher sales volume of approximately $100 million, or 4.1% which includes sales from acquisitions of approximately $120 million, higher legacy sales volume of approximately $16 million."

346. Defendants' statements identified in paragraph 345 were false, misleading, and omitted material facts.  Mohawk's reported net sales figures were artificially inflated by the Saturday Scheme.  Having chosen to discuss the reasons for Mohawk's sales, Defendants were required to inform investors that the Company had achieved its sales through the Saturday Scheme, which was designed for the specific purpose of inflating sales and meeting investor expectations.  *See* ¶¶109-56. Their failure to do so rendered their statements false and misleading.

347.   During the First Quarter 2019 Investor Call, Defendants again offered explanations for the Company's rising inventory and slowing turnover, representing that "[i]nventories ended the quarter at $2.3 billion or 126 days … due to the ramp up of new plants, acquisitions and higher raw material costs."

348. Defendants' statement identified in paragraph 347 was false, misleading, and omitted material facts.  It was false and misleading for Defendants to attribute discuss the reasons for Mohawk's excess inventory and attribute it solely to "the ramp up of new plants, acquisitions and higher raw material costs" without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire

158

Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue, refused to sell Mohawk's domestically manufactured LVT (*see* ¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (viii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09).

349.   During the First Quarter 2019 Investor Call, Lorberbaum also misleadingly claimed that the Company's rising inventories were attributable to the "new plants that required inventories to support them, the acquisitions that we did last year, the inventory flowing in" and "tariffs."  Specifically, in response to an

analyst's question whether Mohawk had "right-sized the business," Lorberbaum stated as follows:

> The inventory levels were up in the period. But almost all the inventory increase was up due to new plants that required inventories to support them, the acquisitions that we did last year, the inventory flowing in. And then with the tariffs that were expected, the products we're importing from China will dramatically increase the inventories in the period. For the most part – most of our inventories in the ongoing businesses were kept under control with lower production rates.

350. Lorberbaum's statements identified in paragraph 349 were false, misleading, and omitted material facts. It was false and misleading for Lorberbaum to discuss the reasons for Mohawk's rising inventory levels and attribute them to "new plants that required inventories to support them, the acquisitions that we did last year" and the "tariffs," without disclosing that its inventory was mounting and turnover slowing because: (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (*see* ¶¶164-68); (ii) approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap (*see* ¶¶164-68; 172; 176); (iii) Mohawk's entire Builder and Multifamily division, which accounted for approximately $1 billion of Mohawk's Flooring North America annual revenue, refused to sell Mohawk's domestically manufactured LVT (*see* ¶¶197-200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (*see* ¶¶186-87); (v) Mohawk distributors stopped carrying the

Company's LVT products to avoid the returns that the products were generating (*see* ¶¶185-87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (*see* ¶184); (vii) Mohawk's President of Flooring North America, Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (*see* ¶¶205-17); and (vii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (*see* ¶¶205-09). Indeed, the Company ultimately disclosed at the close of the Class Period that it had excess inventory.

## VI.   **ADDITIONAL ALLEGATIONS OF SCIENTER**

351.   A host of facts, in addition to those discussed above, support a strong inference that Mohawk and Lorberbaum knew, or, at minimum, were severely reckless in not knowing, the true undisclosed facts when they made their false or misleading representations to investors.

352.   ***The Saturday Scheme was for the specific purpose of inflating Mohawk's quarterly reported sales figures.***  The Saturday Scheme, which witnesses

have described as "the biggest sham ever" and designed for the specific purpose of "cooking the books," ensured that Mohawk would satisfy the market's expectations for continued sales growth. *See* ¶¶111-22.  It was designed to occur on the very last Saturday of the quarter precisely because Mohawk's customers were not open to accept delivery on Saturdays and, thus, could be used as a tool to artificially boost revenues before the quarter's close. *See* ¶¶116; 120.  As witnesses have recounted, "the directive was to deliver on Saturdays, which we never do," as "[n]inety percent of the stores are closed" for delivery on Saturdays. *See* ¶117.  Recognizing sales revenue before delivery actually occurred violated GAAP, Mohawk's own sales revenue-recognition policy, and its Standards of Conduct and Ethics. *See* ¶¶151-56. These fraudulent efforts gave Mohawk the boost it needed to continually meet analysts' expectations and estimates and perpetuate the artificial inflation in the stock price.

