# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MOHAWK INDUSTRIES, INC., and JEFFREY S. LORBERBAUM,<br><br>Defendants. | Civ. A. No.<br>4:20-cv-00005-ELR |

## LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................ iii

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.   SUMMARY OF THE FRAUD ...................................................................... 2

     A.    Mohawk Misrepresented Its Ability to Manufacture LVT and
          Concealed Its Scheme to Boost Margins. ........................................... 2

     B.    Mohawk Used the Saturday Scheme to Meet Analyst Estimates. ....... 5

     C.    Lorberbaum and Carson Knew About the Schemes. .......................... 7

     D.    Investors Suffered Losses as the Truth Emerged. .............................. 8

III.  ARGUMENT .................................................................................................. 9

     A.    The Complaint Adequately Alleges Defendants' Material
          Misrepresentations and Omissions. ................................................... 9

          1.    Defendants Falsely Claimed That Mohawk Was Selling
               All the LVT It Could and Was Capacity Constrained..............10

          2.    Defendants Falsely Claimed That Mohawk's LVT Was
               "Being Well Accepted Across All Channels." ......................12

          3.    Defendants Misled Investors About the Reasons for
               Mohawk's "Record" Quarterly Margins. ...............................14

          4.    Defendants Misled Investors About the Reasons for
               Rising Inventory and Slowing Turnover. ...............................15

          5.    Defendants Misled Investors About Mohawk's "Record"
               Quarterly Sales. ...................................................................17

     B.    The Complaint Raises a Strong Inference of Scienter. .....................24

     C.    The Complaint Adequately Alleges Loss Causation..........................32

i

IV.  CONCLUSION ............................................................................................35

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) ...........................................................................21

*Barney Holland Oil Co. v. FleetCor Techs., Inc.*,
   2007 WL 9702207 (N.D. Ga. Aug. 17, 2007) ..................................................9

*Bellocco v. Curd*,
   2005 WL 2675022 (M.D. Fla. Oct. 20, 2005) .................................................10

*Brophy v. Jiangbo Pharm., Inc.*,
   781 F.3d 1296 (11th Cir. 2015) ......................................................................30

*Carter v. Furniture Brands Int'l, Inc.*,
   2015 WL 357076 (E.D. Mo. Jan. 27, 2015) ...................................................23

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005)...........................................................................13

*City of Pontiac Gen. Emps. Ret. Sys. v Schweitzer-Mauduit Int'l, Inc.*,
   806 F. Supp. 2d 1267 (N.D. Ga. 2011)...........................................................23

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................33

*In re: Ebix, Inc. Sec. Litig.*,
   898 F. Supp. 2d 1325 (N.D. Ga. 2012).....................................................*passim*

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019)......................................... 24, 25, 29, 32

*In re Faro Techs. Sec. Litig.*,
   534 F. Supp. 2d 1248 (M.D. Fla. 2007)............................................. 19, 25, 28

*In re Flowers Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)...........................................*passim*

*In re Focus Enhancements, Inc. Sec. Litig.*,
  309 F. Supp. 2d 134 (D. Mass. 2001).........................................................18, 22

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006).........................................................25

*In re HD Supply Hldgs., Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018).......................................................*passim*

*In re KLX, Inc. Sec. Litig.*,
  232 F. Supp. 3d 1269 (S.D. Fla. 2017).........................................................17

*La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters,
  Inc.*, 2017 WL 3188425 (D. Vt. July 21, 2017) .................................................11

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008).........................................................21

*Luczak v. Nat'l Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020).................................................15, 20, 22, 23

*McDonald v. Kinder-Morgan, Inc.*,
  287 F.3d 992 (10th Cir. 2002).........................................................21

*Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v.
  Welbilt, Inc*, 2020 WL 905591 (M.D. Fla. Feb. 6, 2020).................................35

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008).........................................................30

*Mogensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014).........................................................13

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...........................................15, 17

*In re Netbank, Inc. Sec. Litig.*,
  2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) .......................................12, 32, 33

*In re Paincare Hldgs. Sec. Litig.*,
  541 F. Supp. 2d 1283 (M.D. Fla. 2008).......................................................27, 32

*In re Premiere Techs. Inc.*,
  2000 WL 33231639 (N.D. Ga. Dec. 8, 2000) ...................................................19

*In re PSS World Med., Inc. Sec. Litig.*,
  250 F. Supp. 2d 1335 (M.D. Fla. 2002) .........................................................35

*S.E.C. v. Morgan Keegan & Co.*,
  678 F.3d 1233 (11th Cir. 2012) ......................................................................14

*Schultz v. Applica Inc.*,
  488 F. Supp. 2d 1219 (S.D. Fla. 2007) .....................................................20, 29

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002), *aff'd, Phillips v. Sci.-
  Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004) ...........................................*passim*

*In re STEC Inc. Sec. Litig.*,
  2011 WL 2669217 (C.D. Cal. June 17, 2011) .................................................12

*In re Sunbeam Sec. Litig.*,
  89 F. Supp. 2d 1326 (S.D. Fla. 1999) ...............................................26, 27, 28

*In re Sykes Enters.*,
  2001 WL 964160 (M.D. Fla. Mar. 7, 2001) ..................................................3, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................................24, 32

*In re Theragenics Corp. Sec. Litig.*,
  137 F. Supp. 2d 1339 (N.D. Ga. 2001) ................................................17, 28, 29

*Tung v. Dycom Indus., Inc.*,
  454 F. Supp. 3d 1244 (S.D. Fla. 2020) ..........................................................22

*In re World Access, Inc. Sec. Litig.*,
  119 F. Supp. 2d 1348 (N.D. Ga. 2000) ..........................................................19

## I.   **PRELIMINARY STATEMENT**

This securities class action against Mohawk Industries, Inc. ("Mohawk") and its Chief Executive Officer, Defendant Lorberbaum, arises from Defendants' series of misrepresentations about Mohawk's U.S.-made Luxury Vinyl Tile ("LVT"), the reasons the Company's inventory was ballooning and the time needed to sell that inventory was lengthening, and Mohawk's supposed "record" sales and operating margins. The Complaint—backed by detailed and consistent accounts from over a dozen former Mohawk employees—alleges in detail the myriad reasons why each of Defendants' statements was false or misleading and alleges abundant facts supporting a strong inference of scienter. The Complaint also spells out how Defendants' misstatements caused investors' losses after a series of partial corrective disclosures revealed the truth. No more is required to plead an actionable claim.

Defendants nonetheless move to dismiss the Complaint, arguing it fails to adequately allege falsity, a strong scienter inference, and loss causation. But Defendants' entire motion depends on mischaracterizing and misrepresenting the Complaint and its factual predicate, and ignoring whole categories of facts showing the misleading nature of their statements and the strong inference of scienter. Indeed, Defendants' motion ignores completely the countless allegations concerning their misstatements about the reasons for Mohawk's swelling inventory and the quality of

1

its LVT. A fair reading of the full facts alleged shows that the Complaint pleads the requisite elements of Plaintiff's claims. Defendants' motion should be denied.

