**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, *individually and on behalf of all others similarly situated*, | * * * * * | |
| Plaintiff, | * * | |
| v. | * * | 4:20-CV-00005-ELR |
| MOHAWK INDUSTRIES, INC., et al., | * * * | |
| Defendants. | * * | |

_____

**O R D E R**

_____

Presently before the Court is Defendants Mohawk Industries, Inc. and Jeffrey S. Lorberbaum's "Motion to Dismiss Consolidated Class Action Complaint." [Doc. 54]. The Court's reasoning and conclusions are set forth below.

## I.    Background

Lead Plaintiff Public Employees' Retirement System of Mississippi (hereinafter, "Plaintiff") is a pension fund established for current and retired public employees of the State of Mississippi, including current and retired employees of the Mississippi's public-school districts, municipalities, counties, community

colleges, state universities, libraries, and water districts.[1]   See Am. Compl. ¶ 37 [Doc. 37].  Defendants are Mohawk Industries, Inc. (hereinafter, "Mohawk" or the "Company"), and Jeffrey S. Lorberbaum.  See id. ¶¶ 38–39.

Mohawk is one of the world's largest manufacturers of flooring products, including carpet, rugs, hardwood flooring, laminates, tile, and ceramic.  See id. ¶ 38. The Company is publicly traded on the New York Stock Exchange and sells its flooring products to distributors, wholesalers, and retailers, including big-box stores like Sherwin Williams and Floor & Décor.  See id.  The Company conducts business in three (3) divisions or "segments," with its Flooring North America (or "Flooring, N.A.") segment being the largest by far.  See id. ¶ 6.  Defendant Lorberbaum has been Mohawk's chief executive officer (or "CEO") since January 2001 and its chairman of the board of directors since May 2004.  See id. ¶ 39.

Plaintiff manages over $33 billion in assets for its beneficiaries.  See id. ¶ 37. According to the Amended Complaint, Plaintiff purchased common stock in Mohawk between April 28, 2017 and July 25, 2019, inclusive (the "Class Period"). See id.; see also Compl. ¶ 1 [Doc. 1].  Plaintiff brings this suit on behalf of its members and all others similarly situated to recover losses suffered from Defendants' alleged violations of federal securities laws.  See Am. Compl. 1, ¶ 37.

---

[1] By an Order dated March 18, 2020, the Court appointed Public Employees' Retirement System of Mississippi as Lead Plaintiff for this putative class action, appointed Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel, and appointed Bondurant Mixson & Elmore, LLP as Liaison Counsel for the purported Class.  [Doc. 18].

The Court includes a detailed examination of Plaintiff's allegations in its analysis, but provides here a general summary of the facts Plaintiff alleges in its Amended Complaint for context:

7. Leading up to the start of the Class Period, Mohawk's stock price soared, as the Company reported record earnings for eleven consecutive quarters. Mohawk's dominance of the market for Conventional Flooring Products fueled that growth. But, by the start of the Class Period, a potential threat to Mohawk's market dominance was looming, as Luxury Vinyl Tile ("LVT"), a relatively new flooring option, emerged as an attractive alternative to Conventional Flooring Products.

8. LVT is a resilient flooring product designed to look like wood, stone, or ceramic tile. LVT is waterproof and wears better than wood, stone, or ceramic tile. It is also easier, and hence cheaper, to install. LVT thus offers home and business owners more bang for their buck—the same or similar aesthetic as wood, stone, or tile, but at a much lower cost while being much easier to maintain. That combination caused demand for LVT to skyrocket.

9. The surge in demand for LVT was so great that it represented almost 60% of the total resilient flooring market by 2017 and helped turn resilient flooring into the largest flooring category in the United States. The Company's Chief Executive Officer, Defendant Jeffrey Lorberbaum, described the rise of LVT as the biggest change in flooring since carpet in the 1960s, noting that it had grown faster than anything he had seen in his 40 years in the industry.

10. As demand for LVT swelled, demand for Mohawk's Conventional Flooring Products weakened, and Mohawk had to figure out how to obtain sources of LVT in order to meet the changing demands of the marketplace. One option was to establish relationships with reliable, cost-effective producers (most of whom were in China) that were already producing and supplying LVT. The other option was to attempt to acquire the means to manufacture the products itself. Mohawk's two principal competitors in the U.S. (Shaw Industries and Armstrong Flooring) chose the first option and quickly procured reliable sources of LVT. Mohawk chose the second option, paying $1.2 billion to

acquire a Belgian LVT manufacturer (IVC Group) with a new manufacturing plant in Dalton, Georgia (the "U.S. LVT Plant"). Defendants promised that the U.S. LVT Plant would quickly come online and enable Mohawk to meet the soaring domestic demand for LVT. Unfortunately, those promises proved hollow.

11. A little over eighteen months after Mohawk acquired the U.S. LVT Plant, the Company was falling further and further behind its competitors in the still-burgeoning market for LVT flooring. Shaw, for example, had increased its share of the LVT market from almost zero to nearly 30% in less than 2 years. Mohawk, by comparison, had captured only 12% of the LVT market.

12. Rather than admit it had blundered in attempting to meet domestic LVT demand through Mohawk-manufactured products, the Company offered excuses for its struggles, coupled with assurances that things would soon be better. Defendants routinely blamed "capacity constraints," claiming (falsely) that Mohawk was selling all the LVT it was currently manufacturing and would be able to sell even more when it was able to increase production capacity. But the undisclosed truth was that the Company's efforts to increase domestic production were hamstrung by serious problems with production lines at the U.S. LVT Plant, which caused the lines to consistently produce huge volumes of defective "scrap" LVT that could not be sold to customers.

13. Mohawk's former Senior Vice President of Sales for the Builder and Multifamily division, one of Mohawk's most senior executives and a member of the Company's Executive Leadership Team, recounted that approximately 50% of the LVT the Company produced during the Class Period was unsalable scrap. The quality was so poor, in fact, that he forbade his 125-person salesforce from selling it. That salesforce was responsible for all large-scale builders in North America and generated roughly $1 billion in annual revenue—20% of Mohawk's Flooring[, N.A.] total revenues.

14. When Defendant Lorberbaum asked the former executive why his team was not selling the Company's domestically produced LVT, the executive told him point blank: "we don't make it any good" and "you cannot sell it in our arena because it would not work." Even though the scrap LVT was unsalable and was specifically coded in the Company's

computers as not to be sold, Mohawk nonetheless carried the product in its publicly reported inventory as "first quality" for the express purpose of hiding the ongoing production problems and avoiding the negative financial implications writing down that inventory would cause.

15. By the beginning of the Class Period, losing LVT market share to competitors was not Mohawk's only problem.  The emergence of LVT was also eroding demand for Mohawk's Conventional Flooring Products, especially in the Flooring[, N.A.] segment.  In 2017 alone, the U.S. market for LVT grew more than 20%, while the entire U.S. flooring market grew only 4%.  Defendant Lorberbaum admitted that LVT had "grown faster than anything that I've seen in my 40 years of history."

16. Against this backdrop, many analysts covering Mohawk questioned whether the Company would be able to continue its string of record quarterly sales.  The Company provided a resounding affirmative response to those questions at the start of the Class Period when it reported that it had achieved the highest first-quarter sales in the Company's history in the first quarter of 2017.  Defendants attributed much of that success to the Flooring[, N.A.] segment, which accounted for approximately 42% of Mohawk's total sales.

17. Mohawk reported similarly spectacular results for each of the remaining quarters in 2017, again crediting Flooring[, N.A.] for driving those results.  Analysts were impressed, with many continuing to maintain their "Buy" or "Outperform" ratings on Mohawk's stock.  One even gushed, "All cylinders firing!" This investor enthusiasm drove the Company's stock price to an all-time high in late November 2017.

18. Unbeknownst to investors and the market, however, the Company had "achieved" these results through an unsustainable fraudulent scheme. . . . [A]t the end of each fiscal quarter, Company executives instructed employees in the Company's distribution centers to load Company trucks with millions of pounds of flooring products that were not ordered for delivery to customers until the next quarter or quarters [(the "Saturday Scheme")].  Employees would load the trucks on Friday as if "delivery" would occur on Saturday, knowing full-well that there

would be no one to accept or reject the premature deliveries because the businesses were closed for deliveries on Saturdays.

19. Mohawk would nonetheless recognize the "sales" revenue as soon as the fake "delivery" attempt occurred, i.e., as soon as it was loaded on the Company's trucks.  This sales revenue recognition helped make reported sales for the current quarter appear much better than they actually were.  According to one former distribution center manager, who called the scheme the "biggest sham ever," over time the scheme became even more brazen, with many employees simply scanning the product as if it were being loaded on the truck without physically loading the product.  Employees would walk around scanning the product out on the Friday before the quarter-end and then scan it back in after the quarter closed.  Mohawk would then use these "sales" to boast to investors about its "record sales."

20. Several former employees explained that reports reflecting the results of this Saturday Scheme were sent directly to Mohawk's executive leadership team, including Defendant Lorberbaum and Brian Carson, the President of Flooring[, N.A.].  These reports showed huge end-of-quarter spikes in "sales" followed by huge returns in the beginning of the next quarter, making the scheme as plain as day.  Other reports compiled each quarter specifically showed how many orders were pushed out and the total amount of product shipped prematurely, particularly failed deliveries, on the last Saturday of the quarter.  These reports were sent to Mohawk's senior executives who would meet with Defendant Lorberbaum.

21. The Saturday Scheme was not the only tool Defendants used to deceptively burnish Mohawk's results.  The Company also had begun overproducing products in order to drive down per-unit costs and artificially boost "operating margins"—metrics on which investors were focused. For much of the Class Period, Brian Carson, the President of Flooring[, N.A.], bore ultimate responsibility for the profits and losses of the segment and provided the Company's headquarters with the financial information about Flooring[, N.A.] that was ultimately incorporated in Mohawk's public filings and other statements to investors.

22. Former employees confirmed that Mohawk was producing goods that it knew would not sell to artificially boost its margins.  One former member of the executive leadership team described it thusly: "For LVT and carpet, they would make 400,000 yard runs even if they only needed 100,000.  Then they would just put the extra 300,000 in inventory."  Continuing, he explained, "[t]hen you have the short-term benefit of your production cost going down, but you have a long-term problem because that inventory is going to bite you in the ass."  That is precisely what happened.

23. The former member of Mohawk's executive leadership team confronted Lorberbaum about Carson's various schemes in September 2018.  During an intense exchange with Lorberbaum, the former executive told him that "Carson is destroying your company and screwing with your finances." When the former executive went to Lorberbaum's office to continue the conversation, he found Carson already there.

