# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

PUBLIC EMPLOYEES' RETIREMENT SYSTEM
OF MISSISSIPPI, individually and on behalf of all
others similarly situated,

                Plaintiff,

v.

MOHAWK INDUSTRIES, INC. and
JEFFREY S. LORBERBAUM

                Defendants.

Case No. 4:20-cv-00005-ELR

# EXPERT REPORT

# OF

# LUCY P. ALLEN

**April 13, 2022**

**TABLE OF CONTENTS**

I.     Scope of Assignment ................................................................................................1

II.    Summary of Findings ...............................................................................................1

III.   Qualifications and Remuneration ...........................................................................4

       A.  Qualifications ..............................................................................................4

       B.  Remuneration ..............................................................................................5

IV.    Materials Considered ...............................................................................................5

V.     Background ...............................................................................................................6

VI.    Summary of Allegations ..........................................................................................7

VII.   Methodology ...........................................................................................................12

VIII.  The alleged misrepresentations regarding the alleged "Saturday Scheme" did not have
       price impact .............................................................................................................15

       A.  The alleged "Saturday Scheme" did not have an impact on Mohawk's cash flows....16

       B.  The magnitude of the alleged "Saturday Scheme" represents only a tiny fraction
           of Mohawk's revenues ..............................................................................18

       C.  Contrary to Plaintiff's theory, the alleged "Saturday Scheme" could not have
           helped Mohawk obtain "record sales quarter after quarter" but at most impacts the
           one quarter when introduced ....................................................................20

       D.  The alleged "Saturday Scheme" would not have affected whether Mohawk met
           analysts' revenue expectations .................................................................24

       E.  The alleged "Saturday Scheme" had no effect on reported earnings per share ..........27

       F.  The analysts covering Mohawk described the alleged "Saturday Scheme" as
           "miniscule," "a rounding error," and an alleged scheme for which the "juice is not
           worth the squeeze" ...................................................................................28

IX.    The decline in Mohawk's stock price at the end of the alleged Class Period is not
       evidence of price impact of any of the alleged misrepresentations ..................30

       A.  Contrary to Plaintiff's theory, the decline in Mohawk's stock price at the end of
           the alleged Class Period was due to the announcement of lower-than-expected
           guidance for the future and not due to the revelation of any past issues related to
           the alleged misrepresentations ................................................................30

       B.  The specific reasons for the reduction in Mohawk's guidance at the end of the
           alleged Class Period did not relate to the alleged misrepresentations but rather to a
           new understanding of the effect of macroeconomic issues on the Company's
           business ......................................................................................................35

C.  The macroeconomic headwinds announced at the end of the alleged Class Period reversed the expectations of improving conditions formed in the prior quarter and Mohawk's stock price gave up the gains it had earned ...................................40

D.  Other flooring companies were experiencing similar macroeconomic headwinds as Mohawk around the end of the alleged Class Period ...............................43

X.  Dr. Hartzmark's analysis of market efficiency is flawed and unscientific ......................46

A.  Dr. Hartzmark's analysis comparing "news days" with "no-news days" is flawed and unreliable..........................................................................................................47

B.  Dr. Hartzmark's tests of autocorrelation are unscientific and results driven..............48

## I.   SCOPE OF ASSIGNMENT

1.      I have been asked by counsel for Mohawk Industries, Inc. ("Mohawk" or the "Company") to analyze price impact of the allegedly false and misleading statements that Lead Plaintiff Public Employees' Retirement System of Mississippi ("Plaintiff") claims inflated Mohawk's stock price between April 28, 2017 and July 25, 2019 (the alleged "Class Period").[1] Specifically, I have been asked to analyze price impact of the alleged misrepresentations regarding the alleged "Saturday Scheme" and whether the last alleged corrective disclosure at the end of the alleged Class Period is evidence of price impact of the alleged misrepresentations.  As part of this analysis, I have been asked to review and comment on the Expert Report of Michael Hartzmark, dated January 25, 2022, which addresses Plaintiff's claim of market efficiency and common damages methodology.

## II.   SUMMARY OF FINDINGS

2.      I find that the alleged misrepresentations regarding the alleged "Saturday Scheme" did not impact Mohawk's stock price during the alleged Class Period.  According to Plaintiff, the alleged "Saturday Scheme" involved the booking of revenue on the last Saturday of a quarter for sales that were never actually made and where cash was never exchanged.  As a result, the alleged "Saturday Scheme" could not have had an impact on Mohawk's cash flow.  In an efficient market, the only information that affects the stock price is information that affects the cash flows – in particular, the expected discounted value of future cash flows.[2]  The

---

[1]   Consolidated Class Action Complaint for Violation of the Federal Securities Laws (DCKT # 37), dated June 29, 2020 ("Amended Complaint"), p. 1.

[2]   *See*, for example, Bradford Cornell, *Corporate Valuation* (New York: McGraw-Hill, 1993), p. 108, and Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 7th ed., 2003), p. 366

magnitude of the alleged "Saturday Scheme" was tiny relative to the Company as a whole, representing much less than 1% of Mohawk's revenues (the alleged scheme represented around 0.18% of Mohawk's revenue). Moreover, the alleged "Saturday Scheme" only "boosts" revenues in the one quarter when the alleged scheme is introduced. For later quarters, the continuation of the alleged scheme has no effect at all on revenues since the quarterly boost in revenues from the alleged scheme would be offset by a negative charge related to the sales that were never made but improperly booked in the prior quarter. The market only learned about the alleged "Saturday Scheme" when the complaint in this case was made public, almost a year after the end of the alleged Class Period. Upon learning of the alleged scheme from the complaint, the analysts covering Mohawk described the alleged "Saturday Scheme" as "miniscule," "a rounding error," and an alleged scheme for which the "juice is not worth the squeeze." Contrary to Plaintiff's claim, the alleged scheme had no effect on whether Mohawk met analysts' revenue expectations (either consensus or for any individual analyst) nor did it affect Mohawk's reported earnings per share. Thus, the alleged "Saturday Scheme" did not impact Mohawk's stock price, and there is no link between the alleged scheme and Mohawk's stock price movements.

3.      I find that the decline in Mohawk's stock price after the July 25, 2019 alleged corrective disclosure at the end of the alleged Class Period is not evidence of price impact of any of the alleged misrepresentations. Contrary to Plaintiff's theory, the decline in Mohawk's stock price at the end of the alleged Class Period was *not* due to the revelation of any past issues related to the alleged misrepresentations but rather due to the announcement of lower-than-expected guidance for the future. The decline in Mohawk's stock price could not be due to the alleged "Saturday Scheme" since, according to Plaintiff, Mohawk continued to implement the alleged scheme through the end of the alleged Class Period and into 2020. Similarly, the decline

2

in Mohawk's stock price could not be due to the Company's other alleged fraudulent schemes related to luxury vinyl tile ("LVT") inventory and LVT overproduction since the Company announced improvements, not issues, in its LVT segment.  Instead, the decline in Mohawk's stock price at the end of the alleged Class Period was due to a lower-than-expected guidance driven by the effect that new macroeconomic issues, including cost inflation, lower demand, increased competition and tariffs, were expected to have on Mohawk's future business, an expectation that was precipitated by Mohawk's announcement at the end of the alleged Class Period.  These macroeconomic issues were also affecting other flooring companies around the end of the alleged Class Period.

4.      I find that Dr. Hartzmark's cause and effect analysis comparing "news days" with "no-news days" is flawed and unreliable since it uses a sample that is not large enough by his own standard, includes events that are subject to selection bias, and fails to analyze whether Mohawk stock reacted to any other types of news outside of his narrow definition of "news days."  In addition, I find that Dr. Hartzmark's tests of autocorrelation are unscientific and results driven.  Dr. Hartzmark first performs a standard autocorrelation test and finds that Mohawk's stock exhibited autocorrelation during the alleged Class Period, providing direct evidence contrary to a finding that Mohawk's stock traded in an efficient market.  However, instead of relying on his standard test to draw a conclusion, Dr. Hartzmark performs additional non-standard tests that are unsupported and results driven to try to support a finding that Mohawk's stock traded in an efficient market.

3

## III.   QUALIFICATIONS AND REMUNERATION

### A.   Qualifications

5.      I am a Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice.  NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation.  NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.  NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics.  The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

6.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University.  Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues.  In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics.  In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies.  My resume with recent publications and testifying experience is included as Appendix A.

4

## B.      Remuneration

7.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost.  NERA currently bills for my time at $1,050 per hour.  NERA's fees are not in any way contingent upon the outcome of this matter.

## IV.   MATERIALS CONSIDERED

8.      In preparing this report, I considered the following categories of materials (a complete list of materials considered is included as Appendix B):

a)      Consolidated Class Action Complaint for Violation of the Federal Securities Laws (DCKT # 37), dated June 29, 2020 ("Amended Complaint") and other case documents;

b)      Expert Report of Michael L. Hartzmark, Ph.D. ("Hartzmark Report"), including materials turned over;

c)      Deposition of Michael L. Hartzmark, Ph.D. ("Hartzmark Deposition");

d)      Expert reports of Michael L. Hartzmark, Ph.D. in other matters;

e)      Mohawk's filings with the Securities and Exchange Commission ("SEC") between 2017 and 2020;

f)      Mohawk's press releases and conference call transcripts between 2017 and 2020;

g)      SEC filings, press releases, and conference call transcripts of other publicly traded U.S. flooring companies;

h)      Analyst reports on Mohawk and other publicly traded U.S. flooring companies;

i)      Financial data from Bloomberg, L.P., FactSet Research Systems, Inc. and I/B/E/S; and

j)      Academic literature and textbooks on finance, securities, valuation and statistics.

5

## V.   BACKGROUND

9.      Mohawk is a "leading global flooring manufacturer that creates products to enhance residential and commercial spaces around the world."[3]  The Company has three segments: Flooring North America ("Flooring NA"), Flooring Rest of the World ("Flooring ROW") and Global Ceramic ("Global Ceramic").   The products sold within each segment fall into four product categories: Ceramic & Stone, Carpet & Resilient, Laminate & Wood and Other.[4]  Mohawk's LVT products are categorized under Carpet & Resilient.[5]  The table below shows Mohawk's net sales in 2018 by segment and product category.

| **Exhibit 1** | | | |
|---|---|---|---|
| **Mohawk's Net Sales in 2018** | | | |
| **by Segment and Product Category** | | | |
| | Segment | | |
| **Product Category** | **Flooring NA** | **Flooring ROW** | **Global Ceramic** |
| Ceramic & Stone | $68M | $0M | $3,553M |
| Carpet & Resilient | $3,258M | $646M | $0M |
| Laminate & Wood | $703M | $850M | $0M |
| Other | $0M | $906M | $0M |
| **Total** | **$4,029M** | **$2,402M** | **$3,553M** |

Source:
 Data from Mohawk 2018 Form 10-K, filed February 28, 2019, p. 56.

---

[3]    Mohawk 2018 Form 10-K, filed February 28, 2019, p. 3.

[4]    Mohawk 2018 Form 10-K, filed February 28, 2019, p. 56.

[5]    Mohawk 2018 Form 10-K, filed February 28, 2019, p. 8.

6

## VI.   SUMMARY OF ALLEGATIONS

10.    Plaintiff alleges that Mohawk engaged in several fraudulent schemes "in order to conceal the negative impact that increasing competition and a fundamental shift in the flooring products business was having on the Company." [6]   In particular, Plaintiff alleges that Mohawk concealed the following from investors:

- "the true reasons for the Company's supposedly record sales and margins;"

- "the true reasons for the Company's ballooning inventory levels;" and

- the Company's "rampant manufacturing problems."[7]

11.    Plaintiff alleges that the fraudulent schemes included the following:

**"Defendant's Saturday Scheme to Inflate Sales"**

12.    Plaintiff alleges that Mohawk developed a scheme to inflate sales and thereby report "record sales quarter after quarter driving up its stock price."[8]   According to Plaintiff, at the end of each quarter, Mohawk instructed its North American distribution centers "to load goods on Company trucks on Fridays and pretend to deliver the goods on Saturdays to customers they knew were closed for deliveries and, thus, not there to accept or reject them."[9]   Mohawk would then "recognize these failed 'delivery attempts' as 'sales' dollars in the current quarter even though the product never changed hands to a customer, in violation of generally accepted

---

[6]   Amended Complaint, ¶5.

[7]   Amended Complaint, ¶5.

[8]   Amended Complaint, ¶109.

[9]   Amended Complaint, ¶2.

accounting principles ("GAAP") and Mohawk's revenue-recognition policies."[10]  The goods

would then be returned by the customers "after the books had closed for the quarter."[11]

      13.    Plaintiff claims that the alleged "Saturday Scheme" was employed by Mohawk

"universally across the country," and that it involved "millions of pounds of product, customers

of all sizes, and every product available in the warehouses, including both Conventional Flooring

Products and LVT."[12]  According to Plaintiff, "Mohawk utilized the Saturday Scheme to inflate

its sales in every quarter of the Class Period, except when the Company temporarily abandoned

the alleged scheme in the second and third quarters of 2018."[13]  Plaintiff further claims that the

alleged scheme continued after the end of the alleged Class Period and into 2020.[14]

**"Mohawk Hid Unsalable 'Scrap' LVT in Its Inventory"**

      14.    According to Plaintiff, "Mohawk improperly carried in its reported inventory

enormous quantities of domestically produced unsalable 'scrap' LVT, even though the scrap was

coded in the Company's computers as not to be shipped to customers."[15]  Plaintiff claims that

"carrying that scrap LVT in inventory—rather than writing it down as GAAP requires—bloated

the Company's inventory, while allowing the Company to hide from investors the rampant

quality-control problems plaguing the Company's attempts to compete in the burgeoning LVT

---

[10]  Amended Complaint, ¶110.

[11]  Amended Complaint, ¶116.

[12]  Amended Complaint, ¶131.

[13]  Amended Complaint, ¶136.

[14]  Amended Complaint, ¶231.

[15]  Amended Complaint, ¶159.

8

market" and "led to under-reporting of the Company's cost of sales and, as a result, inflated the Company's margins and net income."[16]

**"Mohawk Overproduces Products to Inflate Profit Margins"**

15.     According to Plaintiff, the Company was "intentionally overproducing multiple products, including LVT and carpet, that would end up sitting in its warehouses and on its balance sheet." [17]  Plaintiff claims that Mohawk had its manufacturing plants "ramp up production to levels divorced from demand for the Company's products in an effort to drive per-unit costs down and thereby artificially increase the Company's margins, metrics on which analysts were keenly focused."[18]  Further, according to Plaintiff, it was Brian Carson, the President of Flooring NA, who ordered this "ramp up" in production of LVT and carpet products, indicating that the overproduction was limited to the Flooring NA segment.

16.     Plaintiff claims the alleged misrepresentations were corrected in three alleged corrective disclosures:

     a)  **July 26, 2018 Alleged Corrective Disclosure**

17.     On July 25, 2018, after-market hours, Mohawk announced 2Q18 financial results, and on July 26, 2018, at 11:00 am, Mohawk hosted a conference call to discuss the financial results. According to Plaintiff, during these announcements, Mohawk allegedly revealed "a substantial EPS miss from its own guidance and consensus estimates, which Defendants attributed, in part, to 'lower sales than we anticipated'" and "that margins were 'down.'"[19]

---

[16]  Amended Complaint, ¶159.

[17]  Amended Complaint, ¶205.

[18]  Amended Complaint, ¶205.

