# Exhibit B

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ROME DIVISION

PUBLIC EMPLOYEES'
RETIREMENT SYSTEM OF
MISSISSIPPI, individually
and on behalf of all
others similarly situated,

            Plaintiffs,
                                 CIVIL ACTION FILE
    vs.                          NO. 4:20-cv-00005-ELR

MOHAWK INDUSTRIES, INC.,
and JEFFREY S. LORBERBAUM,
            Defendants.

VIDEOTAPED DEPOSITION OF
MICHAEL HARTZMARK, Ph.D.

February 24, 2022
9:43 A.M.

Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

Case 4:20-cv-00005-VMC    Document 88-3    Filed 04/13/22    Page 3 of 10
Michael L. Hartzmark, Ph.D.    February 25, 2022
Public Employees' Retirement System of Mississippi

Page 27

Q.    I tell you what.  To save time, would you be willing to produce to us after this deposition the amount of times you've been engaged by the Bernstein form?

MR. GLUCK:  No, we're not going to do that.  This isn't a take-home exam.

MR. LONG:  All right.

THE WITNESS:  I -- we'll go through this.  It's two pages over the last four years.

The first case, Finisar, is not Bernstein.

Wells Fargo I believe is Bernstein.

Christopher Porrino is the Attorney General of New Jersey.  I was engaged by the State of New Jersey.

BY MR. LONG:

Q.    Just interested in the Bernstein firm.

A.    Okay.  BlackRock versus Deutsche Bank, BlackRock versus Deutsche Bank, those are similar ones.

O'Donoghue, not.

TerraForm, not.

Illumina, John Cummings, derivatively on behalf of New Senior --

Q.    So just so I'm understanding, you saying these names, when you say the name, that means it

Page 28

was a Bernstein firm engagement?

A.   It was a firm -- yes, it was associated with one member of the Bernstein firm.  I've worked --

Q.   Okay.

A.   -- with many.

Oklahoma Law Enforcement/Adeptus.

Q.   Okay.

A.   Appaloosa, no.  Marc Muri, no.  HD Supply, no.  Signet.  Aphria, no.  U.S. Steel, no.  Timber Hill, no.

So it looks like maybe 30 percent on page 4; 70 percent other firms.

Next page, which is captioned 77 of 259, Applied Opto, no.  Lord Abbett Affiliated Fund versus Navient is Bernstein.  SNC, no.  Volkswagen, no.  SEB Investment Management/Symantec.

In re:  CenturyLink.  Tahoe, no. Mallinckrodt, no.  Tesla, no.  Help at Home, no. Sasol, no.

Cambridge Retirement System/Amneal Pharmaceuticals, yes.  In Re Evoqua, yes.  City of Sunrise Fighters [sic], yes.  Myriad Genetics, yes. Alta Mesa, no.  Miriam Edwards, yes.

In re Venator, yes.  Ngian and Facebook,

Case 4:20-cv-00005-VMC    Document 88-3    Filed 04/13/22    Page 5 of 10
Michael L. Hartzmark, Ph.D.              February 25, 2022
Public Employees' Retirement System of Mississippi

Page 29

yes.  Gary Cheng versus Activision, yes.  And Camelot Event Driven Fund versus Morgan Stanley, yes.

Q.    Okay.  So in the last four years -- I don't have a rough count, but -- but it looked like there are at least ten engagements by Bernstein in the last four years.

Is that true?

A.    Out of the -- what would be, I think, 30 engagements on these two pages, probably 10, approximately, look to be associated with the Bernstein firm.

Q.    And were you engaged by the Bernstein firm at any time beyond the last four years?

A.    You mean for the future?

Q.    That's poorly -- that's a poorly phrased question.

Going back further than four years ago, were you engaged by the Bernstein firm?

A.    Yes.

Q.    And how many times were you engaged by them in that time?

A.    Well, would have been a lower percentage than this, because, first of all, my prior litigation consulting would have had engagements

Page 30

mostly with firms such as yourself that -- that advocate on behalf of defendants.

And so that -- although, actually, Bernstein did engage me a couple times, because the fact is that, you know, defense firms won't engage plaintiffs experts, but plaintiffs firms will engage defense experts.

So I had a couple engagements.  I also supported other experts who had engagements.  But most of my practice was unrelated to -- to the Bernstein firm prior -- in the prior years prior to these last four years.

