# Exhibit D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ROME DIVISION

CIVIL ACTION FILE NO.:   4:20-cv-00005-ELR

PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF

MISSISSIPPI, individually and on behalf

of all others similarly situated,

        Plaintiffs,

v.

MOHAWK INDUSTRIES, INC., and JEFFREY S.

LORBERBAUM,

        Defendants.

REMOTE VIDEOCONFERENCE VIDEOTAPED

DEPOSITION TESTIMONY OF:

30(b)(6) ROBERT CLARK

March 2, 2022

Case 4:20-cv-00005-VMC    Document 88-5    Filed 04/13/22    Page 3 of 14
30(b)(6) Robert Clark                                            March 2, 2022
Public Employees' Retirement System of Mississippi

Page 25

invest in stocks, so they can buy and sell as they see fit. And again, they have full -- we give them full discretion for that ability to pick stocks.

Q. And what about Epic? Are they considered an active manager also?

A. They are.

Q. And is State Street an active manager?

A. No. State Street is an index manager.

Q. Okay. So in general, would you say Mississippi's investment managers have discretionary authority to buy and sell stock on their own without consulting with anyone at Mississippi?

A. Yes.

Q. Do you know how long Eagle has been an investment manager for Mississippi?

A. I don't know the exact time frame. It's been, I would say, approximately at least ten years.

Page 30

Mohawk that Mississippi invested in during the class period?

A.    To my knowledge, yes.

Q.    Now I'm going to introduce another spreadsheet.  It's Bates marked Mohawk MISSPERS 0002356.  And we're going to mark that as Defendant's Exhibit 8.

(Defendant's Exhibit 8 was marked for identification and is attached.)

A.    Okay.

Q.    Have you seen this document before?

A.    Yes.

Q.    When was that?

A.    Again, during conversations with counsel in preparation for this deposition.

Q.    And this document shows Mississippi's transactions in Mohawk stock between January 6, 2017, and December 20th, 2019.  Is that right?

A.    I'm -- I'm seeing the first trade date as February 6.

Page 31

Q.    That's right.  It's February 6th.

MR. BROWNE:  Yeah, me too. Okay.

A.    And then the last one was December 20th of 2019, yes.

Q.    Okay.  And looking at the top of the spreadsheet, do you see a column called "Source Account Name"?

A.    Yes.

Q.    Do these source accounts correspond to Mississippi's four investment managers that we spoke about earlier?

A.    Yes.

Q.    Do you know if Mississippi purchased any Mohawk stock after December 31st, 2019?

A.    I don't know.

Q.    Do you know if it bought any Mohawk stock after December 31st, 2019?

A.    I don't know.

Q.    The earliest transaction on this

Page 32

document, as you mentioned earlier, is February 6, 2017. Do you know if Mississippi bought or sold Mohawk stock before this date?

A. I don't know.

Q. Mr. Clark, you mentioned that you reviewed the amended complaint in preparation for today; right?

A. Yes.

Q. Do you recall the amended complaint's allegation that the truth concerning the alleged fraud was revealed to the market starting on July 26, 2018?

A. I remember July 2018. I don't -- I didn't remember that exact date, but yes.

Q. Okay. Looking at this chart, would it surprise you to learn that the amended complaint alleges the truth was revealed starting on July 26, 2018?

MR. BROWNE: I'm just going to object to form here and note that this isn't in connection with any of the

Page 33

topics that Mr. Clark has been identified

for.  So for the purposes of these

questions, obviously, he can answer, but

it's his personal knowledge and not to be

imputed to Mississippi.

But, Mr. Clark, you can go ahead

if you know.

THE WITNESS:  Okay.

A.   Could you repeat the question,

please?

Q.   Sure.  Would it surprise you to

learn that the amended complaint alleges

that the truth was first revealed to the

market starting on July 26, 2018, based

on this -- this chart of Mohawk purchases

and sales?

MR. BROWNE:  Just same

objection.

But go ahead.

A.   No, it would not surprise me.

Q.   And why not?

A.   Well, because our managers have

complete discretion to trade stocks.  So

Page 34

I don't know their particular reasons for buying or selling securities.  That's their process.

Q.    But do you personally think it would be reasonable to purchase additional shares in a company after it allegedly disclosed that it was committing fraud?

MR. BROWNE:  Objection to the form.

You can answer.

A.    Again, it's -- it's up to the managers.  There's a lot of factors that go into a trade decision.  And so it's up to them to make that decision per their process.

