# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>MOHAWK INDUSTRIES, INC. and JEFFREY S. LORBERBAUM,<br><br>    Defendants. | Civil Action No.<br>4:20-cv-00005-VMC |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION,
APPOINTMENT AS CLASS REPRESENTATIVE, AND
<u>APPOINTMENT OF CLASS COUNSEL</u>**

Robert R. Long
Elizabeth G. Clark
Courtney E. Quirós
Sierra P. Shear
Charlotte M. Bohn
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Counsel for Defendant
Mohawk Industries, Inc.*

William J. Holley, II
Scott E. Zweigel
PARKER, HUDSON, RAINER
& DOBBS LLP
303 Peachtree Street N.E.
Atlanta, Georgia 30308
Telephone: (404) 523-5300
Facsimile: (404) 522-8409

Richard D. Weinberg
William C. Kinder
MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO PC

565 Fifth Avenue
New York, New York 10017
Telephone: (212) 856-9600
Facsimile: (212) 856-9494

*Counsel for Jeffrey S. Lorberbaum*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

CITATION CONVENTIONS ..............................................................................v

INTRODUCTION ...............................................................................................1

ARGUMENT AND CITATION OF AUTHORITY ...........................................2

I.  MissPERS is ATYPICAL. .......................................................................4

    A.  MissPERS' investment advisor conducted due diligence using information unavailable to the majority of class members. ..................5

    B.  MissPERS' investment advisors' beliefs and post-corrective disclosure purchases of Mohawk stock subject MissPERS to unique defenses. .........................................................................9

II.  The Class Cannot Be Certified Because Individualized Reliance Issues Predominate. .............................................................................13

    A.  MissPERS has not shown that Mohawk stock traded in an efficient market during the Class Period. ..........................................14

    B.  The alleged misrepresentations did not affect Mohawk's stock price. ...............................................................................16

III.  MissPERS Cannot Adequately and Fairly Represent the Class. ...................19

CONCLUSION ..................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)................................................................................................3, 19

*Anderson v. Bank of South, N.A.*,
118 F.R.D. 136 (M.D. Fla. 1987) ........................................................................8

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).....................................................................14, 16, 17, 18

*Beach v. Healthways, Inc.*,
No. 3:08-0569, 2009 U.S. Dist. LEXIS 92557 (M.D. Tenn. Oct. 5,
2009) ....................................................................................................8, 9, 11

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
814 F.3d 132 (2d Cir. 2016) ................................................................21

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
No. 14-CV-6867 (VEC), 2016 U.S. Dist. LEXIS 35385 (S.D.N.Y.
Jan. 12, 2016)..............................................................................................22

*Berwecky v. Bear, Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) ......................................................................11

*Brown v. Electrolux Home Prods., Inc.*,
817 F.3d 1225 (11th Cir. 2016) ........................................................................3

*Cambridge Ret. Sys. v. Mednax, Inc.*,
No. 18-61572-CIV, 2018 U.S. Dist. LEXIS 210491 (S.D. Fla. Dec.
13, 2018) ........................................................................................20

*Cambridge Ret. Sys. v. Mednax, Inc.*,
No. 18-61572-CIV-DIMITROULEAS/SNOW, 2018 U.S. Dist.
LEXIS 207064 (S.D. Fla. Dec. 6, 2018)..........................................20, 21, 23, 25

*Case v. CenturyLink Inc.*,
    No. 3:17-CV-01005, 2017 U.S. Dist. LEXIS 174514 (W.D. La.
    Oct. 20, 2017) ......................................................................................24

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..................................................................................3

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)...............................................................................13

*George v. China Auto. Sys., Inc.*,
    No. 11 Civ. 7533 (KBF), 2013 U.S. Dist. LEXIS 93698 (S.D.N.Y.
    July 3, 2013)....................................................................................11, 13

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021)...........................................................................18

*Grace v. Perception Tech. Corp.*,
    128 F.R.D. 165 (D. Mass. 1989)..............................................................6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................13, 16, 17

*In re Healthsouth Corp. Sec. Litig.*,
    213 F.R.D. 447 (N.D. Ala. 2003) ..............................................3, 4, 8, 11

*In re MIVA, Inc.*,
    No. 2:05-cv-201-FtM-29DNF, 2008 U.S. Dist. LEXIS 21108
    (M.D. Fla., Mar. 12, 2008)........................................................................9

*In re Theragenics Corp. Sec. Litig.*,
    205 F.R.D. 687 (N.D. Ga. 2002) ............................................................20

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset
    Servicing & Securitization, LLC*,
    616 F. Supp. 2d 461 (S.D.N.Y. 2009) ...............................................23, 25

*Knurr v. Orbital ATK, Inc.*,
    220 F. Supp. 3d 653 (E.D. Va. 2016) ....................................................24

iii

*Lehocky v. Tidel Techs., Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004)........................................................................15

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
762 F.3d 1248 (11th Cir. 2014) ..........................................................................11

*LoConte v. Dugger*,
847 F.2d 745 (11th Cir. 1988) ............................................................................20

*Luczak v. Nat'l Bev. Corp.*,
548 F. Supp. 3d 1256 (S.D. Fla. 2021)...............................................................10

