# Exhibit G

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>MOHAWK INDUSTRIES, INC. and JEFFREY S. LORBERBAUM<br><br>        Defendants. | Civ. A. No. 4:20-cv-00005-VMC |

**Expert Rebuttal Report of Michael L. Hartzmark, Ph.D.**

**June 8, 2022**

# Table of Contents

I.      Qualifications and Compensation .................................................................................1

II.     Scope and Summary of Opinions.................................................................................1

III.    Ms. Allen's Report Does Not Dispute My Opinion that Damages for
        Violations of Section 10(b) of the Exchange Act Claims Can Be Calculated
        on a Class-Wide Basis Using a Common Methodology ............................................3

IV.     The Evidence in the Allen Report Does Not Support the Conclusion that
        There Is No Evidence of a Complete Lack of Price Impact........................................4

        A.      Introduction to Price Impact.............................................................................4

        B.      Summary of Price-Impact Related Allegations ................................................5

        C.      The Allen Report Offers No Evidence of a Complete Lack of Price
                Impact Related to the First Two Alleged Partial Corrective
                Disclosures........................................................................................................7

        D.      The Allen Report's Analysis of the Price Impact of the Saturday
                Scheme Is Flawed and Unreliable ...................................................................9

        E.      Ms. Allen's Conclusion that there Is Evidence of a Complete Lack of
                Price Impact from the Information Disclosed on July 25-26, 2019 Is
                Based on an Incomplete, Unscientific and Flawed Qualitative
                Analysis that Lacks Any Empirical Support and Contradicts Facts...............14

                1.      Mohawk's Lower than Expected 3Q19 EPS Guidance Is
                        Related to the Complaint's Allegations ...............................................15

                2.      A Valuation Calculation Demonstrates that Mohawk's Lower
                        than Expected 2Q19 Actual Net Sales Is a Partial Cause of the
                        Stock Price Decline on July 26, 2019 and Related to the
                        Allegations .........................................................................................19

                3.      Ms. Allen's Conclusion that Mohawk's Stock Price Declined
                        Because of Macroeconomic Headwinds Is Flawed .............................23

        F.      Summary..........................................................................................................27

V.      Ms. Allen's Report Does Not Dispute that the Basket of *Cammer* and
        *Krogman* Factors Offer Strong Support for the Conclusion that Mohawk
        Common Stock Traded in an Efficient Market .........................................................28

VI.     Over the Entire Class Period, Autocorrelation First Appears, Then Over
        Various Sub-Samples of Datapoints It Disappears and Changes Direction,
        Supporting My Opinion that Throughout the Class Period Mohawk's Stock
        Price Rapidly Reflected the Flow of Information ......................................................29

        A.      Autocorrelation in the Context of Market Efficiency.....................................30

        B.      Background on Calculating Autocorrelation Coefficients .............................33

C.    The Autocorrelation Coefficient Represents the Average over the Class Period, and the Empirical Tests Using the Whole Sample of Data Assumes that Each of the Observations Contributes Equally to the Estimate ......................................................................................35

D.    Splitting the Sample Period in Half..................................................41

    1.    Introduction and Background..............................................41

    2.    Splitting the Period in Half in My Opening Report ............43

    3.    Evaluating Additional Sub-Samples of Datapoints Demonstrate that Reliance on a Single Autocorrelation Coefficient Is Misleading..........................................................................46

    4.    Ms. Allen's Criticism Is Contrary to the Approach Used by Her Colleague at NERA Economic Consulting...........................47

    5.    Summary on Splitting the Class Period into Sub-Samples of Datapoints ..........................................................................48

    6.    Comparing My Empirical Tests in this Mohawk Matter to those in Other Matters Demonstrates that I Have Applied the Same Standard, Commonly-Utilized, Generally Accepted, Academic-Based Diagnostic Procedures in All My Engagements ........49

E.    Summary............................................................................................54

VII.  Ms. Allen's Criticisms of My News/No-News Analysis Are Flawed and Misleading ......................................................................................................55

A.    Summary of Ms. Allen's Criticisms .................................................55

B.    Fisher's Exact Test, which Is Used to Examine Cause and Effect on Days with News Versus All Other Days, Is Performed with an Appropriate Sample Size .....................................................................56

C.    The Inclusion of Alleged Corrective Disclosure Dates Does Not Bias the Results and Indeed Excluding the Alleged Partial Corrective Disclosure Dates Would Introduce Look-Ahead Bias....................................60

D.    Ms. Allen's Criticism that I Failed to Test Other Types of News Is a Red Herring ......................................................................................62

    1.    The Timing and Frequency of the Issuance of Analyst Reports Supports My Conclusion that Earnings or Guidance Disclosure Dates Are Among the Most Important Considerations for Market Participants ..........................................................64

    2.    Cause and Effect Analysis Examining Days with Analyst Reports Versus All Other Days...........................................66

    3.    Cause and Effect Analysis Examining the Relationship Between the Number of Analyst Reports Issued and the Price Reaction ............67

4.    Cause and Effect Analysis Examining the Type of Information
Revealed on Dates with the Largest Abnormal Returns ....................... 68

VIII.  Conclusions ..................................................................................................... 69

## I.    QUALIFICATIONS AND COMPENSATION

1.    I am President of Hartzmark Economics Litigation Practice, LLC.  My qualifications and remuneration for this matter are set forth in my Expert Report dated January 25, 2022 (the "Hartzmark Report" or "Opening Report").[1]

## II.    SCOPE AND SUMMARY OF OPINIONS

2.    I have reviewed the Expert Report of Lucy P. Allen (the "Allen Report"), submitted on April 13, 2022[2] and maintain the two opinions set forth in my Opening Report, namely:

> **OPINION 1**: An economic analysis of a basket of factors—including those set forth in *Cammer* and *Krogman*—supports the conclusion that throughout the Class Period Mohawk common stock traded in an efficient market.  These factors are consistent with the fundamental principles of economics and finance and academic research.  The economic analyses, which employ commonly utilized and generally accepted statistical tests, demonstrate that Mohawk common stock rapidly responded to unanticipated and material Company-specific information consistent with efficient markets.
>
> **OPINION 2**: The calculations of damages for violations of Section 10(b) of the Exchange Act may be computed on a class-wide basis using broadly accepted methodologies that would be common to all Class members.[3]

3.    After reviewing the Allen Report, I have the following related opinions in response to the opinions Ms. Allen expressed in her report:

> **REBUTTAL OPINION 1:** Although Ms. Allen was "asked to review and comment on the Expert Report of Michael Hartzmark, dated January 25, 2022, which addresses Plaintiff's claim of [a] common damages methodology,"[4] she

---

[1]    An updated *curriculum vitae* is attached to this Rebuttal Report as **Appendix A**. Hartzmark Economics Litigation Practice, LLC is being compensated at a rate of $825 per hour for my work in this matter.  My compensation is not contingent on the outcome of this case in any way.  The same defined terms used in my Opening Report are also used in this Expert Rebuttal Report.

[2]    The Allen Report was submitted in support of Defendants' Opposition to Plaintiff's Motion for Class Certification filed April 13, 2022 (the "Opposition Brief").

[3]    *See* Hartzmark Report, ¶10.

[4]    Allen Report, ¶1 (emphasis added).

offers <u>no</u> review, analysis, evaluation or comment regarding my opinion in the Hartzmark Report that:

> The calculations of damages for violations of Section 10(b) of the Exchange Act may be computed on a class-wide basis using broadly accepted methodologies that would be common to all Class members.[5]

In other words, although she was asked as part of her engagement to review and comment on this opinion, she offered no opinion, nor did she dispute my opinion restated above.

**REBUTTAL OPINION 2:** Ms. Allen was also asked "to analyze price impact of the allegedly false and misleading statements . . . ."[6] Yet, Ms. Allen offers <u>no empirical evidence</u> demonstrating there was a complete lack of price impact related to the alleged misrepresentation and omissions. <u>First</u>, Ms. Allen fails to offer any empirical, qualitative or other evidence that would support a conclusion that there was a complete lack of price impact related to the first two alleged partial corrective disclosures.[7] Moreover, Ms. Allen makes no attempt to fully sever the direct link between the truth revealed by the alleged corrective information disclosed on these two dates and the alleged misrepresentations and omissions, even though there were significant stock price declines (*i.e.,* statistically significant negative abnormal returns).[8] <u>Second</u>, Ms. Allen also does not dispute that the significant stock price decline on July 26, 2019 resulting from the final alleged partial corrective disclosure is statistically significant, yet she fails to present any reliable empirical evidence to demonstrate that 100% of the significant price reaction to the information disclosed on that date was due to factors unrelated to the alleged misrepresentations and omissions (*i.e.*, scientific evidence demonstrating a lack of price impact). Instead, Ms. Allen relies on a flawed qualitative analysis that selectively reviews and subjectively interprets certain analyst reports. This incomplete review fails to offer reliable evidence demonstrating there was a complete lack of price impact related to the alleged misrepresentations and omissions.

**REBUTTAL OPINION 3:** Ms. Allen does not explicitly dispute **OPINION 1** in my Opening Report, namely that Mohawk common stock traded in an open, well-

---

[5]  Hartzmark Report, ¶10.

[6]  Allen Report, ¶1 (emphasis added).

[7]  The price reaction dates for the first two alleged partial corrective disclosures are July 26, 2018 and October 26, 2018, while the price reaction date for the final alleged corrective disclosure is July 26, 2019. Complaint, ¶384.

[8]  In this report when I state an abnormal return is "statistically significant" or has "statistical significance" without a specifying a percentage, I am referring to a p-value that is at or below the 5% level. *See*, Hartzmark Report, fn 81.

developed and efficient market.  Nor does she opine that Mohawk common stock traded in an inefficient market.

**REBUTTAL OPINION 4:** Ms. Allen makes two claims related to *Cammer* Factor 5, namely, that my "cause and effect analysis comparing 'news days' with 'no-news days' is flawed and unreliable" and "Mohawk's stock exhibited autocorrelation during the alleged Class Period, providing direct evidence contrary to a finding that Mohawk's stock traded in an efficient market."[9]  Both of her claims are based on unscientific, incomplete and ad hoc assumptions that are wrong and contradicted within her report.  More critically, her unscientific analyses are at odds with academic literature and generally accepted diagnostic procedures required in peer-reviewed empirical research.  Finally, Ms. Allen has offered no empirical or qualitative evidence demonstrating the lack of "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[10]

4.    In reaching these opinions, I have relied upon various materials, which are listed in **Appendix B** or otherwise cited in this report.  The research and analysis upon which my opinions are based have been conducted by me with the assistance of personnel working under my direction and supervision.  My conclusions are based on information available to me as of the date of this report.  I understand that discovery is ongoing, and I may review, evaluate, and analyze relevant material that becomes available to me in the future.  I reserve the right to modify my conclusions based on additional information.

## III.    MS. ALLEN'S REPORT DOES NOT DISPUTE MY OPINION THAT DAMAGES FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT CLAIMS CAN BE CALCULATED ON A CLASS-WIDE BASIS USING A COMMON METHODOLOGY[11]

5.    In the Hartzmark Report, I presented a methodology and demonstrated that:

> The calculation of class-wide damages for a violation of Section 10(b) of the Exchange Act can be done using a common and broadly accepted methodology that is routinely applied and has become a virtual standard in federal securities litigation like this Mohawk.  This class-wide damages methodology is generally referred to as the "out-of-pocket" methodology.  Using the out-

---

[9]    Allen Report, ¶4.

[10]    *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989) ("*Cammer*").

[11]    Hartzmark Report, ¶¶78-91.

of-pocket methodology, damages suffered by Class members are measured based on the investors' inflation losses.[12]

6.    Although review of this opinion was explicitly stated as part of Ms. Allen's engagement, Ms. Allen does not address this issue and thus does not dispute my opinion.

## IV.    THE EVIDENCE IN THE ALLEN REPORT DOES NOT SUPPORT THE CONCLUSION THAT THERE IS NO EVIDENCE OF A COMPLETE LACK OF PRICE IMPACT

### A.    Introduction to Price Impact

7.    In regard to market efficiency and reliance, the Supreme Court in *Halliburton II* observed:

> The Court in *Basic* acknowledged, however, the debate among economists about the efficiency of capital markets and refused to endorse "any particular theory of how quickly and completely publicly available information is reflected in market price." The Court instead based the presumption of reliance on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." Moreover, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof.[13]

8.    The Court also held in *Halliburton II* that "defendants must be afforded an opportunity before class certification to defeat the presumption [of reliance] through evidence that an alleged misrepresentation did not actually affect the market price of the stock."[14]

---

[12]   Hartzmark Report, ¶79.

[13]   *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014) ("*Halliburton II*"), at 2403 (quoting *Basic*, 485 U.S. at 247, 248, fns 24, 28).

[14]   *Id*. at 2417.

B.  Summary of Price-Impact Related Allegations

9.    Plaintiff alleges that Defendants were able to "report supposedly 'record' sales and achieve various financial metrics highlighted by Wall Street" by engaging in a fraudulent and undisclosed scheme whereby, "at the end of each financial quarter, employees in Mohawk's North American distribution centers were instructed to load goods on Company trucks on Fridays and pretend to deliver the goods on Saturdays to customers they knew were closed for deliveries and, thus, not there to reject them," which the Complaint calls the "Saturday Scheme."[15]  Plaintiff also alleges that Defendants "made repeated false statements to misrepresent and conceal the truth behind the Company's rising inventory levels and slowing inventory turnover," concealing from investors that "Mohawk's bloated inventory resulted from both a conscious scheme to overproduce inventory in order to report higher operating margins and from a glut of unsalable products caused by systemic flaws in Mohawk's production lines."[16]

10.    Plaintiff alleges that the truth about these schemes was revealed through a series of partial corrective disclosures.  First, Plaintiff alleges that, after market close on July 25, 2018 and on the morning of July 26, 2018, Mohawk announced EPS below prior guidance and consensus estimate, lowered its third-quarter guidance, revealed that "the Company's warehouses were full of excess inventory, requiring Mohawk to begin to 'produce less than [it] sold to reduce inventory,'" and disclosed "significant manufacturing issues, including 'manufacturing shutdowns,' a 'lower production rate,' and 'new product inefficiencies,' in Flooring North America" and that "Mohawk was required to increase sourcing of LVT from outside of the U.S."[17]  On July 26, 2018, Mohawk stock exhibited an abnormal return of -18.49% associated with this disclosure, which is statistically significant below the 1% level.[18]

---

[15]  Complaint, ¶¶2-3.

[16]  Complaint, ¶4.

[17]  Complaint, ¶240.

[18]  Hartzmark Report, Appendix E at p. 6.

- 5 -

11.    Second, Plaintiff alleges that, after market close on October 25, 2018 and on the morning of October 26, 2018, Defendants announced that "'[s]ales growth in all segments was lower than our estimates,' and that '[a]dditional manufacturing reductions were required during the [quarter] to control inventory,'" revealed "damning details about the Company's struggle to produce LVT product in the U.S. LVT Plant, including 'physical mechanical failures' and 'software problems,'" disclosed "a significant step down in margins for Flooring North America, with operating margin falling to single digits, which Defendants attributed in part to 'lower than expected production,'" and "once again announced much lower EPS guidance for the fourth quarter of 2018."[19] On October 26, 2018, Mohawk stock exhibited an abnormal return of -22.77% associated with this disclosure, which is statistically significant below the 1% level.[20]

12.    Finally, Plaintiff alleges that, after market close on July 25, 2019 and on the morning of July 26, 2019, "the Company disclosed that, contrary to Defendants' recent assurances, the Company's difficulties reducing inventory were far from over, and that it still had excess inventories that necessitated 'taking actions' to 'manage our inventory' and 'improve sales,' especially in Flooring North America, which had a 7% year-over-year decline in sales and more than a 4% year-over-year decline in operating margin."[21] Plaintiff further alleges that: "Defendants also finally revealed that the inventory issues and lower sales volume were expected to continue, slashing third quarter guidance and noting that the guidance accounted for 'excess inventories' and 'reduced production,' as well as 'lower volume and margins' and 'increased competition.'"[22] On July 26, 2019, Mohawk stock exhibited an abnormal return of -18.01% associated with this disclosure, which is statistically significant below the 1% level.[23]

---

[19]    Complaint, ¶¶245-46.

[20]    Hartzmark Report, Appendix E at p. 7.

[21]    Complaint, ¶253.

[22]    Complaint, ¶253.

[23]    Hartzmark Report, Appendix E at p. 10.

      C.  The Allen Report Offers No Evidence of a Complete Lack of Price Impact Related to the First Two Alleged Partial Corrective Disclosures

13.    Ms. Allen offers the following price-impact related opinions in her report:

> I find that the alleged misrepresentations regarding the alleged "Saturday Scheme" did not impact Mohawk's stock price during the alleged Class Period.[24]

> I find that the decline in Mohawk's stock price after the July 25, 2019 alleged corrective disclosure at the end of the alleged Class Period is not evidence of price impact of any of the alleged misrepresentations.[25]

14.    As explained above, Plaintiff alleges that the first two alleged partial corrective disclosures corrected Defendants' misrepresentations and omissions concerning issues other than the Saturday Scheme—namely, misrepresentations related to inventory and LVT production. However, the only opinion Ms. Allen offers that is relevant to the first two alleged corrective disclosures is her opinion concerning the "misrepresentations regarding the alleged 'Saturday Scheme.'" Ms. Allen does not offer an opinion or any qualitative or empirical analysis concerning whether the first two alleged partial corrective disclosures offer evidence of price impact with respect to the other alleged misrepresentations and omissions. Nor does Ms. Allen dispute the large and highly significant price declines associated with these disclosures. As such, Ms. Allen fails to offer any evidence demonstrating that 100% of either of those significant price declines was due to factors unrelated to the alleged misrepresentations and omissions at issue in this case.

15.    Indeed, evidence shows that the market understood these two disclosures to reveal facts correcting alleged misrepresentations and omissions concerning LVT production and inventory issues. As discussed above, Plaintiff alleges that the first alleged partial corrective disclosure revealed facts related to inventories, LVT production issues,

---

[24]  Allen Report, ¶2.

[25]  Allen Report, ¶3.

production curtailments, and the need to source LVT from abroad.  Analyst reports issued in the wake of the first alleged partial corrective disclosure discussed these very issues:

> Results were well below expectations on increased input costs, capacity curtailments and below industry growth in LVT sales. . . . What Happened In The Quarter?  The primary driver of the EBIT decline versus the prior year was negative price/cost that accounted for almost all of the decline.  Typically productivity gains offset any problems in MHK's business, but this quarter capacity reductions in North America businesses limited the impact of these gains.  Finally, the company grew LVT sales below the market due to limited capacity as it ramps up coupled with sourcing issues, thus limiting revenue gains.[26]
>
> *************************************************
>
> What's Changing: 2Q results included a top and bottom line miss as well as a disappointing 2H18 outlook.  Price/cost in the US is the dominant challenge while the on-going start-up of new plants represents a further burden to economics….  Near-Term Outlook Facing Numerous Headwinds – In 2Q, adj. operating margins contracted 220 bps y/y to 13.3%.  MHK called out headwinds from numerous sources including: 1) lower sales than expected (LVT supply constraints, delayed Godfrey Hirst closing); 2) input cost inflation; 3) higher transportation costs; 4) labor inefficiencies; 5) lower product mix; 6) the delayed implementation of price increases; and 7) higher start-up costs….[27]

16.    Similarly, analyst reports issued in connection with the second alleged partial corrective disclosure also commented on LVT production issues:

> LVT continues to account for virtually all growth within flooring and is adversely impacting sales for the other categories….  LVT Plant Facing Ramping Issues – Against this backdrop of LVT strength, MHK indicated their ramping LVT internal production capability remains behind plan and constraining sales.  Actions taken this quarter are

---

[26]  "Mix Of Challenges Persist But Not Structural," SunTrust Robinson Humphrey Analyst Report, July 26, 2018 (produced as MHK-SEC-00012163) (emphasis added).

[27]  "MHK: Sell-off on Disappointing 2H Outlook Largely De-Risks MHK Shares," Longbow Research Analyst Report, July 30, 2018 (produced as MHK-SEC-00033478) (emphasis added).

<u>beginning to have a positive outcome, but it was also indicated on the call that the full ramp and subsequent optimization would require a push-out in the previously communicated time line.</u>[28]

17.    Together with the significant price declines observed following the first and second alleged partial corrective disclosures, this market commentary provides evidence that misrepresentations and omissions related to LVT production and inventories had price impact.  Ms. Allen offers no opinion or analysis to the contrary.

18.    Thus, the Allen Report provides no basis to conclude that 100% of Mohawk's highly significant price declines following the first two alleged partial corrective disclosures were unrelated to the fraud alleged in this case.

D.  <u>The Allen Report's Analysis of the Price Impact of the Saturday Scheme Is Flawed and Unreliable</u>

19.    As to misrepresentations and omissions regarding the Saturday Scheme, Ms. Allen offers several flawed arguments to claim that the misrepresentations and omissions could not have had price impact.

20.    First, Ms. Allen states that, "[s]ince the sales associated with the alleged 'Saturday Scheme' were never actually made and cash was never exchanged, the alleged scheme could not have had an impact on Mohawk's cash flow."[29]  However, Ms. Allen does not opine that this fact implies that the alleged misrepresentations and omissions concerning the Saturday Scheme could not have had price impact (*e.g.*, the alleged Saturday Scheme would have affected revenue and earnings, both of which are common valuation metrics used by analysts and investors).

21.    Second, Ms. Allen contends that the alleged Saturday Scheme would have amounted to "$4 to $5 million in revenue per quarter," which "would have increased

---

[28]  "MHK: 3Q – Reset Expectations and Capitulation in Shares; We View MHK as Over-Sold vs. Mid-Cycle EPS," Longbow Research Analyst Report, October 29, 2018 (produced as MHK-SEC-00012502) (emphasis added).

[29]  Allen Report, ¶27.

Mohawk's quarterly revenue, on average, by approximately 0.18% or, at most, 0.20%.[30] Again, Ms. Allen does not offer the opinion that this fact implies that the alleged Saturday Scheme had zero price impact.  Nor could she; even if correct, the most that this fact implies is that the price impact of the Saturday Scheme was small, not that it was nonexistent.

22.    Third, Ms. Allen asserts that the Saturday Scheme "would only have *increased* Mohawk's revenues on the quarter when the alleged scheme was introduced."[31] She contends this is the case because, "in the subsequent quarters, the alleged scheme would essentially have no impact on revenues: the boost in revenues from again implementing the alleged scheme at the end of the quarter would be offset by Mohawk having to record a negative charge for the sales that were never actually made but booked in the prior quarter."[32]  However, this does not imply, as Ms. Allen suggests, that the Saturday Scheme had no price impact.

