**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, individually and on behalf of all others similarly situated,<br><br>   Plaintiff,<br>      v.<br><br>MOHAWK INDUSTRIES, INC. and JEFFREY S. LORBERBAUM,<br><br>   Defendants. | Civ. A. No. 4:20-cv-00005-VMC |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION**
**SETTLEMENT AND PLAN OF ALLOCATION**

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ....................................................................1

II.   ARGUMENT............................................................................................6

      A.    The Proposed Settlement Warrants Final Approval ...........................6

            1.    Lead Plaintiff and Lead Counsel Have Adequately
                  Represented the Class ................................................................7

            2.    The Settlement Was Reached After Substantial
                  Discovery and Arm's-Length Negotiations...............................8

            3.    The Settlement Should be Approved in Light of the Costs
                  and Risks of Further Litigation................................................10

            4.    The Settlement Treats Class Members Equitably Relative
                  to Each Other ..........................................................................20

            5.    Other Factors Considered by the Eleventh Circuit
                  Support Approval of the Settlement ........................................21

      B.    The Plan of Allocation is Fair and Reasonable.................................22

      C.    Notice Satisfies Rule 23 and Due Process ........................................23

III.  CONCLUSION.......................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Am. Bank Note Holographies, Inc., Sec. Litig.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) ...............................................................16

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984) ...............................................................7, 10, 21

*In re Biolase, Inc. Sec. Litig.*,
  2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) .................................................17

*Canupp v. Sheldon*,
  2009 WL 4042928 (M.D. Fla. Nov. 23, 2009), *aff'd sub nom.*
  *Canupp v. Liberty Behav. Health Corp.*, 417 F. App'x 843 (11th
  Cir. 2011) ............................................................................................................9

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
  2008 WL 11336122 (N.D. Ga. Oct. 20, 2008) .................................................15

*In re Chicken Antitrust Litig. Am. Poultry*,
  669 F.2d 228 (5th Cir. Unit B 1982) ...............................................................22

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)...........................................................................................13

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 256132 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part*,
  999 F.3d 1247 (11th Cir. 2021) ......................................................................8, 9

*Faught v. Am. Home Shield Corp.*,
  668 F.3d 1233 (11th Cir. 2012) ..........................................................................7

*Francisco v. Numismatic Guar. Corp. of Am.*,
  2008 WL 649124 (S.D. Fla. Jan. 31, 2008)......................................................21

*In re HealthSouth Corp. Sec. Litig.*,
  572 F.3d 854 (11th Cir. 2009) ............................................................................6

*Hefler v. Wells Fargo & Co.*,
   2018 WL 6619983 (N.D. Cal. Dec. 18, 2018), *aff'd sub nom.*
   *Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020) ..............................................20

*Ingram v. Coca-Cola Co.*,
   200 F.R.D. 685 (N.D. Ga. 2001) ..........................................................................9

*Kirkpatrick v. J.C. Bradford & Co.*,
   827 F.2d 718 (11th Cir. 1987) ..............................................................................8

*In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*,
   2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Jan. 31, 2007) .....................................16

*In re Piedmont Off. Realty Tr. Inc. Sec. Litig.*,
   2013 WL 12205636 (N.D. Ga. Apr. 18, 2013)....................................................25

*In re Piedmont Off. Realty Tr. Inc. Sec. Litig.*,
   2013 WL 12205681 (N.D. Ga. Jan. 2, 2013)........................................................25

*Thorpe v. Walter Inv. Mgmt. Corp.*,
   2016 U.S. Dist. LEXIS 144133 (S.D. Fla. Oct. 14, 2016) .................................16

*Vinh Nguyen v. Radient Pharms. Corp.*,
   2014 WL 1802293 (C.D. Cal. May 6, 2014)........................................................22

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) ..................................................................................24

*Yang v. Focus Media Holding Ltd.*,
   2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ......................................................22

**STATUTES**

15 U.S.C. § 78u-4................................................................................................................24