353.  ***The magnitude, breadth, scope, frequency, and duration of the Saturday Scheme support a strong inference of scienter.***  Former employees have confirmed that the Saturday Scheme was implemented at every Flooring North America distribution center across the country, involved millions of pounds of product, and involved every type of product that Flooring North America offered. *See* ¶¶131-33.  Witnesses have recounted that it happened to "everybody," "it didn't

matter the size of the company," and "[i]t was everything" available to ship involving "whatever product we had in the shop."  *See* ¶¶134-35.  The scheme was also implemented at the direction, and with the full knowledge, of senior Mohawk executives, and involved the coordination of employees at every Flooring North America distribution center across the country.  *See* ¶¶123-33.  The Saturday Scheme also occurred throughout the entire Class Period, with the specific exceptions of the second and third quarters of 2018—two quarters in which Mohawk was so far from meeting its sales and earnings targets that Defendants did not bother and were instead forced to disclose disappointing results.  *See* ¶¶136-37.  The sheer breadth, magnitude, number of people involved, and scope of the scheme provides further strong support from which to infer Defendants' scienter.

354.  ***Lorberbaum was told repeatedly that manufacturing problems were causing production of such poor quality LVT that it could not be sold to customers.*** The head of Mohawk's Builder and Multifamily division—which was responsible for 20% of Mohawk's Flooring North America revenues and over half of the vinyl that Mohawk sold—informed Lorberbaum that his entire Builder and Multifamily division's sales organization was instructed not to sell Mohawk's domestically produced LVT under any circumstances.  *See* ¶¶197-200.  When Lorberbaum directly asked FE1 why he made that decision, FE1 directly told Lorberbaum that

the quality of Mohawk's domestically produced LVT was not good and that customer dissatisfaction was destroying the business. *See* ¶200. Soon after, Lorberbaum was told by FE11, Sommers, and Murfin that the LVT production lines were not able to produce the quality of LVT that the market demanded. *See* ¶¶177-78. That Lorberbaum was specifically informed by high-level executives that the Company's severe and persistent manufacturing issues were resulting in production of unsalable LVT—directly contradicting his positive statements to the market about the supposed superior design and performance of the Company's domestically produced LVT—further bolsters the scienter inference.

355.   ***Lorberbaum was directly told that the President of Flooring North America was manipulating Mohawk's financial results.***   Brian Carson, the President of Flooring North America, knew about and orchestrated the Company's schemes to distort its financials, including its quarterly inventory amounts and sales figures.   During an emotional September 2018 meeting, FE1 specifically told Lorberbaum that Carson was "destroying your company and screwing with your finances." *See* ¶¶218-20. The same day, Lorberbaum called Carson into his office and scolded Carson, stating that "[e]very damn number [Carson] gives me is wrong, and he makes up bullsh-- every time I ask him." *See* ¶¶221-22. Thus, Lorberbaum knew that Carson had provided false financial information, and yet Defendants

continued thereafter to conceal the truth and make material misstatements to investors about Mohawk's financial results.

356. ***Lorberbaum fired Carson shortly after accusing him of intentionally providing false financial information.*** Following his September 2018 meeting with FE1, Lorberbaum interviewed every member of the ELT group. *See* ¶224. Within weeks, Lorberbaum admitted to FE1, "I just don't know how I missed it." *See* ¶225. He then fired Carson, as well as his direct report, Gary Lanser. *See* ¶226. Carson was fired effective immediately and with minimal explanation to investors as to why such a long-standing and high-ranking executive who oversaw and had "Full P&L [profit and loss] ownership" of the Company's largest reporting segment had vanished. *See* ¶¶226-27. That Lorberbaum fired Carson and admitted that he should have identified the Company's falsehoods earlier further strengthens the scienter inference.