## II.   SUMMARY OF THE FRAUD

### A.   Mohawk Misrepresented Its Ability to Manufacture LVT and Concealed Its Scheme to Boost Margins.

Entering the Class Period, Mohawk's dominance of the flooring market was threatened as its competitors more quickly capitalized on the skyrocketing demand for LVT, seriously eroding Mohawk's market share. ¶¶55-68.[1] To stem that decline, Mohawk purchased an LVT manufacturer with a new plant in Dalton, Georgia, claiming that the plant would enable Mohawk to recapture market share from competitors selling imported Chinese LVT. ¶¶61-65, 92. As production at the new plant ramped up, Mohawk falsely claimed that its "superior" U.S.-made LVT was "being well accepted across all channels," and that the Company was "selling" everything its manufacturing "capacity" allowed. ¶¶67, 94.

In truth, half of Mohawk's U.S.-made LVT was so defect-riddled that it was unsellable, and the LVT the Company did sell was returned in droves because of

---

[1] All capitalized terms not defined in this brief have the meanings assigned to them in the Consolidated Class Action Complaint ("Complaint"). Citations to "¶" and "Mot." are to the Complaint and Defendants' brief in support of their motion to dismiss (ECF No. 54-1), respectively. Unless otherwise stated, all emphasis is added, and internal quotation marks and citations are omitted.

rampant defects. Numerous former Mohawk employees confirmed these points:

- FE1, the Head of the Builder and Multifamily division and member of Mohawk's Executive Leadership Team (the "ELT"), explained that 50% of the LVT produced and stored in Mohawk's warehouses was unsellable (¶¶163-67);

- FE12, a Regional Distribution Sales Manager, confirmed that at least 50% of the U.S.-made LVT was defective (¶¶172-73, 190);

- FE5, a Division Manager who oversaw East Coast and Canada sales of Mohawk's domestic LVT, said he saw daily audit tests revealing 50% or more of the U.S.-made LVT had manufacturing defects (¶¶171, 176); and

- FE5, FE11 (a VP of Product Development), and FE7 (a Distribution and Plant Manager responsible for distribution from the U.S. LVT Plant), each described several LVT defects that made installation difficult, if not impossible (¶¶174-76).

The defects were so pervasive that Mohawk's main distributors stopped carrying the products, causing distributor sales to drop 60-70% between 2016 and early 2019. ¶¶185-87, 190-92. And Mohawk's $1 billion Builder division stopped selling the Company's domestic LVT altogether in early 2018. ¶¶197-99.[2]

Rather than writing off the defective LVT as GAAP required—which would have negatively impacted the Company's margins and profits by increasing its cost

---

[2] Defendants' self-serving interpretation of extraneous documents, including their assertion that Mohawk "improved its domestic LVT manufacturing capabilities" (Mot. at 7), cannot be considered "for the truth of the matters they assert," especially where, as here, they contradict the Complaint's allegations and are "subject to reasonable dispute." *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *4-5 (M.D. Ga. Mar. 23, 2018). Defendants cannot "substitute their version of the facts for Plaintiff['s] account." *In re Sykes Enters.*, 2001 WL 964160, at *2 (M.D. Fla. Mar. 7, 2001).

of sales—Brian Carson (Mohawk's President of Flooring North America) directed employees to carry the defective LVT in inventory, but with an internal notation that it should not be sold to customers. ¶¶162-68. Writing off the defective LVT also would have tipped off investors about Mohawk's manufacturing problems. ¶159.

Simultaneously, Carson directed employees to overproduce LVT and other products to drive down per-unit manufacturing costs (by spreading the Company's fixed costs over more finished products), which inflated Mohawk's reported operating margins (the percentage profit it earned for each dollar of sales) to 14-16%, eclipsing its largest competitor's 6-8% margins. ¶¶205-17, 215-16.

Together, the intentional overproduction, inability to produce quality LVT, and refusal to write off unsellable inventory caused Mohawk's reported inventory to balloon and the time necessary to sell the products (i.e., "inventory turnover") to lengthen. ¶¶157-217. From 2015 to 2019, Mohawk's LVT inventory nearly tripled, ¶¶210-12, while its carpet inventory likewise exploded, with up to six million square feet of unsellable carpet sitting in just three Mohawk distribution centers. ¶¶206-09. When analysts questioned the disconnect between Defendants' public statements that the Company was selling everything it had produced and its statements that the Company's inventory was rising and its turnover slowing, Defendants offered assorted false excuses, from rising "raw material inflation" to "geographic

4

expansion." ¶¶96-106. In truth, Defendants' various schemes caused vast unsellable LVT and carpet to overfill their warehouses. ¶¶164-68, 205-14.

**B.  Mohawk Used the Saturday
 Scheme to Meet Analyst Estimates.**

Mohawk also artificially inflated its reported sales through an unabashedly fraudulent scheme that its former employees described as "the biggest sham ever." ¶¶109-56. FEs 3 through 9 provided nearly identical accounts of how, under strict orders from Mohawk's senior executives, every Flooring N.A. distribution center pretended to deliver "every order in the system" for every product and all customers on the last Saturday of every quarter. ¶¶109-50. These "deliveries" ranged from scanning product still on warehouse shelves as if loaded onto a truck, to parking loaded trucks in empty Mohawk parking lots, to driving loaded trucks around purported delivery routes. *Id*. Mohawk otherwise never delivered on Saturdays because its customers were not open to accept deliveries then. ¶¶116-18. Yet, Mohawk chose to make these "deliveries" on the last Saturday of each quarter precisely *because* its customers were not open. *Id*. The result was four to five million pounds of fake shipments each quarter. ¶133. Though it never delivered the product, Mohawk generated invoices for the "delivery attempts," counted the "sales" in the current quarter, and then "returned" the product the next quarter. ¶¶111-50. This scheme violated GAAP and Mohawk's policies stated in its SEC filings. ¶¶151-56.

5

The Saturday Scheme allowed Mohawk to meet (barely) or exceed (barely) analysts' consensus expectations—sometimes by as little as one penny; it also allowed Mohawk to continue (falsely) reporting record sales growth. ¶¶75-76, 136-37. During the Class Period, Mohawk fell short of expectations just twice: the second and third quarters of 2018, which were, not coincidentally, the only two quarters when Mohawk temporarily paused the scheme. *Id.*

Mohawk strictly enforced and widely discussed the Saturday Scheme, with employees receiving instructions to "drain the swamp" to meet sales targets in threatening emails and national end-of-quarter conference calls with all distribution managers throughout 2017, 2018, and 2019. ¶¶121-30. As FE4 explained, "It was about meeting financial expectations at the end of the quarter for shareholders. There was no other reason to do it and no one was shy about saying it." ¶126. When FE9, charged with verifying Mohawk's sales reports for headquarters, asked about the quarter-end uptick in sales, he was likewise told it was purposeful and he should not re-evaluate the numbers. ¶¶139-42.

Hundreds of customers were repeatedly subjected to the scheme each quarter between 2017 and 2019, regardless of size or category, including Sherwin Williams and Floor & Décor. ¶¶134-35. Major distributors like Apollo Distributing, New England Floor Supply, and JJ Haines were also subjected to the scheme, despite

complaining about the premature invoices as early as 2017. ¶120.