24. After telling the former executive to sit down, Lorberbaum looked at the former executive and said "what is wrong with this f---ing idiot [Carson].  Every damn number he gives me is wrong, and he makes up bullsh-- every time I ask him."  Within a week, Lorberbaum launched an investigation into Carson's schemes and, when the investigation concluded, Carson was terminated.  Yet Lorberbaum spun his departure as a resignation to pursue other opportunities and continued to keep Carson's fraudulent schemes—which he unquestionably now knew about—hidden from investors.  Even more troubling, Lorberbaum allowed these schemes to continue unabated.

25. Meanwhile, as a result of Carson's schemes, the Company's reported inventories swelled and turnover slowed. Analysts took note, and questioned Defendants about those worrisome trends.  Defendants offered assorted explanations, from geographic expansion and new-product ramp-up, to rising raw material costs.  As Defendants knew, those explanations were misleading and omitted material facts.  In truth, inventory was building because of the Company's intentional overproduction to goose margins and the flood of unsalable LVT—caused by the rampant design flaws in the U.S. LVT Plant—that the Company refused to write down.

26. The truth about Mohawk's sales and worsening inventory problems began to come to light in July 2018, when the Company announced that it had missed its earnings guidance and analysts' consensus estimates for the second quarter of 2018 because of "lower sales than we anticipated." Defendants also admitted for the first time that far from being "capacity constrained," as previously represented, the Company's warehouses were so filled with excess inventory that it had been forced to slow production to try to allow demand to catch up, causing a significant decrease in its margins. Defendants also admitted that manufacturing problems had caused shutdowns, lower production rates, and new product inefficiencies.

27. Though Defendants took great pains to assure investors that this was a temporary blip that would soon pass, shocked investors reacted swiftly to this news, driving Mohawk's stock price down more than 18% and wiping out almost $3 billion in shareholder value in a single day. Unfortunately for investors, the problems were not temporary (as Defendants knew), and the news soon worsened.

28. The next quarter, the third quarter of 2018, saw Mohawk once again announce disappointing results and excess inventory. Defendants admitted that the Company had been forced to continue to cut back on production to address the mounting inventory levels and slowing turnover. In response, Mohawk's stock price plunged an additional 24%, erasing another $2.6 billion in shareholder value.

29. Analysts, too, were stunned by the news; their reaction was exemplified by a report entitled, *"Floored! Coverage Closed,"* which expressed that "[t]here is no getting around that Q3 was a disaster for Mohawk" and that "calling it a disaster is being kind." The same report exclaimed that analysts were "completely blindsided" by the news and wondered "what happens if they can't sell all of that inventory?"

30. Undaunted, Defendants continued to insist that the Company had put these "temporary" problems behind them and would return to producing the kind of results investors and analysts had come to expect. Among other things, Defendants assured investors that Mohawk's problems rightsizing the inventory were over and the Company would "be increasing the production rates to match sales going through the year." Defendants' assurances worked—at least temporarily. But

investors would soon learn that the Company's inventory was far from rightsized and its production problems far from over.

31. Investors finally learned the truth when, in July 2019, the Company announced terrible results for the second quarter of 2019. Mohawk admitted that it continued to have excess inventory issues that would require "taking actions" to "manage our inventory" and "improve sales." They also were forced to admit that the problems would persist and, consequently, lowered their forward-looking financial guidance to account for continued "excess inventories" and "reduced production." Mohawk's stock price sank an additional 18% on the news.

32. All totaled, the serial revelations of Defendants' fraud wiped out $7.4 billion in shareholder value.

See Am. Compl. ¶¶ 6–32.

As a result of these alleged events, Plaintiff initiated this action on January 3, 2020. See Compl. On June 29, 2020, Plaintiff submitted its "Consolidated Class Action Complaint for Violations of the Federal Securities Law." See Am. Compl. By its Amended Complaint, Plaintiff brings two (2) claims: Count I—Violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), alleged against both Defendants Mohawk and Lorberbaum; and Count II—Violations of Section 20(a) of the Exchange Act against Defendant Lorberbaum. See generally id.

On October 27, 2020, Defendants filed their "Motion to Dismiss Consolidated Class Action Complaint." [Doc. 54]. Plaintiff opposes Defendants' motion and

Defendants replied in support of dismissal.  [Doc. 56, 57].  Having been fully briefed, Defendants' motion to dismiss is now ripe for the Court's review.

## II.    Legal Standard

When considering a 12(b)(6) motion to dismiss, the Court must accept as true the allegations set forth in the complaint, drawing all reasonable inferences in the light most favorable to the plaintiff.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); U.S. v. Stricker, 524 F. App'x 500, 505 (11th Cir. 2013) (per curiam).  Even so, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient.  See Ashcroft v. Iqbal, 556 U.S 662, 678 (2009) (quoting Twombly, 550 U.S. at 555); accord Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282–83 (11th Cir. 2007).

Further, the complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 570).  Put differently, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  See id.  This so-called "plausibility standard" is not akin to a probability requirement; rather, the plaintiff must allege sufficient facts such that it is reasonable to expect that discovery will lead to evidence supporting the claim.  See id.

## III.   Discussion

Having set forth the overarching legal standard, the Court now turns to the substance of Defendants' motion to dismiss and Plaintiff's opposition thereto. [Docs. 54, 56, 57].  The Court begins with the Parties' arguments pertaining to Count I—Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (alleged against both Defendants) before turning to Count II—Violations of Section 20(a) of the Exchange Act (alleged against Defendant Lorberbaum).

### A.   Count I—Violations of Section 10(b) & Rule 10b-5

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security."  Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014).  As explained by the Eleventh Circuit:

> Section 10(b) makes it unlawful to
>
> > use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
>
> 15 U.S.C. § 78j(b).  Rule 10b–5, in turn, forbids
>
> > any person, directly or indirectly, . . .
> >
> > (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

See Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1236 (11th Cir. 2008).  Thus, to state a claim pursuant to Section 10(b) and Rule 10b–5, a plaintiff must sufficiently allege six (6) elements:

(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

See FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011) (internal quotation omitted).

The Eleventh Circuit has succinctly set out the standards governing Defendants' instant motion to dismiss as follows:

To survive a motion to dismiss, a claim brought under Rule 10b–5(b) must satisfy: (1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2) ("Rule 8(a)(2)"); (2) the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), and; (3) the additional pleading requirements in the Private

Securities Litigation Reform Act of 1995 ("PSLRA").[2]  See Phillips v. Scientific–Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004) (reviewing a Rule10b-5(b) claim for a company's alleged exaggeration of product demand); Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1197, 1202 (11th Cir. 2001) (reviewing a Rule 10b-5(b) claim for a company's alleged misrepresentation of its profits).

Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  The complaint must allege "enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level."  []Twombly, 550 U.S. [at] 555, 570 [] (2007).

In addition to the Rule 8(a)(2) requirements, Rule 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).  While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth: (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud. Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006); Ziemba, 256 F.3d at 1202.  The "[f]ailure to satisfy Rule 9(b) is a ground for dismissal of a complaint."  Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

The PSLRA imposes additional heightened pleading requirements for Rule 10b–5(b) actions.  For Rule 10b–5(b) claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is

---

[2] Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.).

made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). And for all private Rule 10b–5(b) actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." Id., § 78u–4(b)(2). Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute. Phillips, 374 F.3d at 1016–18. If these PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

See In re Galectin Therapeutics, Inc. Sec. Litig., 843 F.3d 1257, 1269–70 (11th Cir. 2016).

Finally, in assessing whether a complaint sufficiently states a claim for securities fraud, a court "may take judicial notice of the contents of relevant public documents filed with the [SEC] and may also consider undisputedly authentic evidence outside the pleadings on which the plaintiffs rely in their complaint." See City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Intern., Inc., 806 F. Supp. 2d 1267, 1290 (N.D. Ga. 2011) (internal citation omitted); Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999)).

By their instant motion, Defendants argue that Plaintiff's Count I should be dismissed because the Amended Complaint fails to adequately allege three (3) of the six (6) requisite elements pursuant to Section 10(b) and Rule 10b–5: (1) actionable misstatements or omissions, (2) scienter, and (3) loss causation. [See Doc. 54-1 at 10–33]. The Court addresses each issue in turn.

1.   <u>Actionable Misstatements or Omissions</u>

First, Defendants argue that Plaintiff fails to plead sufficiently particularized facts establishing that certain challenged statements or omissions were false or misleading when made, as required by Rule 9(b) and 15 U.S.C. § 78u-4(b)(1). [See Doc. 54-1 at 10–21]. A statement is misleading if, in the light of the facts that existed when the statement was made, a "reasonable investor, in the exercise of due care, would have been misled by it. Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." <u>See FindWhat</u>, 658 F.3d at 1305 (internal quotation omitted). "A duty to disclose may . . . be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises." <u>Rudolph v. Arthur Andersen & Co.</u>, 800 F.2d 1040, 1043 (11th Cir. 1986). Further, the Eleventh Circuit has explained that:

> Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not "so incomplete as to mislead." <u>Backman v. Polaroid Corp.</u>, 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (quoting <u>SEC v. Texas Gulf Sulphur Co.</u>, 401 F.2d 833, 862 (2d Cir. 1968); <u>accord Rudolph</u>, 800 F.2d at 1043 ("Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises."); <u>Lormand v. U.S. Unwired, Inc.</u>, 565 F.3d 228, 248

(5th Cir. 2009) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."). "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." In re K-tel Intern., Inc. Sec. Litig., 300 F.3d 881, 898 (8th Cir. 2002) (internal quotation marks and alteration omitted).

See FindWhat, 658 F.3d at 1305.  Put differently, "a defendant may not deal in half-truths."  See id. (internal quotation omitted).

As stated in the Amended Complaint, Plaintiff claims Defendants made multiple material misleading statements and omissions, specifically in regards to Mohawk's allegedly ill-founded financial reporting, the Saturday Scheme, the quality of its LVT products, its widespread overproduction, and its ever-slowing rate of inventory turnover during the Class Period.  See generally Am. Compl. Throughout the Amended Complaint, Plaintiff relies heavily on confidential witnesses (former employees of Mohawk, or "FEs," as the Parties refer to them) to show that Defendants' statements and omissions were false or misleading.  See generally id.  Defendants claim Plaintiff fails to proffer a sufficient foundation for the allegations of these FEs.  Thus, the Court pauses here to discuss whether it may consider the information Plaintiff proffers in the Amended Complaint from its confidential witnesses.