[19]  Amended Complaint, ¶238.

According to Plaintiff, the Company revealed that "contrary to its prior representations that it was selling out of product and was capacity constrained, the Company's warehouses were full of excess inventory, requiring Mohawk to begin to 'produce[] less than [it] sold to reduce inventory.'"[20]  According to Plaintiff, the Company also disclosed that there were "significant manufacturing issues, including 'manufacturing shutdowns,' a 'lower production rate,' and 'new product inefficiencies,' in Flooring North America" and "that Mohawk was required to increase sourcing of LVT from outside of the U.S."[21]

### b) October 26, 2018 Alleged Corrective Disclosure

18.     On October 25, 2018, after-market hours, Mohawk announced 3Q18 financial results, and on October 26, 2018, at 11:00 am, Mohawk hosted a conference call to discuss the financial results. According to Plaintiff, during these announcements, Mohawk allegedly "disclosed that the issues partially disclosed in the second quarter had persisted."[22]  According to Plaintiff, the Company "provided damning details about the Company's struggle to produce LVT product in the U.S. LVT Plant, including 'physical mechanical failures' and 'software problems.'"[23]  According to Plaintiff, the Company "also revealed a significant step down in margins for Flooring North America, with operating margin falling to single digits, which Defendants attributed in part to 'lower than expected production.'"[24]

### c) July 26, 2019 Alleged Corrective Disclosure

---

[20]  Amended Complaint, ¶240.

[21]  Amended Complaint, ¶240.

[22]  Amended Complaint, ¶245.

[23]  Amended Complaint, ¶245.

[24]  Amended Complaint, ¶246.

10

19.     On July 25, 2019, after-market hours, Mohawk announced 2Q19 financial results, and on July 26, 2019, at 11:00 am, Mohawk hosted a conference call to discuss the financial results. According to Plaintiff, during these announcements, Mohawk allegedly disclosed that "contrary to Defendants' recent assurances, the Company's difficulties reducing inventory were far from over, and that it still had excess inventories that necessitated 'taking actions' to 'manage our inventory' and 'improve sales,' especially in Flooring North America."[25]   According to Plaintiff, the Company revealed "the inventory issues and lower sales volume were expected to continue, slashing third quarter guidance and noting that the guidance accounted for 'excess inventories' and 'reduced production,' as well as 'lower volume and margins' and 'increased competition.'"[26]

20.     The chart below shows Mohawk's stock price, trading volume, and the alleged misrepresentations and alleged corrective disclosures:

---

[25]  Amended Complaint, ¶253.

[26]  Amended Complaint, ¶253.



**Exhibit 2**
**Alleged Misrepresentations and Alleged Corrective Disclosures**

## VII.  METHODOLOGY

21.     An analysis of price impact is an analysis of whether the alleged

misrepresentations affected the market price when made.[27]  In general, the price impact of an

alleged misrepresentation can be analyzed in at least two ways: (1) directly by analyzing the

market reaction following an alleged misrepresentation, including analyzing the stock price

movement and examining market and analyst commentary following the alleged

misrepresentations, or (2) indirectly by analyzing the market reaction to a disclosure that is

---

[27]   See, for example, *Halliburton I*, 131 S. Ct. 2179, 2186 (2011).  ("'[P]rice impact' – that is, whether the alleged
misrepresentations affected the market price in the first place.")

corrective of an alleged misrepresentation.[28]  Plaintiff claims that the alleged misrepresentations either "maintained" the alleged inflation in the stock price or were misleading by omission. Thus, according to Plaintiff's theory, a statistically significant price increase would not be expected at the time the alleged misrepresentations were made.[29]

22.     To analyze the price impact of the alleged misrepresentations in this case, I examined Plaintiff's allegations as well as publicly available information related to Mohawk and Plaintiff's allegations.  I reviewed Plaintiff's claims in the Amended Complaint, the Hartzmark Report, and examined the alleged misrepresentations and the alleged corrective disclosure (including what information was allegedly false, when the alleged "truth" was allegedly revealed to the market and what information was alleged to be corrective).  I analyzed publicly available information related to Mohawk, including analyst reports, SEC filings, and news stories from Bloomberg and Factiva.[30]  I focused on what the market knew about the alleged

---

[28]  See, for example, *Halliburton II*, 134 S. Ct. 2398 (2014).

Note that simply testing whether there were statistically significant price reactions on the dates of the alleged corrective disclosures may not be a reliable analysis of price impact of the alleged misrepresentations for a number of reasons, including the following:

a)  The alleged corrective disclosures may not actually be corrective of the alleged misrepresentations.  (If the alleged corrective disclosures are not in fact corrective, they cannot help one determine the price impact of the alleged misrepresentations.);

b)  The alleged corrective disclosure dates may not properly correspond to when the alleged misrepresentations were first corrected in the market.  (Since, in an efficient market, only new news should affect a security's price, the reaction to repeated news is not a reliable indicator of what the price impact of the news would be initially. If news that is not new affects the price, then that is an indication that the market is not efficient.);

c)  The price reaction on the alleged corrective disclosure dates may be the result of confounding factors or news unrelated to the alleged fraud; and

d)  Market conditions may have changed between the time that the alleged misrepresentations were made and the time of the alleged corrective disclosures.

[29]  Amended Complaint, ¶403.

[30]  Bloomberg is a commonly used provider of financial data and news.  Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world.

13

misrepresentations, and on how the market reacted in terms of analyst and other market commentary and price reactions related to the alleged misrepresentations.

23.     Analyst reports are periodic reports issued by professional financial analysts at brokerage firms who perform research and analysis on specific industries and companies. Analysts analyze companies by studying publicly available information, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management.  Analysts use this information to model and value companies and industries, using financial techniques such as discounted cash flow models and valuation multiples.  Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance (such as estimates of future revenue, profits and earnings per share ("EPS")), and give recommendations to buy, hold or sell the stock. Analysts typically issue reports after new information about the company is released.  These reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time.[31]

---

[31]  The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock.  In particular, courts have relied on analyst reports in determining what information is important to the market in valuing a stock and in determining the cause of stock price movements.  See, for example, *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla. March 30, 2006) ("Specifically, the analyst reports on September 3, 2002, September 23, 2002, October 8, 2002, and January 23, 2003 address ratings cuts, opinions, and predictions regarding TECO's stock value but do not reference any misstatements, omissions, or accounting practices by Defendants as the reason for the bleak forecasts or changes in market conditions.") and *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex. Sept. 25, 2006) ("Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated.").  The First Circuit has also recommended analyzing contemporaneous content for explaining stock price movements, citing a paper that specifically describes performing content analysis of analyst reports and commentary.  *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014), citing David Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis," 2007.

14

24.     The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock, and thus, for determining whether a piece of information had price impact.[32]  There were at least 322 reports issued by 14 analysts covering Mohawk during the alleged Class Period. [33]

## VIII. THE ALLEGED MISREPRESENTATIONS REGARDING THE ALLEGED "SATURDAY SCHEME" DID NOT HAVE PRICE IMPACT

25.     As discussed below, the alleged misrepresentations regarding the alleged "Saturday Scheme" did not impact Mohawk's stock price during the alleged Class Period.  The alleged "Saturday Scheme" could not have had an impact on Mohawk's cash flow.  In an efficient market, the only information that affects the stock price is information that affects the market's expectation of the discounted value of future cash flows. [34] The magnitude of the alleged "Saturday Scheme" was tiny relative to the Company as a whole, representing approximately 0.18% of Mohawk's revenues. Moreover, the alleged "Saturday Scheme" only "boosts" revenues in the one quarter when the alleged scheme is introduced, while for later quarters, the continuation of the alleged scheme has no effect at all.  The analysts covering Mohawk described the alleged "Saturday Scheme" as "miniscule," "a rounding error," and an alleged scheme for which the "juice is not worth the squeeze."  Contrary to Plaintiff's claim, the alleged scheme had no effect on whether Mohawk met analysts' revenue expectations (either

---

[32]  Courts often look to the number of analyst reports published on a company as an indication of market efficiency. See, for example, *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[33]  Based on available analyst reports from Thomson Reuters and documents produced in discovery.

[34]  *See*, for example, Bradford Cornell, *Corporate Valuation* (New York: McGraw-Hill, 1993), p. 108, and Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 7th ed., 2003), p. 366

15

consensus or for any individual analyst) nor did it affect Mohawk's reported earnings per share. The alleged scheme also did not have an impact at the end of the alleged Class Period since according to Plaintiff the alleged scheme continued through the end of the alleged Class Period and into 2020.[35] Thus, the alleged "Saturday Scheme" did not impact Mohawk's stock price, and there is no link between the alleged scheme and Mohawk's stock price movements.

### A.   The alleged "Saturday Scheme" did not have an impact on Mohawk's cash flows

26.     According to Plaintiff, the alleged scheme involved recognizing "failed 'delivery attempts' as 'sales' dollars in the current quarter even though the product never changed hands to a customer."  In other words, Plaintiff alleges that Mohawk recognized the revenue on its books, but that a sale never actually occurred, meaning cash was never exchanged between Mohawk and its customers.[36]  According to the Amended Complaint:

> Throughout the Class Period, and unknown to investors, at the end of each financial quarter, employees in Mohawk's North American distribution centers were instructed to load goods on Company trucks on Fridays and pretend to **deliver the goods on Saturdays to customers they knew were closed for deliveries and, thus, not there to accept or reject them** (the "Saturday Scheme").  Mohawk would nevertheless book the revenue from these "sales" as soon as the products were put on Mohawk's trucks. Eventually, many employees stopped even pretending to deliver the products and **simply scanned them as having been delivered and recorded the "sales" without the products ever leaving the Company's warehouses**.[37]

27.     Since the sales associated with the alleged "Saturday Scheme" were never actually made and cash was never exchanged, the alleged scheme could not have had an impact on Mohawk's cash flow.  According to finance theory, in an efficient market, the only

---

[35]  Amended Complaint, ¶231.

[36]  Amended Complaint, ¶110.

[37]  Amended Complaint, ¶2.

information that affects the price of a stock is information that affects the market's expectation of the discounted value of future cash flows. [38]  That is, the cash flows themselves and the riskiness of achieving them are ultimately the only factors affecting the stock price.[39]  For example, Bradford Cornell's book, *Corporate Valuation*, states the following:[40]

> [E]conomic theory predicts that investor value is derived from cash flow. If market prices reflected some other measure of income, such as accounting earnings rather than cash flow, that would be evidence that the market was inefficient. […] To summarize, intuition, finance theory, and empirical research all support the view that corporate value is based on expectations of future cash flow.

28.    Similarly, according to *Principles of Corporate Finance,* a commonly cited finance textbook: [41]

> In an efficient market there are no financial illusions. Investors are unromantically concerned with the firm's cash flows and the portion of those cash flows to which they are entitled

29.    Moreover, as discussed below, the alleged scheme could only have an impact on the one quarter when the alleged scheme was introduced and the effect on that one quarter is a tiny fraction of Mohawk's revenue.[42]

---

[38]  See, for example, Brealey, Richard A., Stewart C. Myers and Franklin Allen, Principles of Corporate Finance (McGraw-Hill: New York, NY, 7th ed., 2003), p. 366.

[39]  The riskiness of the cash flows affects the stock price via the discount factor. See, for example, Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 7th ed., 2003), p. 239.

[40]  Bradford Cornell, *Corporate Valuation* (New York: McGraw-Hill, 1993), p. 108.

[41]  Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 7th ed., 2003), p. 366

[42]  Note, even if the alleged scheme was bigger and had an effect on more quarters, there would still be no impact on Mohawk's cash flows.

**B.    The magnitude of the alleged "Saturday Scheme" represents only a tiny fraction of Mohawk's revenues**

30.    The purported magnitude of the alleged "Saturday Scheme" represents only a tiny fraction of Mohawk's overall revenues.  According to Plaintiff, the magnitude of the alleged "Saturday Scheme" was of "four to five million pounds of product every [quarter],"[43] which, according to analysts, translates to $4 to $5 million in revenue per quarter.[44]  In contrast, Mohawk's quarterly revenue during the alleged Class Period averaged $2.45 billion and was never lower than $2.22 billion.  Thus, the alleged "Saturday Scheme" would have increased Mohawk's quarterly revenue, on average, by approximately 0.18% or, at most, 0.20%.  The chart below shows Mohawk's quarterly revenue during the alleged Class Period.

---

[43]    Amended Complaint, ¶133.

[44]    *See,* "MHK: The Lawsuit Saga Hasn't Found A Floor, But 2Q EPS/Sales Have," *Wells Fargo*, July 13, 2020, "Thoughts on Litigation; Raising 2Q20 Earnings Estimates," *Evercore*, July 9, 2020, and "Devil's Advocate," *Barclays*, July 13, 2020.



31.     The chart below shows Mohawks reported quarterly revenues along with the portion of the revenue affected by the alleged "Saturday Scheme." To illustrate the relative size of the alleged "Saturday Scheme," the chart below focuses on 1Q17. As the chart illustrates, the magnitude of the alleged "Saturday Scheme" relative to Mohawk's net sales is so small that it can only be detected when magnified.

19



Notes and Sources:
Data from Mohawk's SEC Filings and the Amended Complaint.

C.    **Contrary to Plaintiff's theory, the alleged "Saturday Scheme" could not have helped Mohawk obtain "record sales quarter after quarter" but at most impacts the one quarter when introduced**

32.    Plaintiff claims that Mohawk developed the alleged "Saturday Scheme" to inflate sales and thereby report "record sales quarter after quarter driving up its stock price."[45] However, according to Plaintiff's own theory, the alleged "Saturday Scheme" would have only *increased* Mohawk's revenues on the quarter when the alleged scheme was introduced.  Thus,

---

[45]   Amended Complaint, ¶109.

the alleged scheme *could* not have helped Mohawk obtain "record sales quarter after quarter" throughout the alleged Class Period.

33.      According to Plaintiff, when the alleged scheme was first implemented, the Company would book revenues for sales that were never actually made, thus *boosting* revenues for that quarter.  However, in the subsequent quarters, the alleged scheme would essentially have *no impact* on revenues: the boost in revenues from again implementing the alleged scheme at the end of the quarter would be offset by Mohawk having to record a negative charge for the sales that were never actually made but booked in the prior quarter.  In other words, once implemented, the alleged Saturday Scheme would have to continue each quarter simply to offset the negative charge associated with the initial boost.  According to Plaintiff's theory, once the alleged scheme stopped, there would be a *decrease* in net revenues.

34.      Plaintiff's claim that Mohawk implemented the alleged scheme throughout the alleged Class Period except in 2Q18 and 3Q18.[46]  Thus, the alleged scheme would only have a net *positive* impact on 1Q17, when the alleged scheme was allegedly first introduced, and on 4Q18, when the alleged scheme was allegedly re-introduced after the two-quarter pause.  The alleged scheme would have a net *negative* impact on 2Q18, when the alleged scheme was first stopped.  There would be no net effect on revenues from the alleged scheme in all other quarters. The table below summarizes the net impact of the alleged "Saturday Scheme" on Mohawk's revenue during each quarter of the alleged Class Period.

---

[46]   Amended Complaint, ¶136.