Q.    Thank you.

What is your basis for saying that defendants will not hire plaintiffs experts?

A.    The fact that I worked at Lexecon, Chicago Partners, and Navigant on the defense side, and then I attempted to establish practice with many defense attorneys.  But once I had decisions -- public decisions related to these issues, they found it difficult, if not considered plaintiffs experts toxic.

Q.    The defendants told you that?

A.    I -- again, I've been involved in most of -- well, I don't know.  I've got to look.  Is it

Page 79

MR. LONG:  Fine by me.

VIDEOGRAPHER:  The time is 11:31.  We're off the record.

(Off the record.)

VIDEOGRAPHER:  The time is 11:57.  We're back on the record.

MR. LONG:  Thank you.

BY MR. LONG:

Q.    Dr. Hartzmark, did you talk with your counsel regarding this case during the break?

A.    No, nothing -- nothing of substance, no.

Q.    Thank you.

I'd like to turn to your report.

You found that the daily abnormal returns of Mohawk stock exhibited autocorrelation over the entire class period; right?

A.    There was an autocorrelation coefficient that was statistically significant below the 5 percent level.

Q.    Okay.  Let's start at paragraphs 70 and 71 of your report.

A.    Give me one second.  My computer with Exhibit Share turned off.

All right.  What paragraph again?

Q.    70 and 71.

Case 4:20-cv-00005-VMC    Document 88-3    Filed 04/13/22    Page 8 of 10
Michael L. Hartzmark, Ph.D.    February 25, 2022
Public Employees' Retirement System of Mississippi

Page 80

A.    Okay.  Hold on a sec.

Okay.  Yes.

Q.    And do these paragraphs reflect that you found that the daily abnormal returns of Mohawk stock exhibited autocorrelation over the entire class period?

A.    They -- paragraphs 71 reads that "I derived a coefficient (beta) of -0.087, representing the measurement of the relationship between abnormal current (i.e., today) and lagged (i.e., yesterday) returns.  This coefficient has a p-value of 3.9% making it statistically significant below the 5% level."

Q.    And then as to the statement that the "coefficient has a p-value of 3.9% making it statistically significant below the 5% level," you say that in paragraph 71; right?

A.    I believe that's what I just read.

Q.    Okay.  And -- oh, I'm sorry.  I thought you had -- I'm sorry.  My apologies.  I was toggling between the two.

You found -- does that mean that you found that the daily abnormal returns of Mohawk stock exhibited an autocorrelation over the entire class period?

Page 81

A.    It is -- again, this is why you use an economist.  It shows that over the class period, there was autocorrelation, but that requires further tests to determine whether that's spurious, anomalous, or whether that is reflective of the class period as a whole, whether it's robust or sensitive to small changes.

Q.    Okay.  So if you found that -- that the entire -- that over the entire alleged class period, the daily abnormal returns of Mohawk stock exhibited statistically significant correlation -- and I don't hear you saying that -- that you did find that -- what is the economic significance of your finding?

MR. GLUCK:  Object to the form.  It's vague.

THE WITNESS:  Well, I -- what finding?  There -- there are a number of findings in paragraph 71 and 72.

BY MR. LONG:

Q.    Okay.  Did you find that over the entire alleged class period, the daily abnormal returns of Mohawk stock exhibited statistically significant autocorrelation?

A.    I found that, as I said, "I derived a coefficient (beta) of -0.087, representing the

Michael L. Hartzmark, Ph.D.                February 25, 2022
Public Employees' Retirement System of Mississippi

Page 97

Q.    In order to test whether the autocorrelation was persistent and systematic, one of the things you did was to split the alleged class period in half; right?

A.    Yes.  I created a control period because, as -- as is discussed -- and this is widespread and sort of common knowledge in time series analysis -- the issue is can you use the return from yesterday to predict the return tomorrow.

And, therefore, as is often done, especially in the -- the trade literature, you look at an early period and see whether you can use that information to predict a latter period.

Q.    And do you cite in your report to any Court decisions or literature that supports the splitting in half methodology?

A.    Splitting in half is a -- again, that's a basic principle of time series.  No, I don't.  I -- again, I cite to Greene and I cite to the Lehocky case.

Q.    Okay.  So -- so those -- you're -- you're saying that those support the splitting in half methodology?

MR. GLUCK:  Object to the form.

THE WITNESS:  Again, that -- I split it in