Q.    Sure.  But I'm not asking about the managers.  I'm asking about you personally and whether you think it's reasonable to buy stock in a company after a disclosure of alleged fraud.

A.    Again, it's -- there's a lot of factors that go into picking stocks.

30(b)(6) Robert Clark                              March 2, 2022
Public Employees' Retirement System of Mississippi

Page 35

Whether it's the managers or, you know,

my personal viewpoint, there's a lot of

factors that go into picking a stock.  So

it wouldn't surprise me.

Q.    So from this chart, we can see

that several of Mississippi's investment

managers continued to buy Mohawk stock

after July 26, 2018; right?

A.    Let me see the dates.  Yes.

Q.    Can you tell me how many Mohawk

stock purchases were made after July 26,

2018?

A.    In the class period?

Q.    Yes.  On this chart.

A.    Okay.  After July -- you said

July 26?

Q.    Right.

A.    And you're asking for how many

buys there were?

Q.    Right.

A.    Let's see.  Looks like two,

three, four, five, six, seven, eight,

nine, ten, eleven, twelve, thirteen.

Page 36

Looks like there's fourteen buys, if

that's -- if I counted correctly.

Q.   Does it look like Mississippi

purchased over -- just a ballpark, we'll

round here -- 75,000 shares of Mohawk

stock after July 26, 2018?

A.   I'll have to look.

Q.   And again, we're rounding.

(Witness reviews document.)

A.   You said 75,000?

Q.   Around.

A.   Around 75,000?

(Witness reviews document.)

A.   Yes, that's -- approximately

looks correct.

Q.   Okay.  And it looks like all but

one -- scratch that.

Okay.  Are you familiar with the

fact that the amended complaint alleges

that the next corrective disclosure

happened on October 26, 2018?

MR. BROWNE:  I'm just going to

object and just note for the record again

Page 37

this is his personal knowledge, which is fair game, but he's not designated on this topic for PERS.

And you can answer. I'm sorry.

A. Can you repeat the question again?

Q. Sure.

MS. BOHN: And I'm just going to note that I understand your objection as to the amended complaint-related questions, but his questions and answers are -- about the specific trades are within the designation for these topics.

MR. BROWNE: Yeah, but you asked about the amended complaint, so that's why I objected.

MS. BOHN: Sure.

Q. The amended complaint goes on to allege that the next corrective disclosure happened on October 26, 2018; right?

A. Again, I -- I didn't recall the date.

Page 38

Q.   Okay.   Let's look back at the spreadsheet.   There are additional Mohawk stock purchases after October 26, 2018; right?

A.   Yes.   It looks like there's one. Again, if I'm reading that correctly.

Q.   Sorry, where are you seeing the one?

A.   Well, one trade on line -- did you say -- I'm sorry, did you say 2018?

Q.   2018, October 26, 2018.

A.   Okay.   Sorry.   I was looking at 2019.   So after October 26 of 2018?

Q.   Yes.

A.   Looks like there were one, two, three, four, five, six, seven, eight, nine.   Looks like there were ten purchases after that date.   Again, if I counted --

Q.   And then -- sure.   We can agree that we're just, you know, giving rough counting estimates here.

        And then the third and final

Page 39

corrective disclosure is alleged to have occurred on July 26, 2019; right?

MR. BROWNE:  Just the same objection.

But you can answer.

A.   And again, I didn't remember the exact date, but yes.

Q.   And it looks like there are a couple of additional purchases after July 26, 2019; right?

A.   Yes.

Q.   So looking at this chart, despite, you know, three dates where Mississippi alleged that the fraud was revealed to the market, Mississippi's investment managers continued to purchase stock in Mohawk on its behalf; right?

A.   Yes.

Q.   And was that reasonable?

MR. BROWNE:  Objection to form.

You can answer, Mr. Clark.

A.   It doesn't surprise me, and they have complete discretion.  We have no

Page 40

restrictions on their ability to trade

stocks.

Q.    I understand that -- I

understand that.  I understand there were

no restrictions and they had discretion.

But was it reasonable for them to make

that decision to continue buying

following three alleged corrective

disclosures?

A.    It strikes me as not

unreasonable, as there are a lot of

decisions that have to go into the

purchase and sale decisions.

Q.    Do Mississippi's investment

managers have a practice of investing in

companies that Mississippi believes have

committed securities fraud?

        MR. BROWNE:  Objection to form.

A.    I don't know.

Q.    Have you ever read any analyst

reports on Mohawk?

A.    No.

Q.    Has anyone at Mississippi?