*Priest v. Zayre Corp.*,
118 F.R.D. 552 (D. Mass. 1988)...........................................................................8

*Rutstein v. Avis Rent-A-Car Sys.*,
211 F.3d 1228 (11th Cir. 2000) ............................................................................3

*Seb Inv. Mgmt. Ab v. Symantec Corp.*,
No. C 18-02902 WHA, 2021 U.S. Dist. LEXIS 77040 (N.D. Cal. Apr. 20, 2021)........................................................................................................22

*Villella v. Chem. & Mining Co. of Chile Inc.*,
No. 15 Civ. 2106 (ER), 2018 U.S. Dist. LEXIS 99151 (S.D.N.Y. June 12, 2018)...............................................................................................4, 8

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..........................................................................................2, 3

**RULES**

Fed. R. Civ. P. 23 .................................................................................................passim

**STATUTES**

15 U.S.C. § 78u-4.............................................................................................24, 25

**OTHER AUTHORITIES**

5 Moore's Federal Practice - Civil § 23.24[8][b] .....................................................8

## CITATION CONVENTIONS

"CC": Plaintiff's Consolidated Class Action Complaint for Violations of the Federal Securities Laws (DCKT #37)

"Class Period": putative class period, April 28, 2017 through July 25, 2019

"Decl.": Declaration of Robert R. Long filed concurrently herewith

"Defendants": Defendant Mohawk Industries, Inc. and Defendant Jeffrey S.

Lorberbaum

"Eagle": Eagle Capital Management, LLC

"Ex.": Exhibit to the Decl.

"Mohawk" or the "Company": Defendant Mohawk Industries, Inc.

"Motion for Class Certification": Lead Plaintiff's Motion for Class Certification, Appointment as Class Representative, and Appointment of Class Counsel (DCKT #78)

"MissPERS" or "Lead Plaintiff": Plaintiff Public Employees' Retirement System of Mississippi

## INTRODUCTION

MissPERS asks this Court to certify a class of Mohawk investors under Federal Rule of Civil Procedure 23, to appoint it as class representative, and to appoint class counsel.  (DCKT #78.)  The Court should reject all three requests.

*First*, a class cannot be certified because MissPERS is not a representative member of the class it seeks to lead.  Unlike regular investors, MissPERS delegated its trading authority to investment advisors who conducted an extensive investigation of Mohawk's business, using information unavailable to the class as a whole, in connection with its purchases of Mohawk stock.  The opinions of MissPERS' investment advisors regarding Mohawk stock and their post-alleged corrective disclosure purchases also raise unique defenses as to materiality, reliance, and loss causation, creating a conflict between MissPERS and the proposed class.

*Second*, MissPERS' motion should be denied because individual issues in this case will predominate over common ones.  MissPERS cannot show that Mohawk stock traded in an efficient market, a requirement for invoking the class-wide presumption of reliance upon which MissPERS rests its motion.  Even if MissPERS could initially establish such a presumption, however, Defendants have rebutted it by establishing that the alleged misstatements at issue in this case did not impact the trading price of Mohawk's stock.

1

*Third*, MissPERS cannot demonstrate that it will fairly and adequately represent the interests of the proposed class.  Numerous courts, including at least one in the Eleventh Circuit, have called into question the troubling relationship between MissPERS and its proposed class counsel, Bernstein Litowitz Berger & Grossmann LLP ("Bernstein").  The history of the alleged kickback scheme between Bernstein and MissPERS, when combined with the circumstances underlying MissPERS' decision to bring this action, reveals a figurehead professional plaintiff lending its name to an entirely lawyer-driven lawsuit.

For these reasons, and those set forth below, MissPERS' Motion for Class Certification should be denied.

## ARGUMENT AND CITATION OF AUTHORITY

Parties seeking class certification bear the burden of affirmatively demonstrating that they have satisfied each of the four requirements of Rule 23(a). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Rule 23(a) provides that a class may only be certified if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  In addition, a party seeking

2

class certification must also "satisfy through evidentiary proof" at least one of the three requirements of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Dukes*, 564 U.S. at 350.

"[C]lass certification is not automatic" and requires "a rigorous analysis." *In re Healthsouth Corp. Sec. Litig.,* 213 F.R.D. 447, 456 (N.D. Ala. 2003). "A district court that has doubts about whether the requirements of Rule 23 have been met should refuse certification." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233-34 (11th Cir. 2016) (citations omitted). The court must conduct a searching inquiry, including a possible "probe behind the pleadings before coming to rest on the certification question." *Id*. at 160; *Amchem Prods. v. Windsor*, 521 U.S. 591, 615-16 (1997) (stating that Rule 23 "invites a close look" before certifying a class) (citation omitted); *Rutstein v. Avis Rent-A-Car Sys*., 211 F.3d 1228, 1234 (11th Cir. 2000) ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.") (internal quotation marks and citation omitted). Because MissPERS has not carried its burden of proving that each of Rule 23's requirements is satisfied, class certification should be denied.

## I.   MISSPERS IS ATYPICAL.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Where, as here, a plaintiff may be subject to unique defenses which have the potential to divert the plaintiff's focus from prosecution of the proposed class's claims, it cannot satisfy the typicality requirement of Rule 23 and renders certification of a class inappropriate.  *In re Healthsouth Corp. Sec. Litig.,* 213 F.R.D. at 459.