23.    To start, Ms. Allen's concession that the Saturday Scheme "would . . . have *increased* Mohawk's revenues on the quarter when the alleged scheme was introduced" implies that it would have had price impact in at least that quarter, and certainly does not establish an absence of price impact.  In addition, Ms. Allen's assumption that Mohawk would have "to record a negative charge for the sales that were never actually made but booked in the prior quarter" is unsubstantiated, and I am unaware of an allegation in the Complaint to that effect.  Further, this assumption undermines Ms. Allen's conclusion.  Ms. Allen states that "the alleged Saturday Scheme would have to continue each quarter simply to offset the negative charge associated with the initial boost" and that "once the alleged scheme stopped, there would be a decrease in net revenues."[33]  This implies that, in each quarter, the decision to implement the Saturday Scheme that quarter inflated revenues relative to what they would have been had the Saturday Scheme been abandoned.  This suggests that the Saturday Scheme had price impact, not the opposite.

---

[30]   Allen Report, ¶30.

[31]   Allen Report, ¶32.

[32]   Allen Report, ¶33 (emphasis removed).

[33]   Allen Report, ¶33 (emphasis removed).

24.    Fourth, Ms. Allen contends that "the alleged 'Saturday Scheme' would not have affected whether Mohawk met analysts' revenue expectations" in the two quarters she asserts are the only ones "where the alleged scheme would have positively impacted Mohawk's revenue."[34]   Ms. Allen purports to demonstrate this by comparing the magnitude of the Saturday Scheme revenues to the amount by which Mohawk missed or beat analyst revenue estimates for the entire Mohawk business.[35]  There are several flaws with Ms. Allen's analysis of this point.

25.    As discussed above, the alleged Saturday Scheme would have impacted Mohawk's revenues in each quarter it was implemented.  Thus, Ms. Allen's focus on only two quarters in the Class Period is misplaced.

26.    In addition, Ms. Allen focuses only on analysts' revenue expectations for Mohawk's entire business.  But analysts also provided specific expectations for Mohawk's business segments, including the Flooring North America segment, and Mohawk beat those estimates much more narrowly.  For example, in 2Q17, Mohawk beat Flooring North America consensus revenue estimates by just $2.3 million.[36]  If the Saturday Scheme provided $4 million in revenue that quarter, it would have made the difference between beating and missing that consensus estimate.[37]

27.    Finally, Ms. Allen argues that analyst coverage following the filing of the Complaint in July 2020 shows that the Saturday Scheme was irrelevant.[38]  However, after the Complaint was filed, Mohawk's stock price declined 4.78% on July 8, 2020 and

---

[34]   Allen Report, ¶38.

[35]   Allen Report, ¶¶39-41.

[36]   "Initial Take 2Q17 Results," SunTrust Robinson Humphrey Research Report, July 27, 2017, p. 2.

[37]   Ms. Allen makes similar arguments concerning EPS, contending that the Saturday Scheme would not have changed EPS estimates in certain quarters.  Allen Report ¶¶42-43.  This argument is flawed for improperly focusing only on certain quarters, and is irrelevant because, as shown above, the $4 million Ms. Allen attributes to the Saturday Scheme would have made the difference between beating and missing analyst expectations for other metrics in certain quarters.

[38]   Allen Report, ¶¶44-46.

declined 19.99% on July 9, 2020,[39] analysts commented on the potential risks stemming from the allegations, and news articles connected the stock price decline to facts discussed in the Complaint, including with respect to the Saturday Scheme—all of which suggests that the market saw the news as revealing important facts about this Company.   For example:

> 10:03 EDT Mohawk investors should be aware of allegations in suit, says Deutsche Bank[.]  Deutsche Bank analyst Seldon Clarke said he "would generally avoid commenting on legal matters" but he believes it is important that investors be aware of the potential risks stemming from allegations of accounting fraud made against Mohawk in a complaint originally filed in January of this year.  While the filing of the lawsuit was made previously, a new filing on June 27 is "significantly more detailed" and includes testimony from a previous Logistics Business Analyst at Mohawk who claims that alleged inventory stuffing continued into 2020, according to Clarke, who keeps a Sell rating on Mohawk shares.[40]

> **************************************************

> 10:08 EDT Allegations against Mohawk 'clearly' a negative if proven true, says Wells Fargo[.] Wells Fargo analyst Truman Patterson notes that the Public Employees' Retirement System of Mississippi has filed a Class Action Complaint against Mohawk and CEO Jeff Lorberbaum, claiming the company engaged in a "fraudulent scheme to fabricate revenues through fictitious 'sales' of products that were not delivered to customers and to conceal from investors the true reasons for the company's ballooning inventory," damaging shareholders between April 2017 and July 2019. While Mohawk stakeholders have known about the lawsuit since early January, filings have only recently become publicly available, which the

---

[39]   Source for Mohawk returns: Bloomberg.  In addition, on July 8 and July 9, 2020, the return to the market index (SPTR) was 0.78% and -0.54%, respectively, and the return to the industry index (SPSIHOTR) was 2.21% and -2.68%, respectively.  Based on the variability (standard deviation) of Mohawk's stock price returns during the Class Period+, the returns on July 8 and July 9, 2020 would be statistically significant below the 1% level.

[40]   "10:03 EDT Mohawk investors should be aware of allegations in suit, says Deutsche . . . ," Theflyonthewall.com, July 8, 2020 (emphasis removed).

analyst believes drove shares down on Wednesday. Patterson expresses no opinion on the validity of the allegations against the company, but acknowledges that they would clearly be a negative if proven to be true, likely damaging shareholder confidence in management. [41]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Shares of Mohawk Industries Inc. (MHK) plunged 19.1% in midday trading Thursday, amid concerns over a lawsuit against the commercial flooring products company regarding alleged financial misconduct. The stock has taken a 28.4% dive over the past three days, as details of the lawsuit have become more known. J.P. Morgan analyst Michael Rehaut said the details of the class action complaint, as provided in a filing dated June 29 by the Public Employees' Retirement System of Mississippi, included channel stuffing at the end of the quarter and intentionally overproducing product in order to expand operating efficiencies and benefit margins. "While the veracity of these accusations will likely not be determined until after an extended legal process, which may take the next several months if not longer, we believe that until this matter has been concluded, this lawsuit will likely remain an overhang on the stock...," Rehaut wrote in a note to clients. "Additionally, we believe a higher level of risk now exists for the company due to this lawsuit, given its fairly granular level of detail across the allegations, combined with quotes from interviews with several former employees (including a distribution center manager and a former member of the executive team)."[42]

28.    This is further evidence that the Saturday Scheme had price impact.

---

[41]    "10:08 EDT Allegations against Mohawk 'clearly' a negative if proven true, says...," Theflyonthewall.com, July 9, 2020.

[42]    "MW Mohawk Industries' stock dives, as analyst says lawsuit could [sic] an 'overhang' for months," MarketWatch, July 9, 2020, 1:03 p.m.

E.  Ms. Allen's Conclusion that there Is Evidence of a Complete Lack of Price Impact from the Information Disclosed on July 25-26, 2019 Is Based on an Incomplete, Unscientific and Flawed Qualitative Analysis that Lacks Any Empirical Support and Contradicts Facts

29.   Ms. Allen also fails to offer any reliable evidence demonstrating that the entirety of Mohawk's -18.01% abnormal return on July 26, 2019 is due to factors unrelated to the alleged misrepresentations.

30.   Ms. Allen does not dispute my finding that the stock price decline on July 26, 2019 is statistically significant.  She also offers no quantitative analysis showing that any portion of the price decline is <u>unrelated</u> to the revelation of the truth concerning allegations in the Complaint.

31.   Instead, Ms. Allen merely offers a qualitative analysis—nothing more than reading and subjective interpretation of self-selected analyst reports—to support her conclusion that "the decline in Mohawk's stock price at the end of the alleged Class Period was due to a lower-than-expected guidance driven by the effect that new macroeconomic issues, <u>including cost inflation, lower demand, increased competition and tariffs</u>, were expected to have on Mohawk's future business . . . ."[43]  Based on that purely qualitative analysis, Ms. Allen opines that "[t]he decline in Mohawk's stock price after the July 25, 2019 alleged corrective disclosure at the end of the alleged Class Period is not evidence of price impact of any of the alleged misrepresentations."[44]

32.   Ms. Allen's opinion is flawed for two primary reasons.  First, Ms. Allen incorrectly infers that the underlying factors driving Mohawk's lower-than expected EPS guidance were entirely unrelated to the allegations.  Second, without performing any quantitative analysis, Ms. Allen attributes 100% of the July 26, 2019 stock price decline to lower-than-expected EPS guidance and does not reliably investigate whether it should also be attributed, at least in part, to Mohawk's lower-than-expected 2Q19 net sales result, and

---

[43]   Allen Report, ¶47 (emphasis added).

[44]   Allen Report, ¶47.

whether that result was caused in part by factors related to the alleged misrepresentations and omissions.

33.     As discussed below, evidence contradicts Ms. Allen's speculation.  There is substantial evidence that Mohawk's lower-than-expected EPS guidance was at least partially attributable to negative disclosures about LVT production and inventories, that Mohawk's stock price decline was at least partially caused by its 2Q19 net sales miss, and that the net sales miss was related to Plaintiff's alleged fraud.  These facts render wholly unreliable Ms. Allen's speculation that the stock price decline on July 26, 2019 was entirely unrelated to the allegations in the Complaint.

### 1.     *Mohawk's Lower than Expected 3Q19 EPS Guidance Is Related to the Complaint's Allegations*

34.     Ms. Allen opines that Mohawk's "lower-than-expected EPS guidance for 3Q19 could not have been attributed to the Company's . . . alleged fraudulent schemes related to LVT inventory and LVT overproduction since the Company announced improvements, rather than issues with regard to in [sic] its North America LVT production."[45]  Ms. Allen also states that "Mohawk's announcement at the end of the alleged Class Period regarding inventory issues did not relate to the Flooring NA segment, the segment of the alleged fraud, but instead related to the Company's Global Ceramic segment, a segment unrelated to Plaintiff's overproduction and inventory allegations."[46] Each of these opinions is flawed.

35.     First, Ms. Allen's contention that lower-than-expected EPS guidance was unrelated to concerns about Mohawk's LVT production contradicts numerous facts. During the conference call on July 26, 2019, Defendant Lorberbaum confirmed that the U.S. LVT production line "is about 3 months behind the European line in its progress," and then explained that neither line would reach "breakeven" until 2020:

---

[45]   Allen Report, ¶51.

[46]   Allen Report, ¶55 (footnote omitted).

> Question – Timothy Wojs: Okay.  <u>Is there any sense of – or timeline in terms of when you think the European facility can become beyond breakeven?</u>
>
> Answer – Jeffrey S. Lorberbaum: Yes.  It's moving towards that now.  We have to keep making changes.  <u>We expect next year for the thing to turn, and then the profits will take time.</u>  I don't know how fast we can align the sales with the – and the mix to get it optimized.  It may happen the latter of next year; it may take longer to get it fully optimized.[47]

36.    This was a negative update based on the Company's prior statements.  For example, in a May 13, 2019 report discussing a Mohawk "Sell-side CFO lunch" event, analysts explained that Mohawk personnel had "confirmed" that the U.S. LVT production line had already passed "breakeven":

> LVT manufacturing: A little more than "half-way there".  We borrow this favorite phrase from CEO Jeff Lorberbaum to describe where Mohawk seems to be on its LVT production journey.  Specifically, Mr. Landau stated that the company was in "the bottom of the 5th inning", and that the company now "knows what it doesn't know".  <u>Reliability of production has been the greatest hurdle, with suitable reliability achieved in Europe, but not yet in Dalton, GA – but encouragingly, he indicated that Dalton should be at that point within "months rather than quarters".</u>  After that, optimization will take further time; they are currently optimizing the manufacturing process in Europe with the machine running steadily for flex LVT and increasingly for rigid.
>
> Reallocation of startup costs to be a drag on productivity.  While the company's 10Q filing showed that startup costs had declined faster than we expected, from $25m in 4Q18 to $10m in 1Q19, this may not necessarily drive a more positive outlook for 2Q EBIT, as former startup costs are now being reallocated to productivity.  <u>Mr. Boykin confirmed that the startup figure</u>

---

[47] "Q2 2019 Mohawk Industries Inc Earnings Call – Final," CQ FD Disclosure, July 26, 2019.

- 16 -

in the MD&A section of the filing declined because the two new LVT facilities had crossed over breakeven.[48]

37.    Indeed, numerous analysts, including in reports Ms. Allen cites, discussed issues with Mohawk's internal LVT production, including how Mohawk's internal LVT production was improving more slowly than expected, and connected those issues to the Company's guidance change.  For example:

[T]he dollar headwinds suggested by the guide are harsher than expected and indicate some combination of mounting volume pressures, pricing degradation, and limited manufacturing improvement.[49]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

We believe 3Q guidance was not only due to softer end markets and a more intense competitive environment, but also driven by the benefits from the ramp-up of its investments being less than investor expectations.[50]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

New capacity additions, particularly in LVT, could help to reinvigorate sales growth, but the ramp of these plants has been slower than anticipated and the plants likely won't be fully optimized until 2020.[51]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Some will argue MHK's LVT improvement will be meaningful to the bottom-line.  Although the European rigid LVT line is

[48]    "Thoughts from Sell-side CFO Lunch," Evercore ISI Research Report, May 13, 2019 (emphasis added).

[49]    "2Q19 Results First Look," Barclays Research Report, July 26, 2019 (emphasis added) (cited at Allen Report, ¶68).

[50]    "2Q EPS In Line, But 3Q EPS Guidance Well Below Street (As Well As Below Our Street-Low Estimate)," JPMorgan Research Report, July 25, 2019 (emphasis added) (cited at Allen Report, ¶63).

[51]    "The Struggle is Real," RBC Research Report, July 28, 2019 (emphasis added) (cited at Allen Report, ¶¶57, 59, 62, 63).

- 17 -

> almost producing at the same pace as the "older" lines, it's still not at break-even and we believe won't be until 2020, while not fully optimized until 2021+.  Remember, the US rigid LVT line is even further out.[52]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> Overall, MHK declined 18% on Friday, compared to our building products universe being roughly flat (ex-MHK; S&P: +0.7%), we believe driven by disappointing guidance, as 3Q Operating EPS guidance of $2.58-2.68 was solidly below the Street's $3.05 entering the print as well as our Street-low $2.75E.  Critically, and consistent with our earlier concerns (please see our Notes from the Road, published 6/19), two key elements of the bull thesis, in our view – restructuring benefits and the ramp up of LVT and other new manufacturing assets – appear to be less than expected and pushed out further.[53]

38.    Second, Ms. Allen's suggestion that all the inventory issues Mohawk announced related solely to Mohawk's ceramics business is unsubstantiated.  In support, Ms. Allen cites a disclosure by Mohawk that there was "excess inventory in the market" for "U.S. ceramic,"[54] but on its face, that disclosure says nothing about the drivers of Mohawk's internal inventory issues, which is what Plaintiff alleges was the relevant disclosure.[55]  It certainly does not imply that the entirety of any internal inventory issues was unrelated to Mohawk's LVT production.  Notably, Ms. Allen does not appear to have reviewed any internal Mohawk documents to determine the true drivers of Mohawk's inventory issues.[56]

---

[52]  "MHK: Downgrading to Underperform As Outlook Softens, Wells Fargo Research Report, July 28, 2019 (emphasis added) (cited at Allen Report, ¶¶53, 54).

[53]  "Post-Call Notes: Less Good (i.e., Positive Catalysts), More Bad (Headwinds Peristing/Worsening); Underweight," JPMorgan Research Report, July 29, 2019 (emphasis added) (cited at Allen Report, ¶¶55  fn 64, 64, 68).

[54]  Allen Report, ¶55, fn 63.

[55]  Complaint, ¶253.

[56]  Appendix B to the Allen Report does not reflect that Ms. Allen considered any internal Mohawk documents.

- 18 -

39.   Overall, Ms. Allen's analysis fails to establish that Mohawk's announcement of lower guidance is entirely unrelated to LVT production and inventory issues. Indeed, there is meaningful evidence that at least some portion of the lower guidance relates to those issues, which connect to Plaintiff's allegations.

**2.     *A Valuation Calculation Demonstrates that Mohawk's Lower than Expected 2Q19 Actual Net Sales Is a Partial Cause of the Stock Price Decline on July 26, 2019 and Related to the Allegations***

40.   Separately, Ms. Allen's conclusion that the July 25, 2019 alleged partial corrective disclosure is not evidence of price impact is also flawed because Ms. Allen attributes all of the stock price decline on July 26, 2019 to lower-than-expected EPS guidance, and none of it to Mohawk's 2Q19 net sales miss. Ms. Allen provides no quantitative analysis to justify excluding Mohawk's net sales miss as an explanation for the stock price decline, even though it is likely that the net sales miss would have caused at least a portion of the stock price decline.

**a)     Ms. Allen Ignores Academic Research when She Ignores the 2Q19 Net Sales Miss**

41.   By dismissing the importance of the 2Q19 net sales miss, Ms. Allen's analysis ignores academic research that has found that disclosures of sales in prior quarters that are below (or above) expectations are associated with stock price changes. For example, Jegadeesh and Livnat "find that the earnings announcement date returns are related to the revenue surprise in the previous quarter."[57]

42.   In addition, Ms. Allen ignores academic research that has found that, when changes in guidance are announced contemporaneously with earnings, both the earnings surprise and guidance changes provide incremental information to the market. For example, Atiase et al. find "that current earnings and future guidance both have incremental

---

[57]   Narasimhan Jegadeesh and Joshua Livnat, *Revenue surprises and stock returns*, 41 J.Fin. Econ. 147 (2006) at 149.

information content.  However, current earnings news is more strongly associated with stock returns than is future guidance."[58]

### b)    Ms. Allen Ignores that the 2Q19 Net Sales Miss Was Partially Related to the Alleged Misrepresentations and Omissions

43.    Notably, Plaintiff alleges that the net sales miss was likely at least partially related to the alleged fraud.  Specifically, Plaintiff alleges that the disclosure revealed that Mohawk's "difficulties reducing inventory were far from over, and that it still had excess inventories that necessitated 'taking actions' to 'manage our inventory' and 'improve sales,' especially in Flooring North America, which had a 7% year-over-year decline in sales and more than a 4% year-over-year decline in operating margin."[59]  Plaintiff also alleges that "approximately 50% of Mohawk's U.S.-made LVT was unsalable scrap," "80% of the time, customers of Mohawk's Builder and Multifamily division were refusing to accept the Company's U.S.-made LVT until Mohawk's entire Builder and Multifamily division refused to sell it," "retailers were returning 25-50% of Mohawk LVT because of product defects," "Mohawk distributors stopped carrying the Company's LVT products to avoid the returns that the products were generating," and "the claim rates for Mohawk's U.S.-made LVT were more than twice as high than for the LVT product made in China."[60]  Plaintiff further alleges that "[t]he defective LVT that did reach customers also caused Mohawk to lose additional sales on other product lines throughout the Class Period because the cancellation of orders for LVT radiated to other product lines."[61]   Thus, under Plaintiff's theory of the case, Mohawk's 2Q19 net sales miss could have been related to any or all of these issues.

---

[58]    Rowland K. Atiase, Haidan Li, Somchai Supattarakul and Senyo Tse, *Market Reaction to Multiple Contemporaneous Earnings Signals: Earnings Announcements and Future Earnings Guidance*, 10 Rev. Acctg. Stds. 497 (2005) at 519-521.  Atiase et al. also state: "In sum, prior research establishes that stand-alone earnings and future earnings guidance announcements have information content."  *Id.* at 500.

[59]    Complaint, ¶253.

[60]    Complaint, ¶261.

[61]    Complaint, ¶196.

44.    Because Ms. Allen has failed to demonstrate that Mohawk's net sales miss either failed to cause any part of Mohawk's stock price decline or was entirely unrelated to revelation of the alleged fraud, she has failed to establish a complete lack of price impact for the July 25, 2019 disclosure.

**c)      An Empirical Analysis Demonstrates that a Portion of the Significant Price Decline Was in Reaction to the 2Q19 Net Sales Miss**

45.    To evaluate whether Mohawk's 2Q19 net sales miss could have explained at least part of the July 26, 2019 stock price decline, I utilize a common technique to estimate price effects from financial results.  Specifically, I estimate the valuation impact of both the lower-than-expected 3Q19 EPS guidance and the 2Q19 net sales miss using Mohawk's price-to-earnings ratio ("P-E") and price-to-sales ratio ("P-S").  These ratios can be used to estimate changes in a company's valuation based on changes in earnings or sales, respectively.

46.    On July 25, 2019, Mohawk issued 3Q19 EPS guidance of $2.58 to $2.68 per share.[62]  The midpoint of the new guidance, $2.63, was $0.43 or 14% below 3Q19 consensus EPS estimates of $3.06.[63]  Multiplying Mohawk's quarterly P-E ratio of 50.52[64] by the $0.43 midpoint guidance miss reveals an expected stock price decline of $21.72 attributable to the guidance miss.  This is 77% of the $28.16 abnormal stock price decline Mohawk actually experienced on July 26, 2019—meaning that, based on this analysis, 23% of the actual decline is not explained by the change in EPS guidance.[65]  In other words,

---

[62]    "Mohawk Industries Reports Q2 Results," GlobeNewswire, July 25, 2019, 4:15 p.m.

[63]    Consensus EPS Estimate as of July 24, 2019.  Source: Thomson Estimates via S&P Capital IQ.

[64]    50.52 = Mohawk's stock price of $154.44 on July 24, 2019 divided by 3Q19 consensus EPS estimate of $3.06  I note the ratio is based on only one quarter's EPS estimate. Dividing the 50.52 by 4 (to create a metric based on annual EPS) equals 12.63, which is similar to Mohawk's P-E ratio of 12.88 using Mohawk's stock price of $154.44 divided by fiscal year 2020 consensus EPS estimates of $11.99 (source: Thomson Estimates via S&P Capital IQ).

[65]    Note, even if I use the $0.48 difference between the lowest EPS estimate in the 3Q19 guidance range ($2.58) and $3.06, the expected stock decline is $24.25 (i.e., $0.48

- 21 -

based on this analysis, Mohawk's lower than expected 3Q19 EPS guidance does not explain 100% of Mohawk's abnormal stock price decline on July 26, 2019.

47.   On July 25, 2019, Mohawk also reported actual 2Q19 net sales of $2.584 billion.[66] The net sales miss was $0.063 billion or 2.38% below 2Q19 consensus estimates of $2.647 billion.[67]  Multiplying Mohawk's P-S ratio of 58.35[68] by the $0.063 billion net sales miss reveals an expected stock price decline of $3.68 attributable to the 2Q19 net sales miss, which is 13% of Mohawk's $28.16 abnormal stock price decline on July 26, 2019.  Based on this analysis, Mohawk's lower than expected 2Q19 net sales could explain at least 13% of Mohawk's abnormal stock price decline.