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ........................................................................................................passim

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS" or "Lead Plaintiff"), on behalf of itself and the other members of the certified Class, respectfully submits this memorandum of law in support of its motion for final approval of: (1) the proposed settlement resolving all claims in the Action for $60,000,000.00 in cash for the benefit of the Class (the "Settlement"), and (2) the proposed plan of allocation for distribution of the proceeds of the Settlement (the "Plan of Allocation").[1]

## I.    PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle all claims in the Action in exchange for a cash payment of $60 million. The proposed Settlement is an outstanding result and readily satisfies the standards for final approval under Rule 23(e)(2) of the Federal Rules of Civil Procedure and applicable law. As detailed in the accompanying Browne Declaration and summarized herein, the Settlement was

---

[1] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement dated January 13, 2023 (the "Stipulation") or in the Declaration of John C. Browne in Support of (i) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (ii) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Browne Declaration" or "Browne Decl."), filed herewith. Citations to "¶ __" in this memorandum refer to paragraphs in the Browne Declaration and citations to "Ex. __" refer to exhibits to the Browne Declaration.

- 1 -

reached after extensive, highly-contested litigation that included significant document and deposition discovery, and a lengthy mediation process overseen by a former federal judge who is an experienced class action mediator. If approved, the Settlement would be the fifth largest securities class action recovery in the history of the state of Georgia.

The Settlement is particularly favorable considering the substantial risks of continued litigation. As discussed below and in the Browne Declaration,[2] there was a genuine risk that Lead Plaintiff would have been unable to establish the required elements of falsity, scienter, loss causation, and damages as required to survive a motion for summary judgment and prevail at trial.

Defendants would have made several arguments regarding "falsity," including that Mohawk did not improperly recognize revenue with respect to its undelivered products under the "Saturday Scheme" alleged in the Complaint and, in any event, the amount of revenue allegedly improperly recognized was too small to materially impact Mohawk's overall financials. Further, with respect to Lead Plaintiff's LVT-

---

[2] The Browne Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for detailed descriptions of, *inter alia*: the history, prosecution, and settlement of the Action (¶¶ 11-57); the risks and uncertainties of continued litigation of Action (¶¶ 58-86); and the proposed Plan of Allocation (¶¶ 94-101).

related claims, Defendants would have maintained that they adequately disclosed Mohawk's technical issues with domestic LVT production, and, because LVT sales were just a small fraction of total sales, any alleged misstatements concerning domestic LVT production were immaterial to investors.

Defendants would also have advanced several arguments regarding "scienter." For example, Defendants would have no doubt emphasized both that Defendant Lorberbaum has been and remains Mohawk's largest shareholder and did not engage in any suspicious insider stock sales during the Class Period and that Mohawk announced a large stock repurchase program during the Class Period. And Defendants would have no doubt argued that both facts undermine any inference that Defendants intended to defraud investors.

Defendants would have further contended that Lead Plaintiff could not establish "loss causation" because none of the stock price declines during the Class Period can be connected to the alleged fraud. Among other things, Defendants would have argued that the declines were caused by the disclosure of negative information unrelated to the fraud, such as information concerning Mohawk's carpet and ceramic businesses and information concerning industry-wide factors such as raw material inflation. And regarding "damages," Defendants would have advanced credible "disaggregation" arguments—claiming that, at most, only a small amount of the

- 3 -

stock price declines on the alleged corrective disclosure dates could be related to the alleged fraud.

If successful, these arguments could have significantly reduced, or eliminated altogether, any recovery on behalf of the Class.