357. ***Lorberbaum and Mohawk continued to engage in the fraudulent schemes even after terminating Carson and his direct report.*** Following Lorberbaum's investigation and Carson's termination, Mohawk continued to conceal the fraudulent practices that had artificially inflated their sales and margins throughout 2017 and early 2018. Even worse, they continued the widespread fraudulent practices that had enabled them to achieve their record results. As

confirmed by multiple former employees, Lorberbaum and Mohawk continued to perform the Saturday Scheme after Carson's termination, continued to overrun the production lines, and continued to carry in its reported inventory damaged product and scrap LVT.  *See* ¶¶230-36.  That Lorberbaum and Mohawk continued to engage in these fraudulent practices—even after being confronted with Carson's schemes and terminating him—supports a strong inference of scienter.

358.  ***The President of Flooring North America—who furnished information regarding Flooring North America incorporated into the disclosures to investors—knew about and was actively involved in masterminding the Saturday Scheme and the overproduction scheme and was also aware of the LVT production problems.***  Carson was the Company's President of Flooring North America.  He was deeply involved in and had full ownership of the profits and losses of the five North American business units that comprised Mohawk's Flooring North America segment.  *See* ¶¶43-44.  In addition, Carson oversaw the Company's 42 domestic plants and 41 domestic distribution centers.  *See* ¶43.  In this role, Carson personally certified the accuracy of the financials for Flooring North America each quarter as part of the Company's SOX certification process and furnished financial and other information about his business segments that was incorporated into the Company's SEC filings and other public statements to investors.  *See* ¶45.  Carson

also personally presented the financial information for Flooring North America to Lorberbaum, Boykin, the Board of Directors, and his other fellow corporate-level executives on a monthly and sometimes weekly basis. *See* ¶44.

359.   Multiple former employees have also confirmed that Carson devised and instructed Mohawk employees to carry out the Company's schemes to artificially inflate the Company's reported sales and profit margins. *See* ¶¶164-66; 205-06; 214-17.   Members of Mohawk's accounting team, among others, complained about Carson's practices, stating, "'You're not going to believe what's happening … what Carson is making us do.'" *See* ¶166.  The members of the ELT, including FE1, understood that Carson was engaged in financial fraud. *See* ¶¶215-17.

360.   In addition, former employees also confirmed that Carson was aware of the LVT manufacturing problems plaguing the U.S. LVT Plant.  Among other things, Carson discussed the LVT manufacturing issues during Mohawk's internal January 2017 and January 2018 sales meetings. *See* ¶183.  Carson was also told by Murfin during several meetings why Mohawk "was losing millions of dollars," including because of LVT production issues, returns, high scrap rates, and defective LVT product making its way to customers. *See* ¶182.

361.   Collectively, these facts reflect that Carson knowingly furnished

information for inclusion in, and participated in approving, Defendants' materially false and misleading statements about Mohawk's financial condition and results of its operations.  This supports a strong inference of Mohawk's scienter.

362.  ***Mohawk's scheme to overrun the production lines was for the specific purpose of inflating Mohawk's profit margins to satisfy the market's expectations.*** As discussed above (*see* ¶¶80-84), Defendants touted Mohawk's purportedly "record" Company-wide margins, and particularly the purportedly outstanding margin improvements in Flooring North America, knowing that analysts were intently focused on this performance metric.  This margin performance was achieved through Carson's scheme to over-produce Mohawk's products—to levels that far exceeded demand in the market.  As FE1 explained, "[Carson would] run the plants harder despite not having sales demand for it in order to drive costs of production down."  *See* ¶216.  By overproducing product, Mohawk drove down the per unit production cost by spreading fixed costs across more products, thereby reducing margins.  This allowed Mohawk to, as FE1 explained, "capture all of that short-term gain."  *See* ¶216.  That Defendants' over-production of inventory enabled Mohawk to artificially inflate margins—a critical financial metric—further bolsters the scienter inference.