### C.   **Lorberbaum and Carson Knew About the Schemes.**

Lorberbaum and Carson knew or were informed of, and had access to information revealing, these schemes, including multiple reports they received containing the results of the Saturday Scheme. ¶¶138-50. One such regularly generated report showed the dollar values of orders invoiced each day of a quarter, including spikes on the final day that could not be missed. ¶¶138-42. "Executive dashboard packets" containing orders, claims, and returns data went to Lorberbaum daily. ¶¶143-44. Two other reports created specifically for the last Saturday of each quarter dedicated an entire page to unsuccessful deliveries returned to the warehouses but still invoiced in the current quarter. ¶¶145-50.

Lorberbaum and Carson also knew of the defects plaguing the U.S.-made LVT and the reasons for Mohawk's rising inventory and slowing turnover. ¶¶177-83, 195, 200. In addition to masterminding the overproduction and inventory-misclassification schemes, Carson told his colleagues at a Surfaces Trade Show in January 2017 that—regarding Mohawk's LVT—"the dogs don't like the dog food we're making." ¶179. And, in April 2018, when Lorberbaum confronted FE1 about the Builder division's refusal to sell Mohawk's U.S.-made LVT, FE1 told Lorberbaum plainly that the U.S. LVT Plant did not make quality LVT and Mohawk

7

would lose half its customers if the Builder division sold it. ¶200. Lorberbaum also visited the U.S. LVT Plant in the summer of 2018, when FE11 and two other Senior VPs told Lorberbaum directly that the Plant was not optimized to produce the LVT and was generating a higher rate of waste. ¶¶177-78.

Finally, in September 2018, FE1 confronted Lorberbaum in-person about how Carson was "screwing with [Mohawk's] finances" and "the numbers are wrong." ¶¶218-23. After a brief internal investigation, Lorberbaum—who said that "Carson is lying every time he opens his mouth"—fired Carson and admitted to FE1, "I just don't know how I missed it." ¶¶221-28.

### D.   Investors Suffered Losses as the Truth Emerged.

The truth about Mohawk's LVT and the reasons for Mohawk's rising inventory, slowing turnover, and supposedly record sales and margins gradually began to emerge. A series of disclosures and materializations of risks revealed that— contrary to Defendants' repeated assurances—Mohawk had excess inventory, needed to reduce production, suffered manufacturing problems, and faced falling sales and margins. ¶¶237-57. In addition, when Mohawk temporarily halted the Saturday Scheme, it missed analysts' expectations. ¶¶136-37. Mohawk's stock price dropped precipitously in response to each of the disclosures, wiping out $7.4 billion in market value. ¶¶242, 249, 254, 257.

On June 25, 2020, Mohawk received subpoenas issued by the U.S. Attorney's Office for the Northern District of Georgia and the SEC on topics similar to those raised by the Complaint.[3]

## III.  <u>ARGUMENT</u>

"In a ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff." *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1339 (N.D. Ga. 2012). A complaint may be dismissed under Rule 12(b)(6) only when the facts cannot "state a claim to relief that is plausible." *Flowers Foods*, 2018 WL 1558558, at *3.

### A.  **The Complaint Adequately Alleges Defendants' <u>Material Misrepresentations and Omissions.</u>**

Section 10(b) of the Securities Exchange Act of 1934 imposes liability not only for false statements, but also "omissions of material fact" that make statements "misleading." *In re HD Supply Hldgs., Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1352 (N.D. Ga. 2018). "[A] duty to speak the full truth arises when a defendant undertakes to say anything," and the "prohibition of misleading statements includes not only outright lies, but half-truths." *Barney Holland Oil Co. v. FleetCor Techs., Inc.*, 2007 WL 9702207, at *5 (N.D. Ga. Aug. 17, 2007). Additionally, "a duty to disclose all

---

[3] Mohawk, Current Report (Form 8-K) (July 13, 2020).

material information relating to a particular subject arises by voluntarily touting the subject to investors." *Flowers Foods*, 2018 WL 1558558, at *9. Plaintiff here sufficiently alleges numerous actionable misstatements and omissions.

### 1. Defendants Falsely Claimed That Mohawk Was Selling All the LVT It Could and Was Capacity Constrained.

Lorberbaum repeatedly told investors during the Class Period that even after "increas[ing] the capacity of our LVT," Mohawk was *"selling all of [the LVT] we could have"* and that sales would have been even higher if not for *"capacity constraints."* ¶¶89-93, 260, 296-98, 321-22. These statements were a continuation of his prior representations that Mohawk was *"currently selling all of our LVT we are manufacturing, even as we continue to increase our production capacity."* ¶67.

Those statements were demonstrably false and misleading. In reality, an astonishing 50% of Mohawk's LVT was defective and unsellable; Mohawk's U.S. warehouses were overflowing with defective LVT marked "do not ship"; Mohawk was overproducing and stockpiling so much LVT that it had to build additional warehouses and rent additional storage trailers to store it; and Mohawk's customers, including distributors and builders, refused to sell or accept the defective LVT. ¶¶157-217, 233-34. These facts are more than sufficient to allege that Defendants' statements were misleading, as statements "concerning the capacity for … production" are misleading when production difficulties go undisclosed. *Bellocco v.*

*Curd*, 2005 WL 2675022, at \*1-3 (M.D. Fla. Oct. 20, 2005); *see also La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2017 WL 3188425, at \*4-5 (D. Vt. July 21, 2017) (statements that the company "was straining capacity" misleading when it was "hiding stockpiled and expiring coffee products").

Faced with these damning facts, Defendants improperly attempt to rewrite statements they made during the Class Period (Mot. at 21), claiming that they ***meant*** to say that they were selling all of the ***sellable*** LVT, an assertion they claim would have been literally true. To begin, literal truth is not the standard, as this Court well knows: "The disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *HD Supply*, 341 F. Supp. 3d at 1352. Here, it was surely misleading for Defendants to say Mohawk was "selling all of [the LVT] we could have"—singling out "capacity constraints" as the impediment to further sales—without revealing, among other things: (i) half the U.S.-made LVT was unsellable and sitting in warehouses and rented trailers, (ii) distributors and builders were refusing to carry it, and (iii) Mohawk's own Builder division was refusing to sell it.

Moreover, none of Defendants' ***actual*** statements to investors included the "sellable" caveat they now wish was included. Plus, contrary to Defendants' litigation spin, securities analysts covering the Company contemporaneously ***were***

11

misled, reporting their belief that Mohawk was *"selling everything they produce."* ¶¶68, 93; *see In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) ("analyst statements comport with Plaintiffs' mosaic and the Court's conclusion that Defendants' statements" were misleading). At most, Defendants' self-serving views about how investors supposedly construed their misstatements raise fact-intensive disputes that "have no place in a motion to dismiss," as Judge Martin observed when she was a member of this Court. *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *5 (N.D. Ga. Jan. 29, 2009).