As a general principle, a securities fraud complaint need not name a confidential source.  See Mizzaro, 544 F.3d at 1239.  But the complaint must

"unambiguously provide[] in a cognizable and detailed way the basis of the whistleblower's knowledge." See id. at 1239–40.  The complaint should describe "the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." See id. at 1240.  "In other words, the Court must be able to determine whether the [confidential witness] has reliable first-hand knowledge or whether his statements are based on unreliable hearsay or gossip." Pontiac, 806 F. Supp. 2d at 1297 (citing Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009)).

Upon review of the Amended Complaint here, the Court finds these standards are met with regards to the fourteen (14) confidential witnesses Plaintiff provides.[3] See, e.g., Am. Compl. at ¶¶ 44–45, 111–122, 124–130, 136, 139–40, 142–44, 146–49, 163–67, 169, 171–78, 182, 190, 202, 207.  Accordingly, the Court does not disregard the allegations of these witnesses and will refer to them as Plaintiff has

---

[3] Although Defendants attempt to compare the confidential witnesses' allegations to the allegations this district rejected in Pontiac, the Court finds any such comparison is plainly inapposite.  [See Doc. 57 at 12].  In Pontiac, Chief Judge Batten of this district found that the statements of a single former employee of the defendant were insufficient to support the plaintiffs' allegations where the former employee was "not privy to the specifics of the" underlying controversy and "some of his statements are based on nothing more than 'talk among [other] employees,' 'talk around the mill,' and vague beliefs and impressions." See 806 F. Supp. 2d at 1297.  Here, the Amended Complaint sets forth in detail the roles, supervisors, relevant timeframes, and firsthand experiences of the fourteen (14) confidential witnesses, who are all former employees of Mohawk.  See, e.g., Am. Compl. ¶¶ 44–45, 111–122, 124–130, 136, 139–40, 142–44, 146–49, 163–67, 169, 171–78, 182, 190, 202, 207.

done in its Amended Complaint, i.e., FE1, FE2, FE14, and so forth.  See generally Am. Compl.

Having dispensed with this preliminary matter, the Court will now examine Defendants' challenges to the alleged misleading representations and omissions as asserted in the Amended Complaint.  Defendants challenge the sufficiency of Plaintiff's allegations regarding misrepresentations and omissions on three (3) grounds, arguing that: (1) Plaintiff fails to adequately allege that Mohawk's historical financial statements were false or misleading, or fails to allege such statements were material; (2) Plaintiff fails to plead allegations regarding the purported Saturday Scheme with particularity; and (3) certain statements by Defendant Lorberbaum are not actionable.  [See Docs. 54-1 at 10–21; 57 at 3–9]. The Court addresses each topic below.

### a.   Historical Statements

First, Defendants argue that Plaintiff fails to allege that Mohawk's historical financial statements were false or misleading, or, in the alternative, fails to allege that Mohawk's statements or omissions were material.  [See Doc. 54-1 at 11–13; 57 at 7].  In response, Plaintiff maintains that Defendants misled investors about the reasons for its "record-breaking quarterly margins during the Class Period[,]" failed "to disclose all material facts on the subject," and misled investors about the reasons for Mohawk's "rising inventory and slowing turnover[.]"  [See Doc. 56 at 14–16].

As noted above, to state a claim for securities fraud, Plaintiff bears the burden to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." See 15 U.S.C. § 78u-4(1)(b).

Plaintiff alleges that the following statements and omissions made during the Class Period in regards to Mohawk's historical (financial) statements were misleading.[4]

80. Throughout the Class Period, Mohawk's investors closely tracked the Company's reported "margins," which are important measures of how efficiently the Company is managing its core business. Companies with higher margins than their competitors generally are more attractive and less risky to investors than companies with lower margins because more of their sales revenue drops to the bottom line. Thus, for companies with higher margins, there is more room for error if sales decline and greater upside when sales increase.

82. Defendants further impressed upon analysts and investors that these Company-wide margin improvements were driven by legitimate business practices and products sold under the Flooring[, N.A.] segment[, a division of Mohawk]. For example, on April 28, 2017, Lorberbaum stated that "[t]he continued improvement of our LVT manufacturing process is increasing our capacity and margins." On the same call, when asked "what role carpet played in the margin in the quarter," Lorberbaum said, "it would be hard to drive the margins up dramatically . . . and leave out such a large part of our business." Again, on October 27, 2017, Lorberbaum represented to investors that "[o]ur new product introductions improved our average selling prices and margins, and our process innovations and investments in manufacturing technology improved our cost."

---

[4] Where appropriate, the Court has placed the statements in their original context.

<u>See</u> Am. Compl. ¶¶ 80, 82.   According to Plaintiff, the above statements were

misleading because "[u]nknown to investors, [] Mohawk and its Flooring[, N.A.]

segment achieved their supposed record margins by intentionally over-producing

products to artificially inflate margins and refusing to write off huge volumes of

scrap LVT that was coded not to be sold to customers."  <u>See id.</u> ¶ 84.   Further,

Plaintiff alleges:

> 85. Throughout the Class Period, Mohawk assured investors that it
> achieved its "record sales" and "record margins" through legitimate,
> proper means.  Defendants continuously touted that they were "doing
> the right things to make the business grow" and that they were using
> "the same strategy [they had] been using" to provide results over the
> previous 5 years.  For the full year of 2017, Lorberbaum attributed their
> record results to "the unique strategy that combined the best features of
> a large, well-run public company, a private acquisition firm and a
> venture capital group."
>
> 86. Defendant Lorberbaum doubled down on these assurances during
> the Class Period, stating during Mohawk's earning call for the third
> quarter of 2017 that Mohawk's success had been, and would continue
> to be, reliable and sustainable.   Looking into 2018, Lorberbaum
> reminded investors that Mohawk, and specifically he and his executive
> team, had "a long history of outperforming the market," with a "growth
> rate for sales of 9%."   He reiterated that Mohawk's "strong
> management and balance sheet" would ensure that Mohawk would
> continue to grow and outperform the market.
>
> 87. Defendants buttressed these statements with repeated, specific
> representations that traditional business acumen drove Mohawk's
> continuous revenue growth and margin improvement in its Flooring[,
> N.A.] segment.  In each quarterly report filed with the SEC, Defendants
> told the market that Mohawk's increase in net sales in [its] Flooring[,
> N.A.] segment was primarily attributable to "higher sales volume" and
> "the favorable net impact of price and product mix," leading investors

to believe that Mohawk achieved its financial success through Defendants' mastery of selling more of the right products at the right price—and certainly not through a fraudulent scheme designed to meet analysts' consensus forecasts.

96. At the same time Mohawk was telling investors that it was selling everything it was producing, and that capacity constraints were preventing it from meeting additional untapped demand, its inventory was increasing and the time that the inventory sat before being sold—i.e., the "turnover"—lengthened.   Analysts began to ask why the Company was reporting increasing inventories and slowing inventory turnover, while at the same time reporting "record sales" and telling the market that it was selling everything it had produced.   Instead of disclosing the truth, Defendants made several false and misleading statements to minimize concerns.

100. When questioned about these worrisome trends during the Class Period, Defendants concealed the truth.   They repeatedly offered various justifications, sometimes blaming rising "raw material costs," while at other times claiming inventory was growing to support "geographic expansion."   In the first quarter of 2017, for example, Mohawk assured investors that the rise in inventory and increase in [days its products sat in inventory, or "Days In Inventory"] was the result of "geographic expansion and product growth."

101. In the second quarter of 2017, following another marked increase in inventory and [Days In Inventory], Defendants similarly blamed "raw material inflation and more sourced product needed to support our LVT, ceramic and countertop businesses."   And when a Roe Equity Research analyst specifically questioned what was driving Mohawk's "inventory growth in the [second] quarter [of 2017]," Lorberbaum pointed to "chasing demand," "material costs" that "flow[] into inventory," and the "U.S. economy."

261. [] Defendants misleadingly told investors that Mohawk's rising inventory and increasing days-in-inventory were attributable to factors like inflation and geographic expansion, without disclosing that its inventory was rising and turnover slowing because (i) Mohawk's warehouses were filled with its domestically produced "scrap" LVT that was coded not to be sold (see ¶¶ 164–68); (ii) approximately 50%

of Mohawk's U.S.-made LVT was unsalable scrap (see ¶¶ 164–68; 172; 176); (iii) 80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT until Mohawk's entire Builder and Multifamily division refused to sell it (see ¶[¶] 184; 197–200); (iv) retailers were returning 25-50% of Mohawk LVT because of product defects (see ¶¶ 186–87); (v) Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating (see ¶¶ 185–87); (vi) the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China (see ¶ 184) (vii) Mohawk's President of Flooring[, N.A.], Brian Carson, ordered the Company's production facilities to perform unnecessarily long production runs to lower the per-unit cost of production and increase margins, even though there was insufficient demand for the finished products (see ¶¶ 205–17); and (vii) Mohawk was producing excess carpet knowing that there was insufficient demand for it, which resulted in 30% of the carpet in the existing warehouses sitting in inventory for longer than a year and developing defects that rendered them unsalable (see ¶¶ 205–09).

263. [] Defendants misleadingly reported record quarterly margins and attributed them to specific, legitimate factors, without disclosing that, in reality, Mohawk achieved those margins through intentional overproduction of goods for the specific purpose of artificially lowering the per unit cost of production to drive up margins and refusal to write off huge volumes of scrap LVT that was coded not to be sold to customers. See ¶¶164–68; 205–17.

See Am. Compl. ¶¶ 85–87, 96, 100–01, 261, 263.

In their motion to dismiss, Defendants argue that Plaintiff fails to allege "*why* the omission of the alleged schemes made [these] statements misleading." [See Doc. 54-1 at 11] (emphasis in original).  The Court disagrees.  Plaintiff alleges that Defendants misled investors and analysts by misattributing Mohawk's positive developments—such as its improving (or "record-breaking") margins, revenues, and

product pricing—to legitimate business practices.  See, e.g., Am. Compl. ¶¶ 82, 85, 87, 263.  Plaintiff claims such statements were misleading because they omitted the true reasons underlying these seemingly positive numbers, including "intentional overproduction of goods . . . artificially lowering the per unit cost of production to drive up margins" and "refusal to write off huge volumes of scrap LVT that was coded not to be sold to customers."  See id. ¶ 263; see also id. ¶¶ 84, 96, 261 (explaining why Defendants' statements were misleading considering the alleged schemes).