**Exhibit 5**
**Impact of the Alleged "Saturday Scheme" on Mohawk's Revenue**
**According to Plaintiff's Theory**

| Quarter | Saturday Scheme Implem. In Quarter? | Revenue from Saturday Scheme[1] | Product Returns Related to Saturday Scheme | Net Impact of Saturday Scheme on Revenue | Mohawk's Total Revenue | | |
|---|---|---|---|---|---|---|---|
| | | | | | As Reported | But For Sat. Scheme | % Diff |
| (1) | (2) | (3) | (4) =prior(3)*-1 | (5) =(3)+(4) | (6) | (7) =(6)-(5) | (8) =(6)/(7)-1 |
| 1. 1Q17 | Yes | $4.5M | $0.0M | $4.5M | $2.221B | $2.216B | 0.20% |
| 2. 2Q17 | Yes | $4.5M | -$4.5M | $0.0M | $2.453B | $2.453B | 0.00% |
| 3. 3Q17 | Yes | $4.5M | -$4.5M | $0.0M | $2.449B | $2.449B | 0.00% |
| 4. 4Q17 | Yes | $4.5M | -$4.5M | $0.0M | $2.369B | $2.369B | 0.00% |
| 5. 1Q18 | Yes | $4.5M | -$4.5M | $0.0M | $2.412B | $2.412B | 0.00% |
| 6. 2Q18 | No | $0.0M | -$4.5M | -$4.5M | $2.577B | $2.582B | -0.17% |
| 7. 3Q18 | No | $0.0M | $0.0M | $0.0M | $2.546B | $2.546B | 0.00% |
| 8. 4Q18 | Yes | $4.5M | $0.0M | $4.5M | $2.449B | $2.444B | 0.18% |
| 9. 1Q19 | Yes | $4.5M | -$4.5M | $0.0M | $2.442B | $2.442B | 0.00% |
| 10. 2Q19 | Yes | $4.5M | -$4.5M | $0.0M | $2.584B | $2.584B | 0.00% |

**Notes and Sources:**

Data from Mohawk's SEC Filings and analyst reports covering Mohawk. Plaintiff claims that Mohawk "utilized the Saturday Scheme to inflate its sales in every quarter of the Class Period, except when the Company temporarily abandoned the scheme in the second and third quarters of 2018." Amended Complaint, ¶136.

[1] Based on average impact of alleged "Saturday Scheme" according to analysts. "Devil's Advocate," *Barclays*, July 13, 2020, "Thoughts on Litigation; Raising 2Q20 Earnings Estimates," *Evercore*, July 9, 2020 and "MHK: The Lawsuit Saga Hasn't Found A Floor, But 2Q EPS/Sales Have," Wells Fargo, July 13, 2020.

35.     The chart below shows the effect that the alleged "Saturday Scheme" would have on Mohawk's revenues on each of the quarters during the alleged Class Period. Note that the actual effect on revenue of the alleged scheme is too small to be observable on the blue bars below. (See magnified version in Exhibit 4 above.)

22



**Exhibit 6**
**Impact of the Alleged "Saturday Scheme" on Mohawk's Revenue**

36.     The fact that the alleged "Saturday Scheme" could have had a positive impact in only two out of ten quarters of the alleged Class Period, and that this positive impact would have represented only a tiny fraction of Mohawk's overall revenues, directly contradict Plaintiff's claim that Mohawk's "record sales quarter after quarter" were achieved through the alleged "Saturday Scheme."[47]

37.     Moreover, Plaintiff's own Amended Complaint makes clear that the alleged "Saturday Scheme" did not have an impact when it was paused in the second and third quarters of 2018, because it would not have made a difference to Mohawk's overall results.[48]  The alleged

---

[47]   Amended Complaint, ¶109.

[48]   *See*, Amended Complaint, ¶136, which states that "the Company was not going to engage in the Saturday quarter-end practice because the Company was so far away from making its numbers [...]"

scheme also did not have an impact at the end of the alleged Class Period since according to Plaintiff, the alleged scheme continued through the end of the alleged Class Period and into 2020.[49]

### D. The alleged "Saturday Scheme" would not have affected whether Mohawk met analysts' revenue expectations

38.     Plaintiff claims that Mohawk utilized the alleged "Saturday Scheme" to provide "the necessary boost for the Company to barely meet or beat" analysts' estimates.[50]  However, the purported magnitude of the alleged "Saturday Scheme" was much smaller than Mohawk's revenue surprises for the two quarters where the alleged scheme would have positively impacted Mohawk's revenue.  Thus, the alleged "Saturday Scheme" would not have affected whether Mohawk met analysts' revenue expectations.

39.     In particular, in 1Q17, the first quarter when the alleged scheme was allegedly introduced, Mohawk missed analysts' revenue estimates by $46.1 million, more than ***ten times*** the purported $4.5 million magnitude of the alleged "Saturday Scheme."  Thus, the alleged "Saturday Scheme" would not have even helped Mohawk get close to meeting analysts' revenue expectations in 1Q17. Moreover, in 4Q18, the quarter when the alleged scheme was allegedly first re-introduced, Mohawk would have beaten analysts' consensus revenue estimates even without the additional revenue from the alleged "Saturday Scheme." In other words, re-introducing the alleged "Saturday Scheme" in 4Q18 would not have had the effect of helping Mohawk meet analysts' revenue estimates as Plaintiff alleges.

---

[49]  Amended Complaint, ¶231.

[50]  Amended Complaint, ¶137.

24

40.     Moreover, as shown in the table below, in 1Q17 the purported magnitude of the alleged "Saturday Scheme" was much smaller than all of the individual analysts' revenue surprises and would not have helped Mohawk meet or beat any of the individual analysts' estimates.

---

**Exhibit 7**
**Analysts' Revenue Surprise in 1Q17**
**vs. Alleged Impact of "Saturday Scheme"**

| Analyst | Revenue | | Could "Saturday Scheme" Have Affected Whether a Beat/Miss? |
| | Estimate[1] | Surprise | |
|---|---|---|---|
| (1) | (2) | (3) =$2.221B-(2) | (4) |
| **Actual** | **$2.221B** | - | - |
| *Consensus* | *$2.267B* | *$0.046B. miss* | *No* |
| Barclays | $2.256B | $0.035B. miss | No |
| Bank of America | $2.257B | $0.036B. miss | No |
| Evercore | $2.269B | $0.048B. miss | No |
| MKM | $2.309B | $0.089B. miss | No |
| RBC | $2.291B | $0.070B. miss | No |
| SunTrust | $2.266B | $0.045B. miss | No |
| J.P.Morgan | $2.295B | $0.074B. miss | No |
| Wells Fargo | $2.258B | $0.037B. miss | No |

**Notes and Sources**
Data from Mohawk's SEC Filings and analyst reports covering Mohawk. Note that Gabelli & Company did not report its 1Q17 revenue estimate in its February 13, 2017 or April 27, 2017 reports, so it is excluded from this list.

[1] The revenue estimate is the last estimate available before Mohawk's earnings announcement for 1Q17.

---

25

41.     Similarly, as shown in the table below, in 4Q18 all of the individual analysts' revenue surprises were positive by more than the purported magnitude of the alleged "Saturday Scheme," and Mohawk would have beaten all the of the individual analysts' revenue estimates even without the alleged scheme.

---

**Exhibit 8**
**Analysts' Revenue Surprise in <u>4Q18</u>**
**vs. Alleged Impact of "Saturday Scheme"**

| Analyst | Revenue | | Could "Saturday Scheme" Have Affected Whether a Beat/Miss? |
|---|---|---|---|
| | Estimate[1] | Surprise | |
| (1) | (2) | (3) =$2.449B-(2) | (4) |
| **Actual** | **$2.449B** | - | - |
| *Consensus* | *$2.435B* | *$0.014B. beat* | *No* |
| Bank of America | $2.370B | $0.079B. beat | No |
| Barclays | $2.415B | $0.034B. beat | No |
| Buckingham Research | $2.437B | $0.011B. beat | No |
| Credit Suisse | $2.461B | $0.012B. miss | No |
| Evercore | $2.420B | $0.029B. beat | No |
| J.P.Morgan | $2.434B | $0.015B. beat | No |
| Jefferies | $2.421B | $0.028B. beat | No |
| RBC | $2.387B | $0.062B. beat | No |
| SunTrust | $2.485B | $0.037B. miss | No |
| Wells Fargo | $2.435B | $0.014B. beat | No |

**Notes and Sources**
Data from Mohawk's SEC Filings and analyst reports covering Mohawk. Note that Gabelli & Company did not report its 4Q18 revenue estimte in its October 29, 2018 or February 11, 2019 reports, so it is excluded from this list.
[1] The revenue estimate is the last estimate available before Mohawk's earnings announcement for 4Q18.

26

### E.    The alleged "Saturday Scheme" had no effect on reported earnings per share

42.    Plaintiff claims that Mohawk utilized the alleged "Saturday Scheme" to provide "the necessary boost for the Company to barely meet or beat" analysts' estimates.[51]  However, Mohawk would have reported essentially the same EPS figures after removing the impact of the alleged "Saturday Scheme" since the magnitude of the alleged scheme was so small relative to Mohawk's overall revenues and earnings.

43.    As discussed previously, the alleged scheme would only have a net *positive* impact on Mohawk's financial results for 1Q17 and 4Q18 and would have a net *negative* impact on Mohawk's financial results for 2Q18.  As the table below shows, for each of the three quarters where the alleged "Saturday Scheme" would have had an impact, Mohawk would have reported the same EPS figures with or without the alleged "Saturday Scheme."  The impact of the alleged "Saturday Scheme" was less than a penny in EPS.  Moreover, according to Plaintiff's own expert, Dr. Hartzmark, "one penny [of EPS] was not a substantial amount."[52]

---

[51]   Amended Complaint, ¶137.

[52]   Hartzmark Deposition, 183:2-19.

27

**Exhibit 9**
**Impact of the Alleged "Saturday Scheme" on Mohawk's Adjusted EPS**
**According to Plaintiff's Theory**

| Quarter | Reported Adj. EPS | Revenue Impact from Sat. Scheme | Flooring NA Operating Margin | Earnings Impact from Sat. Scheme | EPS Impact from Sat. Scheme | Adj. EPS But For Sat. Scheme |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| | | | | =(3)×(4)×[1-tax rate] | | =(2)-(6) |
| 1Q17 | $2.72 | $4.5 M | 10% [1] | $0.25 M [2] | $0.003 [4] | $2.72 |
| 2Q18 | $3.51 | -$4.5 M | 10% [1] | -$0.31 M [3] | -$0.004 [4] | $3.51 |
| 4Q18 | $2.53 | $4.5 M | 8% [1] | $0.26 M [3] | $0.004 [4] | $2.53 |

**Notes and Sources:**

Data from Mohawk earnings press release.

[1] Calculated by dividing Mohawk's Flooring NA segment quarterly operating income by net sales.

[2] Using Mohawk's FY17 domestic effective tax rate of 43.1% from Mohawk's FY17 10-K.

[3] Using Mohawk's FY18 domestic effective tax rate of 28.7% from Mohawk's FY18 10-K.

[4] Calculated by dividing earnings impact by Mohawk's diluted weighted-average shares outstanding.

### F. The analysts covering Mohawk described the alleged "Saturday Scheme" as "miniscule," "a rounding error," and an alleged scheme for which the "juice is not worth the squeeze"

44. The details about the alleged "Saturday Scheme" were first disclosed to the market when Plaintiff's Amended Complaint became public in July 2020.[53]  The analysts covering Mohawk, after reviewing Plaintiff's Amended Complaint, described the alleged "Saturday Scheme" as "miniscule," "a rounding error," and an alleged scheme for which the "juice is not worth the squeeze."[54]  For example, the Barclays analysts covering Mohawk

---

[53] "MHK: Details on Class Action Lawsuit," *Wells Fargo,* July 9, 2020.

[54] Note that Mohawk's stock had a negative reaction after the allegations in the Amended Complaint became public and that some analysts were worried that the allegation in the Amended Complaint created uncertainty about the Company's financials and a potential restatement; however, the Company conducted an internal investigation and found that the allegations in the Amended Complaint were unfounded, the financials were never restated and Mohawk's stock bounced back.  *See*, Mohawk 3Q20 Form 10-Q, filed October 30, 2020, p. 28.

indicated that the size of the alleged "Saturday Scheme" was "close to a rounding error for [Mohawk], possibly to the order of one half of one percent of quarterly [Flooring North America] segment revenues."

> We estimate that MHK's Flooring N.A. segment alone ships nearly ~4 billion square feet of flooring annually.  (One can make their own estimate of how many pounds one square foot of carpet or vinyl tile represents, but anywhere from 0.5-2 lbs might be reasonable).  Indeed, one square foot of both carpet and vinyl tile typically sells for about $1 on average at the manufacturer level.  MHK's FY'19 Flooring N.A. revenues were $3.8 billion, and MHK's consolidated revenues were $10.0 billion.  **Put simply, 4 to 5 million pounds are close to a "rounding error" for MHK, possibly to the order of one half of one percent of quarterly [Flooring North America] segment revenues**. [Barclays, 7/13/20, emphasis added]

45.     Similarly, the Wells Fargo analysts covering Mohawk stated that the size of the alleged "Saturday Scheme" was less than $4 million per quarter, a "miniscule" amount relative to Mohawk's North America sales.

> However, the lawsuit also alleges that MHK stuffed the channel with 4M to 5M pounds of various flooring products quarterly—assuming 2.4 pounds per square foot across product lines, and $1.60 per foot retail sales price, we believe the lawsuit only alleges **<$4M in channel stuffing quarterly, or a miniscule 0.3% of 2019 North America sales**. [Wells Fargo, 7/13/2020, emphasis added]

46.     The Evercore analysts covering Mohawk indicated that given the relatively small size of the alleged "Saturday Scheme," "the juice wouldn't be worth the squeeze," and that scheme "would only benefit reported figures once," i.e., the alleged scheme would only have an impact the first time it was introduced.

> [N]umerous contacts have suggested that this amount of product might inflate sales by a little more than $5mm (and **would only benefit reported figures once**).  Even if one were inclined to believe the allegations, it seems to us that **the juice wouldn't be worth the squeeze**. [Evercore, 7/9/20, emphasis added]

29

IX.   **THE DECLINE IN MOHAWK'S STOCK PRICE AT THE END OF THE ALLEGED CLASS PERIOD IS NOT EVIDENCE OF PRICE IMPACT OF ANY OF THE ALLEGED MISREPRESENTATIONS**

47.    The decline in Mohawk's stock price after the July 25, 2019 alleged corrective disclosure at the end of the alleged Class Period is not evidence of price impact of the alleged misrepresentations.  Contrary to Plaintiff's theory, the decline in Mohawk's stock price at the end of the alleged Class Period was *not* due to the revelation of any past issues related to the alleged misrepresentations but rather due to the announcement of lower-than-expected guidance for the future.  The decline in Mohawk's stock price could not be due to the alleged "Saturday Scheme" since, according to Plaintiff, Mohawk continued to implement the alleged scheme through the end of the alleged Class Period and into 2020.  Similarly, the decline in Mohawk's stock price could not be due to the Company's other alleged fraudulent schemes related to LVT inventory and LVT overproduction since the Company announced improvements, not issues, in its LVT segment.  Instead, the decline in Mohawk's stock price at the end of the alleged Class Period was due to a reduction in guidance driven by the effect that new macroeconomic issues, including cost inflation, lower demand, increased competition and tariffs, were expected to have on Mohawk's future business, an expectation that was precipitated by Mohawk's announcement at the end of the alleged Class Period.  These macroeconomic issues were also affecting other flooring companies around the end of the alleged Class Period.