MissPERS admits that it relied exclusively on outside investment advisors to make individual buy-and-sell decisions involving Mohawk securities. (*See* 30(b)(6) Deposition of MissPERS Through its Representative Robert Clark ("Clark Dep.") 25:12-17; 33:11-34:3; 39:12-40:2.)[1]  It therefore stands in the shoes of its agents and is necessarily charged with their understanding of the market and knowledge regarding Mohawk stock.  *See Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2018 U.S. Dist. LEXIS 99151, at *14-15 (S.D.N.Y. June 12, 2018) (explaining that when a "plaintiff wholly outsources their decision making to an investment adviser who acts as their agent, that agent's decision-making calculus is relevant" to the typicality analysis).  MissPERS, through its investment advisors, (1)

---

[1] Excerpts from the March 2, 2022, Clark Dep. are attached as Ex. D to the Decl.

4

conducted an extensive pre-purchase investigation, possessing information that other class members did not; and (2) continued to view Mohawk stock favorably even after the alleged truth was revealed to the market, making multiple post-corrective disclosure purchases.[2]   Accordingly, MissPERS is not an appropriate representative, and its motion should be denied because it will face issues atypical of the class it wishes to represent.

**A.    MissPERS' investment advisor conducted due diligence using information unavailable to the majority of class members.**

Eagle, the outside manager responsible for *68.4%* of MissPERS' Mohawk stock purchases during the Class Period, was Mohawk's largest investor at various times.   (MOHAWK-MISSPERS-0002356.)[3]   Eagle takes a research-intensive "private equity approach" to investing that goes beyond reviewing public disclosures to include interviewing industry experts, competitors, former employees, and company management teams.   (*See* 30(b)(6) Deposition of Eagle Capital Management, LLC Through its Representative Adrian Meli ("Meli Dep.") 16:18-

---

[2] Defendants issued subpoenas for documents to all of MissPERS' investment advisors on January 31, 2022.   One of those advisors has not yet produced documents.  Defendants reserve the right to supplement this brief with additional documents that may be produced at a later date.

[3] Excerpts of the spreadsheet Bates-stamped MOHAWK-MISSPERS-0002356 are attached as Ex. K to the Decl.

17-2; 24:3-25:4.)[4]   Eagle applied this research-based approach to its Mohawk investments, conducting extensive due diligence into Mohawk's business and the flooring industry.  (*Id*. at 41:18-43:6; 59:2-60:2.)

Eagle's investment strategy includes establishing "strong relationships with company management derived from diligence and long-term perspective."  (*Id*. at 28:1-25.)   As a result, Eagle maintained a direct line of communication with Mohawk's senior executive officers throughout the Class Period.  (*Id*. at 44:1-45:16.) Because "[i]t is beyond reality to suggest that any potential shareholder could meet with corporate officers to discuss information that was already available to the public," these "[]personal contact[s] with corporate officers and special meetings … render [MissPERS] atypical to represent the class."[5]  *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 169 (D. Mass. 1989).

Prior to investing in Mohawk, Adrian Meli of Eagle spoke privately with Mohawk CFO Frank Boykin several times.  In these calls, Mr. Meli and Mr. Boykin discussed a wide range of topics, including Mr. Boykin's views on "the flooring

---

[4] Excerpts from the April 6, 2022, Meli Dep. are attached as Ex. E to the Decl.

[5] When pressed by MissPERS' counsel, Mr. Meli testified that Eagle did not possess material, non-public information, but could not say that all of the information Eagle obtained during communications with Mohawk was provided to other investors. (Meli Dep. 136:22-137:9.)

industry," Mohawk's "competitive advantages," "margins," and "capital allocation." (Meli Dep. 44:16-45:4.)  Mr. Meli also asked Mr. Boykin for his opinion on the "future of the flooring industry" along with the "new product luxury vinyl tile" and how "declining carpet impact[ed] the future of Mohawk," among other things.  (Meli Dep. 44:16-45:4.)  Then, on May 24, 2018, Mr. Meli thanked Mr. Boykin for their conversations "over the past couple of months," writing that Eagle "underst[ood] the company well," referring to "continu[ing] its diligence."  (ECM0019690.)[6]  A few weeks later, after months of communications with Mr. Boykin, Eagle purchased 71,460 shares of Mohawk stock on June 13, 2018.  (Meli Dep. 40:11-14.)  Eagle's communications with Mohawk senior management continued throughout the Class Period, with Eagle repeatedly sending reminders to Mohawk senior executives that it was one of Mohawk's largest shareholders when requesting private calls and meetings.[7]  (*Id*. at 72:18-73:3; 73:25-74:13.)

---

[6] The confidential document Bates-stamped ECM0019690 is attached as Ex. F to the Decl.

[7] Mohawk CFO Frank Boykin participated in numerous private meetings and calls with Eagle throughout the Class Period. (Meli Dep. 46:3-7; 50:3-5; 51:1-17; 52:7-17; 103:2-105:7.)  Eagle repeatedly sought to speak with Mohawk CEO Jeff Lorberbaum but was told that Mr. Lorberbaum did not speak with investors because he preferred to focus on the business.  (*Id*. at 43:11-22; 54:17-55:10.)