48.   Therefore, even if Ms. Allen were correct that 100% of the change in 3Q19 EPS guidance is due to factors unrelated to the alleged misrepresentations and omissions, my analysis described above suggests that there is still another at least 23% of the significant price decline that she has failed to explain as unrelated to the alleged misrepresentations and omissions, and that at least 13% of the abnormal price decline may be attributable to the miss in 2Q19 net sales.  This is consistent with MarketWatch's headline on July 26, 2019: "Mohawk's stock tumbles to lead NYSE losers after sales miss, downbeat outlook."[69]  It also contradicts Ms. Allen's conclusion that "the decline in Mohawk's stock price at the end of the alleged Class Period was . . . not due to . . . the

---

times the P-E ratio of 50.52 equals $24.25), which is 86% of the $28.16 excess stock decline and less than 100% of the price decline.  If I use the $0.38 difference between the highest EPS estimate in the 3Q19 guidance range ($2.68) and $3.06, the expected stock decline is $19.20 (*i.e.*, $0.38 times the P-E ratio of 50.52 equals $19.20), which is 68% of the $28.16 excess stock decline and means that 32% of the price decline is due to factors unrelated to the change in 3Q19 EPS guidance.

[66]  "Mohawk Industries Reports Q2 Results," GlobeNewswire, July 25, 2019, 4:15 p.m.

[67]  Consensus Revenue Estimate as of July 24, 2019.  Source: Thomson Estimates via S&P Capital IQ.

[68]  58.35 = Mohawk's stock price of $154.44 on July 24, 2019 divided by 2Q19 consensus revenue estimate of $2.647 billion.

[69]  "MW Mohawk's stock tumbles to lead NYSE losers after sales miss, downbeat outlook," MarketWatch July 26, 2019, 2:48 p.m. (emphasis added).

announcement of results for the current quarter, 2Q19."[70]  Because the net sales miss is related to Plaintiff's allegations, Ms. Allen's failure to meaningfully consider it means that Ms. Allen's analysis fails to demonstrate a complete absence of price impact related to the Complaint's allegations on July 26, 2019.

### 3. Ms. Allen's Conclusion that Mohawk's Stock Price Declined Because of Macroeconomic Headwinds Is Flawed

49. While, as set forth above, Ms. Allen has not established that non-fraud-related information was solely responsible for Mohawk's abnormal stock price decline on July 26, 2019, there are also flaws in her explanation of the alternate causes for that decline.  Ms. Allen claims:

> The macroeconomic headwinds announced at the end of the alleged Class Period reversed the expectations of improving conditions formed over the quarter and consequently, Mohawk's stock price gave up the gains it had earned in the last three months since the 1Q19 results were announced.[71]

> Consistent with the fact that macroeconomic headwinds were affecting Mohawk, around the end of the alleged Class Period, other flooring companies announced that they were experiencing similar macroeconomic headwinds.[72]

> In particular, according to analysts, "Armstrong Flooring, Inc" ("Armstrong Flooring") and "Interface, Inc." ("Interface") were the two other U.S. publicly traded companies in 2019, that like Mohawk, specialized in the production of flooring products.[73]

---

[70]  Allen Report, ¶48.

[71]  Allen Report, ¶65.

[72]  Allen Report, ¶70.

[73]  Allen Report, ¶71.

a)      **Ms. Allen's Conclusion Is Wrong Because the Market Model Accounts for the Industry-Specific Influences**

50.     Ms. Allen's implication is that Mohawk's stock price decline on July 26, 2019 was not the result of new, Mohawk-specific information, but the result of market or industry effects. This is flawed for several reasons.

51.     First, as I explained in the Hartzmark Report, I applied "generally accepted econometric methods and specify a regression model that removes the outside influences on the stock price movement."[74]  I developed a model to calculate Mohawk's daily abnormal return, which is "the portion of the daily return (*i.e.,* the firm-specific portion of the return) that is *not* explained by market- and industry-wide influences."[75]  In her report, Ms. Allen neither disputes nor criticizes my regression model or results. Therefore, Ms. Allen does not dispute that Mohawk's abnormal stock price decline on July 26, 2019 of 18.01% accounts for market and industry influences. Thus, Ms. Allen's implication that Mohawk's decline is somehow attributable to "macroeconomic headwinds" and their effect on the broader flooring industry is flawed and not relevant, as macroeconomic and industry-wide effects are already accounted for in the empirical analysis I performed.

b)      **Ms. Allen's Conclusion Based on the Performances of Other Flooring Companies that Experienced Similar Conditions Is Flawed**

52.     Ms. Allen also refers to two of Mohawk's competitors, Interface and Armstrong Flooring, and cites company and analyst commentary after these two peers announced their respective 2Q19 earnings. Interface announced its 2Q19 earnings after the market closed on July 25, 2019,[76] the same date as Mohawk, while Armstrong announced its 2Q19 earnings before the market opened on August 6, 2019.[77]

---

[74]   Hartzmark Report, ¶55.

[75]   Hartzmark Report, Appendix D.

[76]   "Interface Reports Second Quarter 2019 Results," PR Newswire, July 25, 2019, 4:01 p.m.

[77]   Allen Report, ¶¶71-73.

- 24 -

53. Ms. Allen selectively highlights quotes from the two peers' earnings calls and analyst reports, and Ms. Allen's analysis of this commentary is also flawed.

54. For Interface, the quotes provided by Ms. Allen referring to "slow growth macro environment" appear to be related to Interface's business in Europe and the Middle East. For example, Interface disclosed a "pretty broad slowdown of the market across Europe"[78] and "softer volume trends in Europe, weaker trends in Asia,"[79] which is not relevant because Plaintiff's allegations are primarily focused on Mohawk's North American flooring business.[80] Furthermore, commentary by Interface indicates that its sales in the Americas were growing and taking market share from its competitors. For example, Interface disclosed that sales in the Americas grew 5%, in contrast to Mohawk's same-day announcement of a 7% decline in Flooring North America sales.[81] Similarly, Interface reported:

> We actually hit our target in the Americas [and] we are continuing to take market share [and] Resilient flooring now represents 25% of our portfolio. It's growing at double digits with accretive margins. And we also continue to take market share in carpet. So despite the slowing macro environment, we continue to expect a strong year ….[82]

---

[78] Allen Report, ¶72 (emphasis removed).

[79] Allen Report, ¶72 (emphasis removed).

[80] For example, Plaintiff alleges: "Unknown to investors, however, Mohawk and its Flooring North America segment achieved their supposed record margins by intentionally over-producing products to artificially inflate margins and refusing to write off huge volumes of scrap LVT that was coded not to be sold to customers" and "Former employees have confirmed that the Saturday Scheme was implemented at every Flooring North America distribution center across the country, involved millions of pounds of product, and involved every type of product that Flooring North America offered." Complaint, ¶¶84 and 353.

[81] "Q2 2019 Interface Inc Earnings Call – Final," CQ FD Disclosure, July 26, 2019 and "Q2 2019 Mohawk Industries Inc Earnings Call – Final," CQ FD Disclosure, July 26, 2019; Complaint, ¶253.

[82] "Q2 2019 Interface Inc Earnings Call – Final," CQ FD Disclosure, July 26, 2019 (emphasis added).

55.   For Armstrong, despite the "soft end market conditions" that Ms. Allen references,[83] its stock price <u>increased</u> 12.65% on August 6, 2019 after it reported "Adjusted EBITDA margin improved in the quarter."[84]

56.   In summary, Ms. Allen's qualitative analysis of Mohawk competitors does not show that 100 percent of Mohawk's abnormal price decline on July 26, 2019 is completely unrelated to firm-specific effects.

> **c)   Ms. Allen's Conclusion about the Price Impact of Tariffs Is Flawed Because the News about Tariffs Was Old Information that Would Have Already Been Reflected in the Price of Mohawk Stock**

57.   Ms. Allen also claims that Mohawk's stock price <u>around</u> the end of the Class Period was impacted by news about tariffs.[85]   However, as discussed below, the impact of tariffs would have likely already been reflected in Mohawk's stock price.   Public news reports explain that the relevant tariff was increased well in advance of Mohawk's July 25, 2019 earnings release:

> LVT was developed and refined in China.   As a result, the majority of LVT has always been manufactured there.
>
> However, in 2018, The U. S. was in the midst of a trade war with China.   The ongoing struggle for economic authority resulted in a 10% tariff for all vinyl goods imported from China– including luxury vinyl tile (LVT).   In September 2018, the 10% tariff began.
>
> <u>The 10% tariff was set to increase to 25%, and by the spring of 2019, that's exactly what happened.</u>   Luxury vinyl tile was now imported with an additional 25% tariff.   However, in November

---

[83]   Allen Report, ¶73.

[84]   "Armstrong Flooring Reports Second Quarter 2019 Results," Business Wire, August 6, 2019, 7:00 a.m.

[85]   Allen Report, ¶3.

2019, the tariff was dropped again to 10%, with plans to be pushed back up to 25% again on August 7th, 2020.[86]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The initial 10% tariff imposed on Chinese goods that included many flooring products took effect on Sept. 14, 2018. <u>On May 9, 2019, a 25% tariff (a 15% increase from the original 10%) was announced, with an effective date of products entering the U.S. on or after June 1. However, on May 31, an extension was issued by the Office of the United States Trade Representative (USTR) changing the effective date from June 1 to June 15. Baucom said Shaw has been paying the 25% tariff on imported goods since June 15</u>.

Piet Dossche, president of USFloors and executive vice president, hard surfaces for Shaw Industries, said the company is working diligently with its supply partners in China to find ways to mitigate the 15% increase as much as possible while passing on the absolute minimum possible. "Basically, we are looking at a 7% or 8% increase to our retailers," he explained.[87]

58.    Thus, news about tariffs had <u>already</u> been revealed well before July 26, 2019, and Ms. Allen's conclusion that such news caused some of the price decline on July 26, 2019 is flawed.

F.   Summary

59.    Ms. Allen does not opine that the first two alleged corrective disclosures fail to show evidence of price impact for all of the alleged misrepresentations and omissions, because she only challenges those two disclosures with respect to the Saturday Scheme. In connection with those two disclosures, Mohawk exhibited statistically significant negative abnormal returns, and analysts reported on negative news about LVT production issues,

---

[86]   *See* "Impacts of the Reinstated Tariff on Chinese Luxury Vinyl Tile," available at https://www.builddirect.com/learning-center/flooring/vinyl-flooring/impacts-of-the-reinstated-tariff-on-chinese-luxury-vinyl-tile/ (last visited June 1, 2022).

[87]   *See* "Setting the record straight on tariffs," available at https://www.fcnews.net/2019/07/setting-the-record-straight-on-tariffs/ (last visited June 1, 2022).

which provides evidence that misrepresentations and omissions about LVT production issues had price impact.

60.    Ms. Allen's argument that the final alleged corrective disclosure does not provide evidence of price impact is flawed. My empirical and qualitative analyses reflect that Mohawk's guidance reduction was related, at least in part, to issues concealed by the alleged misrepresentations and omissions, and that Mohawk's net sales miss was both a contributing factor to the significant stock price decline and related, at least in part, to issues concealed by the alleged misrepresentations and omissions. Further, Ms. Allen's attempt to explain Mohawk's stock price decline as being caused by macroeconomic and industry factors ignores that (a) those factors are accounted and controlled for by my market model, (b) Mohawk's North American operations underperformed the industry peers Ms. Allen identified, and (c) the news about tariffs Ms. Allen relies upon to explain the price decline was already public prior to the final alleged corrective disclosure.

## V.    MS. ALLEN'S REPORT DOES NOT DISPUTE THAT THE BASKET OF *CAMMER* AND *KROGMAN* FACTORS OFFER STRONG SUPPORT FOR THE CONCLUSION THAT MOHAWK COMMON STOCK TRADED IN AN EFFICIENT MARKET

61.    Ms. Allen does not dispute that:

a)    *Cammer* Factor I—Average Weekly Trading Volume—supports the conclusion that Mohawk common stock traded in an efficient market.

b)    *Cammer* Factor II—Analyst Coverage—supports the conclusion that Mohawk common stock traded in an efficient market.

c)    *Cammer* Factor III—Market Makers and Arbitrageurs—supports the conclusion that Mohawk common stock traded in an efficient market.

d)    *Cammer* Factor III and the fact that Mohawk common stock was publicly traded on the NYSE supports the conclusion that Mohawk common stock traded in an efficient market.

e)    *Cammer* Factor III and the evidence that there were ample arbitrage opportunities, as demonstrated by the levels and the range of short interest, supports the conclusion that Mohawk common stock traded in an efficient market.

f)  *Cammer* Factor IV—SEC Form S-3 Eligibility—supports the conclusion that Mohawk common stock traded in an efficient market.

g)  The *Krogman* Factor of Market Capitalization supports the conclusion that Mohawk common stock traded in an efficient market.

h)  The *Krogman* Factor of Size of the Float of Mohawk Common Stock supports the conclusion that Mohawk common stock traded in an efficient market.

i)  The *Krogman* Factor of Bid-Ask Spread supports the conclusion that Mohawk common stock traded in an efficient market.

62.  Ms. Allen's only dispute is related to whether the empirical results derived from the tests I performed concerning *Cammer* Factor V—Cause-and-Effect—are strong enough to support my conclusions. Ms. Allen concludes that my analysis of comparing news days to no-news days "is flawed and unreliable" and that my tests of autocorrelation are "unscientific and results driven."[88]  However, Ms. Allen does not offer any alternative empirical or other evidence to dispute my conclusion that Mohawk's common stock exhibited the type of cause-and-effect relationship expected for a stock trading in an efficient market. Moreover, her criticisms are misguided and are based on incomplete, contradictory and unreliable analyses. I discuss these flaws in the next two sections.

63.  In any event, Ms. Allen does not dispute that Mohawk common stock traded in an efficient market throughout the Class Period based on my in-depth examination of the basket of *Cammer* and *Krogman* factors presented in my Opening Report.

**VI.  OVER THE ENTIRE CLASS PERIOD, AUTOCORRELATION FIRST APPEARS, THEN OVER VARIOUS SUB-SAMPLES OF DATAPOINTS IT DISAPPEARS AND CHANGES DIRECTION, SUPPORTING MY OPINION THAT THROUGHOUT THE CLASS PERIOD MOHAWK'S STOCK PRICE RAPIDLY REFLECTED THE FLOW OF INFORMATION**

64.  In my Opening Report I demonstrated that:

> [U]sing a series of empirical tests I show that there is additional evidence supporting the conclusion that throughout the Class

---

[88]  Allen Report, ¶4.

> Period Mohawk's common stock price rapidly reflected the flow of information. The evidence to support this conclusion comes from the empirical results showing that the daily abnormal returns of Mohawk common stock do not exhibit persistent and systematic autocorrelation, which offers further support for my opinion that Mohawk common stock traded in an efficient market throughout the Class Period.[89]

65. Ms. Allen and I agree that:

> An autocorrelation test is a commonly used method to analyze market efficiency. The test is performed over a specific period of time to examine whether, during that period of time, stock price returns, rather than being unpredictable, are correlated one day to the next.[90]

66. We also agree that, in my Opening Report, I "derived a coefficient $\beta$ of 0.087, representing the measurement of the relationship between the abnormal current (*i.e.*, today) and lagged (*i.e.*, yesterday) returns. This coefficient has a p-value of 3.9% making it statistically significant below the 5% level."[91]

67. However, after reviewing my "series of empirical tests," Ms. Allen wholly relies on a single statistic to support her conclusion that there is "evidence for the existence of statistically significant negative autocorrelation."[92] Moreover, Ms. Allen erroneously claims that "Dr. Hartzmark does additional non-standard tests that are unsupported and results driven to try to support a finding that Mohawk's stock traded in an efficient market."[93] As I explain below, both of Ms. Allen's claims are incorrect.

A. Autocorrelation in the Context of Market Efficiency

68. As stated in my Opening Report:

---

[89] Hartzmark Report, ¶69 (emphasis added).

[90] Allen Report, ¶80 (footnotes omitted). *See also*, Hartzmark Report, fn 29 ("The absence of autocorrelation is an indicator of market efficiency.").

[91] Hartzmark Report, ¶71.

[92] Allen Report, ¶88.

[93] Allen Report, ¶81.

> The notion behind efficient markets is that the competition among investors to discover new profit opportunities pushes security prices to reflect all material, publicly available information.[94]

69.    In other words, the relevant inquiry is whether autocorrelation is persistent and systematic enough to support a profitable trading strategy, and the appropriate analysis is to:

> [E]xamine whether prices rapidly adjust to reflect the flow of information by determining whether tomorrow's security price movement can be *systematically* predicted <u>with a reasonable degree of statistical certainty</u> based solely on the security price movement today (or some period in the past).[95]

70.    This approach to describing autocorrelation was explicitly credited by the court in *In Re Teva Securities Litigation*.  Relying on the opinion of Ms. Allen's NERA colleague, Dr. David Tabak, the *Teva* court wrote:

> Dr. Tabak reiterates that the "<u>real question is whether the observed autocorrelation is exploitable, meaning that an investor could earn trading profits as a result</u>."  .  .  . "<u>Autocorrelation that appears and disappears, or changes direction . . . is generally not exploitable</u> because once one determines the proper trading strategy, that strategy may no longer be profitable."[96]

71.    In other words, autocorrelation is an indication of market inefficiency <u>only if</u> it is <u>persistent</u> and <u>systematic</u> (*i.e.*, it remains stable and does not "disappear[], or change[] direction . . . [and] is generally [] exploitable").[97]  Conversely, if an *autocorrelation*

---

[94]  Hartzmark Report, ¶12.

[95]  Hartzmark Report, ¶70 (emphasis added; italics in original).

[96]  *In Re Teva Securities Litigation*, 2021 WL 872156 (D.Conn. March 9, 2021) ("*Teva*"), at *16 (emphasis added).

[97]  Even this is not definitive evidence suggesting the security trades in an inefficient market.  Should there be empirical evidence of the existence of persistent and systematic autocorrelation, academic standards require a comparison between the profits earned using a naïve trading strategy (based on the degree of autocorrelation)

- 31 -

*coefficient* is not stable, then *autocorrelation* cannot be considered persistent and systematic because "[a]utocorrelation that appears and disappears, or changes direction . . . is generally not exploitable."

72.    As Dr. Tabak described, exploiting statistically significant autocorrelation can only be accomplished if the level and direction of autocorrelation remain stable (on average) and thus there is no material changes in direction or variation.  In my Opening Report, to evaluate whether autocorrelation for Mohawk stock disappeared or changed directions, I employed standard academic-based diagnostic procedures to evaluate whether the autocorrelation based on the full sample that includes all 564 datapoints in the entire Class Period was persistent and systematic.  These standard procedures entailed estimating a series of autocorrelation coefficients using different sub-samples of the data (or sub-periods).  Only with this scientific approach to evaluating the level, direction, changes in direction and overall variation in autocorrelation over the entire Class Period can one answer the "real question" concerning autocorrelation relevant to market efficiency— namely, whether the autocorrelation over the entire period can be profitably exploited.[98] Because Ms. Allen's opinion wholly relies upon a single statistically significant negative autocorrelation coefficient based on the full sample without performing any of the standard diagnostic procedures to determine whether this coefficient is stable, she breaches elementary reasonable scientific standards, and thus her conclusion that the Class Period-wide autocorrelation coefficient "provid[es] direct evidence contrary to a finding that Mohawk's stock traded in an efficient market"[99] is flawed and unreliable.

73.    As described in **Appendix C**, there are standard, generally accepted, academic-based diagnostic procedures to determine whether there is persistent and

---

and the transactions costs to implement the strategy (*e.g.,* commissions, bid/ask spreads, normal trading frictions, etc.).  If the transactions costs exceed the profits from the naïve strategy, then the persistent and systematic autocorrelation is not exploitable, and the evidence does not support the conclusion that the security trades in an inefficient market.  I did not find evidence of persistent and systematic autocorrelation, so I did not undertake this examination in my Opening Report.

[98]    *See supra* footnote 97.

[99]    Allen Report, ¶4.

systematic autocorrelation or, alternatively, whether, throughout the Class Period, the observed serial correlation relationship between today's returns and yesterday's returns appears, disappears, or changes direction. These are the procedures I used in the Hartzmark Report.

B. Background on Calculating Autocorrelation Coefficients

74. The standard specification to calculate the autocorrelation coefficient used to estimate first-order serial correlation in any time series of returns is:[100]

$$x_t = \alpha + \rho x_{t-1} + \varepsilon_t,$$

where:
$x_t$ is the return to Mohawk common stock at time $t$;
$\alpha$ is the intercept term (which is assumed and found to be zero);[101]
$\rho$ is the autocorrelation coefficient; and
$\varepsilon_t$ is the error term.

75. This standard specification is presented in the Hartzmark Report and is not disputed by Ms. Allen. Further, both of us agree that a "standard" regression can be used to estimate the autocorrelation coefficient or the degree of serial correlation of the abnormal returns over the specified time period. As I stated in the Opening Report, when running the regression, I found that, using the full sample over the Class Period, the autocorrelation coefficient is -0.087 and that the autocorrelation coefficient is statistically significant below the 5% level.[102] This empirical evidence suggests there <u>might be</u> negative autocorrelation within the time-series of abnormal returns over the entire Class Period.

76. However, by itself, this single statistically significant negative autocorrelation coefficient does not establish that the observed autocorrelation is <u>persistent</u> or <u>systematic</u>

---

[100] In what follows I use the symbol $\rho$, rather than beta ($\beta$) as in the Opening Report. I also use $x_t$, rather than AR$_t$. These substitutions are made to avoid confusion with beta in the market model used for the event study presented in the Opening Report.

[101] This is also supported by Ms. Allen who states, "stock price movements should follow a 'random walk' and be unpredictable – i.e., a stock's future price should not be predictable based on the stock's prior prices." Allen Report, ¶80.

[102] Hartzmark Report, ¶71.

over the Class Period. Specifically, it cannot demonstrate that the autocorrelation coefficient is stable, either: (a) from one subperiod to the next within the Class Period (which is determined by examining whether the autocorrelation coefficient remains similar from one sub-period of the Class Period to another); or (b) from one data sample to another and thus not overly influenced by a small set of unique datapoints (which is determined by examining whether the autocorrelation coefficient remains similar when a small number of datapoints are removed from the 564 datapoints used for the calculation). If autocorrelation fails either (a) or (b), as Dr. Tabak explained, it "appears and disappears, or changes direction" and "is generally not exploitable."