In light of such risks, the recovery of $60 million for the Class is an excellent result. In addition, at the time the settlement agreement was reached, Lead Plaintiff and Lead Counsel had a well-developed understanding of the Action's strengths and weaknesses. Before the Settlement was agreed, Lead Counsel had, among other things: (i) conducted a comprehensive investigation into the claims asserted in the Action; (ii) researched and drafted the detailed 193-page amended complaint; (iii) successfully opposed Defendants' motion to dismiss the Complaint; (iv) obtained certification of the Class through a contested class certification motion; and (v) conducted robust discovery, including obtaining and reviewing over nearly a million pages of documents produced by Defendants and non-parties, and taking or defending seventeen depositions of current and former Mohawk executives, Lead Plaintiff representatives, and experts regarding loss causation, damages, and market efficiency. Lead Plaintiff also consulted with multiple experts on issues relating to GAAP and inventory accounting and engaged in months of extensive settlement

negotiations and mediation under the guidance of former U.S. District Court Judge Layn R. Phillips.

The Settlement was achieved during the last week of fact discovery after extensive litigation. Absent the Settlement, the Parties faced the prospect of further protracted litigation through the remainder of fact discovery; additional costly expert discovery; summary judgment; a trial; post-trial motion practice; and ensuing appeals. The Settlement avoids the risks and delays associated with further litigation while providing a substantial, certain, and immediate benefit to the Class in the form of a $60 million cash payment.

In light of these considerations, Lead Plaintiff and Lead Counsel respectfully submit that the proposed Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiff and Lead Counsel request that the Court approve the proposed Plan of Allocation, which was set forth in the Notice mailed to potential Class Members. The Plan of Allocation provides a reasonable method for allocating the Net Settlement Fund among Class Members who submit valid claims based on damages they suffered that were attributable to the alleged fraud.

## II.    ARGUMENT

### A.    The Proposed Settlement Warrants Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims. *See* Fed. R. Civ. P. 23(e). A class action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). As the Eleventh Circuit has recognized, specifically in the context of securities class actions, "Public policy strongly favors the pretrial settlement of class action lawsuits." *See, e.g.*, *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009).

Rule 23(e)(2) provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:
(i) the costs, risks, and delay of trial and appeal;
(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Eleventh Circuit has held that district courts should also consider the following factors set forth in *Bennett v. Behring Corp.*:[3]

    (1) the likelihood of success at trial;
    (2) the range of possible recovery;
    (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable;
    (4) the complexity, expense and duration of litigation;
    (5) the substance and amount of opposition to the settlement; and
    (6) the stage of proceedings at which the settlement was achieved.

737 F.2d 982, 986 (11th Cir. 1984); *accord Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2012).[4]

All of the applicable factors strongly support approval of the Settlement.

### 1.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

In evaluating a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Courts consider (1) whether class representatives have interests antagonistic to the interests of other class members; and (2) whether class counsel has the necessary qualifications and experience to lead the litigation. *See,*

---

[3] Unless otherwise noted, internal quotes and citations have been omitted.
[4] The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "to focus the court and the lawyers on the core concerns of procedure and substance" to evaluate settlement approval. Advisory Committee Notes to 2018 Amendments.

*e.g.*, *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987); *In re Equifax Inc. Customer Data Sec. Breach Litig.* ("*Equifax Data Breach*"), 2020 WL 256132, at *5 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part*, 999 F.3d 1247, 1275-77 (11th Cir. 2021).

Here, Lead Plaintiff and Lead Counsel have adequately represented the Class in both their vigorous prosecution of the Action for nearly three years and in the arm's-length negotiation of the Settlement. Lead Plaintiff has claims that are typical of and coextensive with those of other Class Members and has no interests antagonistic to the interests of other members of the Class. In addition, Lead Counsel is highly qualified and experienced in securities litigation (*see* BLB&G Firm Resume, Ex. 4A-3) and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement.

Accordingly, the Class was adequately represented.

### 2. The Settlement Was Reached After Substantial Discovery and Arm's-Length Negotiations

In determining whether to approve a class action settlement, courts consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P.