363.  ***The size and scope of Mohawk's "scrap" LVT buildup supports a***

168

***strong inference of scienter.***   The inherent flaws in Mohawk's domestic LVT production lines were causing Mohawk to churn out scrap LVT at alarming rates. Indeed, throughout 2017 and 2018, 50% of the LVT produced domestically was "scrap" that Mohawk never intended to sell and could not sell but was kept in inventory.  *See* ¶¶164-68; 172; 176.  The amount of "scrap" LVT produced was so large that the Company housed it in rented warehouses.  *See* ¶¶164-68.  Precisely because of these failures, Lorberbaum replaced the management of the U.S. LVT Plant production line five times in two years.  *See* ¶181.  These production issues persisted throughout the entire Class Period and were known at every level from Lorberbaum and his executive team, to finance, to production, to sales and distribution employees.  *See* ¶¶169-83.  The product was so defective that FE1 instructed his salesforce, which produced 20% of Flooring North America's revenues, to stop selling the Company's domestically produced LVT.  *See* ¶¶197-200.

364.   The domestically produced LVT that made it to the hands of customers was also of such poor quality that Mohawk experienced a high rate of customer returns.  *See* ¶¶184-88; 201.  The claim rate was so high, that by early 2017, the Company began categorically denying all customer claims for refunds.  *See* ¶¶201-02.  Eventually, all of Mohawk's distributors stopped carrying Mohawk's LVT

products due to the high level of defective product sent to them and the resulting claims it necessitated.  *See* ¶¶185-87.  Furthermore, by the end of 2018, retailers lost interest in selling Mohawk's LVT products and had removed Mohawk's displays from its stores because the products were causing such a high level of customer claims.  *See* ¶188.

365.   That such a vast amount of poor-quality LVT was being produced and that there was a Company-wide coordination, to both warehouse the unsalable LVT and cover up its poor quality, support a strong inference of scienter.

366.   ***Defendants were informed at meetings, were provided contemporaneous data, and had access to contemporaneous data contradicting their statements to investors.***  Mohawk's top executives, including Lorberbaum and Carson, received, reviewed, and had access to reports and data, as well as attended meetings, that undermined Defendants' representations to investors about Mohawk's sales and inventories.  *See* ¶¶138-50.

367.   Throughout the Class Period, Lorberbaum and Carson received daily reports via email that tallied the Company's sales data and showed large spikes in sales at the end of the quarter.  *See* ¶¶138-41.  Throughout the Class Period, Lorberbaum also received "master reports," which rolled up all the sales data of each division, and, daily executive dashboard packets that were compiled by the financial

team and delivered to the corporate officers at 10:00 or 11:00 a.m. every day. *See* ¶¶139, 143. The executive dashboard packets contained critical data including the amount of orders coming in, the amount of product shipped, and the amount of returns and claims. *See* ¶144. Furthermore, prior to and throughout 2019, on the last Saturday of each quarter, Mohawk's senior leadership, including the President of Flooring North America and the Senior Vice President of Supply Chain for Flooring North America, who sat in executive meetings with Lorberbaum, received two reports, one report around noon and another report at the end of the day, providing real-time updates on the quarter's implementation of the Saturday Scheme. *See* ¶¶146-48. These reports tracked the number of orders prematurely recognized as sales, the total weight of product shipped, and the deliveries that were unsuccessful and had to be reset for reshipment in the next quarter. *See* ¶149. These reports clearly showed the spike in sales on the last Saturday of each quarter for each division, the spike in failed deliveries on the Saturdays, and the spike in returns at the beginning of new quarters. *See* ¶¶139, 144. The data in these reports was accessible to everyone in the Company, including Defendants, in a database called "RoadNet." *See* ¶150.