### 2. Defendants Falsely Claimed That Mohawk's LVT Was "Being Well Accepted Across All Channels."

Defendants did not stop at telling investors that Mohawk was selling all the LTV it could; they buttressed those claims about capacity constraints with verifiably false claims that Mohawk's LVT was *"being well accepted across all channels."* ¶¶94-95, 184-96, 262, 273. In fact, Mohawk's LVT was not well accepted. *First*, builders refused to accept it 80% of the time, until the Builder division refused to sell it altogether to avoid losing half of the division's customers. ¶¶184, 197-200. *Second*, retailers returned defective Mohawk LVT 25-50% of the time and reduced their retail space for Mohawk LVT by 50%. ¶¶185-88. *Third*, distributors reduced LVT purchases 60-70% because 25-50% of the product they received was defective. ¶¶185-193. These facts and the FEs' accounts in the Complaint readily show that

Mohawk's LVT was not "well accepted across all channels"; indeed, it was ***not*** "well accepted" by ***any*** of the distribution "channels."

Unable to contest their statements' falsity, Defendants try to recast them as immaterial "puffery." They are not. They are verifiable misrepresentations of fact that are readily contradicted by the Complaint's well-pleaded allegations. Because the statements are "subject to any sort of objective verification," they are not puffery. *HD Supply*, 341 F. Supp. 3d at 1360. Courts, including this one, routinely refuse to discount as immaterial puffery statements like Defendants' misrepresentations about channel acceptance of Mohawk's LVT. After all, neither statements of "perfect deployment of inventory," *id.*, nor those regarding "customers' confidence and growing needs" are immaterial puffery. *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002).[4]

In any event, "[a] statement can be dismissed as puffery as a matter of law ***only*** if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the total mix of facts available." *HD Supply*, 341 F. Supp. 3d at 1360. Such materiality assessments involve "inherently

---

[4] By contrast, Defendants' cited cases involved traditional corporate fluff like management's "feel[ings]," "belie[fs]," "hope[s]," and "want[s]" untethered to verifiable facts. *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1213 (M.D. Fla. 2014); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670-71 (6th Cir. 2005) ("self-praise and confidence" like "best tires in the world").

fact-specific" inquiries that "are peculiarly ones for the trier of fact." *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245-46 (11th Cir. 2012).

### 3.    Defendants Misled Investors About the Reasons for Mohawk's "Record" Quarterly Margins.

Defendants attributed Mohawk's record-breaking quarterly margins during the Class Period to improved "volume, mix and productivity" and "[t]he continued improvement of our LVT manufacturing process." ¶¶80-88, 263, 270-71, 282, 294, 308. In truth, Mohawk achieved its record margins by (i) overproducing LVT and carpet to artificially drive down per-unit costs, and (ii) refusing to write down or take a charge against cost of sales for the defective and obsolete products carried in inventory, including those coded not to be sold. ¶¶164-68, 205-17, 233-35.

Having identified for investors the purported reasons for their record margins, Defendants were obligated—but failed—to disclose all material facts on the subject. As courts in this Circuit and elsewhere have explained, "a duty to disclose all material information relating to a particular subject arises by voluntarily touting the subject to investors." *Flowers Foods*, 2018 WL 1558558, at *9. Here, Defendants misleadingly touted their record margins, including the margins' supposed sources, without disclosing that the margins were actually achieved by keeping defective and excess LVT and carpet in "inventory" and intentionally overproducing product. *See Sci.-Atlanta*, 239 F. Supp. 2d at 1359-63 ("falsely enumerating the reasons for the

14

record growth" actionable when hid GAAP violations); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) (attributing source of income strength to "favorable pricing and volume" "put[] at issue the cause of its financial success" and misleadingly omitted a source of success).

In response, Defendants attack (Mot. at 11-12) an allegation the Complaint does not make. The Complaint challenges the Defendants' misleading descriptions of the ***reasons*** for their record margins—***not*** the reported margins themselves. ¶¶80-88, 263. Defendants also erroneously assert (Mot. at 12) that the Complaint does not allege that their margin statements were material. The Complaint, however, is full of detailed allegations demonstrating the materiality of Defendants' statements. For example, analysts lauded Mohawk's "unprecedented margin performance," stating "[i]t's really [Mohawk's] margin performance that piques our interest" (¶83), which "underscores the materiality." *Sci.-Atlanta*, 239 F. Supp. 2d at 1361 n.6. And, in any event, Defendants' musings about the "immateriality" of their misstatements again raise, at most, factual disputes unfit for resolution on the pleadings. *See Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020).

### 4. Defendants Misled Investors About the Reasons for Rising Inventory and Slowing Turnover.

Defendants also falsely assured investors that Mohawk's rising inventory and slowing turnover resulted from benign and temporary causes like rising "raw

material costs" and "geographic expansion." *E.g.*, ¶¶96-106, 261. In truth, inventory was increasing and turnover lengthening because Defendants refused to write off unsellable LVT totaling 50% of the U.S.-made LVT. ¶¶157-183. Meanwhile, Defendants intentionally overproduced product to improve margins, while Mohawk's distributors and Builder division refused to sell Mohawk-produced LVT. ¶¶184-217. Defendants' statements to investors downplaying and misrepresenting the true causes of its rising inventory and lengthening turnover are actionable. *See, e.g.*, *HD Supply*, 341 F. Supp. 3d at 1358 (statements downplaying extent of issues and assuring problems "behind" the company were misleading when the company was not "fixing the issues long-term" and was not "over the hump").

Unable to overcome the Complaint's detailed allegations, Defendants again try to rewrite them. But contrary to Defendants' repeated assertions (Mot. at 11-12), the Complaint challenges the ***reasons*** Defendants offered to excuse Mohawk's increased inventory and lengthening turnover—***not*** the reported numbers themselves. Also unavailing is Defendants' contention that the Company's disclosures about rising "days-in-inventory" cuts against an inference of fraud because this was supposedly "negative" information. Mot. at 12. Inventory metrics themselves can be positive or negative, depending on what is driving those numbers. ¶¶97, 235. Here, Defendants identified only benign and positive drivers, such as

16

"geographic expansion," thereby hiding the rampant problems and nefarious schemes that actually drove rising inventory. Thus, Defendants' citation to a truly honest disclosure of "negative information" in *In re KLX, Inc. Securities Litigation* does not support them. 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017).

###   5.   Defendants Misled Investors About Mohawk's "Record" Quarterly Sales.

Defendants further misled investors during the Class Period by touting their "record" quarterly sales and falsely attributing them to legitimate factors such as "price and product mix." *E.g.*, ¶¶69-79, 85-88, 259. It was false and misleading for Mohawk to tell investors that it achieved its "record sales" through legitimate factors when, in truth, Mohawk artificially inflated its sales numbers through the Saturday Scheme. *See, e.g.*, *Sci.-Atlanta*, 239 F. Supp. 2d at 1359-63; *In re Theragenics Corp. Sec. Litig.*, 137 F. Supp. 2d 1339, 1343 (N.D. Ga. 2001) (statements that "increased revenues were attributable to increased production volume" misleading when due to other factors); *Mylan*, 2018 WL 1595985, at *6 (statements attributing income to "favorable pricing and volume" misleading when also due to improper practices).