Additionally, Plaintiff alleges that Defendants similarly misrepresented the true reasons underlying any seemingly negative developments—including Mohawk's rising levels of inventory and slowing rate of turnover—by misattributing these developments to reasons such as raw material costs, inflation, the U.S. economy, and geographic expansion.  See id. ¶¶ 96, 100–01, 261.  According to Plaintiff, these statements were misleading because they omitted the real reasons underlying Mohawk's rising inventory and slowing turnover, including intentional overproduction in the face of insufficient demand and the high rates of defects in Mohawk's LVT.  See id. ¶ 263 (explaining why these representations were misleading considering the alleged schemes).

As provided above, a statement is misleading if, in the light of the facts that existed when the statement was made, a "reasonable investor, in the exercise of due

care, would have been misled by it." See FindWhat, 658 F.3d at 1305 (internal

quotation omitted).   Thus, viewing the Amended Complaint in the light most

favorable to Plaintiff, the Court finds that Plaintiff has alleged the statements and

omissions set forth in Paragraphs 82, 85, 87, 100, 101, 261, and 263 were false or

misleading with sufficient particularity to withstand dismissal at this time.[5]  See Am.

Compl. ¶¶ 82, 85, 87, 100–01, 261, 263.

Further, the Court is not persuaded by Defendants' alternative argument

regarding materiality.  [See Doc. 54-1 at 12].  Defendants assert that the Amended

Complaint "fails to allege the purportedly inflated revenues and margins were

material in terms of the Company's overall reported financials."  [See id.]  However,

it is well-established that a complaint alleging securities fraud may not be properly

dismissed on the ground that the supposed misstatements or omissions are not

material unless they "are so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance."  See Carvelli

v. Ocwen Fin. Corp., 934 F.3d 1307, 1320 (11th Cir. 2019) (internal citation

omitted); see also IBEW Loc. Union No. 58 Pension Tr. Fund and Annuity Fund v.

Royal Bank of Scotland Group, PLC, 783 F.3d 383, 390 (2d Cir. 2015) (same);

---

[5] The Court notes that Plaintiff's allegations regarding the falsity or misleading nature of Defendants' representations and omissions about the Company's financial statements appear throughout the Amended Complaint.  See generally Am. Compl.  For the sake of simplicity, having thoroughly reviewed the entire Amended Complaint, the Court has selected the above-cited Paragraphs as the most concise or complete recitations of such allegations.  See id. ¶¶ 82, 85, 87, 100–01, 261, 263.

Bellocco v. Curd, 802CV1141T27TBM, 2005 WL 2675022, at *3 (M.D. Fla. Oct. 20, 2005) ("materiality is not typically resolved at the motion to dismiss stage [] unless the misrepresentations are so obviously unimportant to an investor that reasonable minds cannot differ") (internal quotation omitted).  Here, the Court finds Plaintiff's Amended Complaint alleges that the inflated revenues and margins to be material to a reasonable investor because:

> 83. Analysts took note of Mohawk's rising margins . . . . For example, a Credit Suisse analyst pointed out during an investor call on July 28, 2017 that ". . . margins have really improved nicely as we've moved through the year."  Looking back at all of 2017, a J.P. Morgan Chase analyst noted that . . . Mohawk "continue[d] to do fantastic there in terms of year-over-year margin improvement with the fourth quarter again up strongly year-over-year and a lot of that driven by productivity." Analysts for Wells Fargo similarly noted on July 27, 2017 that "[i]t's really the margin performance that piques our interest," singling out the "solid incremental operating margins []" . . . which were up 24%.  Analysts for Wells Fargo also noted at the close of 2017 that "[Mohawk's] adjusted [earnings per share] beat expectations as [one of Mohawk's divisions] continued its unprecedented margin performance."

> 88. Defendants' Class Period assurances had their desired effect, as analysts continued to recommend the stock to investors and praise the Company's management.  Barclays, for example, called Mohawk a "Top Pick" on April 28, 2017, opining that there was "a sturdy floor under the stock" and maintaining its rating of Overweight due to the promised "sustainable productivity gains."  Analysts for Evercore ISI likewise reiterated that Mohawk was a top pick, writing on April 30, 2017, that "[w]ithin the quarter, [Mohawk's] fundamentals remain sound" and "[Mohawk] remains our Top Pick as key elements of the story remain intact for the remainder of the year, including accelerating [year-over-year] sales growth over the next three quarters."  By this point, Mohawk's stock price had risen to $235—a 22% increase in just twelve months.

105. Analysts accepted Defendants' assurances that rising inventory levels were not a concern.  For example, analysts from Evercore ISI, in their April 30, 2017 report, repeated Mohawk's claim that "inventory issues" were "temporary" and reiterated an "outperform" rating for Mohawk's stock, accepting Mohawk management's "bottom line" representations that Mohawk was "fundamental[ly] strong and [its] story remains intact."   Likewise, after Defendants claimed that inventories rose in the second quarter of 2017 because "more sourced product [was] needed to support our LVT, ceramic and countertop businesses," analysts from Wells Fargo accepted Defendants' assurances that the rising inventories were actually helpful, stating in their July 28, 2017 report that Mohawk had "built inventory back up today" after North America[n] "capacity constraints."

106. Unfortunately for investors, as discussed further below (see ¶¶ 157–217), Defendants' explanations for its rising inventories and increasing [Days In Inventory] were false, misleading, and omitted material facts.  In truth, inventories and [Days In Inventory] were continuing to rise because Mohawk was overproducing product beyond customer demand in order to falsely increase margins and was drowning in unsalable carpet and scrap-rate LVT that the Company improperly refused to write off.

164. FE1 reported that instead of marking unsalable LVT as "scrap," which would have required the Company to take charges to its cost of sales and thereby decrease its margins, Carson decided to mark the unsalable LVT as "first quality" and keep it in inventory, but scan a code over it to denote to Mohawk employees that it should not be released to customers.  FE1 explained that Carson and his immediate report, Gary Lanser, Chief Operating Officer of Flooring[, N.A.], began this practice in April 2017.  FE1 explained, "They put it all in inventory which is what caused [Mohawk's inventory numbers] to swell because they wouldn't release it for sale."

167. The magnitude of these falsely marked products was enormous. FE1 explained that in 2017 through the end of 2018, "[f]ifty percent of what they were making was scrap."   He continued, stating that Mohawk's "stock should've been $130 per share, not the $285 it was. This was a big cause of that."  FE1 reported that Mohawk siloed into

warehouses the unsalable, off-quality scrap LVT falsely carried as "first quality."   FE1 explained that he physically went to warehouses Mohawk had to rent to store all of this off-quality LVT product.  FE1 explained that Mohawk rented these warehouses for the sole purpose of storing the unsalable LVT, recounting, "We were renting warehouses to stick it in.  We had LVT all over."

205. At the same time Mohawk's warehouses were filled with unsalable "scrap" LVT, the Company was also intentionally overproducing multiple products, including LVT and carpet, that would end up sitting in its warehouses and on its balance sheet.  Carson ordered Mohawk's manufacturing plants to ramp up production to levels divorced from demand for the Company's products in an effort to drive per-unit costs down and thereby artificially increase the Company's margins, metrics on which analysts were keenly focused.

213. FE7 explained that, in April 2017, there were no constraints on LVT capacity and the amount of LVT in the stockpile was growing. FE7 further explained that it would be inaccurate for Mohawk to state in July 2017 that the Company was capacity constrained in their ability to sell LVT.   FE7 further explained that Defendant Lorberbaum's statement on October 26, 2017 that the Company had capacity "constraints in laminate, LVT and some of our residential carpet" was inaccurate.  As FE7 noted, Mohawk's inventory problem—i.e., having too much inventory—kept getting worse throughout 2017.

214. FE1 explained that the Company's overproduction—even of unsalable scrap—provided the short-term benefit of lowering per-unit manufacturing costs and boosting margins in the current quarter but led to excessive inventory in the long term.  As FE1 described it, "you have the short-term benefit of your production cost going down, but you have a long-term problem because that inventory is going to bite you in the ass."

217. When asked if other people on the [executive leadership team (or "ELT")] recognized that Carson was doing improper things, FE1 explained that all the members did (with the exception of Lanser, who was involved in the improper schemes).  He explained, "We all knew they were cooking the books. This wasn't just risky decisions.  We knew what he was doing . . . . [B]ut it kept going on and on, the stock

kept going up and up, and then it all fell apart.  We just lied about the numbers and the stock went up."

235. FE8 also reported that Mohawk continued overproduction on the LVT side of the business [even] after Carson was fired [in 2018].  He summarized that he and his fellow distribution managers joked, "You could print money by making inventory.  Why would you stop producing product if it could just sit in inventory and prop up your balance sheet and make up for sales?  Even if the quality was awful, they were never going to stop it."

236. And that is exactly why Lorberbaum and Mohawk continued these schemes and continued to conceal from investors (for as long as they could) the true reasons that inventories were continuing to swell while turnover continued to slow in the face of Mohawk's purported record sales and professed ability to sell everything it produced.

See Am. Compl. ¶¶ 83, 88, 105–06, 164, 167, 205, 213–14, 217, 235–36 (emphasis omitted).  Therefore, the Court does not find that Plaintiff's above allegations regarding materiality are so "obviously unimportant to a reasonable investor" that they warrant dismissal.  See Carvelli, 934 F.3d at 1320.

Next, the Court rejects Defendants' argument that the Amended Complaint "still fails to allege that the Company's statements were material because it lacks allegations as to the amount of the supposed misstated revenues and inflated margins."  [See Doc. 57 at 7] (citing Gavish v. Revlon, Inc., 00 CIV. 7291 (SHS), 2004 WL 2210269, at *18 (S.D.N.Y. Sept. 30, 2004)).  In Gavish, the district court considered whether the plaintiffs had alleged "with particularity facts sufficient to support a reasonable belief" that defendant Revlon was "exacerbating [an] imbalance by selling more inventory to retailers than retailers were selling to

28

consumers and then making misstatements or failing to disclose information about that practice." <u>See</u> 2004 WL 2210269, at *17.  The court held that, although the complaint alleged retailers "found themselves carrying substantially more [Revlon] inventory" than they could sell, plaintiffs failed to adequately allege the purported scheme by Revlon because their complaint failed to address Revlon's quarterly sales reports for the class period or "any measure of sell-through" to consumers at all. <u>See</u> <u>id.</u> at *17–18.