**A.    Contrary to Plaintiff's theory, the decline in Mohawk's stock price at the end of the alleged Class Period was due to the announcement of lower-than-expected guidance for the future and not due to the revelation of any past issues related to the alleged misrepresentations**

48.    Plaintiff's claim that at the end of the alleged Class Period, Mohawk announced "disastrous results for Q2 2019" that "finally revealed" the alleged fraudulent schemes, corrected

30

the alleged misrepresentations and caused a large decline in Mohawk's stock price.[55]  However,

contrary to Plaintiff's theory, the decline in Mohawk's stock price at the end of the alleged Class

Period was due to the announcement of lower-than-expected guidance for the future and not due

to the revelation of any past issues related to the alleged misrepresentations or the alleged

fraudulent schemes, or the announcement of results for the current quarter, 2Q19.

49.     On July 25, 2019, after market hours, Mohawk announced its financial results for

2Q19.  The Company reported adjusted EPS of $2.89, two cents above analysts' consensus of

$2.87, and at the "high end of management's guidance," as well as operating and gross margins

that were higher than the market's expectations.[56]  The Company also reported net sales for the

quarter that were below analysts' consensus and EPS guidance for 3Q19 that was 14% below

analysts' expectations.[57]  According to analysts, even though Mohawk's results for 2Q19 were

generally ahead of or in-line with expectations, the lower-than-expected EPS guidance for 3Q19

was the news that would negatively "hit the stock."  For example:

> **We expect a solidly negative reaction by the stock tomorrow**, as while 2Q Operating
> EPS was roughly in-line with the Street and our estimate, at the same time, and **more
> importantly, in our view, 3Q guidance of $2.58-2.68 was well below the Street's
> $3.05** as well as below our Street-low $2.75E. [J.P. Morgan, 7/25/19, emphasis added]

> Bottom line results were as expected in the quarter, despite a weak topline, on raw
> material savings and cost work **but EPS guidance for 3Q19 was far below the Street
> and will hit the stock**. [SunTrust, 7/25/19, emphasis added]

---

[55]  Amended Complaint, ¶¶253-254.

[56]  "Mohawk Industries Reports Q2 Results," *Mohawk Press Release*, dated July 25, 2019, "Weak Guidance Shows
Market Issues; Puts Turnaround On Hold," *SunTrust,* July 26, 2019 and "2Q19 First Look - 2Q Beat but 3Q
Guide Below Consensus," *Buckingham Research,* July 25, 2019.

[57]  Mohawk announced revenue of $2.58B. vs. analysts' consensus of $2.65B, as well as 3Q19 EPS guidance range
of $2.58-$2.68 which, at the midpoint of $2.63, is 14% lower than analysts' consensus of $3.06. See, "Mohawk
Industries Reports Q2 Results," *Mohawk Press Release*, dated July 25, 2019 and analysts' consensus estimates
from I/B/E/S, accessed via FactSet Research Systems, Inc.

Quarterly **guidance of $2.63 is once again significantly below consensus'** $3.07, implying another quarter of ~20% YoY EPS declines. **We expect the equity trades down** ahead of the 11ET conf. call. [Wells Fargo, 7/25/19, emphasis added]

Mohawk reported 2Q19 adjusted EPS of $2.89 vs. our $2.91 and the Street's $2.87 estimate. **Following earnings, MHK traded down 18% despite an in-line quarter, as the company's disappointing 3Q19 guide of $2.58-$2.68 was well below consensus' $3.06 estimate.** [Evercore, 7/26/19, emphasis added]

MHK reported Q2 results that were in-line with expectations but **provided Q3 guidance well below what we had anticipated** (EPS of $2.58-2.68 vs. our expectations of $3.00) [Gabelli & Company, 7/29/19, emphasis added]

50.     Not only is Mohawk's price drop at the end of the alleged Class Period not due to the revelation of any of the alleged misrepresentations since it is about forward-looking statements, but additionally the forward-looking statements themselves cannot be related to the alleged fraud. First, the guidance reduction for 3Q19 could not have been attributed to the alleged "Saturday Scheme" since, according to Plaintiff, Mohawk continued to implement the alleged scheme through the end of the alleged Class Period and into 2020, and thus there could not have been a negative impact from stopping the alleged scheme in 2Q19 or 3Q19.[58]

51.     Moreover, the lower-than-expected EPS guidance for 3Q19 could not have been attributed to the Company's other alleged fraudulent schemes related to LVT inventory and LVT overproduction since the Company announced improvements, rather than issues with regard to in

---

[58]   Amended Complaint, ¶231.

Note, even if the alleged "Saturday Scheme" did affect the guidance for 3Q19, the magnitude of the alleged scheme was a small fraction of the overall reduction in guidance.  In particular, the Company's reduction in EPS guidance resulted in analysts changing their estimate of Mohawk's net sales for 3Q19 by approximately $95 million, over 20 times the purported $4.5 million magnitude of the alleged "Saturday Scheme." Data from I/B/E/S, accessed via FactSet Research Systems, Inc., which shows that analysts' consensus estimate of revenue for 3Q19 was revised from $2.61B. to $2.51B., a difference of $95M.

its North America LVT production.[59] For example, Jefferies noted that Mohawk's results in its LVT business were "positive" and "in-line with the market:"

> **On a positive note, MHK is growing its LVT business at 20%+, in-line with the market**, as it ramps up its production and import capabilities through 2020.  The LVT lines are expected to contribute to EBITDA in early 2020 and be optimized by the end of 2020, with the potential of adding an incremental $70+ mil of EBITDA over time. [Jefferies, 7/26/19, emphasis added]

52.    Similarly, the SunTrust analysts commented that Mohawk's LVT business "looks better but new issues emerge."[60]

53.    Mohawk's LVT business in North America was not only improving but doing so well that it was "cannibalizing" Mohawk's other product lines, which would be contrary to Plaintiff's theory that Mohawk "hid unsalable 'scrap' LVT in its inventory" or that Mohawk overproduced LVT to inflate profit margins.[61] For example, according to analysts:

> In NA. LVT manufacturing lines are improving but at the same time is also cannibalizing other categories creating issues for the rest of MHK portfolio. [Gabelli, 7/29/19]

> Although LVT manufacturing volumes and margins likely improve, we find these sales cannibalistic of MHK's remaining projects, which will largely offset the profit improvement. [Wells Fargo, 7/28/19]

54.    Note that the only issues reported by Mohawk in its LVT segment at the end of the alleged Class Period were for the European LVT business, which is not part of any of the alleged fraud.

> Additionally, the ramp up of MHK's new manufacturing assets also appears to be over a longer than expected timeline, as **the company's third European LVT line**, which is

---

[59]  *See*, "Mohawk Industries Reports Q2 Results," *Mohawk Press Release*, dated July 25, 2019, which states that the Company was "making substantial progress with [its] LVT manufacturing, with production increasing more than 30% in the period."

[60]  "LVT Looks Better But New Issues Emerge," *SunTrust*, July 25, 2019.

[61]  Amended Complaint, ¶372.

33

roughly three months ahead of its second U.S. LVT line from a production and efficiency standpoint, **is only expected to turn past breakeven next year, while profits "may happen" in 2H20, followed by optimized production that could possibly take longer (i.e., 2021)**.  [J.P.Morgan, 7/29/19, emphasis added]

Some will argue MHK's LVT improvement will be meaningful to the bottom-line. **Although the European rigid LVT line is almost producing at the same pace as the "older" lines, it's still not at break-even and we believe won't be until 2020, while not fully optimized until 2021+.** [Wells Fargo, 7/28/19, emphasis added]

55.     Moreover, Plaintiff's claim that at the end of the alleged Class Period, "the Company disclosed that, contrary to Defendants' recent assurances, the Company's difficulties reducing inventory were far from over, and that it still had excess inventories that necessitated 'taking actions' to 'manage our inventory' and 'improve sales,' especially in Flooring North America."[62] However, Mohawk's announcement at the end of the alleged Class Period regarding inventory issues did not relate to the Flooring NA segment, the segment of the alleged fraud, but instead related to the Company's Global Ceramic segment, a segment unrelated to Plaintiff's overproduction and inventory allegations.[63] As discussed below, the inventory issues in Global Ceramic were due to the sharp increase in imports of Chinese ceramic products ahead of likely tariffs, and not to any issues related to the alleged fraud.[64]

---

[62]   Amended Complaint, ¶253.

[63]   Mohawk announced that in "**U.S. ceramic**, lower demand and purchases ahead of tariffs have created excess inventory in the market […]" *See*, "Mohawk Industries Reports Q2 Results," *Mohawk Press Release*, dated July 25, 2019, emphasis added.

[64]   *See*, for example, "Post-Call Notes: Less Good (i.e., Positive Catalysts), More Bad (Headwinds Persisting/Worsening); Underweight," *J.P.Morgan*, July 29, 2019 and "2Q19 First Look - 2Q Beat but 3Q Guide Below Consensus," *Buckingham Research*, July 25, 2019.

**B.** **The specific reasons for the reduction in Mohawk's guidance at the end of the alleged Class Period did not relate to the alleged misrepresentations but rather to a new understanding of the effect of macroeconomic issues on the Company's business**

56.     Analysts did not attribute the reduction in Mohawk's guidance and the stock price drop at the end of the alleged Class Period to any of the alleged misrepresentations or to any new understanding about the past but rather to a new understanding of the effect of macroeconomic issues on the Company's business.  For example, SunTrust, in a report titled "Weak Guidance Shows Market Issues," noted:

> **3Q19 Guidance Weak; New Macro Issues.** Management provided 3Q19 EPS guidance of $2.81-$2.91, below the consensus of $3.06.  Management indicated that **many markets have become more challenged**, notably in the Ceramic segment where inventory levels are elevated, as well as a more competitive pricing environment in US residential carpet.  **We anticipate these new issues to persist through the remainder of the year**. [SunTrust, 7/26/19, emphasis added]

57.     Similarly, RBC noted the macroeconomic headwinds that were affecting Mohawk:

> Our FY'19E Adj. OM% falls to 9.5% (-240 bps y/y) from 9.7% prior. The change is driven by reductions to our prior ests. in both Flooring NA and Global Ceramic **driven by greater price/mix headwinds and a lack of op. leverage amid a weakened macro environment, the persistence of heightened competition, and further LVT cannibalization**. [RBC, 7/28/19, emphasis added]

58.     Analysts noted several macroeconomic issues that were affecting Mohawk, including cost inflation, lower demand, increased competition and the effect of tariffs on Chinese imports.

**Cost inflation**

59.     According to analysts, investors had "hoped for input costs to reverse and provide a tailwind to EBIT in 2Q and beyond."[65]   However, at the end of the alleged Class Period, analysts noted that cost inflation had affected and would continue to affect the Company's business throughout 2019.  For example, RBC indicated that the Company's margins were expected to be pressured throughout 2019 by freight and raw material inflation, as well as other macroeconomic headwinds, and that it would be difficult for Mohawk to pass on those price increases to its customers in the near term:

> **We expect continued margin pressures across segments through '19 from freight/raw material inflation**, increased levels of competition, customers' willingness to trade down to lower price/value products, and negative mix shifts. **We believe it will remain difficult to pass on sufficient price to offset these in the near term. As a result, we expect earnings to decline in '19, in contrast to the broader building products peer group.** [RBC, 7/28/19, emphasis added]

60.     Similarly, other analysts noted that cost inflation, along with other macroeconomic headwinds, were affecting the Company's business. For example:

> The lower volume hurt operating margin, as well as inflation and the costs to ramp up the LVT production.  The company has several cost actions to improve margin, but we believe 2H19 will be tough for this segment. [SunTrust, 7/26/19]

> Flooring NA revenue declined 7% YoY to $983mm (BofAMLe $1,052mm), driven by unfavorable product mix. Segment operating income of $62.9mm (BofAMLe $48mm) was well above our estimate but down 43% YoY driven by lower volume, inflation and LVT start-up costs. Global Ceramic revenue increased 3.1% YoY to $958mm (BofAMLe $979mm), driven by the Eliane acquisition in Brazil, but was negatively offset by softness in Europe, lower shipping days and FX. Segment operating income of $119mm (BofAMLe $132mm) was below our estimate, as inflation, production curtailment costs and marketing investments were partially offset by productivity. [Bank of America, 7/25/19]

> Bullish investors we have spoken with over the past few months hoped for input costs to reverse and provide a tailwind to EBIT in 2Q and beyond, particularly in Flooring NA. The release and management both highlighted how input costs remained a headwind in

---

[65]   "2Q19 At a Glance," *Evercore*, July 25, 2019.

the quarter, for while raw materials did turn positive, other sources of inflation (energy, labor) more than offset the tailwind from materials. [Evercore, 7/25/19]

Flooring NA margins of 6.4% were solidly above our 5.1%E but down 400 bps YOY, driven by lower volumes, higher inflation and LVT ramp up costs. [J.P. Morgan, 7/29/19]

Margins declined due to heightened competition and elevated inventories.  Cost inflation impacted Ceramics negatively by $20mm, lower volumes and manufacturing down time had an 8mm impact, and selling costs were up $3mm which were partially offset by $16mm lower startup costs and productivity. [Gabelli & Company, 7/29/19]

**Lower demand**

61.     According to analysts, Mohawk was being affected by lower demand across the

Company's footprint. For example, Jefferies indicated that Mohawk was facing a weak demand

environment, which was prompting the Company to take actions, including product curtailments,

promotional activity and shifting to a lower product mix that would affect its margins. For

example:

> **Mgmt expects the weaker demand environment to continue, prompting further production curtailments, promotional activity, and mix shifts lower**. Considering relatively easy comps, it's disappointing the midpoint of the 3Q19 EPS guidance ($2.58 - 2.68) is 14% below consensus ($3.05). [Jefferies, 7/25/19, emphasis added]

62.     Similarly, other analysts noted the impact that the weak demand across the

Company's businesses had on Mohawk's guidance for 3Q19. For example:

> Significant import inventory stocking in the U.S. to end '18 and the lag effect of the slower U.S. resi demand was an ill-fated combo with lingering effects that will indeed persist in 3Q19, including more curtailments, promotions, and negative mix. [Barclays, 7/29/19]

> Further softening of demand across the company's footprint has intensified the competitive pressure from LVT and ceramic imports, especially in the U.S. [RBC, 7/28/19]

> Global flooring demand appears to be softening, and we now expect MHK's organic growth to remain limited through next year. [RBC, 7/28/19]

37

MHK forecasts 3Q19 EPS in the range of $2.58 to $2.68 (revised BofAMLe $2.64), driven by a softer market outlook globally, with the US flooring market as the most challenged. [Bank of America, 7/26/19]

Lastly, MHK provided 3Q EPS guidance of $2.58-2.68, solidly below the Street's $3.05 as well as our $2.75E, as the company cited more challenging conditions across flooring markets around the world resulting in more intense competition. In particular, MHK noted that the U.S. market was the "most difficult" with ceramic seeing lower demand and pre-buy ahead of tariffs causing excess inventory. [J.P. Morgan, 7/25/19]

Ceramics is facing softer demand globally, and the headwinds have been magnified by the excess inventory that has been built in the channel ahead of the tariffs on Chinese imports. [Jefferies, 7/26/19]

**Increased competition**

63.     According to analysts, competition was intensifying in the flooring industry,

which was creating uncertainty about Mohawk's business for the remainder of 2019. For

example:

However, Mohawk guided 3Q19 EPS well below consensus expectations -- to a range of $2.58-$2.68 vs. consensus of $3.06. The company stated in its release that global flooring market have become more challenging and competition more intense, with the U.S. the most difficult market. [Buckingham Research, 7/25/19]