Eagle's communications with Mohawk senior executives show that MissPERS' investment decisions were made by "a sophisticated investor who had access to information or relied on expertise that other class members did not possess." *Villella*, 2018 U.S. Dist. LEXIS 99151, at *23 (citing 5 Moore's Federal Practice - Civil § 23.24[8][b]); *see also Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass. 1988) (distinguishing circumstances where typicality was found from those where the decisions associated with plaintiff's investments were "based on the type of knowledge available only to an institutional investor, or one who had direct contact with corporate officers"); *see also In re Healthsouth Corp. Sec. Litig.*, 213 F.R.D. at 459 (finding named class representatives were not typical because they "had knowledge not available to the open market purchasers"). At minimum, Eagle's sweeping due diligence is the type of "extensive personal investigation" courts have found demonstrates an atypical lack of reliance on the integrity of the market. *Anderson v. Bank of South, N.A.*, 118 F.R.D. 136, 148 (M.D. Fla. 1987); *Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 U.S. Dist. LEXIS 92557, at *16 (M.D. Tenn. Oct. 5, 2009) (concluding that plaintiff whose outside investment manager "met with officers… individually" and who "conducted his own investigation, including talking with the [c]ompany's customers" was atypical).

8

MissPERS may argue that *In re MIVA, Inc.*, No. 2:05-cv-201-FtM-29DNF, 2008 U.S. Dist. LEXIS 21108 (M.D. Fla., Mar. 12, 2008) supports a finding of typicality. That case held only that the reliance on the investment advice of a market professional is not *per se* sufficient to disqualify a class representative. Defendants do not argue that the delegation of authority to an investment advisor alone makes a potential class representative atypical, but that the use of *these* investment advisors, including Mohawk's largest investor at different points in time during the Class Period with direct access to its executives, defeats typicality. *See Beach*, 2009 U.S. Dist. LEXIS 92557, at *10. Accordingly, MissPERS cannot satisfy the typicality requirement of Rule 23.

## B. MissPERS' investment advisors' beliefs and post-corrective disclosure purchases of Mohawk stock subject MissPERS to unique defenses.

MissPERS' investment advisors, as its agents, continued to view Mohawk as a favorable investment throughout the Class Period, as evidenced by their testimony, documents, and continued purchases of Mohawk stock. This gives rise to unique defenses as to reliance, materiality, and loss causation that will be raised uniquely against MissPERS, requiring it to devote "time and attention" that will "distract it

9

from the claims of the rest of the class." *Luczak v. Nat'l Bev. Corp.*, 548 F. Supp. 3d 1256, 1268 (S.D. Fla. 2021) (internal quotation marks omitted).

The views of MissPERS' investment advisors concerning alleged corrective disclosures directly contradict the allegations of the CC.  According to MissPERS, Mohawk's alleged fraud was revealed to the market on July 26, 2018, when its guidance "stunned investors and analysts" and revealed to the market that Mohawk "was selling out of product and was capacity constrained," that its "warehouses were full of excess inventory," and that it was experiencing "significant manufacturing issues."  (CC ¶¶ 240-242.)  Eagle's own communications, however, state the opposite.  On July 2, 2018, Eagle wrote that Mohawk would ███████████ ████████. (ECM0018306.)[8]  Then, immediately after Mohawk's Q2 2018 earnings were announced, an Eagle representative wrote that █████████████████ ███████████████████████████████████████████ (ECM0017842.)[9] Far from a revelation of fraud, Eagle was not "stunned" by Mohawk's results, and these beliefs, imputed to MissPERS, put it squarely at odds with the class of investors it purports to represent.

---

[8] The confidential document Bates-stamped ECM0018306 is attached as Ex. G to the Decl.

[9] The confidential document Bates-stamped ECM0017842 is attached as Ex. H to the Decl.

Furthermore, the July 26, 2018 alleged disclosure did not alter the decision by MissPERS' investment advisors to continue purchasing Mohawk stock. Eagle continued to buy large amounts of Mohawk stock on MissPERS' behalf, even after this date. Numerous courts have held that "[a] person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative."[10] *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000); *see also George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2013 U.S. Dist. LEXIS 93698, at *16-17 (S.D.N.Y. July 3, 2013). On July 27, 2018, Eagle wrote that it "continue[d] to like the long-term story" at Mohawk and that it thought Mohawk's

---

[10] While some post-disclosure conduct does not undermine reliance on allegedly fraudulent statements, "unique circumstances" may defeat typicality. *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014). Such circumstances exist here. Beyond mere post-corrective disclosure purchases, Lead Plaintiff's investment advisor's own documents and testimony show beliefs regarding Mohawk stock and alleged corrective disclosures that directly contradict the allegations of the CC. The Court does not need to resolve whether MissPERS' claims will fail as a matter of law; because these unique defenses have the potential to divert its focus from the proposed class's claims, MissPERS is atypical. *Beach*, 2009 U.S. Dist. LEXIS 92557, at *12. Eagle's beliefs, imputed to MissPERS, create conflicts with the class concerning numerous elements of its claims. Moreover, as explained above, Eagle is also problematic because it was the investment advisor responsible for the majority of MissPERS' Mohawk stock purchases during the Class Period and investigated Mohawk's business using information unavailable to the average class member, distinguishing MissPERS from the majority of the class.

stock "would get back on track soon." (ECM0019762.)[11] Following the July 26, 2018 alleged corrective disclosure, and after speaking with Mr. Boykin on August 1, 2018, Eagle purchased around 75,000 additional shares on MissPERS' behalf. (Clark Dep. 35:10-36:15; Meli Dep. 103:2-105:7; 112:16-114:22; MOHAWK-MISSPERS-0002356.)