77. Whether the autocorrelation coefficient is stable (*i.e.*, there is persistent and systematic autocorrelation over the entire Class Period that does not appear and disappear or change direction) can only be determined with additional empirical diagnostic procedures that examine smaller subsets of the datapoints in the entire Class Period. Generally accepted, standard academic-based procedures are employed to evaluate whether "all of the regression coefficients are [the same] in different subsets of the data."[103]

78. Only if the empirical results shows stable autocorrelation coefficients, meaning autocorrelation that is robust to a different sample of dates or insensitive to small changes in the data sample, is there scientific "evidence for the existence of statistically significant negative autocorrelation—evidence contrary to a finding that Mohawk's stock traded in an efficient market . . . ."[104] Conversely, if the autocorrelation is not robust to a different sample of dates or is sensitive to small changes in the sample, then there is scientific evidence that "Mohawk common stock do[es] not exhibit persistent and systematic autocorrelation."[105]

79. This is consistent with the standard academic-based diagnostic procedures I used in my Opening Report, where I sought to determine:

---

[103] William H. Greene, Econometric Analysis (Pearson, 8th ed. 2018) ("Greene 2018") at 191 (emphasis added).

[104] Allen Report, ¶88.

[105] Hartzmark Report, ¶69.

> [W]hether (i) this [autocorrelation] coefficient is a robust measure of autocorrelation over the 564-day Class Period and not sensitive to small changes, and (ii) the observed statistical relationship was persistent and systematic and, thus, an investor could have used the return from yesterday to predict with some level of certainty the return today.[106]

C.  The Autocorrelation Coefficient Represents the Average over the Class Period, and the Empirical Tests Using the Whole Sample of Data Assumes that Each of the Observations Contributes Equally to the Estimate

80.    As described in **Appendix C**, the autocorrelation coefficient is based on a sum and average; and, to evaluate whether the data in the sample underlying the sum and average has the properties required for proper statistical testing, one must continue the inquiry beyond the flawed standard Ms. Allen employs.

81.    Because the underlying assumption to implement the empirical tests using the full sample of all 564 days of the Class Period assumes that each of the daily observations contributes equally to the estimate of autocorrelation coefficient, in peer-reviewed academic studies, researchers must utilize the standard diagnostic procedures to determine whether any daily observation(s) might not contribute useful information to the estimate and might possibly distort or bias the estimated autocorrelation coefficient.  In other words, it is critical to evaluate whether certain datapoints overly influence the results of the regression estimating the autocorrelation coefficient.   Removing overly influential datapoints, especially when they represent atypical events, is standard practice to determine whether the autocorrelation coefficient based on the full sample of datapoints coming from the entire Class Period is robust, or whether it is sensitive to small changes.  From a statistical perspective, an autocorrelation coefficient for the entire Class Period is not robust if it first appears, but then disappears or changes direction when there are small changes to the data being sampled.

82.    As shown in **Appendix C**, anomalous datapoints underlying the statistical analysis violate the assumption that each daily observation contributes equally to the estimate of autocorrelation coefficient and distort or bias the autocorrelation coefficient.

---

[106]  Hartzmark Report, ¶71.

When that happens, in order to scientifically analyze autocorrelation, one must properly account for the effect of the anomalous datapoints. Only when the results are robust and insensitive to small changes in the sample data can the conclusion be reliably generalized. In other words, even if an autocorrelation coefficient is observed to be statistically significant, it would be improper under any academic-based standard in peer-reviewed research to reach the conclusion Ms. Allen reaches without first asking the critical question as to whether the autocorrelation coefficient is stable, robust and insensitive to small changes.

83.    The next question is how an academic researcher determines whether an outlier is anomalous or not. Greene defines an influential observation as "one that is likely to have a substantial impact on the least squares regression coefficient(s)."[107] Therefore, standard diagnostic procedures require testing to determine if estimates are robust to the removal of outliers. Greene adds that an empirical analysis must carefully consider an observation if it "appears to be outside the reach of the model, perhaps because it arises from a different data-generating process."[108] Accordingly, standard diagnostic procedures involve examining outliers to determine if there might be a reasonable explanation as to why they are outliers and whether they are anomalous relative to the rest of the datapoints in the sample (*i.e.,* are the dates that are excluded considered to be anomalous dates within the Class Period). Conversely, failing to exclude outliers is only justifiable if the outliers are considered to be representative of the full data sample or otherwise do not violate the assumptions underlying the empirical model.

84.    Ms. Allen appears to agree that the datapoints in the full sample that I removed (*i.e.,* the two dates in the Class Period) are anomalous. However, in the Allen Report, she still argues that I offered no support for their removal, simply stating it was "nonsensical."[109] Yet, Ms. Allen later argues that analyzing the very same dates in

---

[107]  Greene 2018 at 104.

[108]  Greene 2018 at 105.

[109]  Allen Report, ¶86.

connection with another test amounted to "a biased selection of events."[110] Thus, she offers a clear justification that the outlier earnings/corrective disclosure dates I eliminated for my autocorrelation analysis are atypical and thus not representative of the other 562 days in the Class Period.

85.    Indeed, it would be inappropriate to conclude that the autocorrelation coefficient is stable—and thus there is statistically significant persistent and systematic negative autocorrelation throughout the Class Period—without estimating an autocorrelation coefficient that accounts for these anomalies.[111]

86.    Assessing autocorrelation by eliminating anomalous dates is also consistent with observations of Ms. Allen's colleague, Dr. Tabak, in *Teva*, in which he explained "that the 'real question is whether the observed autocorrelation is exploitable, meaning that an investor could earn trading profits as a result.'"[112]

87.    For example, in this matter, the autocorrelation coefficient using the full sample is equal to -0.087.  That means that, on average, a 10% decline will be followed the next day by a positive return of 0.87% (= -0.087 x -10%).  Under Ms. Allen's approach, the market would be considered inefficient because one apparently can predict today's returns from yesterday's returns.  However, upon further analysis in my Opening Report, I observed that, during the 564-day Class Period, there is a single date with a -22.77% abnormal return that is preceded by a day with an abnormal return of +0.77% and followed

---

[110]  Allen Report, ¶78.

[111]  *See* G. S. Maddala and In-Moo Kim, Unit Roots, Cointegration and Structural Change (Cambridge University Press, 1998) ("Maddala and Kim 1998") at 425-6.  Maddala and Kim explain: "There is no question that outliers can cause problems with inference." (at 425, emphasis added).

Also, "The only question is what we should do with them.  Legendre, in the first paper on least squares in 1805, suggesting throwing these observations out.  So did Edgeworth in 1887.  However, if outliers are caused by misspecification of the relationships estimated, then the proper course is to change the specification and if they are caused by fat-tailed error distributions, a proper course is to use robust methods." (at 426).

[112]  *Teva* at *16.

by a day with an abnormal return of +2.04%. When the pairs of dates including this single -22.77% abnormal return are excluded from the sample, the new autocorrelation coefficient is statistically indistinguishable from zero at the 5% level. In other words, excluding this single and atypical datapoint eliminates entirely the supposed predictability of returns based on the previous day's returns, and demonstrates that the only reason the price movements appear to be predictable is due to a single atypical return. Because the autocorrelation is driven by a single event (which amounts to only 0.35% of the sample of datapoints that make up the entire Class Period[113]), it is not informative of what happens in general over the entire Class Period, and it alone cannot falsify the hypothesis of market efficiency.[114]

88. As discussed in the Hartzmark Report, I found that two outlying records are anomalous. Thus, it was entirely reasonable, as Greene notes, to remove the anomalous datapoints and re-run the tests to determine whether the autocorrelation coefficient is robust

---

[113] 0.35% is computed as 2 divided by 564, because the atypical return appears in one observation as a dependent variable representing "today's return" and in another observation as an independent variable representing "yesterday's return".

[114] Ms. Allen claims that my decision to remove the alleged partial corrective disclosure dates July 26, 2018 and October 26, 2018 from a sub-sample "is akin to removing a blood stain from a crime scene and then claim[ing] that there is no evidence of a crime." Allen Report, ¶86. This confuses an isolated fact (a blood stain at a crime scene) with the calculation of an average. A better analogy is to suppose that a crime occurred in an apartment building. Ms. Allen's approach is akin to seeing a blood stain in the room where the crime occurred and claiming that there is a good chance that any randomly chosen apartment in the building has blood stains in it. My approach, by contrast, is akin to claiming that you can safely assume the apartments in the building do not have blood stains in them, so long as you do not enter the atypical apartment with police tape on the door.

For another example, assume you want to understand what types of fruit grow in a particular forest. It is the fall in the Midwest and you stroll around the forest of interest, and you find thousands of apples lying on the ground. From this observation you might conclude that you are in an apple orchard. However, on further evaluation you find out that among the hundreds of berry trees that are barren because they are out of season, there are only three large apple trees. And only because you have arrived at this "atypical time" of the year, do you make the incorrect observation that the forest, on average, is full of apple trees rather than berry trees. Only through the additional tests can you determine that the forest is dominated by berry trees and not apple trees.

and persistent—which it is not, because it is sensitive to small changes in the sample of data.[115]

89.    Consistent with standard academic-based diagnostic procedures, in my Opening Report I constructed alternative estimates of the autocorrelation coefficient excluding anomalous datapoints to compare to the original estimate.  The diagnostic procedures demonstrated that the autocorrelation disappears when the outliers are eliminated, which can be clearly shown graphically.  In **Charts 1 and 2** below, I show how the purported negative autocorrelation over the entire Class Period is the result of just two outliers related to two earnings surprises (*i.e.*, four pairs of return and lagged returns associated with the two outliers).  Examining the trendlines (dotted red lines), I show how the relationship between today's abnormal return and yesterday's abnormal return appears to be negative when all data is included in the sample from the Class Period in **Chart 1**.  But after removing the pairs of data related to the atypical earnings release dates that are alleged corrective disclosures (green diamond dots in **Chart 1)**, the autocorrelation over the Class Period disappears, as shown by the slope of the trendline is flat, becoming indistinguishable from zero in **Chart 2**.

---

[115]  Greene 2018 at 107.  For a comprehensive source on outliers, *see* Vic Barnett and Toby Lewis, Outliers in Statistical Data (Wiley, 1978).

**CHART 1**



**CHART 2**



90.    Ms. Allen and I might disagree whether the anomalous datapoints should be removed and whether they are atypical or representative of the other 562 days in the Class Period, but there should be no disagreement that the math incorporated in my rigorous empirical tests clearly demonstrate the two anomalous datapoints are overly influential in the determination of the autocorrelation coefficient over the entire Class Period.

D.  Splitting the Sample Period in Half

91.    Ms. Allen is also critical of the other standard diagnostic procedure I employed, wherein I split the Class Period into two equal-size sub-periods in order to determine whether the autocorrelation coefficient is stable across time.  In this section, I discuss her criticism and why her approach, which relies upon the single statistically significant autocorrelation coefficient over the entire Class Period, is a breach of elementary academic standards and does not answer the critical question of whether autocorrelation observed over the Class Period is persistent or whether it disappears or changes.  I present a detailed academic-based examination of this issue in **Appendix C**.  It demonstrates that my approach is anything but "non-standard."

### 1.    *Introduction and Background*

92.    According to Greene:

> In specifying a regression model, we assume that its assumptions apply to all the observations in the sample.  It is straightforward, however, to test the hypothesis that some or all of <u>the regression coefficients are different in different subsets of the data</u>.[116]

93.    In addition, Maddala and Kim state that:

> [S]tructural change does affect inference . . . and it is important to allow for its possibility at the estimation stage itself.[117]

94.    In this case the standard academic diagnostic procedure suggests that one must evaluate the possibility of change in the autocorrelation coefficient covering the full

---

[116]  Greene 2018 at 191 (emphasis added).

[117]  Maddala and Kim 1998 at 416.

sample of the 564-day Class Period. In order for there to be scientific evidence to support the finding that statistically significant autocorrelation exists throughout the Class Period, the autocorrelation coefficient must be significant and stable across different sub-periods. Put another way, if autocorrelation coefficients change from one sub-period to the next, then there is <u>no</u> profitable trading strategy to exploit across the sub-periods.

95.    This conclusion is again consistent with Dr. Tabak's opinion from *Teva*:

> Dr. Tabak noted that because the directions of the yearly autocorrelation were contradictory, the autocorrelation "should not be profitable, because investors cannot count on any historically observed autocorrelation that they can measure to persist when they are attempting to exploit it."[118]

96.    Thus, to determine whether there is persistent and systematic autocorrelation during the Class Period (*i.e.*, the autocorrelation coefficient is stable), it is critical to determine whether the autocorrelation coefficient is sensitive to different sub-samples of data used for initial estimate. The critical assumption underlying Ms. Allen's opinion that the autocorrelation coefficient based on the full sample of the entire Class Period is "evidence contrary to a finding that Mohawk's stock traded in an efficient market"[119] is the assumption that the data over the 564-day Class Period exhibits no changes, and as such the autocorrelation coefficient remains significant and stable across periods, suggesting there are profitable trading opportunities to exploit. However, the standard academic-based procedures that I applied contradict this assumption. Accordingly, after demonstrating that the direction of "the regression coefficients [*i.e.,* autocorrelation coefficients] are different in different subsets of the data," I concluded that there is no persistent and systematic autocorrelation. I note that I followed a standard practice which is used to construct distinct data samples and, as I describe in **Appendix C**, there is nothing "non-standard" about constructing sub-samples to test whether the autocorrelation coefficient is robust.[120] The

---

[118]    *Teva* at *15.

[119]    Allen Report, ¶4.

[120]    Indeed, as described in **Appendix C**, the academic literature simply refers to the division of the full sample into numbers of datapoints $N_1$ and $N_2$, without explicitly defining the values of these two numbers.

fact that I tested two equal 282-day sub-periods, as opposed to multiple 60-, 120-, 180- or more day subperiods or calendar periods, is not a violation of any academic standard. Critically, Ms. Allen fails to identify the supposedly "standard" approach to splitting the Class Period (because there is no one standard)—and she also fails to offer any analysis suggesting that there is an alternative "standard" method of dividing the Class Period under which autocorrelation actually appears and remains stable.

97.    Splitting the sample period and comparing the autocorrelation coefficients across different samples allows one to evaluate whether the time-series of abnormal returns is stable from one period to the next, and thus whether there is persistent and systematic autocorrelation over the Class Period.  This enables a rigorous empirical analysis to isolate effects in different periods of time to determine whether returns are actually predictable and offer an opportunity to profitably exploit the autocorrelation.

### 2.    *Splitting the Period in Half in My Opening Report*

98.    To evaluate whether the autocorrelation coefficient is stable over the 564-day Class Period, *i.e.*, whether there is persistent and systematic autocorrelation and thus evidence of abnormal returns being predictable, I chose a standard diagnostic procedure and split the Class Period in half.  I showed that, when dividing the Class Period into two equal-sized periods, the autocorrelation coefficients for the two halves are (a) not statistically significant at or below the 5% level (*i.e.,* the autocorrelation disappeared) and (b) of opposite signs (*i.e.,* the autocorrelation changed direction).    This clearly demonstrates "there was no systematic and persistent autocorrelation over the Class Period."[121]

99.    In **Charts 3 and 4** below, I offer additional visual support showing why there is no systematic and persistent autocorrelation over the Class Period.  Examining the trendlines in these two charts shows how the relationship between today's abnormal return and yesterday's abnormal return is virtually flat (slightly positive and not statistically significant at or below the 5% level) in the first half, while it changes to negative (and not

---

[121]  Hartzmark Report, ¶73.  The coefficient in the first period is positive 0.015 (p-value of 80.4%) and in the second period is negative 0.107 (p-value of 7.4%).

statistically significant at or below the 5% level) for the second half of the Class Period.[122] This shows that the autocorrelation disappears and changes direction, which means that it cannot be exploited in a profitable trading strategy. Indeed, had an investor observed the slightly positive autocorrelation in the first half of the Class Period and tried to exploit it in the second half, the strategy would on average have backfired, resulting in no gains or possibly losses.

---

[122] Note, in this instance the negative autocorrelation coefficient is highly influenced by the same outliers that influenced the autocorrelation calculated using the entire Class Period as the sample.

**CHART 3**



**CHART 4**



### 3. *Evaluating Additional Sub-Samples of Datapoints Demonstrate that Reliance on a Single Autocorrelation Coefficient Is Misleading*

100. In calling my autocorrelation tests "results driven,"[123] Ms. Allen implies that I chose a particular method of splitting the Class Period into sub-samples because that particular method provided results that supported a finding of market efficiency. For further support that there is no persistent and systematic autocorrelation over the Class Period, I extend my diagnostic testing and estimate autocorrelation coefficients by dividing the Class Period into various sub-samples. In **Table 1**, I construct a variety of sub-samples of data, including splitting the full Class Period by calendar year and by 60- and 120-trading day periods. **Table 1** offers empirical results consistent with the evidence presented in the Hartzmark Report. Specifically, none of the autocorrelation coefficients for any of the subsamples are statistically significant at or below the 5% level (*i.e.,* the autocorrelation disappears).

101. Possibly the most instructive analysis is examining the 60-day sub-sample periods: there, none of the intervals have autocorrelation coefficients that are statistically significant at or below the 5% level. Moreover, the pattern is erratic (*i.e.,* the autocorrelation changes directions), with two negative coefficients followed by three positive coefficients, then three negative coefficients followed by a positive coefficient.

102. These analyses offer additional support "that there was no persistent or systematic statistically significant autocorrelation at or below the 5% level in the abnormal returns."[124]

---

[123] *E.g.*, Allen Report, ¶75.

[124] Hartzmark Report, ¶75.

**Table 1**

| Date Range | Observations | Coefficient ρ | T-statistic of ρ | P-Value of ρ |
|---|---|---|---|---|
| ***Class Period*** | | | | |
| **04/28/2017 - 07/25/2019** | **564** | **-0.087** | **-2.07** | **3.9%** |
| ***Class Period Split Equally*** | | | | |
| 04/28/2017 - 06/11/2018 | 282 | 0.015 | 0.25 | 80.4% |
| 06/12/2018 - 07/25/2019 | 282 | -0.107 | -1.79 | 7.4% |
| ***Calendar Year*** | | | | |
| 04/28/2017 - 12/29/2017 | 171 | -0.064 | -0.83 | 40.6% |
| 01/02/2018 - 12/31/2018 | 251 | -0.119 | -1.89 | 6.0% |
| 01/02/2019 - 07/25/2019 | 142 | 0.019 | 0.23 | 81.9% |
| ***60 Trading Days*** | | | | |
| 04/28/2017 - 07/24/2017 | 60 | -0.145 | -1.12 | 26.8% |
| 07/25/2017 - 10/17/2017 | 60 | -0.039 | -0.30 | 76.7% |
| 10/18/2017 - 01/12/2018 | 60 | 0.021 | 0.16 | 87.0% |
| 01/16/2018 - 04/11/2018 | 60 | 0.025 | 0.19 | 84.8% |
| 04/12/2018 - 07/06/2018 | 60 | 0.120 | 0.92 | 36.1% |
| 07/09/2018 - 10/01/2018 | 60 | -0.174 | -1.35 | 18.3% |
| 10/02/2018 - 12/27/2018 | 60 | -0.139 | -1.07 | 29.0% |
| 12/28/2018 - 03/26/2019 | 60 | -0.047 | -0.36 | 71.9% |
| 03/27/2019 - 06/20/2019 | 60 | 0.019 | 0.14 | 88.7% |
| ***120 Trading Days*** | | | | |
| 04/28/2017 - 10/17/2017 | 120 | -0.068 | -0.74 | 45.9% |
| 10/18/2017 - 04/11/2018 | 120 | 0.024 | 0.26 | 79.4% |
| 04/12/2018 - 10/01/2018 | 120 | -0.126 | -1.38 | 17.0% |
| 10/02/2018 - 03/26/2019 | 120 | -0.121 | -1.32 | 18.9% |

### 4.    *Ms. Allen's Criticism Is Contrary to the Approach Used by Her Colleague at NERA Economic Consulting*

103. Although Ms. Allen labels my standard, academic-based diagnostic procedures of analyzing autocorrelation by dividing the Class Period into subperiods as "additional nonstandard tests that are unsupported and results driven," [125] her own colleague at NERA, Dr. Tabak, employs a similar approach. In *Teva*, Dr. Tabak found a statistically significant autocorrelation coefficient for the security at issue over a lengthy class period. He also analyzed whether there was persistent and systematic autocorrelation by examining the autocorrelation coefficients calculated based on annual 252-day sub-

---

[125]  Allen Report, ¶81.

periods.[126]  Dr. Tabak observed that there was positive autocorrelation in three of his sub-periods and negative autocorrelation in the other three, with only one sub-period exhibiting statistically significant autocorrelation.[127]  From this, he concluded that there was no persistent and systematic autocorrelation over the class period.

104.  The *Teva* court agreed with Dr. Tabak and stated:

> In any event, I find Dr. Tabak's reasoning persuasive.  What is important is whether the ADS traded in a generally efficient market, and limited, unpredictable autocorrelation is simply not indicative of market inefficiency under these circumstances.[128]

### 5.    *Summary on Splitting the Class Period into Sub-Samples of Datapoints*

105.  Regardless of Ms. Allen's beliefs about the serial correlation of Mohawk's stock returns, robust empirical results clearly demonstrate that the autocorrelation coefficient calculated using the full sample of the entire Class Period is not stable, persistent, or systematic.  The autocorrelation coefficients using different sub-samples of the datapoints in the Class Period clearly show that there is no consistent pattern of autocorrelation when the Class Period is divided into subsamples, regardless of how those subsamples are constructed (*i.e.,* by dividing the Class Period in half, by the various calendar years, or by 60- or 120-trading day periods).

---

[126] Not all of Dr. Tabak's autocorrelation estimates were based on 252 days.  For those beginning and ending portions of the Class Period that were not complete calendar years, fewer than 252 datapoints were used for his calculation.  *See* Expert Report of David I. Tabak, Ph.D., filed June 19, 2020, *In Re Teva Securities Litigation*, ECF. 419-5, Exhibit 10a-a.  Just because he utilized a different method based on calendar years as opposed to equal-sized periods to construct his sub-sample of datapoints, does not mean he employed "non-standard tests that are unsupported and results driven to try to support a finding that [Teva]'s stock traded in an efficient market."  Like all experts, he had to construct sub-samples that were representative, reasonable and offered reliable estimates.

[127] *See Teva* at *15.

[128] *See Teva* at p. *16.

106. Given an initial calculation of a negative autocorrelation coefficient for the entire Class Period that is statistically significant, the additional empirical evidence I presented in my Opening Report (which I further supplement in this Rebuttal Report) is clearly necessary to determine whether the full Class Period autocorrelation coefficient is stable and robust under any academic-based, scientific standard.  To suggest that my "additional non-standard tests [] are unsupported"[129] is incorrect.