23(e)(2)(B).[5] The Settlement was reached only after extensive arm's-length negotiations between experienced counsel, which included an in-person, full-day mediation session with retired federal judge Layn R. Phillips, a highly respected and experienced mediator of securities class actions and other complex litigation, and months of subsequent negotiations after the Parties failed to reach agreement at the initial mediation session. ¶¶ 51-53. This mediation, with Judge Phillips in particular, "a retired federal judge with a wealth of experience in major complex litigation," strongly supports approval of the Settlement, as it did in the *Equifax Data Breach*, litigation, where Judge Thrash "readily conclud[ed]" that a settlement was negotiated at arm's-length after mediation conducted by Judge Phillips. *See also Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (involvement of experienced mediator points to "absence of collusion").

---

[5] This inquiry is comparable to the Eleventh Circuit's traditional threshold examination of whether a proposed settlement is the product of fraud or collusion between the parties. *See Canupp v. Sheldon*, 2009 WL 4042928, at *9 (M.D. Fla. Nov. 23, 2009), *aff'd sub nom. Canupp v. Liberty Behav. Health Corp.*, 417 F. App'x 843 (11th Cir. 2011), and *aff'd sub nom. Canupp v. Liberty Behav. Healthcare Corp.*, 447 F. App'x 976 (11th Cir. 2011) (Courts should examine whether settlements are "achieved in good faith through arms-length negotiations," are "the product of collusion between the parties and/or their attorneys," or involve "unethical behavior or want of skill or lack of zeal on the part of class counsel").

### 3. The Settlement Should be Approved in Light of the Costs and Risks of Further Litigation

In determining whether a settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C).[6]

Here, the Settlement Amount—$60 million in cash—represents a significant recovery. If approved, this Settlement would be the fifth largest securities class action recovery across the three federal district courts in Georgia. The Settlement provides a substantial financial benefit while eliminating the significant risk that the Class could recover less, or nothing at all, if the Action continued. As discussed in detail in the Browne Declaration and below, continued litigation presented several risks that Lead Plaintiff would be unable to establish liability and damages. ¶¶ 58-86. In addition, trial and appeals would impose substantial additional costs on the Class and would result in extended delays—likely running to years—before any recovery. The Settlement avoids those further costs and delays. Moreover, the

---

[6] This factor under Rule 23(e)(2)(C) encompasses four of the six factors of the traditional *Bennett* analysis: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; [and] (4) the complexity, expense and duration of litigation." 737 F.2d at 986.

Settlement represents a substantial percentage of the maximum potential class-wide damages that could be realistically established at trial, and thus represents a very favorable outcome in light of the litigation risks. All of these factors strongly support the Settlement's approval.

### (a)    The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Lead Plaintiff and Lead Counsel believe that the claims asserted in the Action are meritorious, they recognize that there were substantial risks to establishing both liability and damages.

### (i)    Risks To Proving Liability

The Action's core allegations were that Defendants violated the federal securities laws by making materially false and misleading statements about Mohawk's financial results and failing to disclose technical issues with domestic LVT production. In the absence of the Settlement, Lead Plaintiff would have faced substantial challenges in proving the required elements of falsity and scienter.

For example, Defendants would continue to assert that they never engaged in the alleged misconduct. Regarding Lead Plaintiff's "Saturday Scheme" allegations, Defendants would argue that they did not improperly recognize any revenues associated with products that were not actually delivered to customers, and that the Company's financial results were approved by Mohawk's well-qualified outside

- 11 -

auditor. ¶ 69. In addition, Defendants would continue to argue that even assuming the truth of Lead Plaintiff's allegations that they engaged in the "Saturday Scheme," the amount of revenue allegedly improperly recognized was too small to materially impact Mohawk's overall financials or the price of Mohawk's publicly-traded securities. *Id*.