368. Defendants also received reports, participated in meetings, and regularly discussed the Company's defective LVT product and its inability to

consistently manufacture sellable, non-scrap LVT. *See* ¶¶178-80; 182-83. Witnesses have recounted how the "scrap rate" for Mohawk's U.S. LVT Plant was approximately 50% during 2017 and 2018, meaning that approximately half of the LVT manufactured from the U.S. LVT Plant was not sellable. *See* ¶¶164-68; 172; 176. Witnesses have further explained that Murfin told Lorberbaum and Carson about the Company's defective LVT product and the alarmingly high scrap rate. *See* ¶182. Multiple witnesses have also described how these defects resulted in a sharp decline in demand for the Company's domestic LVT, which was the subject of frequent conversation with and reporting to Defendants. *See* ¶¶182; 184-94. Defendants' receipt and ready access to a steady stream of reports and data undermining the Company's representations to investors further bolsters the inference of scienter.

369. ***Defendants' misrepresentations concerned the biggest threat facing the Company.*** Defendants' misrepresentations at issue in this case concerned the most significant threat confronting the Company in its history: the threat that the meteoric rise of demand for LVT would break Mohawk's string of "record sales" and end its historic dominance over its flooring competitors. *See* ¶¶47-60. As Defendants recognized, it was mission critical that they produce first-rate LVT to satisfy the growing demand for LVT product. *See* ¶¶60; 63-65; 89-94. To this end,

Mohawk paid a remarkable $1.2 billion to acquire IVC and its U.S. LVT Plant, which was over 200% of the Company's entire net earnings for 2015, the year of the acquisition. *See* ¶62.

370.   As Defendants told investors, they were intently focused on the exploding U.S. market share for LVT and the pressing need to capture significant share of that market, given the existential threat it posed to the Company.  Indeed, when asked about the growing LVT market, Lorberbaum responded "[w]e have the most knowledge in the category."  Lorberbaum further told investors that he was personally attuned to the growth of the LVT market, explaining to investors in a letter accompanying Mohawk's annual report for 2016 that LVT was his "particular area of focus" as it was "one of the flooring industry's newest and fasted growing products."

371.   ***Defendants' misrepresentations concerned Flooring North America, Mohawk's most important business segment.***  Defendants' misrepresentations at issue in this case all concerned Mohawk's Flooring North America segment, which was the Company's most important business segment.  Over 40% of Mohawk's worldwide reported sales were generated by Flooring North America.  *See* ¶70. Defendants singled out the United States and separately the Flooring North America segment in every single quarterly call, press release, quarterly filing, annual filing,

and investor presentation during the Class Period.  They specifically provided quarterly sales numbers for Flooring North America, and specific information about LVT production in North America.  Meanwhile, the Saturday Scheme and the overproduction scheme impacted the sales, logistics, manufacturing operations, and every product line sold across the Company's entire Flooring North America segment.

372.  ***Defendants made material misstatements and omissions in direct response to analysts' inquiries.***  That Defendants made many of the false and misleading statements at issue in this case in direct response to probing questions from analysts and investors further bolsters the scienter inference.  For example, during the Second Quarter 2017 Investor Call, Defendants were specifically asked what was driving Mohawk's "inventory growth in the [second] quarter [of 2017]."  In response to these and similarly pointed questions about the Company's growing inventory, Lorberbaum assured investors that Mohawk's inventory growth was the result of legitimate and temporary market forces, i.e., not the consequence of keeping unsalable scrap LVT in inventory and intentionally over-producing product to deliver higher margins.

373.  Defendants were also specifically questioned about the Company's supposed "capacity constraints" for its domestic LVT.  For example, during the

Third Quarter 2017 Investor Call, Lorberbaum was asked what he meant when he told investors they were capacity constrained.  In response, Lorberbaum stated that "it means that we have sold all of the LVT that we could make without putting in new capacity."   Lorberbaum's response was false or, at minimum, highly misleading, as numerous former employees have explained that the Company's warehouses were crammed with unsalable carpet and LVT.  *See* ¶¶167-68.

374.  ***Defendants received substantial performance-based compensation from the fraudulent schemes.***  Lorberbaum and Carson both had personal financial interests to artificially inflate the Company's stock price and misrepresent its financial results.   Under the Company's published Executive Compensation Program, Lorberbaum's and Carson's personal incentive awards were expressly tied to the Company's stock price performance and reported EPS at the end of 2017.  More specifically, the Executive Compensation Program set a "target" EPS for the Company of $12.64 for 2017 and a "target" EPS for the Flooring North America segment of $4.30 for 2017.  To the extent the Company's reported EPS exceeded these amounts, Lorberbaum and Carson would receive larger incentive compensation in 2017.