Defendants' challenges to the Complaint's Saturday Scheme allegations fail. ***First***, Defendants assert that the Complaint does not describe the Saturday Scheme with sufficient particularity. Mot. at 14-19. Not so. The Complaint includes seven FE accounts describing the Saturday Scheme in painstaking detail, including:

- <u>Who was subject to the scheme</u>: Every customer of Flooring N.A., regardless of size, including Sherwin Williams, Floor & Decor, Apollo Distributing, New England Floor Supply, and JJ Haines (*e.g.*, ¶¶120-21, 134);

- <u>What products</u>: Every product sold by Flooring N.A., including Conventional Flooring Products and LVT (*e.g.*, ¶¶131, 135);

- <u>When the scheme occurred</u>: The last Saturday of the quarter. Customers did not accept product on Saturday, and Mohawk did not otherwise deliver product on Saturday (*e.g.*, ¶¶111-20);

- <u>Where the scheme occurred</u>: Nationwide, all distribution centers (*e.g.*, ¶¶131-37);

- <u>What transactions</u>: Every outstanding order at the end of the quarter, including for the major LVT customers specifically identified in the Complaint (*e.g.*, ¶135);

- <u>How much product</u>: 4 to 5 million pounds of product each quarter (¶133); and

- <u>Why the scheme occurred</u>: To buoy sales and meet analyst consensus estimates and Mohawk's revenue guidance (*e.g.*, ¶¶111-30).

The Complaint also details the specific GAAP and Company accounting requirements that Mohawk violated by improperly recognizing "sales" revenue for millions of pounds of product each quarter that was never delivered and for which control was never transferred. ¶¶109-56. No more is required because when, as here, the claim is "premature recognition of revenue in violation of the GAAP," the complaint need only state the "revenue recognition policy" and "how that policy was violated." *Sci.-Atlanta*, 239 F. Supp. 2d at 1364; *see also In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 150 (D. Mass. 2001) (allegations that defendants "recognized revenue" from "phony sales" of products "stored in trailers

in [company's] warehouse" were "plainly actionable"). The Complaint pleads both.

Despite this elaborate detail, Defendants argue that the Complaint fails because it supposedly does not precisely quantify the Saturday Scheme's impact on Mohawk's sales each quarter. But courts have repeatedly found that "the complaint need not specify the exact dollar amount of each accounting error." *In re Premiere Techs. Inc.*, 2000 WL 33231639, at *17 (N.D. Ga. Dec. 8, 2000); *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1260 (M.D. Fla. 2007) ("quantify[ing] the falsity to the penny" is "simply not required (and often simply not available) at the pleading stage"). Nor must Plaintiff "detail each single specific transaction in which Defendant[s] transgressed, by customer, amount, and precise method." *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000). Such "further specificity can be satisfied during discovery." *HD Supply*, 341 F. Supp. 3d at 1355.

***Second***, Defendants' self-serving characterization of the Saturday Scheme as mere channel stuffing and "pushes" that are "common practice" (Mot. at 3-4) is false and contrary to the Complaint's allegations. Unlike "channel stuffing" or other practices in which product ***is actually delivered*** with the customer's approval— practices that do not violate the accounting rules *per se*—here, Mohawk ***never delivered*** the product and, in many instances, ***never even attempted delivery***. ¶¶109-56. Thus, none of the Saturday Scheme's sales revenue was properly recognized.

19

***Third***, Defendants assert without support (Mot. at 12) that the Saturday Scheme was not "material." Not so. The Saturday Scheme's phony "sales" enabled Mohawk to meet analysts' quarterly consensus expectations, often by just ***one-fifth of one percent***. ¶76. Mohawk's own executives confirmed the Saturday Scheme's materiality by making it the focus of national conference calls and executive reports. ¶¶111, 123-30, 138-50. And, as courts have explained, GAAP violations themselves are material to investors. *See Sci.-Atlanta*, 239 F. Supp. 2d at 1362-63 (collecting cases). These facts, and the Complaint's many others, amply demonstrate the materiality of Defendants' misstatements. Meanwhile, Defendants' responses raise, at most, factual disputes not fit for resolution on the pleadings. *Luczak*, 812 F. App'x at 924; *see also Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 (S.D. Fla. 2007) (rejecting pleading-stage materiality challenge to revenue recognition violations).

***Fourth***, Defendants' confused assertion that they "accurately reported financial information" and had no duty to disclose risks that "***might*** make future results less favorable" (Mot. at 13-14) ignores that Mohawk's reported sales figures were actually inaccurate and inflated by the Saturday Scheme. *E.g.*, ¶¶69-79, 259. The argument also ignores that Defendants had a duty to disclose the schemes ***actually*** leading to those inflated results. Thus, Defendants' cases are inapposite, as the plaintiffs in those cases conceded the "accurate reporting" of all historic results,

and only alleged omissions of "contingencies that might alter the [future] revenue picture." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002).

**Fifth**, Defendants argue (Mot. at 13) that their failure to voluntarily restate Mohawk's financial reports absolves them of liability. It does not. "[O]fficers and directors are ***not*** exonerated when their own audit committee finds nothing wrong in the company's accounting practices." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008). Indeed, "[t]o rule otherwise would create a huge fox-guards-the-chicken-house loophole in our private securities law enforcement." *Id.*; *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (same).

**Finally**, Defendants urge (Mot. at 2, 4, 15-16, 23) the Court to disregard the FEs' accounts, disparaging them as "lower-level." But not only were the FEs not "lower-level," some helped implement and indisputably had personal knowledge of the schemes. The Complaint includes accounts from, among others, a member of the ELT and the Head of Mohawk's $1 billion Builder division; the heads of Mohawk's primary distribution centers; and former Mohawk Vice Presidents who spoke directly with Lorberbaum, Carson, and other top executives and officers.

Plus, it is of no moment that the Complaint protects the confidentiality of the 14 Mohawk "unnamed" FEs. "A securities fraud complaint need not name a confidential source." *HD Supply*, 341 F. Supp. 3d at 1352. "Indeed, circuit courts

have recognized information from multiple confidential sources can be meaningful when corroborated by one another and the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions." *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1258 (S.D. Fla. 2020). Here, the FEs' accounts are consistent with and corroborate one another, and the Complaint provides all the requisite information about each cited witness—their job titles, employment dates, and responsibilities. *HD Supply*, 341 F. Supp. 3d at 1352. Plus, credibility is ultimately a fact question for the jury to resolve, not a question for the court on a motion to dismiss. *Luczak*, 812 F. App'x at 924.

Equally baseless, Defendants assert (Mot. at 2, 15, 22) that the 14 FEs have no idea what they are talking about because they supposedly had no visibility into the Company's "accounting or corporate finances." But, as set forth in the Complaint, Mohawk's top executives specifically and repeatedly explained the Saturday Scheme's purpose to the FEs and others: to recognize sales and revenue at quarter-end to satisfy analyst and investor expectations. ¶¶111-30, 148-49. Additionally, the FEs include some of the very managers and employees who implemented the executives' orders at the end of each quarter to generate the fake sales included in the Company's financials. *See, e.g.*, *Focus Enhancements*, 309 F. Supp. 2d at 149 (rejecting argument that witnesses without accounting roles lacked

knowledge how sales were booked).