In contrast, Plaintiff here proffers facts to support the extent of the impact of Defendants' purported schemes regarding the inflated margins, inventory increases, and overproduction.  <u>See, e.g.</u>, Am. Compl. ¶¶ 98–99 (setting forth Mohawk's reported inventories for each quarter of the Class Period and the increase in the Days In Inventory metric, which represented slowing turnover); ¶ 167 (price of Mohawk stock was allegedly over twice the price it should have been); ¶ 211 (from 2018–2019, Mohawk rented and filled two (2) warehouses with a combined capacity of over 250,000 square feet with "scrap LVT"); ¶¶ 237–57 (detailing the sequence of alleged events as the "truth" of Defendants' schemes emerged and the corresponding drops in Mohawk stock prices that ultimately resulted in $7.4 billion in market value losses for investors).  Further, the law does not require Plaintiff to disaggregate the financial impact of Defendants' alleged schemes to state its claim with the requisite particularity at this stage.  <u>See</u> <u>In re Faro Techs. Securities Litig.</u>, 534 F. Supp. 2d

1248, 1259 (M.D. Fla. 2007) (where plaintiffs claimed defendants "materially overstated the [c]ompany's profits" during the relevant time period but did not allege a specific amount, the court "reject[ed] [the] argument . . . that a plaintiff may not sue for misrepresentation absent allegations that quantify the falsity to the penny."). "While an accurate accounting would no doubt be ideal, such is simply not required (and often simply not available) at the pleading stage." See id.

Next, Defendants contend that the Amended Complaint fails to "specifically allege that the Company's failure to disclose the purported schemes rendered Mohawk's financial results inaccurate, and, accordingly, fails to allege Mohawk had a duty to make further affirmative disclosures about those alleged practices." [See Doc. 54-1 at 14].   In response, Plaintiff argues that because Defendants "misleadingly touted their record margins [to investors], including the margins' supposed sources," Defendants "were obligated—but failed—to disclose all material facts on the subject." [See Doc. 56 at 14].  "The Eleventh Circuit has held that 'a duty to disclose all material information relating to a particular subject arises by voluntarily touting the subject to investors.'" In re Flowers Foods, Inc. Securities Litig., 7:16-CV-222 (WLS), 2018 WL 1558558, at *9 (M.D. Ga. Mar. 23, 2018) (quoting FindWhat, 658 F.3d at 1298).  When the failure to disclose facts could mislead a reasonable investor, a company's "duty to disclose is triggered." See id. (citing FindWhat, 658 F.3d at 1299).  For the reasons set forth above, the Court finds

that Plaintiff alleges sufficiently that Defendants' duty to disclose all material information was triggered when they "voluntarily touted" Mohawk's record-breaking financial results.  See id.; see also Carvelli, 934 F.3d at 1320.

Finally, Defendants attempt to characterize their assurances to investors from early 2017 that "raw material costs" or "geographic expansion" caused Mohawk's rising inventory levels and increasing turnover time as a "disclosure of negative information" which "contradicts the [Amended Complaint's] theory" of fraud.  [See Doc. 54-1 at 12 n.10] (citing In re KLX, Inc. Sec. Litig., 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017)).  As Plaintiff argues in its response, "[i]nventory metrics themselves can be positive or negative, depending on what is driving those numbers. Here, Defendants identified only benign and positive drivers, such as 'geographic expansion,' thereby hiding the rampant problems and nefarious schemes that actually drove rising inventory.  Thus, Defendants' citation to a truly honest disclosure of 'negative information' in [KLX] does not support them."  [See Doc. 56 at 16–17].  Upon review, the Court agrees with Plaintiff.  In KLX, plaintiffs alleged that the defendants did not disclose the impact of economic downturn in the oil and gas industry on the subject company and omitted negative facts to present "a false impression about how the [c]ompany was faring."  See 232 F. Supp. 3d at 1276. However, the district court found that plaintiffs failed to state a claim because the defendant company consistently disclosed that it was being negatively impacted by

market downturn throughout the class period.  See id.  Because the instant facts are readily distinguishable from those in KLX and viewing the above allegation in the light most favorable to Plaintiff, the Court finds Plaintiff sets forth actionable misrepresentations or omissions sufficient to survive dismissal.  See Am. Compl. ¶ 100; see also Carlton v. Cannon, 184 F. Supp. 3d 428, 472 (S.D. Tex. 2016) ("downplay[ing] the extent and duration of the [] problems" gave a false impression of "a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul").

### b.   The Saturday Scheme

Second, Defendants contend that the Amended Complaint fails to plead actionable omissions regarding the purported "Saturday Scheme" with the requisite particularity.  [See Docs. 54-1 at 14–19; 57 at 4–6].  The Court disagrees.

In the Amended Complaint, Plaintiff alleges that during the Class Period, on the last Saturday of every quarter, Mohawk and its executives directed all the Company's U.S. distribution centers "to load their trucks with all items ordered by customers at any time—even though the agreed-upon delivery dates were in future quarters."  See Am. Compl. ¶ 109.  Once the trucks were loaded with future orders, Mohawk purportedly "auto-generate[d] invoices for customers' accounts and recognize[d] a 'sale' in the current quarter, even though delivery of the product was not completed."  See id.  According to Plaintiff, "Mohawk chose the last Saturday

32

of each quarter to make these purported 'deliveries' [] because customers were not open to reject the unwanted delivery on Saturdays." See id. ¶ 110. "The distribution centers would then just bring the product back and scan it back into the warehouse as a return in the new quarter[,]" thus, the product loaded on the last Saturday of every quarter never actually changed hands to the customer. See id. ¶¶ 112–14. "FE5 explained that the sales from the products placed on the truck were recognized on the Company's books as soon as the Company's trailers were pulled away from the loading dock and placed into the Company's empty parking lot." See id. ¶ 119. "Eventually, many employees stopped even pretending to deliver the products and simply scanned them as having been delivered and recorded the 'sales' without the products ever leaving the Company's warehouses." See id. ¶ 2.

As a supposed result, Mohawk was able to "recognize these failed 'delivery attempts' as 'sales' dollars in the current quarter even though the product never changed hands to a customer, in violation of generally accepted accounting principles ('GAAP') and Mohawk's revenue-recognition policies."[6] See id. ¶ 110. Although "all the distribution centers across the country were engaged in the quarter-end scheme[,]" the distribution center which FE3 managed supposedly "invoiced

---

[6] The Court observes that "violations of the GAAP may constitute false or misleading statements of material fact in violation of Rule 10b–5." See In re Sci.-Atlanta, Inc. Securities Litig., 239 F. Supp. 2d 1351, 1363 (N.D. Ga. 2002), aff'd sub nom. Phillips, 374 F.3d 1015. Moreover, this district has recognized that statements or omissions regarding improper revenue recognition and GAAP violations are material because they would be "important to a reasonable investor." See id. at 1361.

sixty to eighty orders on the last Saturday of each quarter." See id. ¶ 115.  Further, Plaintiff claims this Saturday Scheme was "heavily enforced" by Mohawk's top executives and that the purpose "was to artificially increase revenue" for the current quarter "to show investors" that "[Mohawk's] sales numbers were higher or better than they really were because [Mohawk] knew [its] sales were down." See id. ¶¶ 121–22.

Taking the allegations of the Amended Complaint as true, every customer of Mohawk's Flooring, N.A. division was subject to the supposed Saturday Scheme, the scheme involved every product Mohawk produced, and it involved four (4) to five (5) million pounds of product every quarter.[7] See id. ¶¶ 120–21, 131, 133–35, 148.  Additionally, Plaintiff provides detailed claims of how improperly recognizing the "sales" from the Saturday Scheme violated Mohawk's internal accounting policies, ethics policies, and GAAP. See id. ¶¶ 138–56.  Lastly, Plaintiff emphasizes that Mohawk's own executives "confirmed the Saturday Scheme's materiality by making it the focus of national conference calls and executive reports," because the "phony sales enabled Mohawk to meet analysts' quarterly consensus expectations, often by just one-fifth of one percent." [See Doc. 56 at 20] (citing Am. Compl. ¶¶ 76, 110, 123–30, 138–50) (emphasis and internal punctuation omitted); see also Am.

---

[7] According to the Amended Complaint, the only quarters of the Class Period during which Mohawk did *not* engage in the Saturday Scheme were the second and third quarters of 2018, and in those quarters, "the Company fell substantially short of the market's consensus expectations." See Am. Compl. ¶¶ 135–36.

Compl. ¶¶ 145, 367 (alleging that the senior executives of Mohawk, including Defendant Lorberbaum, received "reports each Saturday at the end of every quarter"—twice a day during 2019—"detailing how many orders were sent out and the total volume of product unsuccessfully 'shipped' prematurely").

Notwithstanding the above, Defendants maintain that "the 'crucial element missing' from [Plaintiff's] Saturday Scheme allegations 'is any indication of the amount of revenue that was improperly recognized.'"[8] [See Doc. 54-1 at 19] (citing In re Coca-Cola Enterprises Inc. Securities Litig., 510 F. Supp. 2d 1187, 1198–99 (N.D. Ga. 2007)).  However, so long as the complaint alleges "particular instances of accounting irregularities" in relation to the purported GAAP violations, "the complaint need not specify the exact dollar amount of each accounting error."  See In re Premiere Techs. Inc., 1:98-CV-1804-JOF, 2000 WL 33231639, at *17 (N.D. Ga. Dec. 8, 2000) (internal punctuation omitted).  "It is not fatal to the complaint that it does not describe in detail each single specific transaction in which Defendant transgressed, by customer, amount, and precise method."[9] In re World Access, Inc.

---

[8] Defendants also assert that Plaintiff cannot meet the heightened pleading standards of the PSLRA with allegations proffered by certain of the fourteen (14) FEs, but the Court has already addressed and rejected this argument above.  [See Docs. 54-1 at 15– 16; 57 at 4–5].

[9] The Court notes that the only case Defendants cite in support of their argument to the contrary involved circumstances where plaintiffs failed to even plead whether the alleged improper practices were "widespread or anecdotal, whether they involved hundreds rather than millions of dollars['] worth of product, or how the alleged [improper] transactions at the end of the quarters differed from sales made at other times during the quarter."  See In re Coca-Cola, 510 F. Supp. 2d at 1199.  Based on the allegations the Court set forth above from the Amended Complaint, the Court finds that Plaintiff makes more detailed claims than those presented by the deficient pleading from In re Coca-Cola.  See id.; see also Am. Compl. ¶¶ 109–56.