Lastly, MHK provided 3Q EPS guidance of $2.58-2.68, solidly below the Street's $3.05 as well as our $2.75E, as the company cited more challenging conditions across flooring markets around the world resulting in more intense competition. In particular, MHK noted that the U.S. market was the "most difficult" with ceramic seeing lower demand and pre-buy ahead of tariffs causing excess inventory. [J.P. Morgan, 7/25/19]

Demand trends in the quarter continued to weaken across the company's global footprint and the intensifying competitive landscape remains disruptive across categories. Management qualified the U.S. market, which represents 61% of MHK sales, as "the most difficult." [RBC, 7/28/19]

Management indicated that many markets have become more challenged, notably in the Ceramic segment where inventory levels are elevated, as well as a more competitive pricing environment in US residential carpet. We anticipate these new issues to persist through the remainder of the year. [SunTrust, 7/26/19]

Our FY'19E Adj. OM% falls to 9.5% (-240 bps y/y) from 9.7% prior.  The change is driven by reductions to our prior ests. in both Flooring NA and Global Ceramic driven by greater price/mix headwinds and a lack of op. leverage amid a weakened macro environment, the persistence of heightened competition, and further LVT cannibalization. [RBC, 7/28/19]

Margins declined due to heightened competition and elevated inventories. [Gabelli & Company, 7/29/19]

**Effects of Tariffs on Chinese Imports**

64.    Analysts indicated that Mohawk's business was being impacted by the effects of tariffs on Chinese imports. In particular, according to analysts, there was a sharp increase in the import of Chinese ceramic products ahead of likely tariffs, which resulted in a build-up of excess inventory, not just for Mohawk, but for the entire industry, and consequently created increased competition and pricing pressure. For example:

Moreover, the softer demand, along with a recent sharp increase in Chinese ceramic tile imports ahead of likely tariffs, has resulted in excess inventory in the marketplace, further pressuring pricing and mix as well as causing MHK to continue to reduce production levels (this related expense is expected to be "more meaningful" than 2Q levels). [J.P.Morgan, 7/29/19]

MHK believes it is performing in line with the overall U.S. Ceramic market which is being hurt by excess inventory (due to inventory build-up ahead of tariffs) and competition.  MHK expects the U.S. Ceramic market to remain soft in 2H19. [The Buckingham Research, 7/25/19]

Production curtailments weigh on ceramic margins.  Ceramics is facing softer demand globally, and the headwinds have been magnified by the excess inventory that has been built in the channel ahead of the tariffs on Chinese imports.  The latter has led to increased competition and MHK now needs to curtail production, which is expected to last through 4Q19 and a major driver for the earnings revisions in 2H19. [Jefferies, 7/26/19]

Management indicated that many markets have become more challenged, notably in the Ceramic segment where inventory levels are elevated, as well as a more competitive pricing environment in US residential carpet.  We anticipate these new issues to persist through the remainder of the year. [SunTrust, 7/27/19]

Overall, the environment was very challenged given a surge of imports ahead of a recent tariff which caused excess industry inventory, and subsequently competitive pricing

39

pressure.  Management anticipates the US ceramic market to remain soft in 2H19 and is initiating promotional activity to increase volume, as well as introducing lower price points. [SunTrust, 7/27/19]

Margins declined due to heightened competition and elevated inventories.  Cost inflation impacted Ceramics negatively by $20mm, lower volumes and manufacturing down time had an 8mm impact, and selling costs were up $3mm which were partially offset by $16mm lower startup costs and productivity.  Management highlighted the potential for anti-dumping duties on China imports; if these take hold, we believe we will see better pricing dynamics in the category which will help support better margins beyond Q3. [Gabelli & Company, 7/29/19]

### C.  The macroeconomic headwinds announced at the end of the alleged Class Period reversed the expectations of improving conditions formed in the prior quarter and Mohawk's stock price gave up the gains it had earned

65.     The macroeconomic headwinds announced at the end of the alleged Class Period reversed the expectations of improving conditions formed over the quarter and consequently, Mohawk's stock price gave up the gains it had earned in the last three months since the 1Q19 results were announced.

66.     As the chart below shows, over the three months prior to the end of the alleged Class Period, Mohawk's stock price had gradually increased from $127.00 on April 26, 2019, the day after Mohawk announced its 1Q19 earnings, to $156.36 on July 25, 2019, the last day of the alleged Class Period when 2Q19 results and guidance for 3Q19 are announced, an increase of 23% in three months.

40



**Exhibit 10**
**Mohawk's Stock Price from 1Q19 to the End of the Alleged Class Period**

Source:
Data from FactSet Research Systems, Inc.

67.     After Mohawk's 1Q19 earnings announcement on April 26, 2019, analysts commented on the improving macroeconomic conditions for the Company, and indicated that those macroeconomic conditions were expected to continue to improve in the future.  For example:

> After 5 quarters of increasingly painful performances, **the U.S. appears to be finally bottoming**.  **The litany of headwinds** (falling volume, negative mix, inflation**,** start-up costs, negative productivity) **all seem to be turning**, **creating modestly better 2Q performances**. [Wells Fargo, 4/26/19, emphasis added]

> … Also LVT sales seem to have accelerated along with **US business in general getting better.** [SunTrust, 4/26/19, emphasis added]

> Our estimate reduction reflects margin headwinds persisting at a greater level than we previously modeled, however, post reset we look for signs of repaired profitability from MHK now aligning production rates with demand **coupled with recovering U.S. housing market growth.** [Barclays, 4/29/19, emphasis added]

41

Given these efforts, **along with improving US housing metrics and retail activity**, the magnitude of profitability declines across its markets should ease as we move through the year. [Credit Suisse, 4/29/19, emphasis added]

With ests re-basing sharply and **sentiment on housing improving as rates fell and the spring selling season off to a solid start,** MHK is one of the few names that have lagged and we could see rallying in 2H19. [Jefferies, 4/30/19, emphasis added]

68.     Three months later, at the end of the alleged Class Period, Mohawk announced 2Q19 results and lower-than-expected guidance for 3Q19.  As discussed above, the lower-than-expected guidance was driven by deteriorating macroeconomic conditions.  Analysts noted that Mohawk's stock price decline at the end of the alleged Class Period was "[giving] back" the gains obtained in the last quarter. [66]  For example:

**MHK stock is +27% since reporting Q1 earnings on 4/25** (S&P was +2%) **as we sensed buy-side expectations had gradually risen on the back of a potentially improving cost environment**, and **accordingly we expect the stock to give back a fair portion of those gains tomorrow.** [Barclays, 7/25/19, emphasis added]

**Bullish investors we have spoken with over the past few months hoped for input costs to reverse and provide a tailwind to EBIT in 2Q and beyond**, particularly in Flooring NA.  **The release and management both highlighted how input costs remained a headwind in the quarter,** for while raw materials did turn positive, other sources of inflation (energy, labor) more than offset the tailwind from materials.  Additionally, management was non-committal when asked if total inputs had peaked or would likely peak in 3Q. [Evercore, 7/25/19, emphasis added]

**The stock had rallied nicely over the past two months as investors became incrementally bullish on the thesis that the worst of the company's challenges were behind it, but these results and the guidance will likely force another reset to expectations and drive investors back to the sidelines.  As a result, we expect the stock will likely come under meaningful pressure tomorrow.** [RBC, 7/25/19, emphasis added]

Moreover, **older headwinds, including softer demand, negative price/mix** and reduced production, **have persisted if not worsened near term,** making the "easing comp" argument for 2H19 more challenging**.** [J.P.Morgan, 7/29/19, emphasis added]

---

[66]   "2Q19 Results First Look," *Barclays,* July 25, 2019.

69.     As the chart above shows, Mohawk's stock price declined to $128.84 after the Company's July 26, 2019 announcement, slightly above the $127.00 price on April 26, 2019 after Mohawk's 1Q19 earnings announcement, erasing almost all of the gains obtained in the last three months.

**D.     Other flooring companies were experiencing similar macroeconomic headwinds as Mohawk around the end of the alleged Class Period**

70.     Plaintiff claims that the decline in Mohawk's stock price at the end of the alleged Class Period was due to the Company's announcement of "disastrous results for Q2 2019" that "finally revealed" the alleged fraud and corrected the alleged misrepresentations.[67]   However, the decline in Mohawk's stock price at the end of the alleged Class Period was due to deteriorating macroeconomic conditions that would affect the Company's future business and not due to the revelation of any past issues related to the alleged misrepresentations.  Consistent with the fact that macroeconomic headwinds were affecting Mohawk, around the end of the alleged Class Period, other flooring companies announced that they were experiencing similar macroeconomic headwinds.

71.     In particular, according to analysts, "Armstrong Flooring, Inc" ("Armstrong Flooring") and "Interface, Inc." ("Interface") were the two other U.S. publicly traded companies in 2019, that like Mohawk, specialized in the production of flooring products.  A review of company announcements and analyst reports shows that Armstrong Flooring and Interface experienced similar macroeconomic headwinds as Mohawk around the end of the alleged Class Period.

**Interface**

---

[67]   Amended Complaint, ¶¶253-254.

72.     Interface is a "global flooring company specializing in carpet tile and resilient flooring, including luxury vinyl tile ("LVT") and rubber flooring."[68]  Around the end of the alleged Class Period, Interface announced its financial results for 2Q19.  Similarly to Mohawk, Interface reported EPS results that beat analysts' estimates and net sales that were below analysts' consensus.[69]  Also similar to Mohawk, analysts decreased their 3Q19 EPS estimates for Interface by 14.3%.[70] According to Interface and analyst covering Interface, around the end of the alleged class period, Interface experienced similar macroeconomic headwinds as Mohawk, including soft market conditions and cost inflation.[71] For example:

> We continue to execute on our value creation strategy and **despite the slow growth macro environment** […] [Interface 2Q19 Earnings Call, 7/26/19, emphasis added]

> I would say on – on a core legacy business, we're still seeing strong growth in the DACH region and **a slowdown pretty much across the board**. **The UK is very soft**. **South Europe has been soft so far this year**. The orders look interesting. **So it's a pretty broad slowdown of the market across Europe**. [Interface 2Q19 Earnings Call, 7/26/19, emphasis added]

> So $20 million of gross productivity offset by **roughly $10 million inflation** to yield $10 million of net productivity [Interface 2Q19 Earnings Call, 7/26/19, emphasis added]

> [T]he near- to intermediate-term nonresidential backdrop appears far less supportive. Specifically, **several key leading macro indicators have softened noticeably in the past year**, and the picture looks eerily similar to the 2014-2015 period that preceded a precipitous drop in stock prices for our nonresidential names. [Seaport Global, 7/17/19, emphasis added]

> Gross margin of 38.8% fell short of our 40.4% estimate and consensus' 40.0%. While strong Americas volume helped gross margin, **softer volume trends in Europe, weaker**

---

[68]  Interface 2019 Form 10-K, filed February 26, 2020, p. 3.

[69]  Interface announced revenue of $357.5M. vs. analysts' consensus of $358.3M., and EPS of $0.51 vs. analysts' consensus of $0.49. See, "Interface Reports Second Quarter 2019 Results," *Interface Press Release*, dated July 25, 2019 and analysts' consensus estimates from I/B/E/S, accessed via FactSet Research Systems, Inc.

[70]  Data from I/B/E/S, accessed via FactSet Research Systems, Inc., which shows that analysts' consensus estimate of Interface's EPS for 3Q19 was revised from $0.49 to $0.42, a decrease of 14%.

[71]  Note that the analyst reports of only two analysts covering Interface in 2019 were available through Thomson Reuters.

**trends in Asia**, and a large (nora) order in Asia each cost between 20-30 bps YoY. [Seaport Global, 7/26/19, emphasis added]

**Armstrong Flooring**

73.     Armstrong Flooring is a "global producer of resilient flooring products for use primarily in the construction and renovation of commercial, residential and institutional."[72] Around the end of the alleged Class Period, Armstrong Flooring announced its financial results for 2Q19.  Similar to Mohawk and Interface, Armstrong Flooring reported EPS results that beat analysts' estimates and revenues that were below analysts' consensus.[73] According to Armstrong Flooring and analyst covering Armstrong Flooring, around the end of the alleged class period, Armstrong Flooring experienced similar macroeconomic headwinds as Mohawk, including soft market conditions, cost inflation and the effect of tariffs.[74] For example:

> [Armstrong has] been working hard to address the continuing trend of **challenging industry dynamics and soft market conditions** […]  During the second quarter, our customers **continued to reduce inventory from elevated levels in previous quarters**. This destocking activity represented the tail end of demand pull-forward into 2018, **ahead of the initial wave of tariffs on Chinese imports** implemented late last year […] That said, the destocking activity, combined with softer end market demand, adversely impacted second quarter sales […] We are working closely with customers to implement price actions **in response to input cost pressures.** [Armstrong Flooring 2Q19 Earnings Call, 8/6/19, emphasis added]

> The decrease in **net sales was largely due to lower volumes and unfavorable mix in almost all product categories**. Volumes were affected by distributor destocking and **soft end market conditions** similar to last quarter. [Armstrong Flooring 2Q19 Earnings Call, 8/6/19, emphasis added]

---

[72]  Armstrong Flooring 2019 Form 10-K, filed March 10, 2020, p. 2.

[73]  Armstrong Flooring announced revenue of $177.7M. vs. analysts' consensus of $194.5M., and EPS of $0.36 vs. analysts' consensus of $0.15. See, "Armstrong Flooring Reports Second Quarter 2019 Results," *Armstrong Flooring Press Release*, dated August 6, 2019, and analysts' consensus estimates from I/B/E/S, accessed via FactSet Research Systems, Inc.

[74]  Note that the analyst reports of only one analyst covering Armstrong Flooring in 2019 was available through Thomson Reuters.

45

We continue to lack visibility on core business stabilization as organic declines continue to be **worse than anticipated even when considering soft end markets and low expectations** [Gabelli, 8/7/19, emphasis added]

The increase to **25% tariffs may also lead to more near term channel inventory related issues** that up until now have been challenging to fully grasp […] **Tariff levels for 2020 are unknown (will they rise will they go away will they stay at 25 %?)** and the risk of future anti-dumping cases are unclear, how fast can supply chain shift out of China, mix has been declining due to lower LVT sales and customer trade-downs when does that stabilize and what kind of an impact will that have […]  All important questions with **very difficult to predict outcome**. [Gabelli, 8/7/19, emphasis added]

[U]nless some of the unknowns turn decidedly positive or more meaningful restructuring is announced **the likelihood of offsetting cost pressures will be challenging at best into 2020**. [Gabelli, 8/7/19, emphasis added]

## X.   DR. HARTZMARK'S ANALYSIS OF MARKET EFFICIENCY IS FLAWED AND UNSCIENTIFIC

74.     Dr. Hartzmark's cause and effect analysis comparing "news days" with "no-news days" is flawed and unreliable. Specifically, Dr. Hartzmark's cause and effect analysis uses a sample that is not large enough by his own standard, includes events that are subject to selection bias, and fails to analyze whether Mohawk stock reacted to any other types of news outside of his narrow definition of "news days."

75.     In addition, Dr. Hartzmark's tests of autocorrelation are unscientific and results driven. Dr. Hartzmark first performs a standard autocorrelation test and finds that Mohawk's stock exhibited autocorrelation during the alleged Class Period, providing direct evidence contrary to a finding that Mohawk's stock traded in an efficient market. However, instead of relying on his standard test to draw a conclusion, Dr. Hartzmark performs additional non-standard tests that are unsupported and results driven to try to support a finding that Mohawk's stock traded in an efficient market.