In fact, it appears that *none* of the corrective disclosures that allegedly revealed the truth of the misstatements to the market impacted Lead Plaintiff's stock purchases. Even after the October 26, 2018 alleged corrective disclosure (¶¶ 245-247), Eagle acknowledged that Mohawk stock had a "tough day," but wrote in an email requesting a private phone call that it was "considering becoming an even larger holder over time." (MHK-SCA-00012544.)[12] Eagle continued to view Mohawk favorably, writing that Mohawk was a "[g]reat company" after spending the day with CEO Jeff Lorberbaum on November 12, 2018. (ECM0026144.)[13] Similarly, after both the October 26, 2018 alleged corrective disclosure (¶¶ 245-247) and the final alleged corrective disclosure on July 26, 2019 (¶¶ 253-254), another

---

[11] The confidential document Bates-stamped ECM0019762 is attached as Ex. J to the Decl.

[12] The document Bates-stamped MHK-SCA-00012544 is attached as Ex. L to the Decl.

[13] The document Bates-stamped ECM0026144 is attached as Ex. I to the Decl.

one of Lead Plaintiff's investment advisors, Northern Trust, continued to purchase Mohawk stock.  (MOHAWK-MISSPERS-0002356.)

MissPERS' continuing purchases throughout the Class Period create substantial challenges for MissPERS that are different from and greater than the typical shareholder. Even assuming the alleged corrective disclosures revealed any prior misstatements, it is clear that those misstatements "were really not a factor in the [earlier Mohawk stock purchases] but rather that other investment considerations drove [those purchases]."   *George*, 2013 U.S. Dist. LEXIS 93698, at *18. MissPERS' problems are atypical, and its motion must be denied.

## II.   THE CLASS CANNOT BE CERTIFIED BECAUSE INDIVIDUALIZED RELIANCE ISSUES PREDOMINATE.

Even if MissPERS was a proper representative, the class cannot be certified because Mohawk's stock did not trade "efficiently" on the market during the Class Period.  To succeed on its securities fraud claims, MissPERS must show that it relied on Defendants' alleged misstatements. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*").  "Considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action," including reliance. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*").

13

*Basic Inc. v. Levinson* allows reliance on alleged public misstatements to be presumed when the securities at issue traded on an efficient market. 485 U.S. 224, 246-47 (1988). A market is said to be "efficient" when the price of the stock fully reflects all publicly available information about the company. *Id*. at 241-42, 246-47. An investor who buys or sells stock at the price set by the market may, therefore, be presumed to have relied on any public material representations made by defendants that are reflected in the trading price. *Id*. at 246-47. Because MissPERS cannot prove that Mohawk stock traded in an efficient market, it is not entitled to the *Basic* presumption.

### A. MissPERS has not shown that Mohawk stock traded in an efficient market during the Class Period.

To support its market efficiency argument, MissPERS relies on the opinion of its expert witness, Dr. Michael L. Hartzmark, Ph.D. Dr. Hartzmark is a long-standing plaintiffs' expert. (*See* Deposition of Dr. Michael L. Hartzmark ("Hartzmark Dep.") 29:4-12.)[14] Although Dr. Hartzmark's report concludes that Mohawk common stock traded in an efficient market during the Class Period, his

---

[14] Excerpts from the February 25, 2022, Hartzmark Dep. are attached as Ex. B to the Decl.

14

analyses underlying that opinion are flawed and must be disregarded.  (*See* Expert Report of Lucy P. Allen dated April 13, 2022 ("Allen Rep.") ¶¶ 74-75.)[15]

Dr. Hartzmark conducted an autocorrelation test in connection with his market efficiency analysis.  As Dr. Hartzmark notes in his report, "[t]he absence of autocorrelation is an indicator of market efficiency."  *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-507 n.20 (S.D. Tex. 2004).  But Dr. Hartzmark does not dispute that his initial analysis using traditional considerations ***revealed*** statistically significant autocorrelation.  (Hartzmark Rep. ¶ 71; Hartzmark Dep. 79:14-19; 80:3-13.)  This finding alone cuts against market efficiency throughout the Class Period. (Allen Rep. ¶¶ 75, 80-81.)  After reaching that conclusion, however, Dr. Hartzmark ran a second test which included dividing the Class Period in two parts in order to reach his desired results.  (*Id.* ¶ 81.)  This splitting in half methodology is scientifically unsupported and does not prove the absence of autocorrelation during the Class Period.  (*Id.* ¶¶ 82-84.)  Dr. Hartzmark's additional test removing two of the alleged corrective disclosure dates from his sample is similarly non-standard and inappropriate.  (*Id.* ¶¶ 86-89.)  The Court should not consider novel theories to support a finding of market efficiency.