> **6.    Comparing My Empirical Tests in this Mohawk Matter to those in Other Matters Demonstrates that I Have Applied the Same Standard, Commonly-Utilized, Generally Accepted, Academic-Based Diagnostic Procedures in All My Engagements**

107.  The diagnostic procedures I used to evaluate autocorrelation in other litigation matters catalogued in the Allen Report[130] may all be understood as variations of the same standard, academic-based practices described above.  The purported differences Ms. Allen suggests are evidence of a "results-based" approach are, in reality, a function of practical differences between cases, such as the differences in the lengths of class periods, the changes in the samples that took place in various sample periods, and the timing and number of corrective disclosures.  There is no single method or "standard" way of dividing a Class Period into sub-samples of datapoints to test whether an autocorrelation coefficient calculated over the entire Class Period is stable.  The way to answer the relevant question as to whether there is persistent and systematic autocorrelation throughout an entire class period is simply to apply reliable, scientific tools to determine whether the autocorrelation coefficient is stable.  I applied precisely that method in this and my other engagements.

108.  Ms. Allen claims that my "method of splitting the alleged Class Period in the middle is unsupported and arbitrary,"[131]  and cites as purported support my reports in other matters that had very different circumstances and durations of class periods than in this case.  However, in each of those matters, I demonstrated that the autocorrelation coefficient over the class period was either not statistically significant, not stable, or was overly

---

[129]  Allen Report, ¶81.

[130]  Allen Report, ¶82.

[131]  Allen Report, ¶82.

influenced by outliers—and, thus, there was no persistent and systematic autocorrelation. The scientific standards I used in those matters are the same as in this *Mohawk* matter and described in detail in **Appendix C**. Namely, depending on the length of the class period, I constructed two or more reasonable sub-samples to investigate whether the autocorrelation coefficient was stable.

109. For example, Ms. Allen writes:

> In *SEB Investment Management AB. v. Symantec Corp. and Gregory S. Clark*, after finding statistically significant autocorrelation using the standard test for the actual class period, Dr. Hartzmark chooses to split the class period, not in the middle like in this case, but in two sub-periods around one of the alleged corrective disclosure dates – a 252-day sub-period before the alleged corrective disclosure and a 55-day sub-period after the alleged corrective disclosure, and rerun his test. Dr. Hartzmark finds no statistically significant autocorrelation in either of the two sub-periods and concludes that there was no autocorrelation over the class period.[132]

110. As in this matter, in *Symantec* I constructed sub-samples of the class period to determine whether the autocorrelation coefficient estimated over the full sample of the entire class period was stable. That I constructed the sub-samples by dividing the full sample of the entire class period in a different way in *Symantec* than here is perfectly consistent with the academic literature from Maddala and Kim and Greene, discussed above and in **Appendix C**. There is no single appropriate method for dividing the class period, as the only relevant question is whether there is a lack of stability of the autocorrelation coefficients. In *Symantec*, it was appropriate to divide the class period before and after the first alleged corrective disclosure.

111. Nonetheless, applying a similar approach here as I did in the *Symantec* matter, I have performed diagnostics by comparing autocorrelation coefficients in the intervals prior to and after the first alleged partial corrective disclosure in this *Mohawk* matter. Using these data sub-samples, I find that neither of the autocorrelation coefficients is statistically

---

[132] Allen Report, ¶82a (emphasis added).

- 50 -

significant at the 5% level (*i.e.,* using these sub-samples the autocorrelation also disappears). [133]    This is additional evidence that there is no stable autocorrelation coefficients and thus no persistent and systematic autocorrelation throughout the Class Period in Mohawk.

112.    Ms. Allen also writes that:

> In *In Re MF Global Holdings Limited Securities Litigation*, after finding statistically significant autocorrelation using the standard test for the actual class period, Dr. Hartzmark chooses to remove the first five trading days of the corrective disclosure period and rerun his test.  He finds no statistically significant autocorrelation and concludes that there was no autocorrelation over the class period.  Dr. Hartzmark does not explain why those five days should be removed and he does not run the test by splitting the class period in any way. [134]

113.    In *MF Global*, I employed the same academic standard and constructed sub-samples of the datapoints to determine whether the autocorrelation coefficient estimated over the entire class period was stable, just as in this matter.  That I constructed the sub-samples by dividing the entire class period in a different way in *MF Global* is perfectly consistent with the academic literature discussed above and in **Appendix C** from Maddala and Kim and Greene.

114.    Moreover, *MF Global* presented unique circumstances entirely absent in this matter that justified the particular approach in that case.  To start, as MF Global teetered toward bankruptcy there was a daily barrage of both good and bad news whipsawing the stock price.  Indeed, the complaint in that matter alleged material, unanticipated curative information was disclosed on several consecutive days.  MF Global's change in solvency, in turn, implied a clear material change in the distribution and volatility of the MF Global returns (*i.e.,* structural change) surrounding the corrective disclosure period.  Moreover, the Class Period was one-third shorter than in this *Mohawk* matter.  Therefore, the different

---

[133]    In the *Symantec* matter there was only one alleged partial corrective disclosure prior to the final alleged corrective disclosure.  For this analysis, I have left in the second alleged partial corrective disclosure in the second sub-sample of data.

[134]    Allen Report, ¶82b.

approach to constructing and testing sub-samples of data in *MF Global* was dictated by the specific circumstances of that matter.

115.  In any event, my approach in *MF Global* was consistent with my approach in this matter.  In *MF Global*, I wrote:

> However, because it is not uncommon for individual security prices to trend over certain time periods when examining the price series in hindsight, <u>the key issue to determine whether there is persistent, pervasive and predictable autocorrelation.  In other words, would a naïve investor be able to use the information on autocorrelation in an early period to develop a successful investment strategy that could be followed in a later period to earn extraordinary profits?</u>[135]

116.  Ms. Allen also writes:

> In *In re Altisource Portfolio Solutions, S.A. Securities Litigation,* after finding statistically significant autocorrelation using the standard test for the actual class period, Dr. Hartzmark removes one day with a large price decline and reruns his test. He finds no statistically significant autocorrelation and concludes that there was no autocorrelation over the class period.[136]

117. In the *Altisource* matter, I employed the same academic standard and constructed sub-samples of the datapoints in the <u>exact same way</u> as in this matter, to determine whether the autocorrelation coefficient estimated over the entire Class Period was stable.  In my first test of the stability of the autocorrelation coefficient in *Altisource*, I removed a single anomalous record that had undue influence on the results.  Moreover, in *Altisource*, I also evaluated whether there was persistent and systematic autocorrelation by splitting the Class Period into two equal sized samples to calculate autocorrelation

---

[135] Expert Report of Michael L. Hartzmark, Ph.D., filed September 15, 2014, *In Re MF Global Holdings Securities Litigation* (ECF. 766-1), ¶88 (footnote omitted, emphasis added).

[136] Allen Report, ¶82c.

coefficients and determine whether autocorrelation disappeared or changed direction (which it did), just as I have done here.[137]

118. Thus, in the *Altisource* matter, I applied the same commonly utilized, generally accepted, academic-based standards to develop a virtually identical approach to test for autocorrelation as I did in this matter.

119. Finally, Ms. Allen demonstrates a lack of understanding of statistical testing and sample size as described in **Appendix C** when she states:

> Dr. Hartzmark's method of splitting the alleged Class Period in the middle is unsupported and arbitrary. Tellingly, in other matters in which Dr. Hartzmark does autocorrelation tests and finds that the standard autocorrelation test (i.e., performing the test over the actual class period) supports a finding of market efficiency, he does not perform any additional tests.[138]

120. As support for this flawed contention, Ms. Allen cites to reports in three matters: *Illumina*, *Finisar*, and *CVB Financial*.[139] It is important to note that the number of trading days in the respective full samples that represent the entire class periods (and thus the full sample sizes to calculate the autocorrelation coefficients) in those matters were only 54, 66, and 110 trading days, respectively. In other words, in each of those matters, the class periods were fewer than six months (and thus substantially shorter in duration than each of the 282-day sub-periods I use in this matter). Moreover, in each of those matters, there was no evidence of persistent or systematic autocorrelation over the entire class period because the autocorrelation coefficients estimated over the entire class period were not statistically significant. Because autocorrelation never even appeared, it could not disappear or change direction. Therefore, dividing these short Class Periods into ultra-small sub-samples of datapoints would make little empirical sense and would not offer the court any further meaningful information.

---

[137] Expert Report of Michael L. Hartzmark, Ph.D., filed August 13, 2016, *In Re Altisource Portfolio Solutions, S.A. Securities Litigation* (ECF. 160-2), ¶118.

[138] Allen Report, ¶82 (emphasis added).

[139] Allen Report, fn 87.

121. Indeed, given that the entire class period autocorrelation coefficients in those matters were not statistically significant (*i.e.*, were not different from zero), the only realistic result from splitting the class periods would have simply reinforced my conclusions that there was no persistent and systematic autocorrelation. Given the mathematics behind the calculation of the full class period autocorrelation coefficient (as described in **Appendix C**), it would have been virtually impossible to observe consistent, statistically significant autocorrelation coefficients with the same signs in sub-periods when the autocorrelation coefficients over the full class periods in those cases were not statistically significant.

E. Summary

122. Demonstrating the falsity of Ms. Allen's accusation that my approach was "results driven," I empirically determine that there is no persistent and systematic autocorrelation here when dividing the full sample or entire Class Period into:

a)  Equal halves;[140]

b)  Calendar years;

c)  120-trading day periods; and

d)  60-trading day periods.

123. I also conclude that the statistically significant negative autocorrelation coefficient over the entire Class Period is driven by inclusion of just one of the 564 days in the full sample. Specifically, when removing the price movement on either of two alleged anomalous corrective disclosure dates, the autocorrelation coefficient for the Class Period is no longer statistically significant at or below the 5% level.[141]

---

[140] *See* Hartzmark Report, ¶¶72-73.

[141] *See* Hartzmark Report, fn 95 ("The empirical results account for anomalous price movements on July 26, 2018 and October 26, 2018 (both earnings announcement and alleged corrective disclosure dates) and thus remove from the regressions two pairs of abnormal return and lagged abnormal return for each date. When I removed abnormal returns involving either July 26, 2018 or October 26, 2018 (which are days with potential impacts from earnings announcements and the alleged corrective disclosures),

124. As stated in the Hartzmark Report:

> In summary, these generally accepted statistical inference procedures clearly demonstrate that throughout the Class Period there was no persistent or systematic statistically significant autocorrelation at or below the 5% level in the abnormal returns. This observation is consistent with the conclusion that Mohawk common stock reacted quickly to the flow of information and traded in an efficient market, which in combination with the news/no-news tests above, offers further support that Mohawk common stock traded in an efficient market throughout the Class Period.[142]

## VII. MS. ALLEN'S CRITICISMS OF MY NEWS/NO-NEWS ANALYSIS ARE FLAWED AND MISLEADING

### A. Summary of Ms. Allen's Criticisms

125. Although Ms. Allen does not dispute there is a cause-and-effect relationship between the flow of information and the reaction of Mohawk's stock price, she offers three purported reasons to claim that "Dr. Hartzmark's cause and effect analysis comparing 'news days' with 'no-news days' is flawed and unreliable."[143]  These purported reasons are:

  a) The sample of ten "news days" is not a large enough sample;

  b) The sample of ten "news days" is biased by its inclusion of corrective disclosure dates (though Ms. Allen offers no analysis suggesting that excluding those dates changes the conclusion of the analysis); and

---

then both coefficients fall to approximately negative 0.066 with a p-values of approximately 12%.  When I removed abnormal returns involving both of these two dates (four of 564 observations or less than 1% of the records), then the coefficient falls to negative 0.019 with a p-value of 64.9%.  In other words, accounting for these two anomalous price movements over the 564-day Class Period, or 0.35% of the days in the Class Period, clearly demonstrates the observed autocorrelation is not statistically significant at or below the 5% level.  Thus, there is no systematic and persistent autocorrelation.").

[142] Hartzmark Report, ¶75.

[143] Allen Report, ¶74.

c) The sample of ten news days includes only days with announcements of earnings or guidance news and does not include dates with the disclosure of "other types of news"[144] (though Ms. Allen does not perform any qualitative or empirical analysis to suggest that a different event definition reflecting those "other types of news" would change the conclusion of the analysis).

126. Below I rebut each of these claims.

B. Fisher's Exact Test, which Is Used to Examine Cause and Effect on Days with News Versus All Other Days, Is Performed with an Appropriate Sample Size

127. Ms. Allen claims that a sample of ten "news days" is purportedly not a large enough sample by my own standards. Ms. Allen's only support is a snippet of a quote taken out of context from a law review article I co-authored. Including the sentence before the one Ms. Allen quoted reveals that the concern I was expressing in the article was about whether sixteen earnings announcements in a four-year class period is typically a large-enough sample to infer statistical significance:

> Should the expert wish to reliably demonstrate that efficiency exists based on cause-and-effect by using a specific type of disclosure--say, earnings--he then must deal with the fact that the class period is generally too short to have a sufficient number of disclosures to infer statistical significance. For example, even when the class period is four years long, there are only sixteen earnings announcements--hardly a large enough sample to reliably test whether there exist any systematic relationships between earnings disclosures and price movements.[145]

128. The article was written to reinforce my claim that the best way to reliably evaluate market efficiency is to examine and evaluate the entire basket of factors laid out

---

[144] Ms. Allen makes a passing reference to additional "news" dates being those dates when SEC Form 10-K and 10-Q are issued. *See* Allen Report, ¶79. However, even though there is more information reported in these reports, the most critical information has generally already been reported in earnings press releases and earnings conference calls. Indeed, academic research utilizes earnings releases rather than the subsequent filings of 10-Ks and 10-Qs.

[145] Michael L. Hartzmark & H. Nejat Seyhun, "The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," 6 Va. L. & Bus. Rev. 415, 429 (2012) ("Hartzmark and Seyhun 2012") (emphasis added).

by the *Cammer* and *Krogman* courts, rather than to wholly rely upon the cause-and-effect factor (*Cammer* Factor V). This is especially the case when the statistical tests for cause-and effect might, by necessity, be implemented when there are only a small samples of news dates.[146] I repeatedly stressed this conclusion in the Hartzmark Report and my deposition. For example, I stated:

[146] For instance, the Second Circuit recently held that market efficiency may be demonstrated where the operational factors support that conclusion, even if the price related factor does not. *Waggoner v. Barclays PLC*, 875 F.3d 79, 98 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702, (2018). In so holding, the Court noted, "The *Cammer* and *Krogman* factors are simply tools to help district courts analyze market efficiency in determining whether the *Basic* presumption of reliance applies in class certification decision–making. But they are no more than tools in arriving at that conclusion, and certain factors will be more helpful than others in assessing particular securities and particular markets for efficiency." *Id*; *see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 2015 U.S. Dist. LEXIS 110382, at *83 (S.D.N.Y. Aug. 20, 2015) ("The vast majority of courts have used the *Cammer* factors as an analytical tool rather than as a checklist. Indeed, not even the *Cammer* court considered the fifth factor necessary, stating only that it *would be helpful* to a plaintiff seeking to allege an efficient market.") (internal quotation marks and citations omitted); *id.* at *84 ("Different contexts require courts to place greater importance on some factors than on others. No other court has adopted a per se rule that any one factor is dispositive. At the same time, courts have found market efficiency in the absence of an event study or where the event study was not definitive."); *id.* at *87 ("It is widely accepted that analysis of the *Cammer* and *Krogman* factors is a reliable and accepted methodology for establishing market efficiency.") (footnote omitted); *In re Countrywide Financial Corporation Securities Litigation*, 273 F.R.D. 586, 610 (C.D. Cal. 2009) ("Here, the *Cammer* factors (and some other factors generally approved by courts following *Cammer*) inform the parties' efficiency arguments."); *id* at 613 ("The five *Cammer* factors are nonexclusive; courts regularly consider other factors that are reasonable under the circumstances as well. The factors are an analytic tool, not a checklist.") (internal quotation marks and citations omitted); *Mark Smilovits, et al. v. First Solar, Inc., et al.*, 295 F.R.D. 423, 427 (D. Ariz. 2013) ("The Ninth Circuit has not articulated the applicable standard of proof for the Rule 23 requirements, but at least four circuits have adopted a preponderance of the evidence standard. This standard appears to be the trend in federal courts, and merely requires that plaintiffs demonstrate that it is more likely than not that a particular requirement of Rule 23 has been satisfied.") (internal quotation marks and citations omitted); *id.* at 437 ("In weighing this evidence, the Court finds it significant that Plaintiffs have shown without dispute that three of the five *Cammer* factors are satisfied, that another is partially satisfied, and that the stock traded on the NASDAQ. Defendants' evidence that the third *Cammer* factor is partially unsatisfied, and the stand-off on the fifth *Cammer* factor, simply do not outweigh

> In summary, when examining the basket of factors that courts generally rely upon for class certification decisions, which are also consistent with the fundamental principles of economics and finance that academics rely upon to evaluate market efficiency, the evidence strongly supports the conclusion that Mohawk common stock traded in an efficient market throughout the Class Period.[147]

129. The reason why I emphasize evaluating the full basket of factors, <u>rather than attempting to demonstrate that efficiency exists based solely on cause-and-effect</u>, is the primary point my article discusses: when a sample is small, it may lack the testing power to demonstrate statistical significance, and thus one might reject market efficiency when in fact it exists and the other factors in the basket support this conclusion.[148]  That does <u>not</u> mean that, when there is a statistically significant result from a test with a relatively small sample size (as there is here), that test result is invalid.  Notably, Ms. Allen nowhere suggests the sample I used in this case is not large enough based on the scientific or mathematical principles underlying statistical inference, and nowhere challenges the statistical validity of my news-related test.

130. Indeed, Ms. Allen does not dispute the appropriateness of my use of Fisher's exact test (a commonly utilized, scientific test) to determine whether the Mohawk-specific information and large price movements of Mohawk stock during the Class Period+ were related.  Nor does she dispute the result that the ten news-day sample was sufficient, in this case, to establish a statistically significant result and conclude that:

> These findings reject the hypothesis that, throughout the Class Period+, Mohawk stock behaved no differently on news days than on all other days.  They allow me to conclude that

---

Plaintiffs' evidence, even if the fifth factor is considered most important.  The Court therefore concludes that Plaintiffs have shown market efficiency by a preponderance of the evidence that the fraud on the market theory is warranted in this case, and that common issues will predominate in light of the fraud on the market theory of reliance.").

[147] Hartzmark Report, ¶77.

[148] We also emphasize in the article that with few datapoints that are news dates one must sometimes employ the approach known as a reverse event study to bolster the evaluation of market efficiency.  Hartzmark and Seyhun 2012 at 430-435.

> Mohawk-specific information and large price movements of Mohawk stock during the Class Period+ were related and cannot be attributed to random volatility, or to market or sector factors.   This clearly provides substantial support for the conclusion that Mohawk common stock traded in an efficient market throughout the Class Period+.[149]

131.   Indeed, I have utilized Fisher's Exact Test and similar non-parametric tests in dozens of expert reports, as well as in my peer-reviewed publications.[150]   Until Ms. Allen offered her unsupported conclusion, there has not been a single objection or criticism related to the sample size nor the use of Fisher's Exact Test.   This is because this test is an especially sharp tool in securities litigation, wherein the expert is asked to evaluate the performance of a single company over a limited time period, which inevitably means there is a relatively small sample of dates of any type of objectively chosen news, especially earnings announcements.[151]

---

[149]   Hartzmark Report, ¶68.

[150]   Note, I have also applied what is considered an almost identical test using a bootstrap approach.

[151]   Fisher's Exact Test is commonly used when sample size is small, but is not limited to small sample size.   *See*, for example, Che-Yang Lin and Ming-Chung Yang, *Improved p-Value Tests for Comparing Two Independent Binomial Proportions*, 38 Communications in Statistics—Simulation and Computation, 78 (2009), at 79 ("For small to moderate sample sizes, the *p*-value derived from Fisher's exact test for H0 in a $2 \times 2$ table is one of the most commonly used valid *p*-values, and it is based on the *exact conditional approach*."); Dan A. Biddle and Scott B. Morris, *Using Lancaster's Mid-P Correction to the Fisher's Exact Test for Adverse Impact Analyses*, 96(5) Jnl. of Applied Psychology, 956 (2011) at 956 ("When sample size is small, Fisher's exact test (FET) is often recommended as the method of choice for assessing statistical significance in 2x 2 tables (Office of Federal Contract Compliance Programs, 1993). The FET is an exact test and does not rely on large sample theory, which makes it an attractive alternative in small-sample settings that can be problematic for other common adverse impact tests, such as the Z-test or the chi-square test.").

Further, my use of Fisher's exact test is conservative because, when the sample size is small to moderate, the actual p-value is less than the p-value reported by the test (meaning the test has less power to reject the null hypothesis and is less likely to find significance).   *See* Che-Yang Lin and Ming-Chung Yang, *Improved p-Value Tests for Comparing Two Independent Binomial Proportions*, 38 Communications in

C. The Inclusion of Alleged Corrective Disclosure Dates Does Not Bias the Results and Indeed Excluding the Alleged Partial Corrective Disclosure Dates Would Introduce Look-Ahead Bias

132. Ms. Allen claims that, because three out of ten days in my sample of news days (objectively defined as earnings or guidance days) are alleged partial corrective disclosures dates, my analysis is biased.[152]  I disagree.

133. First, despite claiming the inclusion of three alleged partial corrective disclosure dates bias the results of my cause-and-effect analysis, Ms. Allen fails to analyze whether excluding such dates would change any empirical results.  It would not.  Applying the same Fisher's test to a sample excluding the alleged final corrective disclosure date (as suggested by Dr. Tabak in the discussion below), or to a sample excluding all three alleged partial corrective disclosure dates, still results in a p-value below 0.01%.  This means that, whether or not I include the alleged partial corrective disclosure dates in the analysis, I can say with 99% confidence that Mohawk-specific news and guidance information and large price movements of Mohawk stock during the Class Period were related and cannot be attributed to random volatility or to market or sector factors.  This provides substantial support for the conclusion that Mohawk common stock traded in an efficient market throughout the Class Period.

134. Second, Ms. Allen ignores my objective selection criteria of "news days" in this analysis.  As defined in the Hartzmark Report and recognized by Ms. Allen, my analysis defines a news day as one of the 565 "days when there are company announcements related to earnings or guidance."[153]  As set forth in more detail below, this is an objective and well-supported definition of "news days" that happens to include the three correctives disclosure days only because they were dates on which earnings or

---

Statistics—Simulation and Computation, 78 (2009), at 78-79; Dan A. Biddle and Scott B. Morris, *Using Lancaster's Mid-P Correction to the Fisher's Exact Test for Adverse Impact Analyses*, 96(5) Jnl. of Applied Psychology, 956 (2011) at 958.