Likewise, as to Lead Plaintiff's LVT-related allegations, Defendants would continue to argue that they promptly and truthfully disclosed Mohawk's technical issues with domestic LVT production throughout the Class Period. ¶ 70. Defendants also would have argued that Mohawk's LVT sales made up only a small fraction of total Company-wide sales, and so any alleged misstatements concerning Mohawk's domestic LVT production would necessarily be immaterial to investors. ¶ 71. Further, Defendants would have argued that Lead Plaintiff's falsity allegations are undermined by the fact that the Company's auditor never required Mohawk to restate any of its financials. *Id*. Thus, there were several significant risks attendant to proving that Defendants' alleged misstatements were materially false and misleading. If the Court or a jury were to have found that Defendants' statements were not materially false or misleading, it would have reduced or even eliminated any recovery for investors.

Even if Lead Plaintiff succeeded in proving falsity, Lead Plaintiff would have faced significant risks in proving that Defendants acted with scienter—the intent to mislead investors or a severely reckless indifference to the truth. Defendants would have argued that they did not act with any fraudulent intent. ¶ 74. Among other things, Defendants would have argued that the absence of any suspicious insider stock sales by Defendant Lorberbaum—who was and remains Mohawk's largest shareholder—undermines any inference of scienter. ¶ 75. Defendants likely would have made a similar argument regarding Mohawk's October 2018 announcement of a $500 million stock repurchase program. *Id.* In addition, Defendants likely would have pointed to contemporaneous documents produced during discovery that they contend undermine any inference that Defendant Lorberbaum and Mohawk senior leadership knew of or condoned any alleged fraudulent schemes. ¶¶ 76-78. If a jury were to have accepted any of these arguments and found that Defendants did not act with the requisite state of fraudulent intent, investors could have recovered nothing.

### (ii)   Risks To Proving Damages and Loss Causation

Even assuming that Lead Plaintiff overcame the above risks and successfully established falsity and scienter, it would have met considerable additional challenges in satisfying its burden in proving "that [Defendants'] misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" *Dura Pharms., Inc. v. Broudo*, 544

U.S. 336, 345-46 (2005). While the Court rejected Defendants' loss causation arguments at the motion to dismiss stage, loss causation is subject only to notice pleading, and loss causation arguments could have presented a significant risk at summary judgment and trial, where the Court or a jury would review evidence and Defendants' position likely would have been bolstered by expert testimony opining that there was no loss causation and limited or no damages.

Defendants would continue to argue that none of the stock price declines on the alleged corrective disclosure dates can be connected to the alleged fraud. ¶ 81. Specifically, Defendants would have argued that any impacts attributable to Lead Plaintiff's allegations—*i.e.*, the "Saturday Scheme," the Company's domestic LVT startup issues, and inventory issues—were immaterial in light of Mohawk's overall size and thus could not have impacted Mohawk's stock price on the dates of the alleged corrective disclosures. ¶ 82. Defendants also would have argued that any stock price declines on the corrective disclosure dates were due to the disclosure of negative information unrelated to the alleged fraud, including information concerning the Company's carpet and ceramic businesses and information concerning industry-wide factors. ¶ 83. If Defendants prevailed on any of their loss causation arguments, damages would be significantly reduced or eliminated. ¶ 84.

- 14 -

With regard to damages, Lead Plaintiff and the Class also faced significant challenges. Each of the alleged corrective disclosures was associated with an earnings release, and thus many facts relevant to Mohawk's valuation—including negative facts unrelated to the alleged fraud—were released contemporaneously with the allegedly corrective information. ¶¶ 83, 85. To quantify the impact of the alleged fraud-related disclosures and isolate the impact of fraud-related disclosures on Mohawk's stock price, Lead Plaintiff would need to successfully disaggregate the stock price declines on the alleged corrective disclosure dates. Any such disaggregation would have been a hotly contested topic, with Defendants arguing that, at most, only a small fraction of the stock price declines on the alleged corrective disclosure dates were related to the alleged fraud.

These disputed issues would have boiled down to a "battle of experts" at trial. Defendants would have presented a well-qualified expert who would opine that the Class's damages were small or nonexistent. As courts have long recognized, the uncertainty as to which expert a jury might credit is "highly unpredictable" and presents another substantial litigation risk in securities actions. *See Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 WL 11336122, at *8 (N.D. Ga. Oct. 20, 2008) ("'[A] jury could be swayed by experts for Defendants,' and find that there were no damages or only a fraction of the amount of damages Lead Plaintiffs

- 15 -

contended. . . .”). (quoting *In re Am. Bank Note Holographies, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001).