375.   As a result of the Company's fraudulent schemes, Mohawk reported an EPS in 2017 of $13.61, as well as an EPS of $4.52 for the Flooring North America

segment.  These reported amounts exceeded the targets set by the Company's Compensation Committee by, respectively, 7.67% and 5.12%.  Consequently, both Lorberbaum and Carson were deemed to have performed at 167% and 147% above their personal "target" levels, respectively, and both received outsized bonuses.  In particular, Lorberbaum received an annual incentive package of $3.84 million, along with a base salary of $1.17 million—for a grand total of $5.01 million.  For his part, Carson received an incentive award of approximately $700,000, stock worth over $890,000, along with a base salary of $634,995—for a grand total of $2.23 million. Defendants' personal financial motivation to misrepresent the Company's sales (and, as a result, increase its EPS) provides yet additional support for the inference of scienter.

376.  ***Defendant Lorberbaum's role and responsibility.***  Lorberbaum has been a director of Mohawk since 1994, has served as Chairman of the Board since May 2004, and has been the Chief Executive Officer of Mohawk since January 2001. Prior to his appointment as the Chief Executive Officer, Lorberbaum served as President and Chief Operating Officer of Mohawk from January 1995 to January 2001.  The Company's Proxy Statement dated April 5, 2019, states that Lorberbaum's role includes providing "leadership and guidance … in the management of the Company's risk profile and pursuit of its strategic goals."

Lorberbaum was also involved in Mohawk's domestic LVT manufacturing, which was a key initiative following the Company's 2015 acquisition of IVC.

377.   As the Chairman of the Board, Chief Executive Officer, and one of the core members of the senior management group, Lorberbaum was provided significant information, formally and informally, about Mohawk's financial performance, over which he had overall responsibility.  In this role, Defendant Lorberbaum knew, or was deliberately reckless in not knowing, of information reflecting true, non-public facts showing that his statements as well as other statements on behalf of the Company were false or misleading, and he had control over and the ability to modify the materially misleading misstatements, but did not do so.  Because of his position with Mohawk, Lorberbaum possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts and investors.  Lorberbaum was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

378.   ***Brian Carson's role and responsibility.***  Carson joined Mohawk as the President of Hard Surfaces in 2006.  From 2008 until 2012, Carson served as Mohawk's Chief Operating Officer, and in 2012 Carson was promoted to President

of Mohawk's Flooring North America segment.  In his role as President, Carson had full responsibility for the profits and losses of the five North American business units that comprised Mohawk's Flooring North America segment.  *See* ¶43.  In this role, he also personally certified the accuracy of the financials for Flooring North America each quarter as part of the Company's SOX certification process and furnished the false and misleading information about his business segments that was incorporated into the Company's SEC filings and other public statements to investors.  *See* ¶45.  Carson also personally presented the financial information for Flooring North America to Lorberbaum, Boykin, the Board of Directors, and his other fellow corporate-level executives on a monthly and sometimes weekly basis.  *See* ¶44.  Further, Mohawk identified Carson in its public filings with the SEC as one of the Company's eight "executive officers," "executive employees," and "key employees" who served at the discretion of Mohawk's Board of Directors.

379.  ***Defendants knew about existing deficiencies in internal controls over financial reporting for inventory and Lorberbaum was personally responsible for correcting these deficiencies.***  In its November 10, 2016 quarterly report filed with the SEC, Mohawk admitted that the Company's controls and procedures were found to be "ineffective" and that the Company was found to suffer from "a material weakness in internal control over financial reporting related to documenting

178

management's inventory control oversight." This weakness permeated the entire reporting structure for inventories, including "the design, operation and documentation of internal controls related to the monitoring of inventory cycle counts and the valuation of obsolete inventory at two of the Company's divisions." This material weakness was so severe that on November 23, 2016, the Company was required to go back and amend publicly its Form 10-K from the prior year, for the fiscal year ended December 31, 2015.