The FEs also include the Logistics Business Analyst charged with preparing reports for the President of Flooring N.A. and other executives on the last Saturday of each quarter showing the amount of improperly recognized "sales" achieved through the Saturday Scheme. ¶¶121, 133, 145-50. And, lastly, the Complaint includes the account of a Mohawk ELT member, who received complaints from Mohawk's accounting group—including its Senior Controller and Director of Finance—about "what [President of Flooring] Carson is making us do." ¶¶166, 220.[5]

At bottom, Defendants ask the Court to find as a matter of law at the pleading stage that the 14 FEs were simply wrong. But, try as they might, Defendants cannot cast aside as "half-baked conspiracy theories" (Mot. at 1) the detailed and consistent accounts of the many FEs cited in the Complaint. Such a challenge to "the credibility of the allegations" asks the court to improperly "weigh the evidence in this way on a motion to dismiss." *Luczak*, 812 F. App'x at 924.

---

[5] Defendants' cases do not undermine the corroborative nature of the **14** first-hand witness accounts here. For example, in *Carter v. Furniture Brands Int'l, Inc.*, the account of a **single** logistics employee was insufficient to establish early revenue recognition because that one employee did not claim to know "when, how, and if revenue was recognized," and was never told the purpose of the scheme. 2015 WL 357076, at *5-7 (E.D. Mo. Jan. 27, 2015); *see also City of Pontiac Gen. Emps. Ret. Sys. v Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1296-97 (N.D. Ga. 2011) (**single** "lab tester" whose knowledge was "based on nothing more than talk among [company] employees" and "talk around the mill").

**B.      The Complaint Raises a Strong Inference of Scienter.**

"In this Circuit, scienter consists of intent to defraud or severe recklessness on the part of the defendant." *HD Supply*, 341 F. Supp. 3d at 1360. The PSLRA permits both "the aggregation of facts to infer scienter" and "[c]ircumstantial evidence." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1232 (N.D. Ga. 2019). The inference of scienter "need not be irrefutable, i.e., of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The inquiry is simply whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 310. "Since scienter is [a] highly fact-intensive inquiry, such questions are most appropriate for a fact finder." *Equifax*, 357 F. Supp. 3d at 1232. Here, the totality of the Complaint's allegations supports the strong inference that Defendants had an intent to defraud or, at least, were severely reckless during the Class Period.

*Carson's knowledge is imputed to Mohawk.* Carson, the President of Flooring N.A., orchestrated, knew of, and received information about the fraudulent schemes. Carson personally instructed employees to carry out the overproduction scheme and to keep defective LVT in inventory while coding it "do not ship," and he received daily and quarter-end reports tallying the quarter-end sales spikes and

unsuccessful "deliveries" as a result of the Saturday Scheme. ¶¶138-42, 150, 164-66, 205-06, 214-17. He also knew and told others the Company's LVT was not well accepted. ¶¶179-83. Because Carson had "[f]ull profit and loss ownership" over Mohawk's North American business (¶43), furnished information to Lorberbaum and the Company for inclusion in SEC filings (¶¶44-45), and personally certified the accuracy of Mohawk's public financial disclosures regarding Flooring N.A. in quarterly SOX certifications (*id.*), his knowledge and intent are imputed to Mohawk. As Chief Judge Thrash found in *Equifax*, a "strong inference" of corporate scienter arises from allegations that executives who "approve" or "furnish information or language for inclusion" in public filings also "knew, or were severely reckless, as to the fraudulent conduct." 357 F. Supp. 3d at 1246-47; *see also Faro*, 534 F. Supp. 2d at 1263 (imputing knowledge of official who "was directly involved in and had knowledge of" the alleged conduct and "had been terminated as a result").[6]

Further, Carson was fired after an investigation confirmed his involvement in the schemes. ¶226. While Defendants proclaim that Carson's firing does not support scienter as "stock losses are often accompanied by management departures" (Mot.

---

[6] Even Defendants' cited cases (Mot. at n.19) support that a strong inference of scienter arises when "the person signing the certification was severely reckless," which is shown, as here, when "the person signing the certification had reason to know … that the financial statements contained material misstatements or omissions." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).

at 25-26), here, the "circumstances surrounding [his] termination" support his scienter. *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999).

***Lorberbaum heard directly about the manufacturing problems causing defective LVT and the real reasons for rising inventory and margins.*** In April 2018, Lorberbaum confronted FE1 about why FE1's entire Builder division (the largest division in Flooring N.A.) was not selling the Company's U.S.-made LVT. ¶200. FE1 told Lorberbaum that the U.S. LVT Plant could not produce LVT of satisfactory quality, and Mohawk would lose half its customers if it sold the defective LVT. *Id.* In the summer of 2018, Lorberbaum was told by FE11 and two Senior Vice Presidents that the U.S. LVT Plant was incapable of producing the LVT designs, resulting in significant waste. ¶¶177-78. And, in a September 2018 meeting, FE1 informed Lorberbaum of Carson's schemes and their effect on Mohawk's financials, with Lorberbaum admitting that "Carson is lying every time he opens his mouth" and "[e]very damn number he gives me is wrong." ¶¶218-24.[7] These facts demonstrate Lorberbaum's actual knowledge of the fraudulent activity or, at least, his severe recklessness. *See Ebix*, 898 F. Supp. 2d at 1347 (allegations of "specific

---

[7] Defendants go too far in saying Carson's conduct and knowledge have "no bearing" on Lorberbaum's scienter (Mot. at 25-26), given the schemes' size and scope, that Carson oversaw the largest segment of the Company, and that Lorberbaum conceded he should have been aware. ¶¶42-43, 109-217, 225.

communications to and from" defendants support scienter); *Sunbeam*, 89 F. Supp. 2d at 1338 (allegations of defendants being "directly confronted" about company's revenue recognition practices support scienter).[8]

Defendants argue (Mot. at 29-31) that FE1's September 2018 confrontation of Lorberbaum regarding Carson does not support Lorberbaum's scienter and even establishes that there could be no prior scienter. They are wrong. To begin, as courts in the Circuit recognize, Mohawk's "assertion that [it] can ignore the elephant in the room, as long as no one told them it was there does ***not*** negate recklessness." *In re Paincare Hldgs. Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008). Moreover, Lorberbaum's admission that "I just don't know how I missed it" evinces a severe recklessness in failing to halt the schemes throughout the Class Period. ¶¶225, 356. Indeed, the September 2018 meeting with FE1 was not the first time Lorberbaum learned of the omitted facts, as detailed above. Finally, the "extraordinary accumulation of" and "necessary expenditures to store" the unsellable LVT and carpet (¶¶164-68, 172, 205-13) would have "place[d] Defendants on notice of the alleged activities, and therefore further support a strong inference of scienter."

---

[8] The Complaint here includes the accounts of FEs who spoke directly with Lorberbaum and Carson. Moreover, even where no such "direct interactions" exist, "this is not fatal to Plaintiff's securities fraud claims because circumstantial proof will suffice." *See Flowers Foods*, 2018 WL 1558558, at *15.