Securities Litig., 119 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000); see also Faro Techs.,

534 F. Supp. 2d at 1260 (rejecting the defendants' argument that the plaintiff never

alleged the amount by which selling expenses were misrepresented and declining to

require that the plaintiff "quantify the falsity to the penny").  Rather, for the purposes

of the heightened pleading standards of Rule 9(b) and the PSLRA, "allegations of

specific problems undermining" Defendants' representations "coupled with

allegations of dissemination of materially false statements [or omissions] are

sufficient."  See id.; see also 17 C.F.R. § 210.4-01(a)(1) (stating that financial

statements filed with SEC and not prepared in conformity with GAAP are presumed

to be misleading or inaccurate).

        In the matter at bar, Plaintiff alleges that specific violations of GAAP and

improper recognition of revenue occurred during all but two (2) quarters of the Class

Period.  See Am. Compl. ¶ 136.  Plaintiff also alleges in detail the means by which

the Saturday Scheme was purportedly implemented, enforced, and concealed.  See

id. ¶¶ 2–3, 109–56, 367.  These allegations are sufficient to state a claim at this

juncture.  See Sci.-Atlanta, 239 F. Supp. 2d at 1363 (where defendants' alleged

"violations of the GAAP distorted the financial information available to the public,"

such "allegations are sufficient to state a claim" so long as defendants "were aware

of the revenue recognition error"); In re Theragenics Corp. Secs. Litig., 137 F. Supp.

2d 1339, 1346–47 (N.D. Ga. 2001) (finding that the plaintiffs need not state the exact

number of medical professionals who provided information to them or the sales volume that could be attributed to them and instead it was sufficient that the plaintiffs provided the sources for their information and belief and additional information could be obtained through discovery); Gross v. Medaphis Corp., 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (finding allegations that defendants improperly recognized income that they knew should not be recognized under GAAP sufficient to plead both fraud and scienter).

Thus, viewing the Amended Complaint's allegations in the light most favorable to Plaintiff, the Court finds that Plaintiff has pleaded its claim regarding the Saturday Scheme with sufficient particularity to meet the standards of Rule 9(b) and 15 U.S.C. § 78u-4(b)(1) and withstand dismissal at this time.  See Am. Compl. ¶¶ 2–3,109–56; see also FED. R. CIV. P. 9(b); 15 U.S.C. § 78u-4(b)(1); Sci.-Atlanta, 239 F. Supp. 2d at 1365 ("Considering the amount of detail provided, [p]laintiffs should be allowed to pursue discovery in an attempt to further develop the claims asserted.").

### c.   *Actionable Statements by Defendant Lorberbaum*

Third, Defendants contend that at least two (2) statements by Defendant Lorberbaum identified in Amended Complaint are not actionable.  [See Docs. 54-1 at 19–21; 57 at 8–9].  Specifically, Defendants challenge the following statements:

- On April 28, 2017, Defendant Lorberbaum stated to investors that "with their superior design and performance, our flexible, rigid and

commercial LVT collections are being well accepted across all channels[.]" <u>See</u> Am. Compl. ¶¶ 94, 195.

- Defendant Lorberbaum told an analyst during a Third Quarter 2017 Investor Call that Mohawk was "selling all of [the] [LVT] [it] could[.]" <u>See</u> <u>id.</u> ¶ 297.

[<u>See</u> Docs. 54-1 at 19–21; 57 at 8–9].

Defendants contend that the first statement above amounts to no more than "corporate puffery" and thus, is not actionable pursuant to Section 10(b). [<u>See</u> Docs. 54-1 at 19–20; 57 at 8–9]. A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the "total mix" of facts available. <u>See</u> <u>Sci.-Atlanta</u>, 239 F. Supp. 2d at 1360. The Court finds that the first half of the statement from Paragraph 94, that Mohawk's LVT collections possessed "superior design and performance[,]" is nonactionable puffery because it is vague and not subject to any sort of objective verification or clear definition. <u>See</u> <u>IBEW Loc. 595 Pension and Money Purchase Pension Plans v. ADT Corp.</u>, 660 F. App'x 850, 857 (11th Cir. 2016) (describing a stock repurchase plan as "thoughtful," "effective," and "optimal" was nonactionable corporate puffery); <u>Next Century Commc'ns Corp. v. Ellis</u>, 318 F.3d 1023, 1029 (11th Cir. 2003) (characterizing a comment regarding "strong performance" as nonactionable mere puffery); <u>Oregon Pub. Emps. Ret. Fund v. Apollo Group Inc.</u>, 774 F.3d 598, 606 (9th Cir. 2014) ("Statements by a company that are capable of objective verification are not 'puffery' and can constitute material

38

misrepresentations."); <u>Amalgamated Bank v. Coca-Cola Co.</u>, CIV.A. 1:05-CV-1226-, 2006 WL 2818973, at *3 (N.D. Ga. Sept. 29, 2006), <u>aff'd sub nom.</u> <u>Selbst v. Coca-Cola Co.</u>, 262 F. App'x 177 (11th Cir. 2008) ("alleged fraud must be based upon a statement capable of 'empirical verification' and not a statement of 'opinion or expectation'") (quoting <u>Next Century Commc'ns Corp.</u>, 318 F.3d at 1028).

However, the Court will not dismiss the second half of Lorberbaum's statement from Paragraph 94 that Mohawk's LVT was "being well accepted across all channels" as corporate puffery.  As Plaintiff alleges in its Amended Complaint, builders returned approximately 80% of the LVT Mohawk produced domestically, and retailer customers returned approximately 25–50% of LVT they received.  <u>See</u> <u>id.</u> ¶¶ 184–88.  Additionally, Plaintiff alleges that Mohawk's LVT sales through its distributors fell by 60–70% due to alleged defects and widespread customer complaints.  <u>See id.</u> ¶¶ 191–92.  Taking these allegations as true, the Court finds that Defendant Lorberbaum's alleged statement that Mohawk's LVT was "being well accepted across all channels" is not a vague statement of opinion and could plausibly be subject to objective verification.   Thus, the second half of Defendant Lorberbaum's statement in Paragraph 94 is actionable.

Next, Defendants argue that Defendant Lorberbaum's statement in Paragraph 297 that Mohawk was "selling all of" the LVT it "could" is "not actionable" because the Amended Complaint offers only a conclusory allegation that this statement was

39

misleading and supposedly fails to allege it was a misrepresentation.  [See Doc. 54-1 at 11 n.9, 21].   Indeed, Defendants maintain that "accepting the [Amended Complaint]'s allegations that much of Mohawk's U.S. manufactured LVT was 'unsalable' and marked 'not to be sold' as true, the Company's statement that Mohawk was selling all of the LVT it 'could have' would not be false or misleading."  [See Doc. 57 at 9].

As is relevant to this challenged statement, the Amended Complaint sets forth the below context:

> During the Third Quarter 2017 Investor Call, Lorberbaum told investors that "we expect higher sales with the relief of some of our capacity constraints, enabling us to expand our market position." . . . [Lorberbaum] explained [to any analyst] that [he] meant Mohawk was selling all of the product it could produce: "It means that we have sold *all of the laminate that we could make without putting in new capacity*, which is just getting started up . . . . [S]o we were selling all of it we could have."

See Am. Compl. ¶¶ 296–97 (emphasis added).

The Eleventh Circuit has explained that "[a] statement is misleading if in the light of the facts existing at the time of the statement[,] a reasonable investor, in the exercise of due care, would have been misled by it.  Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth."   See FindWhat, 658 F.3d at 1305 (internal quotation and punctuation omitted); see also Lormand, 565 F.3d at 248 ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the

40

statements to accurately inform rather than mislead prospective buyers"). It is clear from the context of Lorberbaum's alleged statement that he represented Mohawk was selling all the LVT it could produce "without putting in new capacity," and that such "capacity constraints" were the limiting factor for Mohawk's LVT sales—not the extraordinarily high rate of defects in Mohawk's LVT products—which Plaintiff claims was the true source of the low LVT sales. See Am. Compl. ¶¶ 296–98; see also id. ¶ 89 ("Defendants repeatedly told investors that the Company was selling all the product it made and that it would have sold even more if its production facilities had been able to produce more product, i.e., had more production capacity. Defendants claimed that when those 'capacity constraints' were lifted, sales would continue to climb at or above the same rate."). Thus, taking the allegations of the Amended Complaint as true, the Court finds that a reasonable investor could have been misled by Defendant Lorberbaum's statement set forth in Paragraph 297, and therefore, it is actionable. See FindWhat, 658 F.3d at 1305.

2.   Scienter

Having addressed Defendants' arguments as to whether Plaintiff sufficiently alleges material, actionable misleading statements or omissions with particularity, the Court now turns to the issue of scienter. Defendants claim Plaintiff fails to plead particularized facts giving rise to a "strong inference" that Defendants acted with the "required state of mind" of scienter, as required by 15 U.S.C. § 78u-4(b)(2). [See

Docs. 54-1 21–31; 57 at 9–16].   In response, Plaintiff contends that "[h]ere, the totality of the Complaint's allegations supports the strong inference that Defendants had an intent to defraud or, at least, were severely reckless during the Class Period." [See Doc. 56 at 24].

The Eleventh Circuit has explained the standard governing scienter as follows:

> Rule 10b–5 requires a plaintiff to show that the defendant made the material misstatement or omission with the requisite culpable state of mind, or scienter.  In this Circuit, "scienter consists of intent to defraud or severe recklessness on the part of the defendant." Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 790 (11th Cir. 2010) (internal quotation marks omitted).   As we have explained,

>> [s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

> Mizzaro, 544 F.3d at 1238[].

> As we've noted, the PSLRA explicitly requires that the complaint's allegations create "a strong inference" of scienter.  15 U.S.C. § 78u–4(b)(2) (emphasis added).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 [](2007).  "The inquiry is inherently comparative," as "the court must take into account plausible opposing inferences." Id. at 323 [].  The PSLRA also mandates that the court assess scienter "with respect to each act or omission alleged to violate this chapter."  15 U.S.C. § 78u–4(b)(2);  accord  Phillips[], 374 F.3d [at] 1016

[]("[Scienter] must be inferred for each defendant *with respect to each violation*." (emphasis added)).  "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  Mizzaro, 544 F.3d at 1239 (quoting Tellabs, 551 U.S. at 326 []).

See FindWhat, 658 F.3d at 1299–1300.  Further, the Eleventh Circuit has held that the PSLRA permits that "all relevant facts and reasonable inferences therefrom may be aggregated to establish the necessary strong inference" of scienter.  See Phillips, 374 F.3d at 1018 n.6 (11th Cir. 2004) (citing 15 U.S.C. § 78u–4(b)(2)) (internal punctuation omitted); In re Equifax Inc. Securities Litig., 357 F. Supp. 3d 1189, 1232 (N.D. Ga. 2019) (same).