46

### A. Dr. Hartzmark's analysis comparing "news days" with "no-news days" is flawed and unreliable

76.     Dr. Hartzmark's cause and effect analysis involves testing "whether there was a *difference* between the observed proportions of statistically significant abnormal returns on news days as compared to no-news days."[75] Dr. Hartzmark defines "news days" as days when there were earnings or guidance disclosures and "no-news days" as any other day.[76] Out of the 565 trading days over the allege Class Period, Dr. Hartzmark finds ten such "news days," including the three alleged corrective disclosure dates.[77]

77.     By Dr. Hartzmark's own standards, a sample of ten "news days" isn't a "large enough sample." Specifically, Dr. Hartzmark finds in one of his papers that sixteen "news days" during a four-year class period is "hardly a large enough sample to reliably test whether there exist any systematic relationships between earnings disclosures and price movements."[78]

78.     The inclusion of the three alleged corrective disclosure days within Dr. Hartzmark's already not-large-enough sample of "news days" further undermines the reliability of his analysis. The alleged corrective disclosures are a biased selection of events. It is not surprising to find statistically significant price reactions following alleged corrective disclosures given that stock price drops often spur securities class action filings and these disclosure dates are presumably selected by plaintiff's counsel.[79] Thus, the inclusion of the three alleged

---

[75]  Hartzmark Report, ¶65.

[76]  Hartzmark Report, ¶64.

[77]  Hartzmark Report, ¶64.

[78]  Hartzmark, M. L., & Seyhun, H. N. (2012). The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation. *Va. L. & Bus. Rev.*, 6, 415.

[79]  See, for example, Ferrillo, Paul A., et al., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," St. John's Law Review 78(1): 2004. ("The

corrective disclosures as "news days" biases the results of Dr. Hartzmark's cause and effect analysis.

79.     Moreover, by limiting his "news days" to only days with earnings and guidance disclosures, Dr. Hartzmark's cause-and-effect analysis fails to test whether Mohawk's stock reacted to any other types of news that are "unanticipated and material."[80] Note that a number of the alleged misrepresentations are not earnings announcements but days on which 10-Ks or 10-Qs were issued.[81]

## B.     Dr. Hartzmark's tests of autocorrelation are unscientific and results driven

80.     An autocorrelation test is a commonly used method to analyze market efficiency.[82]  The test is performed over a specific period of time to examine whether, during that period of time, stock price returns, rather than being unpredictable, are correlated one day to the next.[83] In an efficient market, stock price movements should follow a "random walk" and be unpredictable – *i.e.*, a stock's future price should not be predictable based on the stock's prior prices.[84]

---

examination would exclude those days in which a corrective disclosure was made because plaintiffs would normally choose a class period where corrective disclosures coincide with large negative price movements; including those days in the analysis would bias the results.")

[80]  Hartzmark Report, ¶10.

[81]  See, for example, Amended Complaint, ¶¶266-269.

[82]  See, for example, Rosenberg, B., & Rudd, A. (1982). Factor-related and specific returns of common stocks: Serial correlation and market inefficiency. *The Journal of Finance*, *37*(2), 543-554. ("One of the most basic tests of market efficiency is the test for serial correlation [a/k/a autocorrelation] of returns.")

[83]  See, for example, Rosenberg, B., & Rudd, A. (1982). Factor-related and specific returns of common stocks: Serial correlation and market inefficiency. *The Journal of Finance*, *37*(2), 543-554. ("If the return on a typical stock in period t is correlated with its return in period t-1, then the best (unbiased minimum mean square error) prediction for the return in period t equals the prior return multiplied by the correlation coefficient.")

[84]  See, for example, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 10th ed., 2014), p. 350.

81.     In his report in this matter, Dr. Hartzmark first does a standard autocorrelation test and finds that Mohawk's stock exhibited autocorrelation during the alleged Class Period, providing direct evidence contrary to a finding that Mohawk's stock traded in an efficient market.[85] However, instead of relying on his standard test to draw a conclusion, Dr. Hartzmark does additional non-standard tests that are unsupported and results driven to try to support a finding that Mohawk's stock traded in an efficient market. In particular, Dr. Hartzmark chooses to split the alleged Class Period in the middle and run autocorrelation tests separately for the first half and the second half of the alleged Class Period. Upon finding that there is no statistically significant autocorrelation for either test, Dr. Hartzmark concludes that there was no autocorrelation over the alleged Class Period.[86]

82.     Dr. Hartzmark's method of splitting the alleged Class Period in the middle is unsupported and arbitrary. Tellingly, in other matters in which Dr. Hartzmark does autocorrelation tests and finds that the standard autocorrelation test (i.e., performing the test over the actual class period) supports a finding of market efficiency, he does not perform any additional tests.[87] However, when the standard autocorrelation test *does not* support a finding of market efficiency, Dr. Hartzmark does a variety of additional non-standard tests and seems to always find a test that supports a finding of market efficiency. For example:

a) In *SEB Investment Management AB. v. Symantec Corp. and Gregory S. Clark*, after finding statistically significant autocorrelation using the standard test for the

---

[85]  Hartzmark Report, ¶¶70-71.

[86]  Hartzmark Report, ¶73.

[87]  *See*, for example, Expert Report of Michael L. Hartzmark, Ph.D. dated September 14, 2018 in the matter of *In re Illumina, Inc. Securities Litigation*, Expert Report of Michael L. Hartzmark, Ph.D. dated August 14, 2017 in the matter of *In re Finisar Corporation Securities Litigation*, and Report of Michael L. Hartzmark, Ph.D. dated September 9, 2016, in the matter of *Barry R. Lloyd, et al. v. CVB Financial Corp., et al.*

actual class period, Dr. Hartzmark chooses to split the class period, not in the middle like in this case, but in two sub-periods around one of the alleged corrective disclosure dates – a 252-day sub-period before the alleged corrective disclosure and a 55-day sub-period after the alleged corrective disclosure, and rerun his test.[88] Dr. Hartzmark finds no statistically significant autocorrelation in either of the two sub-periods and concludes that there was no autocorrelation over the class period.[89]

b)  In *In Re MF Global Holdings Limited Securities Litigation,* after finding statistically significant autocorrelation using the standard test for the actual class period, Dr. Hartzmark chooses to remove the first five trading days of the corrective disclosure period and rerun his test. He finds no statistically significant autocorrelation and concludes that there was no autocorrelation over the class period. Dr. Hartzmark does not explain why those five days should be removed and he does not run the test by splitting the class period in any way.[90]

c)  In *In re Altisource Portfolio Solutions, S.A. Securities Litigation,* after finding statistically significant autocorrelation using the standard test for the actual class period, Dr. Hartzmark removes one day with a large price decline and reruns his test. He finds no statistically significant autocorrelation and concludes that there was no autocorrelation over the class period.[91]

---

[88]  If, in this matter, Dr. Hartzmark had split the alleged Class Period in a similar way – one sub-period before the October 26, 2018 alleged corrective disclosure and one sub-period after the October 26, 2018 alleged corrective disclosure, Dr. Hartzmark would have found that there is statistically significant negative autocorrelation over the first sub-period, consistent with his findings using the actual alleged Class Period.

[89]  Expert Report of Michael L. Hartzmark, Ph.D. dated January 17, 2020 in the matter of *SEB Investment Management AB. v. Symantec Corp. and Gregory S. Clark,* ¶¶83-87.

[90]  Expert Report of Michael L. Hartzmark, Ph.D. dated September 15, 2014 in the matter of *In Re MF Global Holdings Limited Securities Litigation,* ¶¶86-90.

[91]  Report of Michael L. Hartzmark, Ph.D. dated September 14, 2018 in the matter of *In re Altisource Portfolio Solutions, S.A. Securities Litigation,* ¶¶115-119.

83.     In his deposition, Dr. Hartzmark testified that splitting the alleged Class Period in half is "a basic principle of time series."[92] However, Dr. Hartzmark does not provide any reference to academic literature or textbooks (and there is none) that supports his claim that splitting the class period in half is "a basic principle of time series." Moreover, Dr. Hartzmark's claim is belied by the fact that he does not apply this "basic principle" to any of the other market efficiency tests in his report. Dr. Hartzmark does not split the alleged Class Period in half when he tests any of *Cammer* or *Krogman* factors.

84.     Dr. Hartzmark's practice of running additional "post-hoc" autocorrelation tests after finding undesirable results using his standard method runs counter to how scientific studies should be conducted. For example, a report published in the New England Journal of Medicine specifically warns that the use of "post hoc" analyses is of "particular concern:"

> "Post hoc analyses refer to those in which the hypotheses being tested are not specified before any examination of the data. Such analyses are of particular concern because it is often unclear how many were undertaken and whether some were motivated by inspection of the data."[93]

85.     Similarly, the U.S. Food & Drug Administration ("FDA") warns about issues with "post hoc" analyses in its guidelines for clinical trials:

> "Although post hoc analyses of trials that fail on their prospectively specified endpoints may be useful for generating hypotheses for future testing, they do not yield definitive results. The results of such analyses can be biased because the choice of analyses can be influenced by a desire for success."[94]

---

[92]  Hartzmark Deposition, 97:14-20.

[93]  Wang, R., Lagakos, S. W., Ware, J. H., Hunter, D. J., & Drazen, J. M. (2007). Statistics in Medicine - Reporting of Subgroup Analyses in Clinical Trials. *New England Journal of Medicine*, *357*(21), 2189-2194.

[94]  "Multiple Endpoints in Clinical Trials Guidance for Industry." *FDA Center for Biologics Evaluation and Research (CBER)* (2017).

86.     In addition to performing the autocorrelation tests using the non-standard method of splitting the alleged Class Period in half, Dr. Hartzmark also performs an additional non-standard test that removes two of the alleged corrective disclosure dates (July 26, 2018 and October 26, 2018) from the sample. It is not surprising that Dr. Hartzmark would want to remove those two alleged corrective disclosure dates. According to Dr. Hartzmark's own event study results, the statistically significant declines in Mohawk's stock price after the two alleged corrective disclosures were both followed by statistically significant increases the next day. In other words, Mohawk's stock price reactions after the two alleged corrective disclosures exhibited negative autocorrelation, consistent with the result of Dr. Hartzmark's standard autocorrelation test using the actual alleged Class Period. Removing the two alleged corrective disclosure dates from his autocorrelation test is nonsensical since it removes the very evidence that is supportive of Dr. Hartzmark's initial finding of a statistically significant autocorrelation. Dr. Hartzmark's non-standard method is akin to removing a blood stain from a crime scene and then claim that there is no evidence of a crime.

87.     The table below shows the data points associated with the two alleged corrective disclosures that Dr. Hartzmark removes in his non-standard method. In an autocorrelation test, each data point consists of a pair of returns, the return on the prior trading day (the independent variable) and the return on the current trading day (the dependent variable). Thus, the returns on the two alleged corrective disclosure days are associated with *four* pairs of data points.

**Exhibit 11**
**Data Points Removed by Dr. Hartzmark**

| | Date | *Independent Variable* Excess Return on Prior Trading Day | *Dependent Variable* Excess Return on Current Trading Day |
|---|---|---|---|
| Pair #1 | 7/26/18 | 0.16% | -18.49% |
| Pair #2 | 7/27/18 | -18.49% | 2.75% |
| Pair #3 | 10/26/18 | 0.77% | -22.77% |
| Pair #4 | 10/29/18 | -22.77% | 2.04% |

**Notes and Sources:**
Data from Hartzmark Report and spreadsheet produced by Dr. Hartzmark
("MOHAWK-HARTZMARK-0000002.XLSX"). Excess returns on
the two alleged corrective disclosure days shown in red.

88.     While one may argue that the returns on the alleged corrective disclosure days are event driven and, when compared to the prior trading day (Pair #1 and Pair #3), may not be evidence of autocorrelation, the bounce-back following the alleged corrective disclosure days (Pair #2 and Pair #4) are the very evidence that one needs to examine to determine whether Mohawk stock price reacted to information allegedly related to the alleged misrepresentations in a manner consistent with market efficiency. If Dr. Hartzmark only removes Pair #1 and Pair #3 but keeps Pair #2 and Pair #4, he would find statistically significant autocorrelation over the alleged Class Period. In other words, the bounce-backs following the alleged corrective disclosures are evidence for the existence of statistically significant negative autocorrelation - evidence contrary to a finding that Mohawk's stock traded in an efficient market and evidence that Dr. Hartzmark removes from his non-standard autocorrelation test.

89.     Dr. Hartzmark's non-standard method of removing the bounce-backs following the alleged corrective disclosures also defeats the purpose of the market efficiency analysis since

it removes Mohawk's stock price movements following the very events that are central to Plaintiff's claims – events that are allegedly corrective of the alleged misrepresentations. In other words, after removing the bounce-backs following the two alleged corrective disclosure dates, Dr. Hartzmark's analysis would be irrelevant to the question of whether Mohawk stock reacted to new information relating to the alleged misrepresentations in a manner consistent with market efficiency.

Lucy P. Allen



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

Appendix A

# LUCY P. ALLEN
# MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present
**National Economic Research Associates, Inc.**
Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993
**Council of Economic Advisers, Executive Office of the President**
Staff Economist.  Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*.  Working Group member of the President's National Health Care Reform Task Force.

1986-1988
1983-1984
**Ayers, Whitmore & Company (General Management Consultants)**
Senior Associate.  Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.

Lucy P. Allen

Marketing plan to increase international market share for major accounting firm.

Summer 1985     **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983     **Arthur Andersen & Company**
<u>Consultant</u>.    Designed,  programmed  and  installed  management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

## Teaching

1989- 1992     <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance*, Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

 "Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

Lucy P. Allen

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

Lucy P. Allen

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).


## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al..,* 2022

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2021.

Lucy P. Allen

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

Deposition Testimony before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. Xavier Becerra et al.*, 2018.

Deposition Testimony before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc*., 2018.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America et al.*, 2018.

Deposition Testimony before the District Court for the State of Nevada in *Dan Schmidt v. Liberator Medical Holdings, Inc., et al.*, 2018.

Deposition Testimony before the United States District Court, Northern District of Illinois, Eastern Division, in *In re the Allstate Corporation Securities Litigation,* 2018.

Lucy P. Allen

Testimony before the American Arbitration Association in *Arctic Glacier U.S.A, Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Marvin Pearlstein v. Blackberry Limited et al.*, 2018.

Deposition Testimony before the United States District Court, Eastern District of Texas, in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Deposition Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2018.

Testimony and Deposition Testimony before the United States District Court, District of New Jersey, in *Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Gurbir Grewal et al.,* 2018.