---

[15] The expert report of Lucy P. Allen dated April 13, 2022 is attached as Ex. A to the Decl.

But Dr. Hartzmark's analysis of actual price movements responding the public information fares no better.  He conducted an "event study" in an attempt to test whether Mohawk's stock price rapidly reacted to disclosures of new information. (Hartzmark Rep. ¶¶ 64-65.)  In conducting this test, however, he selected only ten "news days" from the two-year period where Mohawk disclosed information about its earnings or guidance.  (Allen Rep. ¶¶ 74, 76-79.)  Put differently, in the period of time tested by Dr. Hartzmark, **555** days in the Class Period were not assessed.  *Id*. As set out in Defendants' expert's report, a ten-day test over a two-year period is simply too small a sample to reach any kind of scientifically reliable conclusion and is inadequate to establish a finding of market efficiency sufficient to establish the *Basic* presumption of reliance.  (*Id*. ¶¶ 77-79.)  MissPERS' motion should be denied.

B.     **The alleged misrepresentations did not affect Mohawk's stock price.**

Even assuming MissPERS could meet its burden to show that Mohawk stock traded in an efficient market, class certification should still be denied.  Defendants may rebut the *Basic* presumption at the class certification stage through evidence that the misrepresentation did not actually affect the stock price.  *Halliburton II,* 573 U.S. at 279, 282.  The Supreme Court has held that "'[a]ny showing that severs the link between the alleged misrepresentation and . . . the price . . . paid . . . by the plaintiff . . . will be sufficient to rebut the presumption of reliance' because 'the basis

16

for finding that the fraud has been transmitted through the market price would be gone.'" *Id.* at 281 (quoting *Basic*, 485 U.S. at 248).  As Defendants' expert explains, the alleged misrepresentations at issue in this case did not have an impact on Mohawk's stock price.

*First*, the alleged misrepresentations concerning the "Saturday Scheme" concerned a minor fraction of Mohawk's revenues and were treated by the market as equivalent to a "rounding error" in the Company's financials.  (Allen Rep. ¶¶ 25, 30-31, 44-46.)  The CC alleges that Mohawk engaged in a "Saturday Scheme" where, at the end of each quarter, Mohawk instructed its North American distribution centers "to load goods on Company trucks on Fridays and pretend to deliver the goods on Saturdays to customers they knew were closed for deliveries and, thus, not there to accept or reject them."  (CC ¶ 2.)  Mohawk would then allegedly "recognize these failed 'delivery attempts' as 'sales' dollars in the current quarter even though the product never changed hands to a customer, in violation of generally accepted accounting principles ('GAAP') and Mohawk's revenue-recognition policies."  (*Id.* ¶ 110.)

According to the CC's own allegations, the "Saturday Scheme" involved a mere four to five million pounds of product each quarter.  (*Id.* ¶ 133.)  Four to five million pounds translates to around $4 to $5 million in revenue—a drop in the bucket

17

for Mohawk's quarterly net sales.  (Allen Rep. ¶ 30.)  To put this into context, Mohawk's quarterly revenue during the Class Period was never lower than *$2.22 billion*.  (*Id.*)  Analysts describing the CC's allegations agreed, describing the Saturday Scheme as "miniscule" and expressing the view that the "juice is not worth the squeeze." (*Id.* ¶¶ 44-46.)  Because of the small value of product involved, the alleged "Saturday Scheme" could not have helped Mohawk meet analyst revenue expectations or affected Mohawk's earnings per share.  (*Id.* ¶¶ 38-43.)   And the "Saturday Scheme," as explained by Defendants' expert, could not have had an impact on Mohawk's cash flows.  (*Id.* ¶¶ 26-29.)  As a result, any alleged corrective announcement concerning the "Saturday Scheme" would not have been significant enough to move Mohawk's stock price, severing the link between the alleged misrepresentations and the price paid by MissPERS for Mohawk stock.  *Basic*, 485 U.S. at 248.[16]

*Second*, the price decline at the end of the Class Period can be attributed to factors unrelated to the alleged misrepresentations.  For example, the market

---

[16] MissPERS may argue that this inquiry relates to the question of materiality and should be reserved for the merits.  A recent Supreme Court holding, however, makes clear that the Court must consider all evidence relevant to price impact at the class certification stage, even if that evidence is also relevant to materiality.  *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021).

recognized that, at the time of the price decline, Mohawk faced a number of macroeconomic issues including cost inflation, lower demand, increased competition, and tariffs on Chinese imports. (Allen Rep. ¶¶ 47-69.) MissPERS' own investment advisor testified that Mohawk's business was particularly "economically sensitive," and that the stock price declines associated with the alleged corrective disclosures could be attributed to a number of macroeconomic factors, including "movements of the S&P, movements of the dollar, crude oil," "interest rates," and "volatility of importers," among others. (Meli Dep. 117:3-13; 130:2-20.) A review of public disclosures by Mohawk's peers shows the impact of these macroeconomic headwinds across the industry around the conclusion of the Class Period. (Allen Rep. ¶¶ 70-73.) None of these factors are tied to the alleged misrepresentations and subsequent corrective disclosures. (*Id*. ¶¶ 48-55.) This likewise severs any presumed connection between that price decline and the prior alleged misstatements. Accordingly, MissPERS' motion should be denied.