[152]  *See* Allen Report, ¶78.

[153]  *See* Hartzmark Report, ¶60, and Allen Report, ¶76.

guidance information was disclosed.    Whether a date is an alleged partial corrective disclosure is irrelevant to my objective selection criteria.

135.    Third, the only evidence Ms. Allen shows to support her view is an article published in 2004 authored by Ferrillo, Dunbar, and Ms. Allen's colleague, Dr. Tabak (the "FDT Article"), suggesting that corrective disclosure dates should be excluded.[154]    The FDT Article was published 18 years ago, and Dr. Tabak has since admitted a mistaken view about the exclusion of corrective disclosure dates.    Indeed, Dr. Tabak now states the only corrective disclosure date that should be considered for exclusion is the final day of a class period, but within-class period corrective disclosures dates should not be excluded. As explained in *Teva*:

> Dr. Tabak acknowledges that the FDT Article "was a little confusing, maybe even miswritten, when it says to exclude corrective disclosure dates." . . . Since the FDT Article was published in 2004, Dr. Tabak has clarified that the only corrective disclosure date that a tester should exclude is the final day of a class period.    See Tabak 2016 Article at 2 n.5 (explaining that it would be "contrary to proper statistical technique" to include "the event ending the class period" because "its inclusion would have been driven, at least in part, by the fact that there was an associated stock-price movement").    The reason for doing so is to avoid selection bias:[155]    The final day of a class period invariably coincides with a corrective disclosure because plaintiffs' counsel normally chooses to end a class period on a day with "both news and a substantial decline in the price of at least one of the securities at issue." .... In contrast, there is no selection bias issue with testing all days within a class period because plaintiffs' counsel cannot choose what days are included within a class period.[156]

136.    I agree with a portion of this, but I suggest that the last day of the Class Period should be included in the analysis and categorized depending on whether it is an objectively

---

[154] *See* Allen Report, footnote 79.

[155] *Teva* at *34 fn 33 ("Selection bias is '[s]ystematic error due to nonrandom selection of subjects for study.'" (quoting Reference Manual on Sci. Evid. at 296)).

[156] *Teva* at *34(emphasis added).

defined news day or no-news day. In this case, it should be included as a news day because, as stated above, news days are defined according to a well-supported and objective selection criterion—namely, as dates with earnings or guidance disclosures which obviously could be identified as such in advance of any filing of a legal proceeding.

137. Indeed, Dr. Tabak goes further, explaining (as discussed by the *Teva* court) that excluding alleged corrective disclosure dates would introduce bias:

> In fact, excluding certain days within a class period based on the tester's notion of when corrective disclosures occurred would almost certainly introduce an element of look-ahead bias because "[t]he only way to know to remove" those days "would be to read the complaint and discover that those dates were already described as corrective disclosures (and often described as being associated with large price declines)."[157]

138. The *Teva* court accepted Dr. Tabak's reasoning for including corrective disclosure dates (other than the last date of the Class Period) and also agreed that removing such dates would introduce "look-ahead" bias.

139. In sum, Ms. Allen's criticism that the inclusion of alleged corrective disclosure dates in my analysis bias my results is due to an apparent misunderstanding of my objective selection criteria of news days and lacks any academic support. Indeed, as Dr. Tabak argues, Ms. Allen's suggestion to exclude alleged corrective disclosure dates "would almost certainly" introduce bias.

D. Ms. Allen's Criticism that I Failed to Test Other Types of News Is a Red Herring

140. Ms. Allen also claims that I:

> Fail[ed] to analyze whether Mohawk stock reacted to any other types of news outside of his narrow definition of "news days.[158]

141. Not only has Ms. Allen failed to offer an alternative definition of "news" or an approach to objectively distinguish what is news from a position of hindsight, but she

---

[157] *Teva* at *34 (emphasis added).

[158] Allen Report, ¶4.

has, once again, ignored fundamental principles of academic-based finance.    In my Opening Report, I clearly explained that:

> I use earnings or guidance disclosure dates because a company's financial results and forecasts are among the most important considerations market participants utilize in valuing the company's stock.    While not every earnings or guidance announcement communicates new, unexpected, and material information, the academic and trade literature in finance notes that unanticipated material information is more frequently and more systematically disclosed on such announcement dates rather than on other dates.    Indeed, earnings and guidance announcement dates are a highly studied area of the academic research related to news and price movements.    Moreover, the use of collective tests comparing price movements on news days to lesser or no-news days is widely used to assess market efficiency throughout a class period.[159]

142.  For decades, economists have been studying the impact on a company's stock price from the disclosure of earnings and guidance news because it is the one of the most consistent and commonly-utilized pieces of information that is comparable across companies.

143.  Indeed, even the Allen Report offers support for my use of earnings and guidance announcements as "news."    Ms. Allen's discussion of analysts, and my below analysis of the issuance of analyst reports, confirms that earnings "are among the most important considerations market participants utilize in valuing the company's stock."[160] Ms. Allen states:

> Analyst reports are periodic reports issued by professional financial analysts at brokerage firms who perform research and analysis on specific industries and companies.    Analysts analyze companies by studying publicly available information, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management.    Analysts use this information to model and value companies and industries, using financial techniques such as discounted cash flow models and

---

[159]  Hartzmark Report, ¶61 (emphasis added).

[160]  Hartzmark Report, ¶61.

valuation multiples. Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance (such as estimates of future revenue, profits and earnings per share ("EPS")), and give recommendations to buy, hold or sell the stock. Analysts typically issue reports after new information about the company is released. These reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time.[161]

144. Overall, Ms. Allen's criticism of my use of earnings or guidance days as news days is a red herring and irrelevant. Even so, as I show below there is additional evidence that strongly supports my opinion that:

> Mohawk-specific information and large price movements of Mohawk stock during the Class Period+ were related and cannot be attributed to random volatility, or to market or sector factors. This clearly provides substantial support for the conclusion that Mohawk common stock traded in an efficient market throughout the Class Period+.[162]

**1.   *The Timing and Frequency of the Issuance of Analyst Reports Supports My Conclusion that Earnings or Guidance Disclosure Dates Are Among the Most Important Considerations for Market Participants***

145. Given Ms. Allen's view of the timing of analyst reports, which I agree with, I examined the timing of issuance of "in-depth" analyst reports as reported in Exhibit II-A of my Opening Report.[163] I find that nearly 50% of the analyst reports written about

---

[161] Allen Report, ¶23 (including footnote 31: "The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock. In particular, courts have relied on analyst reports in determining what information is important to the market in valuing a stock and in determining the cause of stock price movements.").

[162] Hartzmark Report, ¶68.

[163] To determine the number of analyst reports associated with a stock trading day, I rely on analyst reports issued by the "in-depth" research analysts as listed in paragraph 26 of the Opening Report and eliminate duplicate reports (reports issued by the same

Mohawk were issued around the Company's earnings/guidance announcements,[164] even though the number of days with earnings/guidance announcements represent just approximately 3% of the 565-day Class Period (10 out of 565 days).  **Chart 5** below also visually demonstrates that analyst reports were overwhelmingly issued following earnings/guidance announcements.  This supports my view (and that of the academic community) that earnings announcement dates are days when there is the highest likelihood of the disclosure of previously undisclosed, material information about the company.

---

analyst on the same date with same or similar headlines).  Although I rely on analyst reports available on both Eikon and S&P Capital IQ for Exhibit II-A in the Opening Report, for this analysis I rely on only analyst reports available on S&P Capital IQ, because the S&P Capital IQ database provides the date and time stamp for when each report is issued.  Any report issued on or after 4 p.m. on a previous trading day and before 4 p.m. current trading day is associated with the current trading day.

[164] Computed as 184 reports associated with 19 trading days – either the same impact date of earnings/guidance date or the following trading date (for the last earnings announcement impact, I only include analyst reports associated with July 26, 2019, not July 27, 2019, because July 27, 2019 is past the Class Period+), divided by 375 analyst reports during the Class Period+.

**CHART 5**



■ Count of Analyst Reports    ◆ Impact Date of Earnings/Guidance News

**Note**: Count of analyst reports associated with each trading date is based on the number of analyst reports available from S&P Capital IQ. Analyst reports with a date and time stample on or after 4 pm on a trading day is mapped to the following trading day.

### 2. Cause and Effect Analysis Examining Days with Analyst Reports Versus All Other Days

146. There were 30 days (or approximately 5% of the days in the class period) when three or more analysts issued reports. Given Ms. Allen's claim that "[a]nalysts typically issue reports after new information about the company is released," I utilize this as an alternative definition of news dates. Using this definition, I find that 17 of the 30 days (or 56.7%) have abnormal returns that are statistically significant below the 5% level, while only 29 out of 535 no-news days (or 5.4%) are associated with statistically significant returns at or below 5% level. If news and stock price movements are random and unrelated, the likelihood of finding the proportion of news days that are associated with statistically significant returns to be ten times greater than the corresponding proportion for non-news days is less than 0.01%.[165] This alternative version of demonstrating "Mohawk-specific information and large price movements of Mohawk stock during the Class Period+ were

---

[165] Based on Fisher's Exact Test.

related and cannot be attributed to random volatility, or to market or sector factors[,] clearly provides substantial support for the conclusion that Mohawk common stock traded in an efficient market throughout the Class Period+."[166]

### 3. Cause and Effect Analysis Examining the Relationship Between the Number of Analyst Reports Issued and the Price Reaction

147. I also examine whether, throughout the 565-day Class Period+, there is a relationship between analysts issuing reports and abnormal returns in Mohawk stock. While the analysis above is a discrete empirical study, in that it is based on whether or not there was news released (using the fact that three analyst reports were released as a proxy for the release of news), this analysis is a more continuous empirical study because it allows me (a) to examine more potential news dates throughout the Class Period (because there is no limitation on the number of analyst reports for a date to be defined as a date with news), and (b) to test whether the number of reports issued on a given date is a representative proxy of the importance of the news released to market participants. For example, if only one analyst issues a report about a company's disclosure, this could signal that the information released is less meaningful to investors and thus would be expected in an efficient market to be related to a lower level of price response than if, say, five analyst reports were issued. Therefore, in this analysis I am examining whether a greater number of reports reflects greater importance of the information that is processed and released by the analysts, as measured by the magnitude of the associated stock price reaction.

148. For this analysis I run a regression:

$$\text{Absolute Value of Abnormal Return}_t = \alpha + \beta(\text{Number of Analyst Reports Issued}_t) + \varepsilon_t$$

149. The result shows a highly significant relationship. The beta coefficient is 0.45%, with a t-Statistic of 14.74 and associated p-value less than 0.01%, meaning the likelihood of finding this strong a relationship between the issuance of reports and the magnitude of abnormal return by random chance is less than 0.01%. This coefficient suggests that, on average, on days when ten analyst reports are issued, Mohawk's stock

---

[166] Hartzmark Report, ¶68.

price volatility is approximately 4.5%—more than twice the level of volatility observed on days when only four reports were issued, and ten times the volatility on days when only one report is issued.

150. This empirical analysis further confirms the empirical results presented in the Hartzmark Report, and I repeat that:

> These findings reject the hypothesis that, throughout the Class Period+, Mohawk stock behaved no differently on news days than on all other days. They allow me to conclude that Mohawk-specific information and large price movements of Mohawk stock during the Class Period+ were related and cannot be attributed to random volatility, or to market or sector factors. This clearly provides substantial support for the conclusion that Mohawk common stock traded in an efficient market throughout the Class Period+.[167]

### 4.     *Cause and Effect Analysis Examining the Type of Information Revealed on Dates with the Largest Abnormal Returns*

151. Finally, I listed other types of news in the Hartzmark Report, explaining that:

> It is not unusual that over a class period a corporation will announce earnings, dividends, discoveries, new products, management changes, new issues of securities, lawsuits that it files, lawsuits filed against it, projections, regulatory changes that impact its business, and more.[168]

152. Ms. Allen did not perform analysis on any alternative definition of "news."[169] Based on her criticism that I "fail[ed] to analyze whether Mohawk stock reacted to any other types of news outside of his narrow definition of "news days,[170] I look at approximately 5% of days in the Class Period+ (28 of 565 days) where the abnormal returns are associated with the smallest p-values to determine if the stock price movements on those days appear to reflect the release of material unanticipated news <u>other than</u> earnings

---

[167] Hartzmark Report, ¶68.

[168] Hartzmark Report, ¶57.

[169] *See supra* footnote 144.

[170] Allen Report, ¶4.

or guidance. In **Exhibit I**, I present results from my event study and list the 28 dates. I also list the type of news (if any) that was disclosed on that date. **Exhibit I** clearly shows that the largest returns are generally associated with earnings disclosures (on 8 of the 10 earnings disclosures dates during the Class Period+), followed by analyst reports (on 11 of the remaining 20 days). This is not surprising: Mohawk has more than a 100-year history,[171] competes in a mature industry, and is not a high technology company or involved in new discoveries or exploration, Reand so it would be expected that earnings news and price targets based on financial analysis were the critical price discovery mechanism for Mohawk stock. It is also not surprising for a stock that trades in an efficient market.

## VIII. CONCLUSIONS

153. Based on the foregoing, my conclusions are as follows:

 i. Throughout the Class Period, Mohawk common stock traded in an efficient market.

 ii. The calculation of damages for violations of Section 10(b) (and SEC Rule 10b-5) of the Exchange Act may be computed on a class-wide basis using common methodologies.

I declare under penalty of perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED THIS 8th DAY OF JUNE 2022*

_____

Michael L. Hartzmark, Ph.D.

---

[171] http://www.hudsonvalleyruins.org/yasinsac/amsterdam/mohawk01.html (last visited June 7, 2022).

**Exhibit I**

**Analysis of 5% of Days in the Class Period+ Where Mohawk Common Stock Abnormal Returns Are Associated with the Smallest P-Values**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Excess | | | | | |
| | | | | Market | Industry | Predicted | Abnormal | | | |
| Date | Volume | Price | Return | Return | Return | Return | Return | t-statistic | p-Value | Events |
| 10/26/18 | 9,601,798 | $115.03 | -23.86% | -1.73% | -0.09% | -1.08% | -22.77% | -22.21 | 0.0000% | Earnings Disclosure |
| 7/26/18 | 7,360,529 | $179.31 | -17.51% | -0.30% | 2.01% | 0.98% | -18.49% | -18.18 | 0.0000% | Earnings Disclosure |
| 7/26/19 | 4,420,435 | $128.84 | -17.60% | 0.74% | -0.68% | 0.41% | -18.01% | -16.14 | 0.0000% | Earnings Disclosure |
| 7/28/17 | 1,202,612 | $248.65 | 4.33% | -0.13% | -0.84% | -0.50% | 4.83% | 8.24 | 0.0000% | Earnings Disclosure |
| 9/22/17 | 1,163,236 | $245.67 | -3.32% | 0.07% | 0.31% | 0.21% | -3.53% | -5.68 | 0.0000% | Analyst Report Issuance |
| 2/8/19 | 3,807,538 | $135.78 | 5.91% | 0.10% | -0.22% | -0.19% | 6.10% | 5.23 | 0.0001% | Earnings Disclosure |
| 4/27/18 | 3,139,891 | $217.36 | -4.33% | 0.12% | 0.34% | 0.18% | -4.51% | -5.11 | 0.0001% | Earnings Disclosure |
| 2/9/18 | 2,167,116 | $249.46 | -2.77% | 1.53% | -0.74% | 0.81% | -3.58% | -4.52 | 0.0015% | Earnings Disclosure |
| 4/30/19 | 1,411,839 | $136.25 | 4.36% | 0.10% | -0.39% | -0.40% | 4.76% | 4.35 | 0.0030% | Analyst Report Issuance |
| 7/11/18 | 2,242,372 | $224.84 | 2.63% | -0.71% | -0.36% | -0.94% | 3.58% | 3.79 | 0.0244% | Analyst Report Issuance |
| 11/5/18 | 1,185,374 | $127.93 | -2.92% | 0.56% | 0.59% | 0.96% | -3.88% | -3.50 | 0.0660% | Reuters: Tariffs, labor costs, interest rates to pressure margin in 2019. |
| 10/30/18 | 3,093,089 | $123.94 | 6.59% | 1.58% | 3.25% | 3.03% | 3.56% | 3.42 | 0.0874% | |
| 6/23/17 | 1,364,152 | $246.50 | 1.57% | 0.16% | -0.94% | -0.26% | 1.83% | 3.27 | 0.1437% | Analyst Report Issuance |
| 7/20/17 | 672,161 | $242.58 | -2.14% | -0.01% | -1.15% | -0.38% | -1.76% | -3.21 | 0.1747% | |
| 3/23/18 | 1,172,643 | $230.57 | -4.04% | -2.10% | 0.51% | -1.44% | -2.60% | -3.18 | 0.1913% | |
| 10/9/18 | 1,319,243 | $160.67 | -5.13% | -0.11% | -2.60% | -1.81% | -3.32% | -3.13 | 0.2192% | Analyst Report Issuance |
| 4/26/19 | 1,971,843 | $127.00 | -2.84% | 0.47% | 0.20% | 0.48% | -3.32% | -3.03 | 0.3011% | Earnings Disclosure |
| 4/24/18 | 1,316,940 | $227.25 | -3.68% | -1.34% | 0.12% | -1.19% | -2.48% | -2.92 | 0.4255% | |
| 11/1/18 | 2,452,605 | $131.71 | 5.60% | 1.06% | 2.25% | 2.46% | 3.14% | 2.90 | 0.4521% | |
| 9/8/17 | 603,443 | $257.92 | 2.13% | -0.14% | 1.50% | 0.43% | 1.70% | 2.80 | 0.5915% | |
| 1/10/18 | 882,123 | $272.09 | -2.75% | -0.11% | -1.04% | -0.69% | -2.07% | -2.77 | 0.6510% | |
| 7/27/18 | 3,309,155 | $183.06 | 2.09% | -0.66% | 0.01% | -0.66% | 2.75% | 2.69 | 0.8138% | Analyst Report Issuance |
| 7/25/17 | 1,112,144 | $241.27 | -1.13% | 0.29% | 0.30% | 0.39% | -1.52% | -2.66 | 0.8904% | |
| 3/2/18 | 1,196,514 | $236.56 | -1.88% | 0.52% | -0.17% | 0.23% | -2.12% | -2.56 | 1.1846% | Analyst Report Issuance |
| 5/16/19 | 1,248,011 | $140.31 | 3.19% | 0.92% | -0.42% | 0.42% | 2.77% | 2.52 | 1.2935% | Analyst Report Issuance |
| 5/1/19 | 1,302,029 | $215.86 | 2.85% | 0.26% | 0.91% | 0.57% | 2.27% | 2.51 | 1.3421% | Analyst Report Issuance |
| 3/7/19 | 1,359,075 | $129.61 | -2.79% | -0.79% | 0.91% | 0.14% | -2.93% | -2.51 | 1.3595% | Analyst Report Issuance |
| 9/12/18 | 1,900,141 | $185.56 | -2.20% | 0.04% | 0.55% | 0.35% | -2.55% | -2.48 | 1.4636% | Analyst Report Issuance |

**Notes:**

[1] - [10]: *See* Appendix E to the Hartzmark Opening Report.

[11]: *See* Appendix C to the Hartzmark Opening Report.

# APPENDIX A

# MICHAEL L. HARTZMARK, PH.D.
1018 Bucida Road
Delray Beach, FL 33483
(312) 718-9699
mhartzmark@HELP-Econ.com

## PRESENT POSITIONS

HARTZMARK ECONOMICS LITIGATION PRACTICE, LLC
<u>President</u> (2013 - present)
Specializing in the application of economic, financial and accounting principles to securities, complex commercial, investment, intellectual property, antitrust and automotive litigation and regulatory matters
OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW JERSEY
<u>Independent Contractor</u> (2015 - present)
MDA FINANCIAL, INC.
<u>President</u> (1981 - present)

## EDUCATION

Ph.D.    Department of Economics, the University of Chicago, 1984
(Doctoral Exams in Industrial Organization and Regulation; Public Finance)
M.A.    Department of Economics, the University of Chicago, 1982
B.A.    The University of Michigan (Economics, High Honors and Phi Beta Kappa), 1978

## ACADEMIC HONORS AND FELLOWSHIPS

*John M. Olin Faculty Fellowship*, (George Stigler, Director) (1986 - 1987)
*PEW Teaching Fellow*, the University of Chicago (1980 - 1981)
*Phi Beta Kappa,* the University of Michigan (1978)
*Parker Prize,* in Labor Economics, University of Michigan (1978) -- Given for the best graduate or undergraduate paper in Labor Economics

## GRANTS

Grant from the University of Chicago (1984). Center for the Study of Futures Prices: grant to analyze margin regulation for the Chicago Board of Trade Studies.

**PROFESSIONAL EXPERIENCE**

FINRA (fka NATIONAL ASSOCIATION OF SECURITY DEALERS) Dispute Resolution
  Member Arbitrator (2005 - 2021)
OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW YORK
  Independent Contractor (2013 - 2019)
CRA INTERNATIONAL, INC.
  Independent Contractor (2015)
NAVIGANT ECONOMICS (FORMERLY CHICAGO PARTNERS, LLC)
  Academic Affiliate (2012 - 2013)
  Principal/Director (2008 - 2012)
  Vice President (2004 - 2007)
DARMA, LLC
  President (2005 - 2008)
PACIFIC BIOMETRICS, INC.
  Interim Chief Financial Officer (2004 - 2006)
CRAGAR INDUSTRIES, INC.
  Chairman, CEO, President and Treasurer (1993 - 2004)
MDA FINANCIAL, INC.
  President (1981 - present)
FAHNESTOCK & Co., Inc. (now Oppenheimer & Co., Inc.)
  Financial Consultant (Series 7 and Series 63) (2001 - 2003)
ECONOHIO CORPORATION
  President (1989 - 1992)
LEXECON INC.
  Senior Economist (1987 - 1989)
UNIVERSITY OF CHICAGO, Center for the Study of the Economy and the State, and the
  Graduate School of Business (now the Chicago Booth School of Business)
  John M. Olin Visiting Scholar (1986 - 1987)
UNIVERSITY OF MICHIGAN, Joint with Michigan Business School (now the Stephen M.
  Ross School of Business) and Department of Economics
  Assistant Professor (1984 - 1988)
  Lecturer (1984)
COMMODITY FUTURES TRADING COMMISSION, Division of Economics and
  Education, Washington, D.C.
  Financial Economist (1982 -1983)
UNIVERSITY OF CHICAGO, Department of Economics
  Instructor for Economic Analysis (1981)
  Research Assistant for A. C. Harberger (1982)
  Research Assistant for Sam Peltzman (1981 - 1982)
U. S. DEPARTMENT OF THE TREASURY, Office of Tax Analysis, Washington, D.C.
  Research Assistant (1981)

## PUBLICATIONS

"Understanding the Efficiency of the Market for Preferred Stock," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 8, Number 2, Spring 2014.