### (b)     The Settlement Represents a Substantial Percentage of Likely Recoverable Damages

The $60 million Settlement is also a very favorable result when considered in relation to the maximum potential damages that Lead Plaintiff could establish at trial. The maximum potential damages that could Lead Plaintiff could realistically establish at trial—assuming aggressively that investors prevailed on all aspects of their claims and all corrective disclosures, and adjusting only for issues of loss causation—is approximately $350 million to $500 million. The $60 million Settlement Amount, thus, represents approximately 12% to 17% of Lead Plaintiff's maximum potential realistic class-wide damages, which assumes that investors prevailed on all of the alleged misstatements during the entire Class Period. This fraction represents an excellent recovery for the Class, especially when considered in light of the real risk of no-or-lesser recovery and the typical level of recovery in securities class actions. *See, e.g.*, *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 U.S. Dist. LEXIS 144133, at *9 (S.D. Fla. Oct. 14, 2016) (finding $24 million settlement that represented “5.5% of th[e] best-case scenario” was “an excellent recovery, returning more than triple the average settlement in cases of this size”); *In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*, 2007 U.S. Dist. LEXIS 9450, at *33 (S.D.N.Y. Jan.

31, 2007) ("The [$40.3 million] settlement . . . represents a recovery of approximately 6.25% of estimated damages. This is at the higher end of the range of reasonableness of recovery in class actions securities litigations."); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at \*4 (C.D. Cal. Oct. 13, 2015) (settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").

### (c) The Costs and Delays of Continued Litigation Support Approval of the Settlement

The substantial costs and delays required before the Class could obtain any recovery through litigation also strongly support approval of the Settlement.

While this case settled after both Class certification and substantial document and deposition discovery, achieving a litigated verdict would have required substantial additional time and expense. Without the Settlement, achieving a Class recovery would have required: (i) the conclusion of fact discovery (including numerous additional depositions); (ii) conducting complex and expensive expert discovery; (iii) briefing an expected motion for summary judgment; (iv) substantial pre-trial motion practice in the form of *Daubert* motions and motions *in limine*; (v) a trial involving substantial fact and expert testimony; and (vi) post-trial motions. Finally, whatever the outcome at trial, appeals from any verdict would be virtually

certain. Even assuming success at all these stages, they too would pose substantial expense and delay stretching to years.

In contrast to costly, lengthy, and uncertain continued litigation, the Settlement provides an immediate, significant, and certain $60 million recovery for Class Members.

### (d)    All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims"; "the terms of any proposed award of attorney's fees, including timing of payment"; and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors supports approval here.

First, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods widely used in securities class action litigation. The Settlement proceeds will be distributed to Class Members who submit eligible Claim Forms with required documentation to the Court-appointed Claims Administrator, JND Legal Administration ("JND"). JND, an independent company with extensive experience administering securities class action settlements, will review and process the Claims,

will provide Claimants with an opportunity to cure any deficiencies in their Claims or request the Court's review, and will then mail or wire eligible Claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon the Court's approval. This is the standard method in securities class actions and has long been found effective. *See, e.g.,* Stipulation and Agreement of Settlement at 32-37, *In re Equifax Inc. Sec. Litig.*, No. 1:17-cv-03463-TWT (N.D. Ga. Feb. 13, 2020), ECF No. 159-2; Stipulation and Agreement of Settlement at 34-39, *City of Sunrise General Emps.' Ret. Plan v. Fleetcor Techs. Inc., et al.*, No. 1:17-cv-02207-LMM (N.D. Ga. Nov. 7, 2019).