380.   After the material weaknesses in Mohawk's inventory reporting were identified, Lorberbaum was personally responsible for "updating policies that require specific monitoring activities occur at defined levels and management's conduct of monitoring activities for inventory cycle counts and the valuation of obsolete inventory in these divisions be evidenced upon completion." Thus, Defendant Lorberbaum had been on notice by the start of the Class Period that he and Mohawk had previously failed to ensure that the Company was properly monitoring and reporting its inventory counts, and key parts of the inventory cycle.

381.   The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Mohawk's and Lorberbaum's scienter.

## VII.  LOSS CAUSATION

382.   Defendants' wrongful conduct, as alleged above, directly and

proximately caused the damages suffered by Lead Plaintiff and other Class members.  Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Mohawk's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid.

383.  It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Mohawk's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Mohawk's securities to decline.

384.  Defendants' numerous false and misleading statements and omissions artificially inflated the price of Mohawk's stock.  That artificial inflation was removed on July 26, 2018, October 26, 2018, and July 26, 2019 in direct response to information revealed in a series of disclosures, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions.  These disclosures and/or materializations divulged or revealed information that gradually corrected Defendants' prior misrepresentations and omissions of material fact, and/or disclosed facts Defendants misrepresented or omitted that were a substantial

factor in causing investors' economic loss.

385.   None of these revelations was sufficient on its own to fully remove the inflation from Mohawk's stock price because each only partially revealed Mohawk's financial state that had been concealed from or misrepresented to investors. Moreover, as explained above, the corrective impact of the disclosures alleged herein was tempered by Defendants' continued reassuring statements and failure to fully disclose the truth.

386.   The timing and magnitude of the declines in Mohawk's share price negate any inference that Lead Plaintiff's or the Class' losses were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

## VIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

387.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Mohawk's sales and margins growth and the reasons for those sales and margins growth, Mohawk's

manufacturing abilities and the demand for its manufactured products, and Mohawk's inventory numbers and the reasons they continued to rise.

388.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Mohawk's sales and margins growth and the reasons for those sales and margins growth, Mohawk's manufacturing abilities and the demand for its manufactured products, and Mohawk's inventory numbers and the reasons they continued to rise.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Mohawk were insufficient to insulate Defendants from liability for their materially false and misleading statements.

389.   Mohawk's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

390.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the

particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Mohawk who knew that the statement was false when made. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## IX.   PRESUMPTION OF RELIANCE

391.   At all relevant times, the market for Mohawk's common stock was an efficient market for the following reasons, among others:

      a.     Mohawk common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      b.     As a regulated issuer, Mohawk filed periodic public reports with the SEC and NYSE;

      c.     Mohawk regularly and publicly communicated with investors via established market communication mechanisms, including through

regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Mohawk was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

392.   As a result of the foregoing, the market for Mohawk's common stock reasonably promptly digested current information regarding Mohawk from all publicly available sources and reflected such information in the price of Mohawk common stock. All purchasers of Mohawk common stock during the Class Period suffered similar injury through their purchase of Mohawk common stock at artificially inflated prices, and a presumption of reliance applies.

393.   A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty

to disclose.

## X.   <u>CLASS ACTION ALLEGATIONS</u>

394.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Mohawk between April 28, 2017 and July 25, 2019, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Mohawk at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

395.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Mohawk shares were actively traded on the NYSE.  As of July 31, 2019, Mohawk had over 72 million shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the proposed Class.  Class members who purchased Mohawk common stock may be identified from records maintained by Mohawk or its transfer agent(s) and may be

notified of this class action using a form of notice similar to that customarily used in securities class actions.

396.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

397.   Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.  Among the questions of fact and law common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein; (b) whether the Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts; (c) whether Defendants acted with scienter; and (d) the proper way to measure damages.