*Sunbeam*, 89 F. Supp. 2d at 1338-39. That Defendants incurred unnecessary storage costs to effectuate the schemes rather than writing down the unsellable inventory supports the inference that they intended to deceive investors about the reasons for the inventory build-up and the LVT manufacturing problems. ¶¶164-68, 208-12.[9]

***Lorberbaum and Carson were highly focused on LVT production***. Soaring demand for LVT was the most significant threat confronting Mohawk in its history, eroding demand for Mohawk's Conventional Flooring Products. ¶¶47-60. Both Lorberbaum and Carson assured investors that the U.S. LVT Plant would enable Mohawk to meet that threat and recapture market share taken by competitors selling cheaper, imported LVT. ¶¶63-65. Lorberbaum told investors that LVT had "grown faster than anything [he'd] seen in [his] 40 years of history," and that LVT was his "particular area of focus." ¶¶60, 370. That Defendants "closely and continually monitored" the subject of their misstatements supports an inference of scienter. *Theragenics*, 137 F. Supp. 2d at 1348.

***Lorberbaum had access to and repeatedly received reports and information***

---

[9] Though Defendants insist (Mot. at 29) that Mohawk's pre-Class Period amendment to its Form 10-K for 2015 is irrelevant to scienter, the Company's history of material weakness in inventory reporting also put Lorberbaum directly on notice. ¶¶379-80; *see, e.g.*, *Faro*, 534 F. Supp. 2d at 1259 (scienter inference where defendant was "specifically aware of severe problems in [the company's] inventory control systems" and was "responsible for assurance of adequate internal controls").

*evidencing the Saturday Scheme.* A strong inference of scienter also exists where, as here, Defendants *either* "possessed knowledge of facts *or* access to information contradicting their public statements." *Equifax*, 357 F. Supp. 3d at 1233; *Theragenics*, 137 F. Supp. 2d at 1349 (holding "failure to disclose the [known] reasons for the increased [product] demand … was, at the least, sufficiently lacking in prudence or caution as to constitute severe recklessness"). Regarding the Saturday Scheme, several FEs provided daily reports to Lorberbaum showing conspicuous spikes in sales at the quarter-end and subsequent returns. ¶¶138-50. Lorberbaum also had access to the Company's database containing this data. ¶¶140, 150. These facts strengthen the inference of Lorberbaum's scienter. *See HD Supply*, 341 F. Supp. 3d at 1361 (finding scienter pled when defendants were "involved in daily and weekly updates …, including metrics data, [and] gauged daily progress"). So, too, does the fact that the Saturday Scheme, about which Lorberbaum knew or was severely reckless in not knowing, violated Mohawk's revenue recognition policies specified in SEC filings that Lorberbaum signed. ¶¶39, 151-56; *see Schultz*, 488 F. Supp. 2d at 1226 (finding violation of "internal policy" supports an inference of scienter).

 *The Saturday Scheme's nature, duration, and scope support scienter.* That the Saturday Scheme lasted years and involved every customer, every product, and every distribution center throughout the U.S. (¶¶109-50) further supports the scienter

inference because those facts "would lead a reasonable person to conclude [Defendants] knew about the fraud or were at least severely reckless in not knowing about it." *Ebix*, 898 F. Supp. 2d at 1347.[10] Defendants' scienter is also bolstered by the fact that Flooring N.A., which generated over 40% of Mohawk's worldwide sales, was a core part of Mohawk's operations. *Flowers Foods*, 2018 WL 1558558, at *14.

In response, Defendants assert (Mot. at 27-28) that the Complaint's "core business" allegations do not strengthen the scienter inference. But, as courts in this Circuit have explained in rejecting this assertion, "the Court is not aware of any cases stating … that courts in this circuit cannot consider whether the alleged fraudulent activity was a core operation .… After all, a plaintiff may prove fraudulent intent with circumstantial evidence." *Flowers Foods*, 2018 WL 1558558, at *14.

***That the Saturday Scheme was orchestrated and overseen by senior Mohawk executives for the specific purpose of meeting analysts' consensus***

---

[10] Contrary to Defendants' assertion (Mot. at 24-25) the Complaint need not say more about "the financial impact of the purported schemes" at this stage. *See supra* p. 19. Unlike *Brophy v. Jiangbo Pharm., Inc*., in which the plaintiff did not "allege any particular amount or even a range" that could "allude to the magnitude" of overstated cash balances, 781 F.3d 1296, 1304 (11th Cir. 2015), and *Mizzaro v. Home Depot, Inc*., in which the complaint relied entirely on "estimates of fraud occurring at one or a few stores" 544 F.3d 1230, 1251 (11th Cir. 2008), here, the Complaint relies on the 14 FEs' corroborating accounts providing quantities and spanning the entire U.S. ¶¶107-50, 157-236.

***estimates and Company guidance supports scienter.*** The scienter inference is strengthened when, as here, Defendants "fac[ed] the prospect of failing to meet Wall Street estimates, [and] began to employ a variety of improper means to ensure that [the Company] would match the analysts' estimates," thereby allowing the Company to "extend its unbroken streak." *Sykes*, 2001 WL 964160, at \*1-2. Indeed, Lorberbaum knew about and quelled analyst concerns that Mohawk's record growth would end, assuring that "2017 sales will grow similarly to last year [2016]" and continually touting the continued "record" quarterly growth. ¶¶54, 69-79. And the only two quarters during the Class Period in which the Company did not engage in the Saturday Scheme was when it was futile to do so because Mohawk was so far from meeting Wall Street's estimates. ¶¶136-37.

Defendants posit several arguments why the totality of these allegations supporting the scienter inference must be disregarded, none of which is availing.

***First***, Defendants are wrong (Mot. at 26) that Lorberbaum's role and responsibilities must be ignored. As CEO and Board Chairman, Lorberbaum had access to significant internal information, formally and informally, and significant oversight responsibilities. *E.g.*, ¶¶138-50, 177-78, 181-82, 376-77. This contributes to the scienter inference. *See Flowers Foods*, 2018 WL 1558558, at \*14.

31

*Second*, ignoring the Complaint's scienter allegations, Defendants assert that Lorberbaum had no "plausible personal motive" because he did not sell stock. Mot. at 28-29. But, as the Supreme Court has held, "absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325; *Netbank*, 2009 WL 2432359, at *12-13 (rejecting assertion that lack of stock sales undercuts scienter). And, in any event, the Complaint includes motive allegations. ¶¶352, 362, 374-75; *see Sci.-Atlanta*, 239 F. Supp. 2d at 1366 (scienter bolstered where "bonuses and stock compensation" tied to the Company's performance); *Paincare*, 541 F. Supp. 2d at 1293 (same).

*Finally*, contrary to Defendants' assertion (Mot. at 24) that the Complaint pleads mere "corporate mismanagement," the FE accounts demonstrate that Defendants intentionally misrepresented the state of the Company's LVT operations and concealed the deceptive measures driving its record sales, margins, and inventory metrics. ¶¶107-236. "[A]llegations that the Defendants made false or misleading statements or omissions concerning such corporate mismanagement" are actionable under Section 10(b). *Equifax*, 357 F. Supp. 3d at 127-18.