First, Defendants argue that Plaintiff fails to allege facts in support of a strong inference of Mohawk's scienter because Plaintiff does not establish "the financial impact of the purported schemes."  [See Doc. 54-1 at 25].  In support, Defendants purport that, unlike the Flowers Foods case cited by Plaintiff, the pleading at issue here does not allege that Mohawk's "core business" was implicated in the fraud. [See Doc. 57 at 13] (citing In re Flowers Foods, Inc. Securities Litig., 7:16-CV-222 (WLS), 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018)).  Rather, Defendants proffer that the Amended Complaint's allegations "concern one of Mohawk's three business segments [Flooring, N.A.], and just two of [Flooring, N.A.'s] many product lines."  [See Docs. 54-1 at 27–28; 57 at 13].  Plaintiff disagrees and argues that "Defendants' scienter is also bolstered by the fact that Flooring[,] N.A., which

generated over 40% of Mohawk's worldwide sales, was a core part of Mohawk's operations."  [See Doc. 56 at 30].

In Flowers Foods, the Middle District of Georgia found that an inference of scienter is "bolstered" by allegations that a fraudulent scheme was a "core operation" of the corporate defendant.  See 2018 WL 1558558, at *14.  The court found that such "core operation" allegations, when "combined with [p]laintiff's other allegations, make it more likely that [d]efendants were aware of the alleged compliance issues posed by the" fraudulent scheme during the class period.  See id. Thus, Plaintiff's allegations regarding Flooring, N.A.'s substantial contribution to Mohawk's overall operations serve to bolster any inference of scienter when combined with Plaintiff's other allegations as to Mohawk's state of mind; such allegations need not carry Plaintiff's burden on their own.  See id.

Additionally, the Court rejects Defendants' argument that Plaintiff's allegations regarding Carson's scienter cannot be imputed to Mohawk.  As this district has explained:

> Corporations, of course, have no state of mind of their own.  Instead, the scienter of their agents must be imputed to them. . . . [T]he [p]laintiff can survive dismissal if it raise[s] a strong inference that *somebody* responsible for the allegedly misleading statements must have known about the fraud.  To do so, the [p]laintiff must allege facts . . . creating a strong inference that [corporate] officials were both responsible for issuing the allegedly false public statements and were aware of the alleged fraud.  It can do so through allegations relating the state of mind of corporate officials who make or issue the statement (or

order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like).

See Equifax, 357 F. Supp. 3d at 1246–47 (internal footnotes, punctuation, and citations omitted; emphasis in original).  Similarly, in Faro Techs., a plaintiff alleged a member of "senior management" for the defendant corporation was "terminated as a result of [an] internal investigation" into his allegedly fraudulent conduct on behalf of the company.  See 534 F. Supp. 2d at 1263.  The court found it was "thus clear that the wrongdoing alleged was not a single act of a low-level employee, but rather, an ongoing method of doing business" and that "[t]his is sufficient to plead corporate scienter[.]"  See id.

As the Court has noted, Carson was president of Mohawk's Flooring, N.A. division prior to his termination in 2018 and had been with the Company for twelve (12) years.  See Am. Compl ¶ 226.  Following a 2018 internal investigation conducted by Defendant Lorberbaum, Carson was terminated due to his role in the alleged schemes.  See id. ¶¶ 224–26.  Plaintiff alleges Carson "orchestrated, knew of, and received information about the fraudulent schemes[,]" going so far as to "personally instruct" Mohawk's employees to carry out "enormous quantities of domestically produced unsalable 'scrap' LVT, even though the scrap was coded in the Company's computers as not to be shipped to customers."  See id. ¶¶138–42, 150, 159, 164–66, 205–06, 214–17.  According to the Amended Complaint, Carson was also aware of the Saturday Scheme because he received daily and quarter-end

financial reports setting forth the spike in sales on the last Saturday of every quarter (as well as the increase in "returns" thereafter).  See id. ¶¶ 44.  Additionally, Plaintiff asserts that Carson "furnished, approved and personally certified each quarter the purported accuracy of the information" contained within the financial reports of Mohawk's Flooring, N.A. division—information which "was provided to investors during quarterly conference calls and incorporated in Mohawk's consolidated financial statements and SEC filing[s]."  See id. ¶ 45.  Among the Amended Complaint's other allegations regarding Carson, it provides that he supposedly "ordered Mohawk's factories to perform overly long production runs that caused production to far outstrip demand" so as  "to further inflate profits and margins[.]"  See id. ¶ 160.  Viewing these allegations in the light most favorable to Plaintiff, the Court finds Plaintiff has pled sufficient facts at this stage to support a strong inference of scienter as to Defendant Mohawk.  See Equifax, 357 F. Supp. 3d at 1246–47; FindWhat, 658 F.3d at 1299–1300.

Next, Defendants argue that Plaintiff fails to sufficiently allege scienter as to Defendant Lorberbaum.  [See Docs. 54-1 at 25–; 57 at 13–15].  The Court disagrees.  "With regard to [i]ndividual [d]efendants, the question is 'whether a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount.'"  Equifax, 357 F. Supp. 3d at

1233 (quoting In re Ebix, Inc. Sec. Litig., 898 F. Supp. 2d 1325, 1344 (N.D. Ga. 2012); see also Mizzaro, 544 F.3d at 1249) (same). "In the Eleventh Circuit, a strong inference of severe recklessness remains the standard by which a plaintiff may satisfy the scienter requirement." Theragenics, 137 F. Supp. 2d at 1348 (internal citation omitted). Additionally, a plaintiff "may prove [severe] recklessness by providing evidence that defendants possessed knowledge of facts or access to information contradicting their public statements, so as to prove that defendants knew or should have known that they were misrepresenting material facts related to the corporation." See Equifax, 357 F. Supp. 3d at 1233 (quoting Sci.-Atlanta, 754 F. Supp. 2d at 1360) (internal quotation marks omitted).

In the matter at hand, Plaintiff alleges that FE1 informed Defendant Lorberbaum that Mohawk's U.S. LVT Plant could not produce LVT of satisfactory quality for sale, and that FE1 and two (2) senior vice presidents of Mohawk reiterated this information to Lorberbaum during the summer of 2018. See Am. Compl. ¶¶ 177–78, 200. Thus, the Amended Complaint alleges Lorberbaum "possessed knowledge of facts or access to information contradicting" Defendants' public statements about their LVT-related business even prior to the September 2018 meeting where FE1 allegedly informed Lorberbaum of Carson's schemes and their impact on the Company's financials (in response to which Lorberbaum supposedly admitted he knew Carson's was "lying" about the Company's numbers, even when

he had not yet investigated the particulars of Carson's purported schemes). <u>See</u> <u>id.</u> ¶¶ 218–24.   Additionally, Plaintiff alleges that Lorberbaum stated after the 2018 meeting with FE1: "I just don't know how I missed it." <u>See</u> <u>id.</u> ¶¶ 225, 356 (referring to Carson's alleged schemes).   Further, the Amended Complaint claims that Lorberbaum and Mohawk continued to engage in the fraudulent schemes even after terminating Carson. <u>See</u> <u>id.</u> ¶¶ 230–36, 357.   Such "[c]ircumstantial evidence can be sufficient to establish a strong inference of scienter." <u>See</u> <u>Equifax</u>, 357 F. Supp. 3d at 1232 (N.D. Ga. 2019) (citing <u>Mizzaro</u>, 544 F.3d at 1249); <u>see also</u> <u>Hubbard v. BankAtlantic Bancorp, Inc.</u>, No. 07-61542-CIV-UNGARO, 2009 WL 3261941, at *3 (S.D. Fla. May 12, 2009) (finding allegations that the individual defendants were presented with information that would have shown the falsity of the company's financials or they were confronted with concerns regarding the company's lending practices, as supported by confidential witnesses, were sufficient to show scienter).

Moreover, considering Lorberbaum's role as Mohawk's CEO and chairman of the board, his "active participation in press releases, earnings calls, and SEC filings dealing with the issues" alleged by the Amended Complaint, as well as "the nature, duration and extent of the fraud alleged, would lead a reasonable person to conclude" that Lorberbaum "knew about the fraud or [was] at least severely reckless in not knowing about it." <u>See</u> <u>Ebix</u>, 898 F. Supp. 2d at 1346–47.   The "type and amount of fraud alleged here would not be hidden from the CEO . . . of the

company." See id. at 1347.  This is particularly true where, as here, Plaintiff alleges Lorberbaum received daily financial reports that showed the "conspicuous spikes in sales" and "subsequent returns" resulting from the Saturday Scheme at the end of each financial quarter and signed the SEC filings on behalf of Mohawk which improperly recognized the revenue from this alleged scheme (in violation of GAAP). See Am. Compl.  ¶¶ 39, 138–56; see also Primavera Inv'rs v. Liquidmetal Techs., Inc., 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005) (finding scienter where, by virtue of their positions, the individual defendants had unfettered access to internal information and ample opportunity to prevent the release of any misleading statement); Gross, 977 F. Supp. at 1472 (finding allegations that defendants improperly recognized income that they knew should not be recognized under GAAP sufficient to plead both fraud and scienter).

Accordingly, the Court finds that the aggregated allegations of the Amended Complaint viewed in the light most favorable to Plaintiff—and the "reasonable inferences therefrom"—are sufficient to plead scienter as to both Defendants to survive dismissal.  See Phillips, 374 F.3d at 1018 n.6; see also FindWhat, 658 F.3d at 1299–1300 (citing Mizzaro, 544 F.3d at 1239).

### 3.    Loss Causation

Finally, Defendants maintain that Plaintiff fails to state a claim pursuant to Section 10(b) and Rule 10b-5 because the Amended Complaint does not adequately

plead that Plaintiff's claimed losses were caused by the alleged fraud.  [See Docs. 54-1 at 31–33; 57 at 16–20].

"The loss causation element of a Rule 10b–5 claim requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses."  FindWhat, 658 F.3d at 1309.  "The plaintiff must show that the defendant's fraud—as opposed to some other factor—proximately caused his claimed losses."  Id.  "Loss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA."  Ebix, 898 F. Supp. 2d at 1347 (citing In re Coca-Cola, 510 F. Supp. 2d at 1203–04).  "Rule 8 is satisfied if plaintiff provides a short and plain statement adequate to give defendants some indication of the loss and the causal connection that the plaintiff has in mind."  See id. (internal quotation omitted).  A plaintiff "need not show that the defendant's fraud was the 'sole and exclusive cause' of the injury."  See id. (quoting FindWhat, 658 F.3d at 1309).  Rather, a plaintiff need "only show that the defendant's act was a substantial or significant contributing cause."  See FindWhat, 658 F.3d at 1309 (internal quotation omitted).  Put differently, "a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value."  See Meyer v. Greene, 710 F.3d 1189, 1195 (11th Cir. 2013); see also Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) ("plaintiff must show that

the misrepresentation touches upon the reasons for the investment's decline in value") (internal citation omitted).