Deposition Testimony before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Deposition Testimony before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

# Appendix B
# Materials Considered

**Case Documents and Filings in this Matter, including**

1. Consolidated Class Action Complaint for Violation of the Federal Securities Laws (DCKT # 37), filed June 29, 2020
2. Order on Defendants' Motion to Dismiss Consolidated Class Action Complaint, filed September 29, 2021

**Expert Report and Deposition of Michael L. Hartzmark, Ph.D.**

3. Expert Report of Michael L. Hartzmark, Ph.D., dated January 25, 2022, including materials turned over
4. Deposition of Michael L. Hartzmark, Ph.D., taken on February 24, 2022

**Expert reports of Michael L. Hartzmark in other matters, including**

5. Expert Report of Michael L. Hartzmark, Ph.D. dated September 15, 2014 in the matter of *In Re MF Global Holdings Limited Securities Litigation*
6. Report of Michael L. Hartzmark, Ph.D. dated September 9, 2016, in the matter of *Barry R. Lloyd, et al. v. CVB Financial Corp., et al*
7. Expert Report of Michael L. Hartzmark, Ph.D. dated August 14, 2017 in the matter of *In re Finisar Corporation Securities Litigation*
8. Expert Report of Michael L. Hartzmark, Ph.D. dated September 14, 2018 in the matter of *In re Illumina, Inc. Securities Litigation*
9. Report of Michael L. Hartzmark, Ph.D. dated September 14, 2018 in the matter of *In re Altisource Portfolio Solutions, S.A. Securities Litigation*
10. Expert Report of Michael L. Hartzmark, Ph.D. dated January 17, 2020 in the matter of *SEB Investment Management AB. v. Symantec Corp. and Gregory S. Clark*

**Mohawk filings with the SEC between 2017 and 2020**

11. 2017.05.05 – Form 10-Q
12. 2017.08.04 – Form 10-Q
13. 2017.11.03 – Form 10-Q
14. 2018.02.28 – Form 10-K
15. 2018.05.04 – Form 10-Q
16. 2018.08.03 – Form 10-Q
17. 2018.11.02 – Form 10-Q
18. 2019.02.28 – Form 10-K
19. 2019.05.03 – Form 10-Q
20. 2019.08.02 – Form 10-Q
21. 2019.11.01 – Form 10-Q

1

# Appendix B
# Materials Considered

22. 2020.02.28 – Form 10-K
23. 2020.10.30 – Form 10-Q

**Mohawk press releases and conference call transcripts between 2017 and 2020**

24. 2017.04.27 - Earnings Announcement
25. 2017.04.28 - Earnings Call
26. 2017.07.27 - Earnings Announcement
27. 2017.07.28 - Earnings Call
28. 2017.10.26 - Earnings Announcement
29. 2017.10.27 - Earnings Call
30. 2018.02.08 - Earnings Announcement
31. 2018.02.09 - Earnings Call
32. 2018.04.26 - Earnings Announcement
33. 2018.04.27 - Earnings Call
34. 2018.07.25 - Earnings Announcement
35. 2018.07.26 - Earnings Call
36. 2018.10.25 - Earnings Announcement
37. 2018.10.26 - Earnings Call
38. 2019.02.07 - Earnings Announcement
39. 2019.02.08 - Earnings Call
40. 2019.04.25 - Earnings Announcement
41. 2019.04.26 - Earnings Call
42. 2019.07.25 - Earnings Announcement
43. 2019.07.26 - Earnings Call

**SEC filings, press releases and conference call transcripts of other publicly traded U.S. Flooring Companies, including**

Armstrong Flooring, Inc.

44. 2019.08.06 – Earnings Announcement
45. 2019.08.06 – Earnings Call
46. 2020.03.10 – Form 10-K

Interface, Inc.

47. 2019.07.25 – Earnings Announcement
48. 2019.07.26 – Earnings Call
49. 2020.02.26 – Form 10-K

# Appendix B
# Materials Considered

**Analyst Reports on Mohawk**

50.  2020.07.14 - MHK - Suntrust
51.  2020.07.27 - MHK - Deutsche Bank
52.  2020.07.28 - MHK - Wells Fargo
53.  2020.08.05 - MHK - JPMorgan
54.  2020.08.06 - MHK - Barclays
55.  2020.08.06 - MHK - BofA
56.  2020.08.06 - MHK - Deutsche Bank
57.  2020.08.06 - MHK - Evercore ISI
58.  2020.08.06 - MHK - Jefferies
59.  2020.08.06 - MHK - JPMorgan (1)
60.  2020.08.06 - MHK - JPMorgan (2)
61.  2020.08.06 - MHK - RBC
62.  2020.08.06 - MHK - Suntrust
63.  2020.08.06 - MHK - Wells Fargo
64.  2020.08.07 - MHK - BofA
65.  2020.08.07 - MHK - Credit Suisse
66.  2020.08.07 - MHK - Suntrust
67.  2020.08.07 - MHK - Wells Fargo (1)
68.  2020.08.07 - MHK - Wells Fargo (2)
69.  2020.08.09 - MHK - Barclays
70.  2020.08.09 - MHK - Deutsche Bank
71.  2020.08.09 - MHK - Evercore ISI
72.  2020.08.09 - MHK - Jefferies
73.  2020.08.09 - MHK - JPMorgan
74.  2020.08.10 - MHK - RBC
75.  2020.10.29 - MHK - CIMB
76.  2020.10.29 - MHK - Jefferies
77.  2020.10.29 - MHK - RBC
78.  2020.10.29 - MHK - Wells Fargo
79.  2017.01.18 - MHK - Suntrust
80.  2017.01.19 - MHK - Evercore ISI
81.  2017.02.03 - MHK - Barclays
82.  2017.02.03 - MHK - JP Morgan
83.  2017.02.03 - MHK - MKM (1)
84.  2017.02.03 - MHK - MKM (2)
85.  2017.02.06 - MHK - RBC

# Appendix B
# Materials Considered

86.   2017.02.09 - MHK - Barclays
87.   2017.02.09 - MHK - BofA
88.   2017.02.09 - MHK - Evercore ISI
89.   2017.02.09 - MHK - JP Morgan
90.   2017.02.09 - MHK - RBC
91.   2017.02.09 - MHK - Suntrust
92.   2017.02.10 - MHK - BofA
93.   2017.02.10 - MHK - MKM
94.   2017.02.10 - MHK - Suntrust
95.   2017.02.10 - MHK - Wells Fargo (1)
96.   2017.02.10 - MHK - Wells Fargo (2)
97.   2017.02.10 - MHK - Wells Fargo (3)
98.   2017.02.12 - MHK - Evercore ISI
99.   2017.02.13 - MHK - Barclays
100.   2017.02.13 - MHK - Gabelli Company
101.   2017.02.13 - MHK - JP Morgan
102.   2017.02.13 - MHK - MKM
103.   2017.02.13 - MHK - RBC
104.   2017.03.02 - MHK - Suntrust
105.   2017.03.19 - MHK - Evercore ISI
106.   2017.03.20 - MHK - Barclays
107.   2017.03.21 - MHK - Suntrust
108.   2017.03.29 - MHK - RBC
109.   2017.04.13 - MHK - Evercore ISI
110.   2017.04.13 - MHK - MKM (1)
111.   2017.04.13 - MHK - MKM (2)
112.   2017.04.21 - MHK - RBC
113.   2017.04.27 - MHK - Barclays
114.   2017.04.27 - MHK - BofA
115.   2017.04.27 - MHK - Evercore ISI
116.   2017.04.27 - MHK - JP Morgan
117.   2017.04.27 - MHK - MKM
118.   2017.04.27 - MHK - RBC
119.   2017.04.27 - MHK - Suntrust
120.   2017.04.27 - MHK - Wells Fargo
121.   2017.04.28 - MHK - Barclays
122.   2017.04.28 - MHK - BofA

# Appendix B
# Materials Considered

123.   2017.04.28 - MHK - JP Morgan
124.   2017.04.28 - MHK - Suntrust
125.   2017.04.28 - MHK - Wells Fargo (1)
126.   2017.04.28 - MHK - Wells Fargo (2)
127.   2017.04.30 - MHK - Evercore ISI
128.   2017.05.01 - MHK - Gabelli Company
129.   2017.05.01 - MHK - MKM
130.   2017.05.01 - MHK - RBC
131.   2017.06.07 - MHK - JP Morgan
132.   2017.06.07 - MHK - Suntrust (1)
133.   2017.06.07 - MHK - Suntrust (2)
134.   2017.06.22 - MHK - Credit Suisse
135.   2017.06.23 - MHK - Suntrust
136.   2017.07.27 - MHK - Barclays
137.   2017.07.27 - MHK - BofA
138.   2017.07.27 - MHK - Evercore ISI
139.   2017.07.27 - MHK - Goldman Sachs
140.   2017.07.27 - MHK - JP Morgan
141.   2017.07.27 - MHK - MKM
142.   2017.07.27 - MHK - Suntrust
143.   2017.07.27 - MHK - Wells Fargo
144.   2017.07.28 - MHK - Barclays
145.   2017.07.28 - MHK - BofA
146.   2017.07.28 - MHK - Credit Suisse
147.   2017.07.28 - MHK - Goldman Sachs
148.   2017.07.28 - MHK - JP Morgan
149.   2017.07.28 - MHK - RBC
150.   2017.07.28 - MHK - Suntrust
151.   2017.07.28 - MHK - Wells Fargo (1)
152.   2017.07.28 - MHK - Wells Fargo (2)
153.   2017.07.30 - MHK - Evercore ISI
154.   2017.07.31 - MHK - Gabelli Company
155.   2017.07.31 - MHK - RBC
156.   2017.08.01 - MHK - MKM (1)
157.   2017.08.01 - MHK - MKM (2)
158.   2017.08.08 - MHK - Evercore ISI
159.   2017.08.14 - MHK - JP Morgan

# Appendix B
# Materials Considered

160.    2017.08.18 - MHK - Evercore ISI
161.    2017.08.21 - MHK - Suntrust
162.    2017.09.19 - MHK - RBC
163.    2017.09.20 - MHK - Credit Suisse
164.    2017.09.22 - MHK - Suntrust
165.    2017.10.12 - MHK - Evercore ISI
166.    2017.10.17 - MHK - MKM
167.    2017.10.17 - MHK - Suntrust
168.    2017.10.20 - MHK - JP Morgan
169.    2017.10.26 - MHK - Barclays
170.    2017.10.26 - MHK - BofA
171.    2017.10.26 - MHK - Evercore ISI
172.    2017.10.26 - MHK - Goldman Sachs
173.    2017.10.26 - MHK - JP Morgan
174.    2017.10.26 - MHK - MKM
175.    2017.10.26 - MHK - Suntrust
176.    2017.10.26 - MHK - Wells Fargo
177.    2017.10.27 - MHK - Barclays
178.    2017.10.27 - MHK - BofA
179.    2017.10.27 - MHK - Credit Suisse
180.    2017.10.27 - MHK - Evercore ISI
181.    2017.10.27 - MHK - Goldman Sachs
182.    2017.10.27 - MHK - JP Morgan
183.    2017.10.27 - MHK - RBC
184.    2017.10.27 - MHK - Suntrust
185.    2017.10.27 - MHK - Wells Fargo (1)
186.    2017.10.27 - MHK - Wells Fargo (2)
187.    2017.10.30 - MHK - Gabelli Company
188.    2017.10.30 - MHK - MKM (1)
189.    2017.10.30 - MHK - MKM (2)
190.    2017.10.30 - MHK - RBC
191.    2017.11.09 - MHK - Evercore ISI
192.    2017.11.20 - MHK - Barclays
193.    2017.11.20 - MHK - BofA
194.    2017.11.20 - MHK - Evercore ISI
195.    2017.11.20 - MHK - JP Morgan
196.    2017.11.20 - MHK - Suntrust (1)

# Appendix B
# Materials Considered

197.   2017.11.20 - MHK - Suntrust (2)
198.   2017.11.21 - MHK - BofA
199.   2017.11.21 - MHK - Evercore ISI
200.   2017.11.21 - MHK - RBC
201.   2017.11.27 - MHK - Evercore ISI
202.   2017.12.12 - MHK - Jefferies
203.   2017.12.21 - MHK - Jefferies
204.   2018.01.04 - MHK - Jefferies
205.   2018.01.05 - MHK - JP Morgan
206.   2018.01.11 - MHK - JP Morgan
207.   2018.01.12 - MHK - Barclays
208.   2018.01.17 - MHK - Jefferies
209.   2018.02.01 - MHK - Evercore ISI
210.   2018.02.01 - MHK - MKM (1)
211.   2018.02.01 - MHK - MKM (2)
212.   2018.02.02 - MHK - JP Morgan
213.   2018.02.08 - MHK - Barclays
214.   2018.02.08 - MHK - BofA
215.   2018.02.08 - MHK - Credit Suisse
216.   2018.02.08 - MHK - Evercore ISI
217.   2018.02.08 - MHK - Goldman Sachs
218.   2018.02.08 - MHK - Jefferies
219.   2018.02.08 - MHK - JP Morgan
220.   2018.02.08 - MHK - MKM
221.   2018.02.08 - MHK - Suntrust
222.   2018.02.08 - MHK - Wells Fargo
223.   2018.02.09 - MHK - Wells Fargo
224.   2018.02.11 - MHK - Evercore ISI
225.   2018.02.11 - MHK - Wells Fargo
226.   2018.02.12 - MHK - Barclays
227.   2018.02.12 - MHK - BofA
228.   2018.02.12 - MHK - Gabelli Company
229.   2018.02.12 - MHK - Goldman Sachs
230.   2018.02.12 - MHK - Jefferies
231.   2018.02.12 - MHK - JP Morgan
232.   2018.02.12 - MHK - MKM
233.   2018.02.12 - MHK - RBC

# Appendix B
# Materials Considered

234.  2018.02.12 - MHK - Suntrust
235.  2018.02.13 - MHK - MKM
236.  2018.02.22 - MHK - Evercore ISI
237.  2018.02.22 - MHK - Jefferies
238.  2018.03.01 - MHK - Credit Suisse
239.  2018.03.01 - MHK - Goldman Sachs
240.  2018.03.12 - MHK - Evercore ISI
241.  2018.03.13 - MHK - Evercore ISI
242.  2018.03.16 - MHK - Wells Fargo
243.  2018.03.20 - MHK - Jefferies
244.  2018.03.26 - MHK - Suntrust
245.  2018.04.02 - MHK - Evercore ISI
246.  2018.04.06 - MHK - Wells Fargo
247.  2018.04.11 - MHK - Barclays
248.  2018.04.17 - MHK - RBC
249.  2018.04.26 - MHK - Barclays
250.  2018.04.26 - MHK - BofA
251.  2018.04.26 - MHK - Evercore ISI
252.  2018.04.26 - MHK - Goldman Sachs
253.  2018.04.26 - MHK - Jefferies
254.  2018.04.26 - MHK - JP Morgan
255.  2018.04.26 - MHK - MKM
256.  2018.04.26 - MHK - Suntrust
257.  2018.04.26 - MHK - Wells Fargo
258.  2018.04.27 - MHK - BofA
259.  2018.04.27 - MHK - Credit Suisse
260.  2018.04.27 - MHK - Evercore ISI
261.  2018.04.27 - MHK - Suntrust
262.  2018.04.27 - MHK - Wells Fargo (1)
263.  2018.04.27 - MHK - Wells Fargo (2)
264.  2018.04.30 - MHK - Barclays
265.  2018.04.30 - MHK - Credit Suisse
266.  2018.04.30 - MHK - Gabelli Company
267.  2018.04.30 - MHK - JP Morgan
268.  2018.05.01 - MHK - Jefferies
269.  2018.05.01 - MHK - RBC
270.  2018.05.04 - MHK - JP Morgan