## III.   MISSPERS CANNOT ADEQUATELY AND FAIRLY REPRESENT THE CLASS.

MissPERS bears the burden of proving that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. In the Eleventh

19

Circuit, this includes an assessment of plaintiff's counsel, including its qualifications, expertise, and ability. *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 696 (N.D. Ga. 2002).

MissPERS' selection of Bernstein as class counsel in this case is problematic at best.  In 2018, the Southern District of Florida declined to appoint MissPERS as lead plaintiff in a securities class action because "[t]he [c]ourt's research revealed that the Bernstein Litowitz firm recently was alleged to have engaged in a kickback scheme with the Mississippi Attorney General's Office."[17]  *Cambridge Ret. Sys. v. Mednax, Inc.*, No. 18-61572-CIV-DIMITROULEAS/SNOW, 2018 U.S. Dist. LEXIS 207064, at *38 (S.D. Fla. Dec. 6, 2018) (internal quotations and citation omitted) (Snow, Mag. J.), *adopted by* 2018 U.S. Dist. LEXIS 222766, at *2 (S.D. Fla. Dec. 21, 2018).[18]  That court explained that "while representing MissPERS in a securities class action . . . [Bernstein] paid a solo practitioner in Jackson, Mississippi for various legal work which was unnecessary."  *Id*.  This individual "lacked

---

[17] MissPERS filed a request for modification of Magistrate Judge Snow's report and recommendation, asking that the discussion of the alleged kickback scheme be removed.  The motion was denied. *Cambridge Ret. Sys. v. Mednax, Inc.*, No. 18-61572-CIV, 2018 U.S. Dist. LEXIS 210491, at *5-6 (S.D. Fla. Dec. 13, 2018) (Snow, Mag. J.).

[18] A magistrate judge's "findings of fact, when adopted by the district court, become the findings of the district court itself." *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988).

experience in securities law," and the payments were "not disclosed" to the court presiding over the case. *Id*. at *38-39. When a Bernstein lawyer discovered these payments, he raised the issue with firm leadership, who "dismissed" his concerns, and he "resigned rather than having his employment terminated." *Id*. The court added that "[t]he Bernstein firm apparently did not deny that it made the payment, nor did the Attorney General's Office deny the payment was made." *Id*. at *39. Instead, "Special Assistant Attorney General Neville tried to keep the material confidential." *Id*.

According to the Second Circuit, these very allegations "would naturally be of legitimate interest to the public… and to federal courts in the future (e.g., those considering whether to name Bernstein Litowitz as lead counsel or find MissPERS to be an adequate class representative in future class actions.)" *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 143 (2d Cir. 2016). Indeed, "federal judges who decide whether to designate MPERS as an adequate class representative in securities class action matters . . . and whether to name Bernstein Litowitz as lead class counsel — might well want to know that the Attorney General's Office is selecting outside counsel to represent MPERS based on which firms are willing to pay kickbacks to attorneys whose primary qualification is alleged to be their personal relationship with members of the Attorney General's

21

Office and that Bernstein Litowitz is going along with the arrangement." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, No. 14-CV-6867 (VEC), 2016 U.S. Dist. LEXIS 35385, at *46-48 (S.D.N.Y. Jan. 12, 2016) (citation omitted).

MissPERS' ability to represent the interests of the class fairly and adequately is further called into question by its decision to select Bernstein as class counsel despite warnings by other courts about the accuracy of information provided by Bernstein as recently as August 2021.  The Northern District of California held recently that Bernstein attorneys provided "misleading" information to that court concerning a potential *quid pro quo* arrangement.  *Seb Inv. Mgmt. Ab v. Symantec Corp.*, No. C 18-02902 WHA, 2021 U.S. Dist. LEXIS 77040, at *5 (N.D. Cal. Apr. 20, 2021).  Although it did not find "clear-cut evidence" of the existence of such an arrangement, it was so troubled by Bernstein's conduct that it required Bernstein to "bring [the] order to the attention of the assigned judge and the decision-maker for the lead plaintiff who is to select counsel" in future cases.  *Id*. at *7.  MissPERS confirmed that it was made aware of the Bernstein's "misleading" conduct, as required by the *Symantec* Order.  (*See* Experts of 30(b)(6) Deposition of MissPERS Through its Representative Ta'Shia Gordon ("Gordon Dep.") 65:2-68:7.)[19]  Despite

---

[19] Excerpts from the March 2, 2022, Gordon Dep. are attached as Ex. C to the Decl.

that court's warning, MissPERS proceeded to reaffirm its selection of Bernstein as class counsel in this case.  (*Id*. at 69:7-12.)