"An Economist's View of Amgen," Law360, May 2, 2013. http://www.law360.com/articles/438303/an-economist-s-view-of-amgen.

"The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 6, Number 3, 2012.

"Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market," (with Cindy A. Schipani and H. Nejat Seyhun), Columbia Business Law Review, Number 3, Volume 2011.

"Luck Versus Forecast Ability: Determinants of Trader Performance in Futures Markets," Journal of Business, January 1991. Also reprinted in Classic Futures: Lessons from the Past for the Electronic Age, by Lester Telser, Risk Books, March 2000.

"Business Valuations for the Personal Lawyer," Law and Fact, September 1991.

"Is Risk Aversion a Theoretical Diversion?" The Review of Futures Markets, Volume 7, Number 1, 1988.

"Returns to Individual Traders of Futures: Aggregate Results," Journal of Political Economy, December 1987.

"Regulating Futures Margin Requirements," Review of Research on Futures Markets, Volume 5, Number 3, 1986.

"The Effects of Changing Margin Levels on Futures Market Activity, the Composition of Traders in the Market, and Price Performance," Journal of Business, April 1986.

"Individual Income Taxation, 1947-1979," (with Eugene Steuerle), National Tax Journal, June 1981.

## BOARDS

POWHATAN BUILDING CORPORATION, Director, Treasurer, (2010 - 2016)

MIDTOWN EDUCATIONAL FOUNDATION, Auxiliary Board Member, (2009 - 2013)

GLOBAL ENTERTAINMENT CORPORATION (Formerly AMEX: GEE, currently not listed); Director, Audit Committee Member (2004 - 2008);

THE BOARD INSTITUTE (private software company), Financial Advisory Board (2004 - 2006)

SHAKER INVESTMENTS, Financial Advisory Board (1992 - 2005)

PACIFIC BIOMETRICS, INC. (OTC BB: PBMC currently not listed and renamed as Pacific Biomarkers), Director and Chairman of Audit Committee (2002 - 2004)

CRAGAR INDUSTRIES, INC. (Formerly OTC BB: CRGR, company sold); Director and Chairman of the Board (1993 - 2004)

**EXPERT REPORTS, DECLARATIONS AND DISCLOSURES PAST FOUR YEARS**

In Re Finisar Corporation, Inc. Securities Litigation. U.S. District Court for the Northern District of California; Report (8/14/2017); Deposition (9/14/2017); Rebuttal Report (11/3/2017); Deposition (11/7/2018).

BlackRock Allocation Target Shares: Series S Portfolio, et al. v. Wells Fargo Bank, N.A. U.S. District Court for the Southern District of New York; Report (10/30/2017); Deposition (11/16/2017); Rebuttal Report (1/26/2018).

Christopher S. Porrino, Attorney General of New Jersey on behalf of Amy G. Kopleton, Deputy Chief of the New Jersey Bureau of Securities v. Credit Suisse Securities (USA) LLC, et al. Superior Court of New Jersey, Chancery Division Mercer County; Report (12/1/2017); Opposition Report (5/14/2018); Reply Report (7/16/2018); Deposition (2/13/2019).

BlackRock Balanced Capital Portfolio (FI), et al. v. Deutsche Bank National Trust Company, and Deutsche Bank Trust Company Americas. Superior Court of California in and for the County of Orange; Report (1/17/2018); Deposition (3/13/2018); Rebuttal Report (4/30/2018).

BlackRock Balanced Capital Portfolio (FI), et al. v. Deutsche Bank National Trust Company, and Deutsche Bank Trust Company Americas. U.S. District Court for the Southern District of New York; Report (1/26/2018); Deposition (3/13/2018); Rebuttal Report (4/16/2018).

Brian J. O'Donoghue, as authorized representative vs. Inland Bank and Trust, et al. U.S. District Court for the Northern District of Illinois Eastern Division; Report (4/1/2008).

In Re TerraForm Global, Inc. Securities Litigation. U.S. District Court for the Southern District of New York; Report (7/30/2018); Updated Report (8/17/2018); Reply Report (11/1/2018).

In Re Illumina, Inc. Securities Litigation. U.S. District Court Southern District of California; Report (9/14/2018); Deposition (10/19/2018).

John Cumming, derivatively on behalf of New Senior Investment Group, Inc., v. Wesley R. Edens, et al. Court of Chancery of the State of Delaware; Report (11/9/2018).

The Arbitrage Fund, on behalf of itself and all other similarly situated shareholders of Exactech, Inc. v. William Petty, et al. Circuit Court of Florida, Eleventh Judicial Circuit, Miami-Dade County; Report (12/6/2018).

Oklahoma Law Enforcement Retirement System vs. Adeptus Health Inc. U.S. Eastern District of Texas, Sherman Division; Report (12/7/2018); Rebuttal Report (3/22/19).

In the Matter of the Trusts established under the Pooling and Servicing Agreements relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30, et al. v. Appaloosa Investment L.P., et al. U.S. District Court for the Southern District of New York; Report (1/18/2019); Rebuttal Report (2/8/2019); Deposition (3/12/2019).

Marc J. Muri, individually and on behalf of all others similarly situated v. National Indemnity Company. U.S. District Court District of Nebraska; Report (1/24/2019); Reply Report (2/14/2019); Deposition (3/4/2019).

In Re HD Supply Holdings, Inc. Securities Litigation. U.S. District Court for the Northern District of Georgia; Report (3/1/2019); Deposition (5/2/2019).

In Re Signet Jewelers Limited Securities Litigation. U.S. District Court for the Southern District of New York; Report (3/15/2019); Rebuttal Report (5/17/2019); Deposition (6/7/2019); Damages Report (9/20/2019); Damages Rebuttal Report (11/13/2019).

Tracey Rogers v. Aphria et al./ Garri Mirzoian v. Aphria et al. Ontario, Superior Court of Justice; Affidavit (4/5/2019).

In Re U.S. Steel Consolidated Cases. U.S. District Court for the Western District of Pennsylvania; Report (4/19/2019); Deposition (6/4/2019) Rebuttal Report (7/18/2019); Damages Report (7/12/2021); Deposition (8/23/2021); Damages Reply Report (9/13/2021).

Timber Hill LLC. v. Kraft Heinz Company et al. U.S. District Court for the Northern District of Illinois; Declaration (5/15/2019).

4

Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al. U.S. District Court for the Southern District of Texas; Report (5/28/2019); Supplemental Report (8/26/2019).

Lord Abbett Affiliated Fund, Inc., et al, v Navient Corporation, et al. U.S. District Court for the District of Delaware; Report (9/6/2019); Deposition (10/23/2019); Reply Report (12/20/2019); Damages Report (11/3/2020); Damages Rebuttal (12/1/2020); Stock Damages Reply (1/21/2021); Deposition (6/25/2021).

Graaf v. SNC-Lavalin Group Inc., et al. Quebec, Superior Court; Expert Report (10/15/2019); Reply Report (2/4/2021).

BRS v. Volkswagen AG, et al. ("Bondholders Securities Action"). U.S. District Court for the Northern District of California; Report (11/8/2019); Deposition (1/10/2020).

SEB Investment Management AB. v. Symantec Corp. and Gregory S. Clark. U.S. District Court for the Northern District of California; Report (1/17/2020); Deposition (2/7/2020); Reply Report (3/14/2020); Damages Report (1/29/2021); Damages Reply Report (2/19/2021); Deposition (2/25/2021).

In re: CenturyLink Sales Practices and Securities Litigation. U.S. District Court for the District of Minnesota; Report (1/21/2020); Deposition (2/25/2020); Rebuttal Report (5/4/2020); Deposition (6/5/2020).

Abram B. Dyck v. Tahoe Resources Inc. and Ronald Wayne Clayton. Ontario, Superior Court of Justice; Affidavit (5/28/2020) Reply Report (3/17/2021); Examination (5/3/2021).

Patricia A. Shenk, et al., v. Mallinckrodt PLC et al. U.S. District Court for the District of Columbia; Report (7/22/2020).

In Re Tesla, Inc. Securities Litigation. U.S. District Court for the Northern District of California; Report (9/22/2020); Deposition (11/19/2020); Damages Report (11/10/2021); Deposition (3/18/2022).

Jennifer Phillips, et al., v. Help at Home, LLC. U.S. District Court for the Northern District of Illinois Eastern Division; Report (10/2/2020).

Chad Lindsey Moshell, et al., v. Sasol Limited et al. U.S. District Court for the Southern District of New York; Report (10/2/2020); Deposition (8/17/2021).

Cambridge Retirement System, et al. v Amneal Pharmaceuticals, Inc., et al. Superior Court of New Jersey, Somerset County Law Division; Report (10/30/2020); Deposition (3/2/2021).

In Re Evoqua Water Technologies Corp. Securities Litigation. U.S. District Court for the Southern District of New York; Report (12/4/2020).

City of Sunrise Firefighters' Pension Fund, et al. v. Citigroup Inc., et al. U.S. District Court for the Southern District of New York; Declaration (1/19/2021).

In Re Myriad Genetics, Inc. Securities Litigation. U.S. District Court for the Central District of Utah; Report (6/7/2021).

In Re Alta Mesa Resources, Inc. Securities Litigation. U.S. District Court for the Southern District of Texas; Report (7/30/2021); Deposition (11/17/2021); Supplemental Report (1/14/2022).

Miriam Edwards, Individually and On Behalf of All Others Similarly Situated versus McDermott International, Inc., David Dickson, and Stuart Spence. U.S. District Court for the Southern District of Texas; Report (9/29/2021); Deposition (11/11/2021).

In re Venator Materials PLC Securities Litigation. U.S. District Court for the Southern District of Texas; Report (11/19/2021).

Ngian, individually and on behalf of all others similarly situated v. Facebook, Inc. n/k/a Meta Platforms, Inc., et al. U.S. District Court for the Eastern District of New York; Ohio Public Employees Retirement System v. Meta Platforms, Inc. f/k/a Facebook, Inc., et al. U.S. District Court for the Northern District of California; Declaration (12/27/2021).

Gary Cheng, individually and on behalf of all others similarly situated v. Activision, et al. U.S. District Court for the Central District of California; Declaration (1/3/2022).

Camelot Event Driven Fund, et al. v. Morgan Stanley & Co. LLC, et al. Supreme Court for the State of New York, County of New York; Report (1/3/2022).

5

Public Employees' Retirement System of Mississippi, et al. v. Mohawk Industries, Inc. and Jeffrey S. Lorberbaum. U.S. District Court for the Northern District of Georgia; Report (1/25/2022); Deposition (2/25/2022).

UA Local 13 Pension Fund, et al. v. Bumble Inc., et al. U.S. District Court for the Southern District of New York; Declaration (4/15/2022).

In re Pattern Energy Group Inc. Securities Litigation. U.S. District Court for the District of Delaware; Report (5/5/2022).

**Appendix B**
**Materials Relied Upon in the Opening and Reply Report**

## MOHAWK INDUSTRIES, INC. NEWS AND DISCLOSURES

News Articles, April 28, 2017 – July 26, 2019, searched through Bloomberg and Factiva.

Transcripts of teleconference (source: Bloomberg):
> Mohawk Industries, Inc. Conference Calls: 4/28/2017; 7/28/2017; 10/27/2017; 2/9/2018; 4/27/2018; 7/26/2018; 10/26/2018; 2/8/2019; 4/26/2019; and 7/26/2019.
> Bloomberg Intelligence presentation: 6/19/2017.

List of investor / conferences participated by Mohawk Industries, Inc., April 28, 2017 – July 26, 2019, from Bloomberg.

Mohawk Industries, Inc. filings with the U.S. Securities and Exchange Commission (SEC).

Mohawk Industries, Inc. 2017 and 2018 annual reports.

List of analyst reports on Mohawk Industries, Inc., April 28, 2017 – July 26, 2019, available through S&P Capital IQ and Thomson Eikon Databases.

## CITED NEWS, CALL TRANSCRIPTS AND ANALYST REPORTS

"Initial Take 2Q17 Results," SunTrust Robinson Humphrey Research Report, July 27, 2017.

"Mix Of Challenges Persist But Not Structural," SunTrust Robinson Humphrey Analyst Report, July 25, 2018 (produced as MHK-SEC-00012163).

"MHK: Sell-off on Disappointing 2H Outlook Largely De-Risks MHK Shares," Longbow Research Analyst Report, July 30, 2018 (produced as MHK-SEC-00033478).

"MHK: 3Q – Reset Expectations and Capitulation in Shares; We View MHK as Over-Sold vs. Mid-Cycle EPS," Longbow Research Analyst Report, October 29, 2018 (produced as MHK-SEC-00012502).

"Thoughts from Sell-side CFO Lunch," Evercore ISI Research Report, May 13, 2019.

"Interface Reports Second Quarter 2019 Results," PR Newswire, July 25, 2019, 4:01 p.m.

"Mohawk Industries Reports Q2 Results," GlobeNewswire, July 25, 2019, 4:15 p.m.

"2Q EPS In Line, But 3Q EPS Guidance Well Below Street (As Well As Below Our Street-Low Estimate)," JPMorgan Research Report, July 25, 2019.

"Q2 2019 Interface Inc Earnings Call – Final," CQ FD Disclosure, July 26, 2019.

"Q2 2019 Mohawk Industries Inc Earnings Call – Final," CQ FD Disclosure, July 26, 2019.

"MW Mohawk's stock tumbles to lead NYSE losers after sales miss, downbeat outlook," MarketWatch July 26, 2019, 2:48 p.m.

"2Q19 Results First Look," Barclays Research Report, July 26, 2019.

"The Struggle is Real," RBC Research Report, July 28, 2019.

"MHK: Downgrading to Underperform As Outlook Softens, Wells Fargo Research Report, July 28, 2019.

Post-Call Notes: Less Good (i.e., Positive Catalysts), More Bad (Headwinds Peristing/Worsening); Underweight," JPMorgan Research Report, July 29, 2019.

"Armstrong Flooring Reports Second Quarter 2019 Results," Business Wire, August 6, 2019, 7:00 a.m.

"10:03 EDT Mohawk investors should be aware of allegations in suit, says Deutsche...," Theflyonthewall.com, July 8, 2020.

"10:08 EDT Allegations against Mohawk 'clearly' a negative if proven true, says...," Theflyonthewall.com, July 9, 2020.

"MW Mohawk Industries' stock dives, as analyst says lawsuit could an 'overhang' for months," MarketWatch, July 9, 2020, 1:03 p.m.

## COURT DOCUMENTS

Consolidated Class Action Complaint for Violations of the Federal Securities Laws, filed June 29, 2020 (ECF No. 37) (N.D. Georgia).

Order, filed September 29, 2021 (ECF No. 60).

Expert Report of Michael L. Hartzmark, Ph.D., January 25, 2022.

Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, Appointment as Class Representative, and Appointment of Class Counsel, filed April 13, 2022 (ECF. No. 88).

Expert Report of Lucy P. Allen, April 13, 2022 (ECF. No. 88-2).

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

*Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150 (S.D.N.Y. 2012).

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

*Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays PLC, et al.,* 2015 U.S. Dist. LEXIS 110382 (S.D.N.Y. 2015).

*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003).

*City of Ann Arbor Emps' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247 (D.S.C. 2010).

*Christakis Vrakas, et al. v. U.S. Steel Corp., et al.*, 2019 U.S. Dist. LEXIS 222783 (W.D. Pa., Dec. 31, 2019).

**Appendix B**
**Materials Relied Upon in the Opening and Reply Report**

**COURT DOCUMENTS, CONT'D.**

*Erica P. John Fund, Inc. v. Halliburton Co, et al.*, 131 S. Ct. 2179 (2011).

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014).

*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008).

*In re Cobalt Intl. Energy, Inc., Sec. Litig.*, 2017 WL 2608243 (S.D. Tex. 2017).

*In re Computer Sciences Corp. Securities Litig.*, 288 F.R.D. 112 (E.D. Va. 2012).

*In re Countrywide Financial Corporation Securities Litigation*, 273 F.R.D. 586 (C.D. Cal. 2009).

*In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008).

*In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011).

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006).

*In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321 (N.D. Ill. 2015).

*In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009).

*In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101 (E.D. Va. 2009).

*In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006).

*In re Scientific-Atlanta*, 571 F. Supp. 2d 1315 (N.D. Ga. 2007).

*In re Signet Jewelers Limited Sec. Litig.*, 2019 WL 3001084 (S.D.N.Y. 2019).

*In Re Teva Securities Litigation*, 2021 WL 872156 (D.Conn., March 9, 2021).

*In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005).

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

*Lapin v. Goldman Sachs & Co.,* 254 F.R.D. 168 (S.D.N.Y. 2008).

*Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).

*Mark Smilovits, et al. v. First Solar, Inc., et al.*, 295 F.R.D. 423 (D. Ariz. 2013).

*McIntire v. China MediaExpress*, 38 F. Supp. 3d. 415 (S.D.N.Y. 2014).

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Group PLC*, 2016 WL 7409840 (S.D.N.Y. Nov. 4, 2016).

*Vinh Nguyen v. Radient Pharm. Corp.,* 287 F.R.D. 563 (C.D. Cal. 2012).

*Peil v. Speiser*, 806 F.2d 1154 (3d Cir. 1986).

*Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019), *adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir. 2008).

*The Pennsylvania Avenue Funds v. Inyx Inc.*, 2011 U.S. Dist. LEXIS 72999 (S.D.N.Y 2011).

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*, *et al.*, 2016 WL 4138613 (E.D. Pa. 2016).

*Waggoner v. Barclays PLC*, 875 F.3d 79, 98 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702, (2018).


**ACADEMIC PAPERS AND BOOKS**

Daniella Acker, *Implied Standard Deviations and Post-Earnings Announcement Volatility*, 29 J. of Bus., Fin. and Accounting 429 (2002).

Nihat Aktas, Eric de Bodt, and Jean-Gabriel Cousin, *Event Studies with a Contaminated Estimation Period*, 13 Jnl. Corp. Fin. 129 (2007).

Carol Alexander, Market Models: A Guide to Financial Data Analysis (John Wiley & Sons, 2001).

Rowland K. Atiase, Haidan Li, Somchai Supattarakul and Senyo Tse, *Market Reaction to Multiple Contemporaneous Earnings Signals: Earnings Announcements and Future Earnings Guidance*, 10 Rev. Acctg. Stds. 497 (2005).

Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stock Efficiency*, 19 J. Corp. L. 285 (Winter 1994).

Vic Barnett and Toby Lewis, Outliers in Statistical Data (Wiley, 1978).

William H. Beaver, *The Informational Content of Annual Earnings Announcements*, 6 J. of Accounting Research 67 (1968).

Dan A. Biddle and Scott B. Morris, *Using Lancaster's Mid-P Correction to the Fisher's Exact Test for Adverse Impact Analyses*, 96(5) Jnl. of Applied Psychology, 956 (2011).

Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, 2020 U. of Ill. Online L. Rev. 96 (2020).

Ekkehart Boehmer, Jim Masumeci, & Annette B. Poulsen. *Event-study methodology under conditions of event-induced variance*, 30 J. Fin. Econ. 253 (1991).

Michael J. Brennan, Narasimhan Jegadeesh, and Bhaskaran Swaminathan, *Investment Analysis and the Adjustment of Stock Prices to Common Information*, 6 Rev. of Fin. Stds. 799 (1993).

G. E. P. Box & G. C. Tiao, *Intervention Analysis with Applications to Economic and Environmental Problems*, 70 J. Am. Stat. Assn., 70 (1975).

Kee H.Chung & Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data*, 17 J. of Fin. Markets 94 (2014).

**Appendix B**
**Materials Relied Upon in the Opening and Reply Report**

**ACADEMIC PAPERS AND BOOKS, CONT'D.**

Nicholas I. Crew, Kevin L. Gold and Marnie A. Moore, *Federal Securities Acts and Areas of Expert Analysis*, Litigation Services Handbook: The Role of the Financial Expert (Wiley, 5th ed. 2012).

Bradley Efron & Robert J. Tibshirani, An Introduction to the Bootstrap (CRC Press LLC, 2d ed.) (1993).

Frank J. Fabozzi and Steven V. Mann, The Handbook of Fixed Income Securities (McGraw-Hill Education, 7th ed. 2005).

Ray Fair, *Events That Shook the Market*, 75 Jnl. of Bus. 713 (2002).

Eugene Fama, *Efficient Capital Markets:  A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

Eugene Fama, *Efficient Capital Markets: II*, 46 J. Fin. 1575 (1991).

Eugene Fama, *Market Efficiency, Long-Term Returns, and Behavioral Finance*, 49 J. Fin. Econ. 283 (1998).

Jill E. Fisch, *The Role and Regulation of the Research Analyst*, Research Handbook on the Economics of Corporate Law, Edgar Elgar Publishing (2012).

William H. Greene, Econometric Analysis (Prentice Hall, 2d ed. 1993).

William H. Greene, Econometric Analysis (Pearson, 8th ed. 2018).

Larry Harris, Trading and Exchanges: Market Microstructure for Practitioners (Oxford University Press, 2003).

Michael L. Hartzmark, Cindy A. Schipani, and H. Nejat Seyhun, *Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market*, 2011 Colum. Bus. L. Rev. 654 (2011).

Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev. 415 (Winter 2012).

Michael L. Hartzmark and H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev. 149 (Spring 2014).

Glenn V. Henderson, Jr., *Problems and Solutions in Conducting Event Studies*, 57 J. of Risk and Ins. 282 (June 1990).

Narasimhan Jegadeesh and Joshua Livnat, *Revenue surprises and stock returns*, 41 J.Fin. Econ. 147 (2006).

Jonathan M. Karpoff, *The Relation between Price Changes and Trading Volume: A Survey*, 22 J. of Fin. and Quantitative Analysis, 109 (1987).

David H. Kaye and David A. Freedman, *Reference Guide on Statistics*, in Reference Manual on Scientific Evidence (National Academy of Sciences, 3d. ed. 2011).

David F. Larcker, Lawrence A. Gordon & George E. Pinches, *Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis*, 15 J. Fin. & Quant. Analysis 267 (1980).

Che-Yang Lin and Ming-Chung Yang, *Improved p-Value Tests for Comparing Two Independent Binomial Proportions*, 38 Communications in Statistics—Simulation and Computation, 78 (2009).

G. S. Maddala and In-Moo Kim, Unit Roots, Cointegration and Structural Change (Cambridge University Press, 1998).

Paul H. Malatesta, *Measuring Abnormal Performance: The Event Parameter Approach Using Joint Generalized Least Squares*, 21 J. Fin. & Quant. Analysis, 27 (1986).