Second, the Settlement's relief for the Class is also adequate when accounting for the proposed attorneys' fees to be paid upon award by the Court. As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 25% are reasonable in light of Lead Counsel's efforts and the litigation's risks. Approval of attorneys' fees is entirely separate from Settlement approval, and neither Lead Plaintiff nor Lead Counsel has the right to terminate the Settlement based on this Court's or any appellate court's ruling on attorneys' fees. *See* Stipulation ¶ 15.

Lastly, Rule 23 asks the Court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the only such agreement is the Parties'

confidential Supplemental Agreement, which defines Mohawk's right to terminate the Settlement if the number of Class Members requesting exclusion exceeds a certain threshold. This type of agreement is a standard provision in securities class actions and has no negative impact on the Settlement's fairness. *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018), *aff'd sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020).[7]

### 4.    The Settlement Treats Class Members Equitably Relative to Each Other

As discussed below in Part II.B., the Plan of Allocation provides that Class Members whose claims are Court-approved will receive their *pro rata* share of the recovery based on their losses resulting from their transactions in Mohawk common stock during the relevant time periods. Lead Plaintiff will receive the same level of *pro rata* recovery (based on the Plan of Allocation) as all other Class Members. This ensures equitable treatment among the Class.

---

[7] The Supplemental Agreement is not being made public solely to avoid incentivizing opt-outs from attempting to leverage the threshold to exact individual settlements. As now-Senior Circuit Judge Carnes observed, in *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, it is unnecessary to make similar agreements public. 258 F.R.D. 545, 560 (N.D. Ga. 2007). The Supplemental Agreement may be disclosed to the Court in camera, and the parties are happy to do so if the Court requests.

### 5.    Other Factors Considered by the Eleventh Circuit Support Approval of the Settlement

Other factors considered by the Eleventh Circuit, including the Class's reaction to the Settlement and the stage of proceedings at which the Settlement was achieved, *see Bennett*, 737 F.2d at 986, also support the Settlement's approval. Under the Preliminary Approval Order, the deadline for Class Members to exclude themselves from the Class or object to the Settlement is May 10, 2023. To date, no objection to the proposed Settlement has been received, and just one request for exclusion—submitted on behalf of a group of opt-out plaintiffs who previously filed an individual action—has been received. Lead Plaintiff will file a reply by May 24, 2023, addressing all requests for exclusion and objections received.

The stage of proceedings at which the Settlement was achieved also supports its approval. Here, as discussed above and in the Browne Declaration, the Settlement was reached after nearly three years of extensive, hard-fought litigation. As a result, "Class Counsel had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation." *Francisco v. Numismatic Guar. Corp. of Am.*, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008).

In sum, all of the factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

**B.    The Plan of Allocation is Fair and Reasonable**

Like a settlement, a plan of allocation for distribution of the settlement must be "fair, adequate and reasonable" and not collusive. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982). A plan of allocation need not be precise but is fair and reasonable where there is a "rough correlation" between class members' injuries and the settlement distribution. *Id.* at 240; *see Vinh Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) ("An allocation formula need only have a reasonable, rational basis."). Courts give great weight to the opinion of experienced counsel in evaluating plans of allocation. *See Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *9 (S.D.N.Y. Sept. 4, 2014).

The proposed Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members. Lead Plaintiff alleges that Defendants made false statements and omitted material facts during the Class Period (*i.e.*, from April 28, 2017 through July 25, 2019, inclusive), which had the effect of artificially inflating the price of Mohawk common stock. Table A to the Plan of Allocation provides the estimated alleged artificial inflation in the per share closing prices of Mohawk common stock allegedly caused by Defendants' alleged

- 22 -

misrepresentations and omissions. The estimated artificial inflation accounts for price changes in Mohawk common stock in reaction to certain public announcements alleged to be corrective disclosures concerning Defendants' alleged misrepresentations and omissions, adjusting for price changes attributable to market or industry forces. *See* Appendix A to Notice, ¶ 2.