398.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.   Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class

186

action.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

399.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

400.    This Count is asserted on behalf of all members of the Class against Defendants Mohawk and Lorberbaum for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

401.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

402.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to

purchase Mohawk common stock at artificially inflated prices.

403.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Mohawk common stock.

404.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Mohawk common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, (i) Mohawk's sales and the reason for those sales, (ii) Mohawk's

188

manufacturing abilities and the demand for their manufactured products, and (iii) Mohawk's inventory numbers and the reasons they continued to rise; (b) artificially inflate and maintain the market price of Mohawk common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Mohawk common stock at artificially inflated prices and suffer losses when the true facts became known.

405.   Defendants Mohawk and Lorberbaum are liable for all materially false and misleading statements made during the Class Period, as alleged above.

406.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Mohawk stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

407.   Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Mohawk's common stock, which inflation was removed from its price when the true facts became known.

408.   Defendants' wrongful conduct, as alleged above, directly and

proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Mohawk's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Mohawk's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Mohawk's securities to decline.

409. Defendants' numerous false and misleading statements and omissions artificially inflated the price of Mohawk's stock. That artificial inflation was removed in direct response to information revealed in a series of disclosures, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions. As set forth above, these disclosures and/or materializations divulged or revealed information that gradually corrected Defendants' prior misrepresentations and omissions of material fact, and/or disclosed facts Defendants misrepresented or omitted that were a substantial factor in causing investors' economic loss.

190

410.   None of these revelations was sufficient on its own to fully remove the inflation from Mohawk's stock price because each only partially revealed Mohawk's financial state that had been concealed from or misrepresented to investors. Moreover, as explained above, the corrective impact of the disclosures alleged herein was tempered by Defendants' continued reassuring statements and failure to fully disclose the truth.

411.   The timing and magnitude of the declines in Mohawk's share price negate any inference that Lead Plaintiff's or the Class' losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.

412.   Accordingly, as a result of their purchases of Mohawk common stock during the Class Period, Lead Plaintiff's and the Class suffered economic loss and damages under the federal securities laws.

413.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### <u>Against Lorberbaum</u>

414.   Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

191

415.   This count is asserted on behalf of all members of the Class against Defendant Lorberbaum for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

416.   Defendant Lorberbaum acted as a controlling person of Mohawk within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of his high-level position, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and his power to control public statements about Mohawk, Defendant Lorberbaum had the power and ability to control the actions of Mohawk and its employees.  By reason of such conduct, Defendant Lorberbaum is liable pursuant to Section 20(a) of the Exchange Act.

## XII.   **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.     As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

E.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  June 29, 2020

*/s/ John C. Browne*
John C. Browne (admitted *pro hac vice*)
Alexander T. Payne (admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York  10020
Tel: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
alex.payne@blbglaw.com

-and-

Jonathan D. Uslaner (admitted *pro hac vice*)
Richard D. Gluck (admitted *pro hac vice*)
Lauren M. Cruz (admitted *pro hac vice*)
2121 Avenue of the Stars
Los Angeles, California  90067
Tel: (310) 819-3470
rich.gluck@blbglaw.com

193

jonathanu@blbglaw.com
lauren.cruz@blbglaw.com

*Counsel for Lead Plaintiff Public
Employees' Retirement System of
Mississippi and Lead Counsel for the Class*

H. Lamar Mixson
Georgia Bar No. 514012
Amanda Kay Seals
Georgia Bar No. 502720
**BONDURANT MIXSON &
   ELMORE, LLP**
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA  30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
mixson@bmelaw.com seals@bmelaw.com

*Liaison Counsel for Lead Plaintiff Public
Employees' Retirement System of
Mississippi*

John L. Davidson (admitted *pro hac vice*)
**DAVIDSON BOWIE, PLLC**
1062 Highland Colony Parkway
200 Concourse, Suite 275
Ridgeland, Mississippi 39157
Telephone:  (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Lead Plaintiff Public
Employees' Retirement System of
Mississippi*

194

## **CERTIFICATE OF SERVICE**

I certify that on this 29th day of June, 2020, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

/s/ *John C. Browne*
John C. Browne