### C.   The Complaint Adequately Alleges Loss Causation.

"Loss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA." *Ebix*, 898 F. Supp. 2d at 1347. A plaintiff need only plead "some indication of the loss and the causal connection that

the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 337 (2005).

Loss causation is a fact-based inquiry that "should not typically be resolved on a

Rule 12(b)(6) motion." *Netbank*, 2009 WL 2432359, at *14. The standard is satisfied

where, as here, the disclosures "relate back to the misrepresentation," *HD Supply*,

341 F. Supp. 3d at 1363, or "a concealed risk" materialized and caused a stock price

decline, *Flowers Foods*, 2018 WL 1558558, at *18.

Here, the Complaint pleads loss causation through disclosures and admissions

that revealed Defendants' misrepresentations and the materialization of risks those

misrepresentations concealed. ¶¶237-57, 382-86. Specifically, on July 26, 2018,

Mohawk announced a sales and margin miss, and made several startling revelations.

Among them, Mohawk announced that it had manufacturing issues in Flooring N.A.

and that instead of "capacity constraints" and exhausted LVT inventory, it had

stockpiled unsellable inventory, requiring it to "produce[] less than [it] sold to reduce

inventory" and source LVT internationally. ¶¶238-40. In response, Mohawk's stock

price plummeted 18%. ¶¶241-42. Next, on October 26, 2018, Mohawk again

announced another sales miss and that, after "[a]dditional manufacturing reductions"

"to control inventory," Flooring N.A.'s operating margins had fallen to single digits.

¶¶245-46. Mohawk further revealed "physical mechanical failures" and "software

problems" at the U.S. LVT Plant. ¶245. Upon this news, the stock price toppled

another 24%. ¶¶247-49. Finally, on July 26, 2019, Mohawk revealed these issues were ongoing, slashing its margins and sales guidance due to "excess inventories," "reduced production," and "lower volume and margins," causing the stock price to fall another 18%. ¶¶253-54. No more is required.

In response, Defendants claim (Mot. at 32-33) that Mohawk's disclosures did not "relate" to Plaintiff's theory of securities fraud because the schemes were never admitted. But "Plaintiff need not allege an express admission of fraud," as "Defendants cannot escape liability for fraud simply by not admitting the fraud." *Flowers Foods*, 2018 WL 1558558, at *20. The disclosures "need not precisely mirror the earlier misrepresentation," *HD Supply*, 341 F. Supp. 3d at 1363, they need only "share the same subject matter." *Flowers Foods*, 2018 WL 1558558, at *19. That is the case here. Indeed, analysts identified the "disconnect" between Defendants' misstatements and subsequent disclosures and connected Mohawk's "inventory right-sizing" to falling margins (¶¶241, 248), "support[ing] Plaintiff['s] inference" that the truth was revealed. *HD Supply*, 341 F. Supp. 3d at 1364.

Alternatively, loss causation may be alleged through a materialization of the risk theory, which requires no corrective disclosure at all. *Flowers Foods*, 2018 WL 1558558, at *18. Here, the Saturday Scheme concealed the risk that Mohawk's inability to produce quality LVT posed to the Company's sales and earnings. That

risk materialized when Mohawk missed its earnings and sales guidance in Q2 and Q3 2018, the only quarters when Mohawk temporarily paused the Saturday Scheme. Thus, the Complaint sufficiently alleges the link between Defendants' fraud and the disclosures. *See In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1351. (M.D. Fla. 2002) ("Defendants' fraud in committing GAAP violations and improprieties was part of a course of conduct that was ultimately the proximate cause of the Plaintiff['s] loss.").

Finally, Defendants are wrong (Mot. at 4, 32-33) that Plaintiff needs to "disaggregate" losses at this stage. "At the pleading stage, it may be impossible for [Plaintiff to] apportion the drop in [Defendants'] stock." *Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v. Welbilt, Inc*, 2020 WL 905591, at *7 (M.D. Fla. Feb. 6, 2020). And fraud need not be "the sole and exclusive cause of the injury." *Ebix*, 898 F. Supp. 2d at 1347. The Complaint amply alleges the disclosures affected Mohawk's stock price and that halting the Saturday Scheme caused, in material part, the "disappointing financial results." ¶¶136-37, 237-57, 382-86.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion should be denied.[11]

---

[11] Because Defendants' sole ground (Mot. at 34) for dismissing the Section 20(a) claim is the Complaint's supposed failure to allege a primary violation of Section 10(b), the Court should likewise deny the motion to dismiss the Section 20(a) claim.

Respectfully submitted this December 28, 2020.

*/s/ John C. Browne*

| | |
|---|---|
| John C. Browne, *pro hac vice* | H. Lamar Mixson |
| Alexander T. Payne, *pro hac vice* | Georgia Bar No. 514012 |
| **BERNSTEIN LITOWITZ BERGER** | Amanda Kay Seals |
| **& GROSSMANN LLP** | Georgia Bar No. 502720 |
| 1251 Avenue of the Americas | **BONDURANT MIXSON &** |
| New York, New York  10020 | **ELMORE, LLP** |
| Tel: (212) 554-1400 | 1201 West Peachtree Street NW |
| Fax: (212) 554-1444 | Suite 3900 |
| johnb@blbglaw.com | Atlanta, GA  30309 |
| alex.payne@blbglaw.com | Tel: (404) 881-4100 |
| | Fax: (404) 881-4111 |
| -and- | mixson@bmelaw.com |
| | seals@bmelaw.com |
| Jonathan D. Uslaner, *pro hac vice* | |
| Richard D. Gluck, *pro hac vice* | *Liaison Counsel for Lead Plaintiff Public* |
| Lauren M. Cruz, *pro hac vice* | *Employees' Retirement System of* |
| 2121 Avenue of the Stars | *Mississippi* |
| Los Angeles, California  90067 | |
| Tel: (310) 819-3470 | |
| jonathanu@blbglaw.com | John L. Davidson, *pro hac vice* |
| rich.gluck@blbglaw.com | **DAVIDSON BOWIE, PLLC** |
| lauren.cruz@blbglaw.com | 1062 Highland Colony Parkway |
| | 200 Concourse, Suite 275 |
| *Counsel for Lead Plaintiff Public* | Ridgeland, Mississippi 39157 |
| *Employees' Retirement System of* | Tel:  (601) 932-0028 |
| *Mississippi and Lead Counsel for the* | jdavidson@dbslawfirm.net |
| *Class* | |
| | *Additional Counsel for Lead Plaintiff Public* |
| | *Employees' Retirement System of* |
| | *Mississippi* |

## **LOCAL RULE 7.1(D) CERTIFICATION**

The undersigned counsel certifies that this document has been prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1(C) and complies with Local Rule 7.1(D), as modified by the Court's Order, Doc. 53, extending the page limitation for this response from 25 pages to 35 pages.

/s/ *John C. Browne*
John C. Browne

Local Rule 7.1(D) Certification

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 28th day of December, 2020, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.


/s/ *John C. Browne*

John C. Browne