A plaintiff often alleges loss causation "by asserting that a defendant's corrective disclosure revealed that a prior statement was false and that the revelation caused the stock price to drop." See Flowers Foods, 2018 WL 1558558, at *18 (citing FindWhat, 658 F.3d at 1311–12). "To be corrective, [a] disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." Meyer, 710 F.3d at 1197 (internal quotation omitted). In a case involving a corrective disclosure, a plaintiff "need not rely on a single, complete corrective disclosure" to plead loss causation, "rather, it is possible to show that the truth gradually leaked out into the marketplace through a series of partial disclosures." See id. (internal quotation omitted).

Alternatively, "[s]ome courts have also found that 'it is sufficient to show that a risk defendants allegedly concealed materialized and arguably caused the plaintiffs' losses.'" See Flowers Foods, 2018 WL 1558558, at *18 (quoting In re Jiangbo Pharm., Inc., Sec. Litig., 884 F. Supp. 2d 1243, 1264–65 (S.D. Fla. 2012)); see also Meyer, 710 F.3d at 1197 n.8. Pursuant to either theory of loss causation— corrective disclosure or materialization of the risk—the "key is that plaintiffs allege that a concealed truth became known, or a concealed risk materialized, and caused

51

economic loss for the plaintiffs." See Flowers Foods, 2018 WL 1558558, at *18 (citing The Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005)).

As was the case in Flowers Foods, Defendants "appear to concede that Plaintiff sufficiently alleges that [it] purchased stock at prices that subsequently dropped. The only apparent dispute is whether corrective disclosures were made revealing the falsity of prior statements . . . and whether such disclosures caused the [] losses." See 2018 WL 1558558, at *19; [see also Docs. 56 at 34; 57 at 17–18]. In the Amended Complaint, Plaintiff alleges such corrective disclosures occurred on three (3) dates: (1) July 26, 2018, (2) October 26, 2018, and (3) July 26, 2019.

Regarding the first supposed corrective disclosure, Plaintiff alleges that on July 26, 2018, Mohawk announced "lower sales than [] anticipated" and "that margins were down." See Am. Compl. ¶ 238 (internal punctuation omitted). "The Company also revealed that, contrary to its prior representations that it was selling out of product and was capacity constrained, the Company's warehouses were full of excess inventory," and Mohawk needed to lower its production to "reduce inventory." See id. ¶ 239. Additionally, Plaintiff claims Defendants "disclosed, for the first time, significant manufacturing issues, including 'manufacturing shutdowns,' a 'lower production rate,' [] 'new product inefficiencies,'" and that Mohawk would be required to "increase sourcing of LVT from outside of the U.S." See id. ¶ 240. According to Plaintiff, these July 26, 2018 disclosures "stunned

investors and analysts, who had been consistently assured of record-breaking sales," leading one analyst to report stating that there was a "disconnect between [Mohawk's] financial models and what is really happening in the business."[10]  See id. ¶ 241.  Plaintiff alleges that as a result of these disclosures, there was an unusually high trading volume of Mohawk's stock on July 26, 2018 ("a total of 7.36 million shares of Mohawk common stock traded [that day], an increase of 271% above trading volume from the prior session") and the Company's stock price fell by 18%. See id. ¶ 242.

Second, Plaintiff proffers that a corrective disclosure occurred on October 26, 2018.  See id. ¶¶ 245–49.  According to the Amended Complaint, Lorberbaum announced that sales across the Company had fallen short, and that the operating margins of Mohawk's Flooring, N.A. division had "fall[en] to single digits[.]"  See id. ¶¶ 245–46.  Lorberbaum supposedly discussed continuing difficulties with excess inventory and "damning details about the Company's struggle to produce LVT product in the U.S. LVT Plant, including 'physical mechanical failures' and 'software problems.'"  See id. ¶ 245.  In response, Plaintiff provides that analysts from various sources (including Pacific Square Research, Barclays, Wells Fargo, and Credit Suisse) released a series of reports, calling the quarter a "disaster" for

---

[10] The Court observes that "corrective disclosures" can come from sources other than Defendants themselves, including "analysts [and] news reports[.]"  See Flowers Foods, 2018 WL 1558558, at *20.

Mohawk, questioning what would happen if Mohawk could not sell its excess inventory, expressing "wariness" of Mohawk's "story," and linking Mohawk's underperformance to its failure to "right-siz[e]" its inventory.  See id. ¶¶ 247–48. Following another day of unusually high trading volume ("9.6 million shares of Mohawk common stock traded on October 26, 2018, an increase of 440% above . . . the prior trading session"), Mohawk's stock "toppled an additional 24%[.]"  See id. ¶ 249.

Third, Plaintiff alleges a corrective disclosure emerged on July 26, 2019.  See id. ¶¶ 253–56.  Specifically, Plaintiff claims Mohawk disclosed continuing struggles with excess inventories, poor sales, and steadily declining operating margins.  See id. ¶ 253.  Purportedly, Mohawk "finally revealed that the inventory issues and lower sales volume were expected to continue" into future financial quarters.  See id. Plaintiff alleges that, in response, "4.4 million shares of Mohawk common stock traded on July 26, 2019, an increase of 338% above trading volume in the prior session[,]" and the stock price fell a further 18%.  See id. ¶ 254.  Thereafter, analysts from Evercose ISI, J.P. Morgan, and SunTrust released scathing reports about Mohawk, saying the Company's name had been "pushe[d] . . . back to the starting line" and downgrading the Company's rating.  See id. ¶¶ 255–56.

Defendants claim that none of the alleged corrective disclosures concern the schemes asserted by Plaintiff or reveal "the Company's purported misstatements or

omissions." [See Doc. 57 at 17].  Thus, Defendants contend that these "general statements" fail to "satisfy the Eleventh Circuit's standard for corrective disclosures concerning the alleged fraud." [See id.] (citing Kinnett v. Strayer Educ., Inc., 501 F. App'x 890, 894 (11th Cir. 2012)).

However, the Court disagrees with Defendants.  At least some of the above alleged disclosures were "corrective" insofar as they "collectively revealed that [Defendants'] prior statements" about its margins, sales, inventory, and LVT production "were misleading."  See Flowers Foods, 2018 WL 1558558, at *20. Although Defendants may have offered alternative explanations for Mohawk's production and inventory "difficulties," these statements stand in contradiction to Defendants' prior representations that the Company was "selling out of product and was capacity constrained" such that it needed to make more product to keep up with demand.  See Am. Compl. ¶ 239.  Additionally, even though these announcements do not directly contradict Defendants' purported previous misleading representations or "reveal" the alleged fraud, they at least "relate back" to topics that share the same subject matter.  See Meyer, 710 F.3d at 1197; FindWhat, 658 F.3d at 1311 n.28. Further, Plaintiff alleges various reports from shocked analysts following each of the supposed corrective disclosures, and "[a]nalysts' reports issued" following corporate disclosures "strengthen the inference that the disclosure

revealed a truth to the market." See Richard Thorpe & Darrel Weisheit v. Walter

Inv. Mgt., Corp., 111 F. Supp. 3d 1336, 1382 (S.D. Fla. 2015).

Viewing this series of announcements together, the Court finds that Plaintiff

has pled sufficient facts to support its allegations that corrective disclosures occurred

on July 26, 2018, October 26, 2018, and July 26, 2019, and that Mohawk's stock

price dropped after each announcement.  See Am. Compl. ¶¶ 238–42, 245–49, 253–

56.  Accordingly, the Court finds Plaintiff has sufficiently pled loss causation to

proceed on its Section 10(b) claim.  See Meyer, 710 F.3d at 1195–97; FindWhat,

658 F.3d at 1309.  Thus, the Court denies Defendants' request to dismiss Plaintiff's

Section 10(b) and Rule 10b-5 claim.[11]  [Doc. 54].

### B.    Count II—Violations of Section 20(a) of the Exchange Act

Having considered Defendants' motion in regards to Plaintiff's Count I, the

Court now turns to an analysis of Plaintiff's Count II.  Defendants argue that because

Plaintiff has failed to plead a primary violation of Section 10(b) and Rule 10b-5,

Plaintiff's Section 20(a) claim alleged solely against Defendant Lorberbaum must

also be dismissed.  [See Doc. 54-1 at 34].

> To state a claim under § 20(a) of the Exchange Act, a plaintiff must
> show: (1) a primary violation of the securities laws; (2) that the
> individual defendants had the power to control the general business
> affairs of the primary violator; and (3) that the individual defendants

---

[11] As provided above, the Court grants Defendants' motion to dismiss in part with regards to the
portion of the statement from Paragraph 94 of the Amended Complaint (that Mohawk's LVT
collections possessed "superior design and performance").  See Am. Compl. ¶ 94.  However, the
Court denies Defendants' motion to dismiss Plaintiff's Count I in all other respects.

"had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."

See Ebix, 898 F. Supp. 2d at 1340–41 (quoting Mizzaro, 544 F.3d at 1237).

The Parties do not appear to dispute that Defendant Lorberbaum, as the CEO of Mohawk, meets the second and third criteria of the Section 20(a) test.  [See generally Docs. 54-1, 56].  Accordingly, having found that Plaintiff's Section 10(b) claim for a primary violation of the securities laws may proceed, the Court denies Defendants' motion to dismiss the Section 20(a) claim.  [Doc. 54].

### C.    Summary

In sum, the Court finds that Plaintiff's Section 10(b) and Rule 10b-5 claim (Count I) is sufficiently pled so as to proceed, with the exception of the portion of the specific statement discussed above located at Paragraph 94 of the Amended Complaint.  Additionally, the Court finds that Plaintiff's Section 20(a) claim (Count II) may proceed.

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' "Motion to Dismiss Consolidated Class Action Complaint." [Doc. 54].  Specifically, the Court **GRANTS** Defendants' motion as to the specific portion of the statement discussed herein from Paragraph 94 of the Amended Complaint.  The Court **DENIES** Defendants' motion in all other respects.

**SO ORDERED**, this 29th day of September, 2021.

Eleanor L. Ross
United States District Judge
Northern District of Georgia