# Appendix B
# Materials Considered

271.   2018.05.04 - MHK - Suntrust
272.   2018.05.07 - MHK - Evercore ISI
273.   2018.05.11 - MHK - JP Morgan
274.   2018.05.11 - MHK - Suntrust
275.   2018.05.13 - MHK - Evercore ISI
276.   2018.05.17 - MHK - Evercore ISI
277.   2018.05.22 - MHK - Jefferies
278.   2018.05.24 - MHK - Suntrust
279.   2018.05.31 - MHK - Credit Suisse
280.   2018.06.01 - MHK - Jefferies
281.   2018.06.05 - MHK - JP Morgan
282.   2018.06.07 - MHK - JP Morgan
283.   2018.06.12 - MHK - WM SMITH
284.   2018.06.19 - MHK - Credit Suisse (1)
285.   2018.06.19 - MHK - Credit Suisse (2)
286.   2018.06.19 - MHK - Evercore ISI
287.   2018.06.19 - MHK - MKM
288.   2018.06.19 - MHK - RBC
289.   2018.06.27 - MHK - RBC
290.   2018.06.28 - MHK - RBC
291.   2018.07.10 - MHK - Wells Fargo
292.   2018.07.11 - MHK - Evercore ISI
293.   2018.07.11 - MHK - Jefferies
294.   2018.07.17 - MHK - Gabelli Company
295.   2018.07.23 - MHK - Evercore ISI
296.   2018.07.25 - MHK - BofA
297.   2018.07.25 - MHK - Credit Suisse
298.   2018.07.25 - MHK - Evercore ISI
299.   2018.07.25 - MHK - Jefferies
300.   2018.07.25 - MHK - JP Morgan
301.   2018.07.25 - MHK - Suntrust
302.   2018.07.25 - MHK - Wells Fargo
303.   2018.07.26 - MHK - Barclays
304.   2018.07.26 - MHK - BofA
305.   2018.07.26 - MHK - Credit Suisse
306.   2018.07.26 - MHK - Evercore ISI
307.   2018.07.26 - MHK - MKM

# Appendix B
# Materials Considered

308. 2018.07.26 - MHK - RBC
309. 2018.07.26 - MHK - Suntrust
310. 2018.07.26 - MHK - Wells Fargo (1)
311. 2018.07.26 - MHK - Wells Fargo (2)
312. 2018.07.27 - MHK - Gabelli Company
313. 2018.07.27 - MHK - RBC
314. 2018.07.30 - MHK - Jefferies
315. 2018.07.30 - MHK - JP Morgan
316. 2018.08.07 - MHK - Evercore ISI
317. 2018.08.07 - MHK - JP Morgan
318. 2018.08.09 - MHK - Jefferies
319. 2018.08.15 - MHK - Credit Suisse
320. 2018.09.04 - MHK - WM SMITH
321. 2018.09.05 - MHK - JP Morgan
322. 2018.09.12 - MHK - Suntrust
323. 2018.09.24 - MHK - Jefferies
324. 2018.10.05 - MHK - Suntrust (1)
325. 2018.10.05 - MHK - Suntrust (2)
326. 2018.10.08 - MHK - Jefferies
327. 2018.10.09 - MHK - JP Morgan
328. 2018.10.11 - MHK - Wells Fargo
329. 2018.10.15 - MHK - RBC
330. 2018.10.22 - MHK - Jefferies
331. 2018.10.22 - MHK - MKM
332. 2018.10.22 - MHK - Suntrust
333. 2018.10.25 - MHK - Barclays
334. 2018.10.25 - MHK - BofA
335. 2018.10.25 - MHK - Credit Suisse
336. 2018.10.25 - MHK - Evercore ISI
337. 2018.10.25 - MHK - Goldman Sachs
338. 2018.10.25 - MHK - Jefferies
339. 2018.10.25 - MHK - JP Morgan
340. 2018.10.25 - MHK - RBC
341. 2018.10.25 - MHK - Suntrust
342. 2018.10.26 - MHK - BofA
343. 2018.10.26 - MHK - Evercore ISI
344. 2018.10.26 - MHK - Goldman Sachs

# Appendix B
# Materials Considered

345.   2018.10.26 - MHK - Jefferies
346.   2018.10.26 - MHK - RBC
347.   2018.10.26 - MHK - Suntrust
348.   2018.10.26 - MHK - Wells Fargo (1)
349.   2018.10.26 - MHK - Wells Fargo (2)
350.   2018.10.28 - MHK - Wells Fargo
351.   2018.10.29 - MHK - Barclays
352.   2018.10.29 - MHK - Credit Suisse (1)
353.   2018.10.29 - MHK - Credit Suisse (2)
354.   2018.10.29 - MHK - Gabelli Company
355.   2018.10.29 - MHK - JP Morgan
356.   2018.11.12 - MHK - Evercore ISI
357.   2018.11.13 - MHK - Credit Suisse
358.   2018.11.14 - MHK - Suntrust
359.   2018.11.23 - MHK - Evercore ISI
360.   2018.12.07 - MHK - Suntrust
361.   2019.01.02 - MHK - Jefferies
362.   2019.01.04 - MHK - JP Morgan
363.   2019.01.11 - MHK - RBC
364.   2019.01.24 - MHK - Evercore ISI
365.   2019.01.31 - MHK - The Buckingham Research
366.   2019.02.01 - MHK - The Buckingham Research
367.   2019.02.07 - MHK - BofA
368.   2019.02.07 - MHK - Credit Suisse
369.   2019.02.07 - MHK - Evercore ISI
370.   2019.02.07 - MHK - Jefferies
371.   2019.02.07 - MHK - JP Morgan
372.   2019.02.07 - MHK - RBC
373.   2019.02.07 - MHK - Suntrust
374.   2019.02.07 - MHK - The Buckingham Research
375.   2019.02.08 - MHK - Barclays
376.   2019.02.08 - MHK - BofA
377.   2019.02.08 - MHK - Evercore ISI
378.   2019.02.08 - MHK - RBC
379.   2019.02.08 - MHK - Suntrust
380.   2019.02.08 - MHK - The Buckingham Research
381.   2019.02.08 - MHK - Wells Fargo (1)

# Appendix B
# Materials Considered

382.   2019.02.08 - MHK - Wells Fargo (2)
383.   2019.02.10 - MHK - Wells Fargo
384.   2019.02.11 - MHK - Barclays
385.   2019.02.11 - MHK - Credit Suisse
386.   2019.02.11 - MHK - Gabelli Company
387.   2019.02.11 - MHK - Jefferies
388.   2019.02.11 - MHK - JP Morgan
389.   2019.02.11 - MHK - The Buckingham Research
390.   2019.03.12 - MHK - Credit Suisse
391.   2019.03.13 - MHK - Wells Fargo
392.   2019.04.03 - MHK - Evercore ISI
393.   2019.04.09 - MHK - Jefferies
394.   2019.04.10 - MHK - The Buckingham Research
395.   2019.04.25 - MHK - BofA
396.   2019.04.25 - MHK - Credit Suisse
397.   2019.04.25 - MHK - Evercore ISI
398.   2019.04.25 - MHK - Jefferies
399.   2019.04.25 - MHK - JP Morgan
400.   2019.04.25 - MHK - RBC
401.   2019.04.25 - MHK - Suntrust
402.   2019.04.25 - MHK - Wells Fargo
403.   2019.04.26 - MHK - Barclays (1)
404.   2019.04.26 - MHK - Barclays (2)
405.   2019.04.26 - MHK - BofA
406.   2019.04.26 - MHK - RBC
407.   2019.04.26 - MHK - Suntrust
408.   2019.04.26 - MHK - The Buckingham Research
409.   2019.04.26 - MHK - Wells Fargo (1)
410.   2019.04.26 - MHK - Wells Fargo (2)
411.   2019.04.28 - MHK - Evercore ISI
412.   2019.04.29 - MHK - Barclays
413.   2019.04.29 - MHK - Credit Suisse
414.   2019.04.29 - MHK - Gabelli Company
415.   2019.04.29 - MHK - JP Morgan
416.   2019.04.29 - MHK - Suntrust
417.   2019.04.30 - MHK - Jefferies
418.   2019.05.02 - MHK - Credit Suisse

12

# Appendix B
# Materials Considered

419.  2019.05.10 - MHK - Evercore ISI
420.  2019.05.13 - MHK - Evercore ISI
421.  2019.05.13 - MHK - Jefferies
422.  2019.05.13 - MHK - JP Morgan
423.  2019.05.14 - MHK - JP Morgan
424.  2019.05.14 - MHK - Suntrust
425.  2019.05.14 - MHK - Wells Fargo
426.  2019.05.15 - MHK - Gabelli Company
427.  2019.05.15 - MHK - Jefferies
428.  2019.05.23 - MHK - Jefferies (1)
429.  2019.05.23 - MHK - Jefferies (2)
430.  2019.06.11 - MHK - Suntrust
431.  2019.06.19 - MHK - JP Morgan
432.  2019.07.09 - MHK - Jefferies
433.  2019.07.17 - MHK - The Buckingham Research
434.  2019.07.18 - MHK - Wells Fargo
435.  2019.07.25 - MHK - Barclays
436.  2019.07.25 - MHK - BofA
437.  2019.07.25 - MHK - Evercore ISI
438.  2019.07.25 - MHK - Jefferies
439.  2019.07.25 - MHK - JP Morgan
440.  2019.07.25 - MHK - RBC
441.  2019.07.25 - MHK - Suntrust
442.  2019.07.25 - MHK - The Buckingham Research
443.  2019.07.25 - MHK - Wells Fargo
444.  2019.07.26 - MHK - BofA
445.  2019.07.26 - MHK - Evercore ISI
446.  2019.07.26 - MHK - Jefferies
447.  2019.07.26 - MHK - Suntrust
448.  2019.07.26 - MHK - Wells Fargo
449.  2019.07.28 - MHK - RBC
450.  2019.07.28 - MHK - Wells Fargo
451.  2019.07.29 - MHK - Barclays
452.  2019.07.29 - MHK - Gabelli Company
453.  2019.07.29 - MHK - JP Morgan
454.  2019.07.30 - MHK - The Buckingham Research (1)
455.  2019.07.30 - MHK - The Buckingham Research (2)

# Appendix B
# Materials Considered

456.    2019.08.06 - MHK - Evercore ISI
457.    2019.08.09 - MHK - Jefferies
458.    2019.08.20 - MHK - Wells Fargo
459.    2019.09.10 - MHK - Gabelli Company
460.    2019.09.10 - MHK - Jefferies
461.    2019.09.10 - MHK - Suntrust
462.    2019.09.11 - MHK - RBC
463.    2019.09.18 - MHK - RBC
464.    2019.09.26 - MHK - Evercore ISI
465.    2019.10.01 - MHK - Jefferies
466.    2019.10.11 - MHK - RBC
467.    2019.10.13 - MHK - Wells Fargo
468.    2019.10.21 - MHK - The Buckingham Research
469.    2019.10.24 - MHK - BofA
470.    2019.10.24 - MHK - Evercore ISI
471.    2019.10.24 - MHK - Jefferies
472.    2019.10.24 - MHK - JP Morgan
473.    2019.10.24 - MHK - RBC
474.    2019.10.24 - MHK - Suntrust
475.    2019.10.24 - MHK - The Buckingham Research
476.    2019.10.24 - MHK - Wells Fargo
477.    2019.10.25 - MHK - Barclays
478.    2019.10.25 - MHK - BofA
479.    2019.10.25 - MHK - RBC
480.    2019.10.25 - MHK - Suntrust
481.    2019.10.25 - MHK - Wells Fargo
482.    2019.10.26 - MHK - Evercore ISI
483.    2019.10.27 - MHK - Jefferies
484.    2019.10.27 - MHK - Wells Fargo
485.    2019.10.28 - MHK - Barclays
486.    2019.10.28 - MHK - JP Morgan
487.    2019.10.29 - MHK - Gabelli Company
488.    2019.11.07 - MHK - Jefferies
489.    2019.11.11 - MHK - RBC
490.    2019.11.12 - MHK - Evercore ISI
491.    2019.11.12 - MHK - Gabelli Company
492.    2019.11.12 - MHK - Jefferies

# Appendix B
# Materials Considered

493.  2019.11.20 - MHK - Deutsche Bank
494.  2019.12.02 - MHK - Barclays
495.  2019.12.05 - MHK - Goldman Sachs
496.  2019.12.10 - MHK - Suntrust (1)
497.  2019.12.10 - MHK - Suntrust (2)
498.  2019.12.13 - MHK - Gabelli Company
499.  2020.07.07 - MHK - Deutsche Bank
500.  2020.07.08 - MHK - Deutsche Bank
501.  2020.07.08 - MHK - JPMorgan
502.  2020.07.08 - MHK - Suntrust (1)
503.  2020.07.08 - MHK - Suntrust (2)
504.  2020.07.09 - MHK - Evercore ISI
505.  2020.07.09 - MHK - Jefferies
506.  2020.07.09 - MHK - Suntrust
507.  2020.07.09 - MHK - Wells Fargo
508.  2020.07.10 - MHK - Deutsche Bank
509.  2020.07.10 - MHK - RBC
510.  2020.07.13 - MHK - Barclays
511.  2020.07.13 - MHK - Deutsche Bank
512.  2020.07.13 - MHK - Wells Fargo
513.  2020.07.14 - MHK – RBC

**Industry Reports**

514.  2018.11.28 – JPMorgan
515.  2019.02.26 – JPMorgan
516.  2019.03.25 - Suntrust
517.  2019.04.17 – Macquarie
518.  2019.06.03 - Suntrust

**Analyst Reports on other publicly traded U.S. Flooring Companies**

Armstrong Flooring, Inc.

519.  2019.08.07 - Gabelli

Interface, Inc.

520.  2019.07.17 - Seaport Global
521.  2019.07.25 - SunTrust
522.  2019.07.26 - Seaport Global

15

# Appendix B
# Materials Considered

523.  2019.07.28 - Seaport Global

**Data from Bloomberg, L.P., FactSet Research Systems, Inc. and I/B/E/S, including**

524.  Price and trading volume data for Mohawk
525.  Revenue and earnings consensus estimates from I/B/E/S for Mohawk, Interface and Armstrong Flooring

**Academic literature and textbooks on finance, securities, valuation and statistics, including**

526.  Rosenberg, B., & Rudd, A. (1982). Factor-related and specific returns of common stocks: Serial correlation and market inefficiency. *The Journal of Finance*, *37*(2), 543-554
527.  Bradford Cornell, *Corporate Valuation* (New York: McGraw-Hill, 1993)
528.  Brealey, Richard A., Stewart C. Myers and Franklin Allen, Principles of Corporate Finance (McGraw-Hill: New York, NY, 7th ed., 2003)
529.  Ferrillo, Paul A., et al., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," St. John's Law Review 78(1): 2004
530.  Wang, R., Lagakos, S. W., Ware, J. H., Hunter, D. J., & Drazen, J. M. (2007) Statistics in Medicine - Reporting of Subgroup Analyses in Clinical Trials. *New England Journal of Medicine*, *357*(21), 2189-2194
531.  Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 8th ed., 2009)
532.  Hartzmark, M. L., & Seyhun, H. N. (2012). The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation. *Va. L. & Bus. Rev.*, 6, 415
533.  "Multiple Endpoints in Clinical Trials Guidance for Industry." *FDA Center for Biologics Evaluation and Research (CBER)* (2017)

**Court Decisions in other matters**

534.  *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)
535.  *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla. March 30, 2006)
536.  *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex. Sept. 25, 2006)
537.  *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014)

16

# Appendix B
# Materials Considered

538.   *Halliburton I,* 131 S. Ct. 2179, 2186 (2011)

539.   *Halliburton II*, 134 S. Ct. 2398 (2014)