MissPERS' selection of Bernstein was likely a foregone conclusion.  As MissPERS' testimony revealed, Bernstein conducted the "investigation" underlying the initiation of this lawsuit.  (*Id*. at 29:15-30:19; 59:6-19.)  MissPERS has a "monitoring agreement" with Bernstein, whereby Bernstein is given access to MissPERS' investment portfolio.  (*Id*. at 30:16-19.)  Pursuant to this agreement, Bernstein "monitors" the portfolio for potential fraud and provides recommendations about whether to file lawsuits alleging securities fraud.  (*Id*. at 29:15-30:15.)  When it brought this action, MissPERS had a policy of selecting whichever monitoring firm raised the potential lawsuit first if multiple monitoring firms alerted it to purported "fraud."[20]  (*Id*. at 61:2-21.)  This practice, coupled with the contingency fee with which Bernstein operates, "creates a clear incentive for [the firm] to discover 'fraud' in the investments it monitors and to recommend . . . that the [f]und, at no cost to itself, bring a class action lawsuit."  *Cambridge Ret. Sys.*, 2018 U.S. Dist. LEXIS 207064, at *32-33 (quoting *Iron Workers Local No. 25*

---

[20] MissPERS' 30(b)(6) representative testified that this first-in-time policy is no longer in place, although she did not know why.  (Gordon Dep. 63:8-16.)

23

*Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009)).

MissPERS has brought a multitude of securities class actions in recent years, a number of which involved Bernstein.  (Gordon Dep. 33:21-34:3.)  From the period of January 1, 2017, through December 31, 2019 alone, MissPERS served or sought to serve as lead plaintiff in ***thirteen*** securities fraud actions.  (DCKT #1-1.)  In addition to raising concerns about its ability to juggle oversight obligations, the fact that MissPERS has sought to serve as lead plaintiff in thirteen cases in a two-year period runs afoul of the PSLRA's bar against professional plaintiffs. [21]  15 U.S.C. § 78u–4(a)(3)(B)(vi).

---

[21] The PSLRA's "Professional Plaintiff" provision restricts a party from serving as lead plaintiff in "more than 5 securities class actions brought as plaintiff class actions . . . during any 3-year period."  15 U.S.C. § 78u–4(a)(3)(B)(vi).  MissPERS may argue that this provision does not apply to institutional investors, but numerous courts have rejected that proposition.  *See, e.g., Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653, 660 (E.D. Va. 2016) (stating that institutional investor's argument that five-in-three rule does not apply to it as "flawed in several respects" and holding that the plain language of PSLRA does not exempt institutional investors); *see also Case v. CenturyLink Inc.*, No. 3:17-CV-01005, 2017 U.S. Dist. LEXIS 174514, at *11 (W.D. La. Oct. 20, 2017) (rejecting lead plaintiff application of institutional investor who was appointed lead in eight securities cases because "the PSLRA imposes restrictions on 'professional plaintiffs'").

MissPERS' litigation history and its decision to select Bernstein despite warnings from other courts concerning the firm's representation indicates a pattern of rubber-stamping potential lawsuits while giving Bernstein carte blanche to create and run the action. And its practice of bringing actions when "fraud" is raised by Bernstein "fosters the very tendencies toward lawyer-driven litigation that the PSLRA was designed to curtail." *Cambridge Ret. Sys.*, 2018 U.S. Dist. LEXIS 207064, at \*32-33 (quoting *Iron Workers Local No. 25 Pension Fund*, 616 F. Supp. 2d at 464). Accordingly, MissPERS' motion should be denied.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Lead Plaintiff's Motion for Class Certification be denied.

This 13th day of April, 2022.

<div style="display: flex;">
<div style="width: 50%;">

*/s/ Robert R. Long*

Robert R. Long
Georgia Bar No. 141546
Elizabeth G. Clark
Georgia Bar No. 917979
Courtney E. Quirós
Georgia Bar No. 527069
Sierra P. Shear *(Appearing Pro Hac Vice)*
Charlotte M. Bohn
Georgia Bar No. 657525
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Emails:  robert.long@alston.com
        elizabeth.clark@alston.com
        courtney.quiros@alston.com
        sierra.shear@alston.com
        charlotte.bohn@alston.com

*Counsel for Defendant*
*Mohawk Industries, Inc.*

</div>
<div style="width: 50%;">

*/s/ William J. Holley, II*

William J. Holley, II
Georgia Bar No. 362310
Scott E. Zweigel
Georgia Bar No. 786616
303 Peachtree Street N.E.
Atlanta, Georgia 30308
Telephone: (404) 523-5300
Facsimile: (404) 522-8409
Emails: wholley@phrd.com
       szweigel@phrd.com

**MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC**

Richard D. Weinberg (*Appearing Pro Hac Vice*)
William C. Kinder (*Appearing Pro Hac Vice*)
565 Fifth Avenue
New York, New York 10017
Telephone: (212) 856-9600
Facsimile: (212) 856-9494
Emails: rweinberg@maglaw.com
      wkinder@maglaw.com

*Counsel for Jeffrey S. Lorberbaum*

</div>
</div>

26

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

By signature below, counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.

<div align="right">

*/s/ Robert R. Long*
Robert R. Long
Georgia Bar No. 141546

</div>

# **CERTIFICATE OF SERVICE**

The undersigned counsel certifies that the foregoing was filed with the clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all Counsel of Record.

This 13th day of April, 2022.

/s/ Robert R. Long
Robert R. Long
Georgia Bar No. 141546