Burton G. Malkiel, *The Efficient Market Hypothesis and Its Critics*, 17 J. Econ. Perspectives 59 (2003).

Mahesh Pritamani and Vijay Singal, *Return Predictability Following Large Price Changes and Information Releases*, 25 Jnl. of Banking & Fin. 631 (2001).

G. William Schwert, *Anomalies and Market Efficiency*, in *Handbook of the Economics of Finance* (G. Constantinides, et al., eds., 2003).


**DATA**

Bloomberg price and volume data for Mohawk Industries, Inc. common stock, November 2016 – December 2019.

Miscellaneous stock return index data, November 2016 – July 2019, from Bloomberg (Bloomberg identifier in parentheses): the S&P 500 Total Return Index (SPTR), the S&P 500 Consumer Durables & Apparel Industry Group GICS Level 2 Total Return Index (S5CDAGTR), the S&P 500 Household Durables Industry GICS Level 3 Total Return Index (S5HDTR), the S&P 500 Home Furnishings Sub Industry GICS Level 4 Total Return Index (S5HOMFTR), the S&P Homebuilding Select Industry Total Return Index (SPSIHOTR), the S&P Supercomposite Household Durables Industry GICS Level 3 Total Return Index (STRHODU), the S&P Supercomposite Home Furnishings Sub Industry GICS Level 4 Total Return Index (STRHOMF), the S&P 500 Equal Weight Consumer Discretionay CME Total Return Index (SPXEWCD), and the Dow Jones U.S. Select Home Builders Total Return Index (DJSHMBT).

Bloomberg returns for the following peer companies (Bloomberg identifiers for each peer company in parentheses): Armstrong Flooring, Inc. (AFI); Dixie Group, Inc. (DXYN); Interface, Inc. (TILE); Leggett & Platt, Inc. (LEG); MASCO Corporation (MAS) and Stanley Black & Decker (SWK), November 2016 – July 2019.

**Appendix B**
**Materials Relied Upon in the Opening and Reply Report**

**DATA, CONT'D.**

Daily weights of Mohawk Industries, Inc. common stock in the S&P 500 Consumer Durables & Apparel Industry Group GICS Level 2 Total Return Index (S5CDAGTR), the S&P 500 Household Durables Industry GICS Level 3 Total Return Index (S5HDTR), the S&P 500 Home Furnishings Sub Industry GICS Level 4 Total Return Index (S5HOMFTR), the S&P Homebuilding Select Industry Total Return Index (SPSIHOTR), the S&P Supercomposite Household Durables Industry GICS Level 3 Total Return Index (STRHODU), the S&P Supercomposite Home Furnishings Sub Industry GICS Level 4 Total Return Index (STRHOMF), the S&P 500 Equal Weight Consumer Discretionay CME Total Return Index (SPXEWCD), and the Dow Jones U.S. Select Home Builders Total Return Index (DJSHMBT), November 2016 – July 2019.

Members of the S&P 500 Home Furnishings Sub Industry GICS Level 4 Total Return Index (S5HOMFTR), November 2016 – July 2019, obtained from Bloomberg.

Bloomberg short interest in Mohawk Industries, Inc. common stock, April 2017 – July 2019.

Bloomberg bid and ask prices for Mohawk Industries, Inc. common stock, April 2017 – July 2019.

Bloomberg total analyst recommendations for Mohawk Industries, Inc., April 2017 – July 2019.

Number of analysts providing consensus I/B/E/S estimates for Mohawk Industries, Inc., April 2017 – July 2019.

Quarterly institutional holdings in Mohawk Industries, Inc. common stock, March 31, 2017 – December 31, 2019, from S&P Capital IQ.

Date and time stamps of press releases for earnings and guidance for Mohawk Industries, Inc., April 2017 – July 2019, from PR Newswire and GlobeNewswire on Factiva.

Bloomberg prices for Mohawk Industries, Inc. common stock, index levels for the S&P 500 Total Return Index (SPTR) and the S&P Homebuilding Select Industry Total Return Index (SPSIHOTR) and daily weights of Mohawk Industries, Inc. common stock in the S&P Homebuilding Select Industry Total Return Index (SPSIHOTR) for July 7, 2020 to July 9, 2020.

Consensus EPS estimates for 3Q2019 and FY2020 and consensus revenue estimate for 2Q2019 as of July 24, 2019.  Source: Thomson Estimates via S&P Capital IQ.

**MISCELLANEOUS**

The NYSE Market Model, https://www.nyse.com/market-model.

102.01 Minimum Numerical Standards-Domestic Companies-Equity Listings, https://nyseguide.srorules.com/listed-company-manual/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7B0588BF4A-D3B5-4B91-94EA-BE9F17057DF0%7D--WKUS_TAL_5667%23teid-4.

Miscellaneous Bloomberg information regarding Mohawk Industries, Inc.

Private Securities Litigation Reform Act of 1995.

SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions" (updated November 2018).

Securities Exchange Act of 1934.

U.S. Securities and Exchange Commission: Division of Investment Management: Frequently Asked Questions About Form 13F, February 24, 2020, http://www.sec.gov/divisions/investment/13ffaq.htm.

17 C.F.R § 240.10b-5 (2011).

15 U.S.C. §§ 78p(b), 78p(c), 78p(a) (2011).

15 U.S.C. § 78u-4(e)(1).

http://www.hudsonvalleyruins.org/yasinsac/amsterdam/mohawk01.html.

"Impacts of the Reinstated Tariff on Chinese Luxury Vinyl Tile," available at  https://www.builddirect.com/learning-center/flooring/vinyl-flooring/impacts-of-the-reinstated-tariff-on-chinese-luxury-vinyl-tile/.

"Setting the record straight on tariffs," available at https://www.fcnews.net/2019/07/setting-the-record-straight-on-tariffs/.

Expert Report of Michael L. Hartzmark, Ph.D., filed September 15, 2014, *In Re MF Global Holdings Securities Litigation* (ECF. 766-1).

Expert Report of Michael L. Hartzmark, Ph.D., filed August 13, 2016, *In Re Altisource Portfolio Solutions, S.A. Securities Litigation* (ECF. 160-2).

Expert Report of Michael L. Hartzmark, Ph.D., filed January 17, 2020, *SEB Investment Mgmt. v. Symantec Corp. and G. Clark* (ECF. 197-8).

Expert Report of David I. Tabak, Ph.D., filed June 19, 2020, *In Re Teva Securities Litigation*, ECF. 419-5.


All other specific materials and information otherwise described or set forth in the body of this Rebuttal Report, Exhibits or Appendices.

**Appendix C**

**I.    BACKGROUND ON CALCULATION OF THE *AUTOCORRELATION COEFFICIENT* USED TO DETERMINE WHETHER THERE IS PERSISTENT AND SYSTEMATIC *AUTOCORRELATION***

1.    The first-order autocorrelation coefficient $\rho$ in any time series $x_t$ can be found by running a "standard" Ordinary Least Squares regression.[1]  This standard empirical relationship can be specified as:

$$x_t = \alpha + \rho x_{t-1} + \varepsilon_t,$$

where:
$x_t$ is the abnormal return to Mohawk common stock at time $t$;
$\alpha$ is the intercept term (assumed and shown to be zero);[2]
$\rho$ is the autocorrelation coefficient; and
$\varepsilon_t$ is the error term.

2.    For a sample with mean of zero indexed by $i = 1, \ldots, N$, the estimate of $\rho$ (or $\hat{\rho}$) is given by:

$$\text{Estimated Autocorrelation Coefficient: } \hat{\rho} = \frac{\sum_{i=1}^{N} x_i x_{i-1}}{\sum_{i=1}^{N} x_{i-1}^2},$$

where, in this *Mohawk* matter, the full sample $N$ is 564, or the number of days in the Class Period.[3]

3.    In addition, the standard error of this estimate is calculated as the standard deviation of the error term ($\varepsilon_t$ $or$ $x_t - \hat{\rho} x_{t-1}$) divided by the square root of the sum of the squared lagged abnormal returns ($x_{t-1}$) or:

---

[1]    In what follows I use the symbol $\rho$, rather than beta ($\beta$) to represent the autocorrelation coefficient as in the Opening Report.  I also use $x_t$, rather than AR$_t$ to represent the daily abnormal return.  These substitutions are made to avoid confusion with beta in the market model used for the event study presented in the Opening Report.

[2]    This is also supported by Ms. Allen who states, "stock price movements should follow a 'random walk' and be unpredictable – *i.e.*, a stock's future price should not be predictable based on the stock's prior prices."  Allen Report, ¶80.

[3]    Hartzmark Report, ¶70.

**Appendix C**

Standard Error of the Autocorrelation Coefficient: $s_{\hat{\rho}} = \sqrt{\dfrac{\sum_{i=1}^{N}(x_i - \hat{\rho} x_{i-1})^2}{(N-2) \times \sum_{i=1}^{N} x_{i-1}^2}}$ .

4.    A t-statistic for $\hat{\rho}$ is obtained by dividing $\hat{\rho}$ by $s_{\hat{\rho}}$, or:

$$t\text{-}statistic = \hat{\rho} \; divided \; by \; s_{\hat{\rho}}.$$

5.    Under the <u>null hypothesis that $\rho = 0$</u>, the t-statistic has the Student-t distribution with $N - 2$ degrees of freedom.  The statistical significance of the autocorrelation coefficient $\hat{\rho}$ is measured using *p-values* derived from this distribution, which express the probability that the null hypothesis is true, given the data in the sample.

6.    Thus $\hat{\rho}$ represents the estimated *autocorrelation coefficient* based on the full sample of datapoints representing the abnormal returns on each of the $N$ days in the full sample period.

## II.    ADJUSTING FOR ANOMALOUS DATA POINTS

7.    Standard academic-based diagnostic procedures (such as those applied in the Hartzmark Report) are undertaken to determine if $\hat{\rho}$ is a stable estimate of $\rho$; in other words, whether when using sub-samples of the full sample of datapoints, alternative estimates of autocorrelation coefficients are also different from zero (*i.e.*, the difference is statistically significant) and have the same sign (*i.e.*, do not change direction).  If the answer to both questions is affirmative, then the estimate $\hat{\rho}$ can be considered to be stable and there is evidence of persistent and systematic autocorrelation.[4]

---

[4]    Even this is not definitive evidence suggesting the security trades in an inefficient market. Should there be empirical evidence of the existence of persistent and systematic autocorrelation, academic standards require a comparison between the profits earned using a naïve trading strategy (based on the degree of autocorrelation) and the transactions costs to implement the strategy (*e.g.,* commissions, bid/ask spreads, normal trading frictions, etc.).  If the transactions costs exceed the profits from the naïve strategy, then the persistent and systematic autocorrelation is not exploitable, and the evidence does not support the conclusion that the security trades in an inefficient market.  I did not find evidence of persistent and systematic autocorrelation, so I did not undertake this examination in my Opening Report.

**Appendix C**

8.    To understand the importance of this additional inquiry about the stability of $\hat{\rho}$, I begin by emphasizing that the autocorrelation coefficient $\hat{\rho}$ and its standard error $s_{\hat{\rho}}$ are both based on *sums* and *averages*.  To describe this, the equations above can be decomposed to show how each observation contributes to the overall estimates of $\hat{\rho}$ and $s_{\hat{\rho}}^2$.  Expanding the equations:

$$\hat{\rho} = \frac{x_1 x_0 + x_2 x_1 + \cdots + x_{j+1} x_j + \cdots + x_N x_{N-1}}{x_0^2 + x_1^2 + \cdots + x_j^2 + \cdots + x_{N-1}^2}$$

and

$$s_{\hat{\rho}}^2 = \frac{(x_1 - \hat{\rho} x_0)^2 + (x_2 - \hat{\rho} x_1)^2 + \cdots + (x_{j+1} - \hat{\rho} x_j)^2 + \cdots + (x_N - \hat{\rho} x_{N-1})^2}{\{(1 + 1 + \cdots + 1 + \cdots + 1) - 2\} \times \{x_0^2 + x_1^2 + \cdots + x_j^2 + \cdots + x_{N-1}^2\}}.$$

9.    Using each day t in the full sample as a datapoint in the estimation of $\hat{\rho}$, it is assumed that <u>each of the daily observations is generated by the same underlying process and thus contributes equally</u> to the estimates of $\hat{\rho}$ and $s_{\hat{\rho}}^2$ and that no observation(s) overly influence the estimate $\hat{\rho}$. Clearly, if this assumption is violated, the estimate of $\hat{\rho}$ might be a biased estimate of $\rho$.  Therefore, in academic studies researchers utilize standard diagnostic procedures to determine whether any daily observation(s) might <u>not</u> contribute useful information to or might overly influence the estimate of $\hat{\rho}$.  The diagnostics are undertaken because an influential but non-representative observation might distort or bias the empirical results and potentially lead to an incorrect conclusion about the autocorrelation $\rho$.

10.    For example, <u>if</u> throughout a 564-day period most of the observations $x_i$ in the full sample take small values (as is generally the case for residuals or the abnormal returns in a well-specified market model regression), <u>but</u> a certain datapoint such as $x_j$ is very large relative to the other small values, then the products $x_{j+1} x_j$ and $x_j x_{j-1}$ will be considerably larger than the other products in the numerator of $\hat{\rho}$.[5]  This then leads to the possibility that $\hat{\rho}$ will be a biased estimate of the true autocorrelation $\rho$.

11.    Thus, once $\hat{\rho}$ is estimated using the full sample and is found to be statistically significant, the next series of diagnostics include (a) how to determine whether there is an outlier within the full sample; (b) whether the outlier is an influential datapoint that causes a significant

---

[5]    This is only partly balanced by the larger terms $x_j^2$ in the denominator.

**Appendix C**

change in the estimate $\hat{\rho}$; and (c) if it does, whether the outlying datapoint can be explained as being an anomalous, non-representative or atypical.

12.    Greene defines an influential observation as "one that is likely to have a substantial impact on the least squares regression coefficient(s)."[6]  Greene then adds that "in the absence of an underlying theory that explains (and justifies) the extreme values of $x_i$, eliminating such observations is an algebraic exercise that has the effect of forcing the regression line to be fitted with the values of $x_i$ closest to the means."[7]  Therefore, once an outlier is identified, in the next step the regression is re-estimated without the outlier to determine whether the autocorrelation coefficient (*i.e.,* the regression line) changes significantly.  Should it be determined that the $x_j$ observation is an outlier that distorts the estimate of $\rho$, and should it be determined that the outlier is an anomalous, non-representative or atypical datapoint, then the datapoint should be eliminated and there should be an alternative regression run to estimate the autocorrelation coefficient $\hat{\rho}$.

13.    Therefore, under standard diagnostic procedures, a supplementary regression is run that eliminates $x_j$ from the full sample (*i.e.*, eliminates the pair of $x_{j-1}$ and $x_j$ and the pair of $x_j$ and $x_{j+1}$) to present an alternative estimate of autocorrelation coefficient to compare to $\hat{\rho}$, which was estimated using the full sample.  Such an alternative autocorrelation coefficient can be expressed as:

$$\widehat{\rho_{-\{J,J+1\}}} = \frac{\sum_{i=1}^{j-1} x_i x_{i-1} + \sum_{i=j+2}^{N} x_i x_{i-1}}{\sum_{i=1}^{j-1} x_{i-1}^2 + \sum_{i=j+2}^{N} x_{i-1}^2}$$

and

$$s_{\widehat{\rho_{-\{J,J+1\}}}}^2 = \frac{\sum_{i=1}^{j-1}(x_i - \hat{\rho} x_{i-1})^2 + \sum_{i=j+2}^{N}(x_i - \hat{\rho} x_{i-1})^2}{\{(N-2)-2\} \times \{\sum_{i=1}^{j-1} x_{i-1}^2 + \sum_{i=j+2}^{N} x_{i-1}^2\}}.$$

---

[6]    William H. Greene, Econometric Analysis (Pearson, 8th ed. 2018) ("Greene 2018") at 104.

*See also*, G. S. Maddala and In-Moo Kim, Unit Roots, Cointegration and Structural Change (Cambridge University Press, 1998) ("Maddala and Kim 1998") at 425 ("There is no question that outliers can cause problems with inference.").

[7]    Greene 2018 at 105.

**Appendix C**

14.   The next step in standard diagnostic procedures is to determine whether $\hat{\rho}$ and $\widehat{\rho_{-\{J,J+1\}}}$ are different.[8]   In other words, should statistical inference demonstrate that the two autocorrelation coefficients ($\hat{\rho}$ and $\widehat{\rho_{-\{J,J+1\}}}$) are not the same from a statistical perspective (*i.e.,* within a reasonable degree of scientific certainty), there is empirical evidence that the outlying observation $x_j$ is overly influential in determining or in fact driving conclusions about the statistical significance of the single autocorrelation coefficient $\hat{\rho}$.  This overly influential outlier might then bias any generalized conclusions based on the original estimate of the autocorrelation coefficient $\hat{\rho}$.

15.   Finally, absence of a theory to justify retaining the influential outlier (*i.e.,* if there is support that the outlier is an explainable anomalous, non-representative or atypical datapoint) and it results in an alternative autocorrelation coefficient that is not stable and changes sign or significance over different sub-samples of data (*i.e.,* $\hat{\rho}$ and $\widehat{\rho_{-\{J,J+1\}}}$ are different based on comparing the original regression results to the alternative), there is justification for removing it from the full sample to estimate an unbiased measure of autocorrelation $\rho$.

16.   Indeed, not removing the outlier would potentially cause two pairs of abnormal returns and lagged abnormal returns in the market model regression to substantially impact the autocorrelation coefficient estimate based on the full sample; and because the outliers are not representative of the other $N - 2$ observations in the full sample of datapoints,[9] they would potentially bias the resulting estimate of $\rho$.  In other words, standard academic-based diagnostic procedures suggest that the influential outlier should be accounted for and possibly eliminated from the estimation process.

---

[8]   The alternative test statistic $t = \widehat{\rho_{-\{J,J+1\}}}/s_{\widehat{\rho_{-\{J,J+1\}}}}$ now has the Student-t distribution with $N - 4$ degrees of freedom under the null hypothesis that $\rho = 0$.  When $N$ is large (more than approximately fifty observations), the difference in the distribution of the test statistics will be quite small.

As $N$ grows, the Student-t distribution converges to the standard normal distribution.  In practical terms, $N$ is large when the quantiles of the Student-t distribution are reasonably close to those of the normal.

[9]   $x_j$ either represents the current abnormal return or the lagged abnormal return (*i.e.,* the two pairs that shows the relationship between $x_{j-1}$ and $x_j$ as well as the relationship between $x_j$ and $x_{j+1}$).

**Appendix C**

## III.    DIVIDING THE FULL SAMPLE PERIOD INTO SMALLER INTERVALS

17.    In this section, I describe why it is important to divide the full sample (*i.e.,* the entire Class Period) into sub-periods.  A similar academic-based explanation as discussed above justifies dividing the full sample into sub-sample intervals.

18.    According to Greene:

> In specifying a regression model, we assume that its assumptions apply to all the observations in the sample.  It is straightforward, however, to test the hypothesis that some or all of the [autocorrelation] coefficients are different in different subsets of the data.[10]

19.    Thus, it is critical for determining whether the estimation of the autocorrelation coefficient $\hat{\rho}$ is stable or is sensitive to different intertemporal sub-samples (*i.e.,* whether the autocorrelation is systematic and persistent, or over time disappears or changes directions).  To determine whether $\hat{\rho}$ is unbiased estimate of $\rho$, diagnostics require an examination of whether the autocorrelation coefficient $\hat{\rho}$ is stable over different time intervals — meaning it keeps the same sign and is statistically significant over those intervals.  Simply put, if "the regression coefficients are different in different subsets of the data,"[11] there is empirical evidence to support a conclusion that that $\hat{\rho}$ is biased estimate of $\rho$.

20.    As a straightforward extension of the equations above for two intervals, for subsamples of size $N_1$ and $N_2$ on either side of an observation $x_j$, the estimated autocorrelation coefficients and standard errors are given as:[12]

---

[10]    Greene 2018 at 191.  *See also*, Maddala and Kim 1998 at 416 ("[S]tructural change does affect inference… and it is important to allow for its possibility at the estimation stage itself.").

[11]    Greene 2018 at 191.

[12]    Using these standard academic-based procedures generates the usual test statistics described above, with $N_1 - 2$ and $N_2 - 2$ degrees of freedom.  Again, provided $N_1$ and $N_2$ are large, the differences in the distributions of the test statistics relative to those for the pooled sample will be slight.  The equations can be divided into more than two intervals and the discussion still holds.

**Appendix C**

$$\hat{\rho}_1 \;=\; \frac{\sum_{i=1}^{j} x_i x_{i-1}}{\sum_{i=1}^{j} x_{i-1}^2}$$

$$\hat{\rho}_2 \;=\; \frac{\sum_{i=j+1}^{N} x_i x_{i-1}}{\sum_{i=j+1}^{N} x_{i-1}^2}$$

and

$$s_{\widehat{\rho_1}}^2 \;=\; \frac{\sum_{i=1}^{j}(x_i - \hat{\rho}x_{i-1})^2}{(N_1 - 2) \times \sum_{i=1}^{j} x_{i-1}^2}$$

$$s_{\widehat{\rho_2}}^2 \;=\; \frac{\sum_{i=j+1}^{N}(x_i - \hat{\rho}x_{i-1})^2}{(N_2 - 2) \times \sum_{i=j+1}^{N} x_{i-1}^2}$$

21.    Dividing the full sample or entire Class Period into two or more sub-samples, enables one to evaluate the stability of $\hat{\rho}$, and implicitly answers the question of whether stock returns are predictable and possibly exploitable.[13]  This is done by comparing $\hat{\rho}$, $\hat{\rho}_1$, and $\hat{\rho}_2$.  By isolating the effects in different time intervals one can determine whether the autocorrelation disappears or changes direction — whether it is predictable and exploitable and an investor could earn trading profits.  This stability analysis compares two or more sub-periods to demonstrate whether the significance of or lack of statistical significance of $\hat{\rho}$ (as well as the directionality of $\hat{\rho}$) is evident in both sub-samples, confined to one of the sub-samples, or not evident in either sub-sample — *i.e.,* appears, then disappears or changes direction.  It is yet another way to determine whether or not $\hat{\rho}$ is unbiased estimate of $\rho$.

22.    As Maddala and Kim and Greene suggest, if $\hat{\rho}$, $\hat{\rho}_1$, and $\hat{\rho}_2$ change direction or disappear over different intervals or sub-samples of the data then the single autocorrelation coefficient based on the full sample is not stable and, thus, there is no systematic or persistent autocorrelation.

---

[13]    *See supra* footnote 4.