The Plan of Allocation will calculate a "Recognized Loss Amount" for each documented purchase or acquisition of Mohawk common stock during the Class Period listed in the Claim Form. Notice, App. A ¶ 4. In general, the Recognized Loss Amount will be the lesser of the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase and sale price of the stock. *Id*. ¶¶ 3, 5.

Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses from the alleged misconduct. ¶¶ 95-101. To date, Lead Counsel has received no objections to the proposed Plan of Allocation. ¶ 102.

## C.    Notice Satisfies Rule 23 and Due Process

The Notice to the Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ.

- 23 -

P. 23(c)(2)(B). The Notice also satisfies Rule 23(e)(1), requiring that it "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 114 (2d Cir. 2005).

Both the Notice's substance and its method of dissemination to potential members of the Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, JND began mailing copies of the Notice and Claim Form to potential Class Members on March 3, 2023. *See* Ex. 2, Segura Decl. ¶¶ 5-8. Through April 25, 2023, JND disseminated 221,509 copies of the Notice Packet to potential Class Members and nominees. *See id.* ¶ 11. In addition, JND caused the Summary Notice to be published in the *Wall Street Journal* and over the *PR Newswire* on March 14, 2023. *See id.* ¶ 14. This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by publication in a widely circulated newspaper and over a newswire, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). Furthermore, courts routinely find that comparable notice procedures meet the requirements of due process, Rule 23, and the PSLRA. *See, e.g.*, Order Preliminarily

Approving Settlement and Authorizing Dissemination of Notice of Settlement at 6-7, *In re Equifax Inc. Sec. Litig.*, No. 1:17-cv-03463-TWT (N.D. Ga. Feb. 25, 2020), ECF No. 163; Final Judgment at 5-6, *In re Equifax Inc. Sec. Litig.*, No. 1:17-CV03463-TWT (N.D. Ga. July 1, 2020), ECF No. 182 (approving comparable notice plan); *In re Piedmont Off. Realty Tr. Inc. Sec. Litig.*, 2013 WL 12205681, at *2-3 (N.D. Ga. Jan. 2, 2013); *In re Piedmont Off. Realty Tr. Inc. Sec. Litig.*, 2013 WL 12205636, at *3 (N.D. Ga. Apr. 18, 2013) (same).

## III.    CONCLUSION

Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate. A proposed Judgment and Order granting the requested relief will be submitted with Lead Plaintiff's reply papers after the deadlines for objecting to the Settlement and requesting exclusion from the Class have passed.

Dated: April 26, 2023                    Respectfully submitted,

                                         */s/ John C. Browne*
                                         John C. Browne (admitted *pro hac vice*)
                                         **BERNSTEIN LITOWITZ BERGER &
                                         GROSSMANN LLP**
                                         1251 Avenue of the Americas
                                         New York, NY  10020
                                         Tel: (212) 554-1400
                                         Fax: (212) 554-1444
                                         JohnB@blbglaw.com

- 25 -

-and-

Jonathan D. Uslaner (admitted *pro hac vice*)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA  90067
Tel: (310) 819-3472
JonathanU@blbglaw.com

*Lead Counsel for Lead Plaintiff and the Class*

H. Lamar Mixson
Georgia Bar No. 514012
Amanda Kay Seals
Georgia Bar No. 502720
**BONDURANT MIXSON & ELMORE, LLP**
1201 West Peachtree Street NW,
Suite 3900
Atlanta, GA  30309
Tel: (404) 881-4100
Fax: (404) 881-4111
mixson@bmelaw.com
seals@bmelaw.com

*Liaison Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi and the Class*

John L. Davidson (admitted *pro hac vice*)
**DAVIDSON BOWIE, PLLC**
1062 Highland Colony Parkway
200 Concourse, Suite 275
Ridgeland, MS  39157
Tel: (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Lead Plaintiff Public*

- 26 -

- 27 -

*Employees' Retirement System of Mississippi*

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1(C).

/s/ John C. Browne
John C. Browne (admitted *pro hac vice*)