# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>MOHAWK INDUSTRIES, INC. and JEFFREY S. LORBERBAUM,<br><br>        Defendants. | Civ. A. No. 4:20-cv-00005-VMC |

**DECLARATION OF JOHN C. BROWNE IN SUPPORT OF
(I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION
AND (II) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES
<u>AND LITIGATION EXPENSES</u>**

JOHN C. BROWNE declares as follows:

## I.    INTRODUCTION

1.    I, John C. Browne, am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"). BLB&G is Lead Counsel and Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS" or "Lead Plaintiff") in the above-captioned action (the "Action").[1] I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of the Action.

2.    I respectfully submit this Declaration in support of: (a) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Final Approval Motion"); and (b) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Fee and Expense Motion").

3.    The proposed Settlement provides for the resolution of the Action in exchange for a $60 million cash payment. The proposed Settlement represents an extraordinary result, providing a substantial payment to Class Members while avoiding the significant risk and expense of continued litigation, including the risk

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated January 13, 2023 (the "Stipulation" or "Stipulation of Settlement") previously filed with the Court. *See* ECF No. 119-1.

that the Class could recover nothing or less than the amount of the Settlement after years of additional litigation, appeals, and delay.

4. As discussed in more detail below, the highly favorable Settlement was achieved in considerable part due to the substantial litigation efforts of Plaintiff's Counsel, including:

(i) conducting a comprehensive investigation of the claims and potential claims against Defendants, which involved a comprehensive review of the voluminous public record, including relevant accounting standards, Mohawk's SEC filings, analyst reports, news articles, and transcripts of investor calls, as well as contacting more than 100 former Mohawk employees as potential witnesses, including more than a dozen whose accounts were cited in the Amended Complaint and the Court's motion to dismiss order;

(ii) drafting the 193-page Consolidated Class Action Complaint (the "Amended Complaint");

(iii) successfully opposing Defendants' motion to dismiss, which included researching and drafting a 35-page brief in opposition to the more than 100 pages of briefing and exhibits submitted by Defendants;

(iv) aggressively pursuing discovery, including obtaining and reviewing nearly a million pages of documents from Defendants and third parties;

(v) successfully seeking certification of the action as a class action and appointment of Lead Plaintiff as class representative, including by submitting more than 450 pages of briefing and exhibits, with Defendants submitting more than 150 pages of briefing and exhibits in opposition;

(vi) taking or defending seventeen depositions of current and former Mohawk executives, Lead Plaintiff representatives, and experts regarding loss causation, damages, and market efficiency;

(vii)    drafting and filing a highly contested motion seeking issuance of a letter rogatory in order to seek the deposition of a foreign witness, including the retention of foreign counsel; and

(viii)    engaging in extended arm's-length settlement negotiations, which included the submission of fulsome mediation briefing and a full-day mediation session with the Honorable Layn R. Phillips (U.S.D.J. (Ret.)), one of the nation's preeminent mediators of securities class actions and other complex litigations.

Due to these efforts, Lead Plaintiff and Lead Counsel were well-informed of the strengths and weaknesses of the claims and defenses in this Action at the time they achieved the proposed settlement.

5.    The $60 million Settlement was based on a mediator's recommendation made on a "double-blind" basis by Judge Phillips following several additional months of arm's-length settlement negotiations after the mediation session.

6.    Lead Plaintiff is a sophisticated institutional investor that actively participated in the Action, closely supervised the work of Plaintiff's Counsel, and strongly endorses the approval of the Settlement. *See* Declaration of Tricia Beale, Special Assistant Attorney General, Legal Counsel to the Public Employees' Retirement System of Mississippi, in Support of:  (i) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (ii) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Beale Decl."), attached as Exhibit 1, at ¶¶ 6-9.

7.      As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiff's damages expert, provides for the equitable distribution of the Net Settlement Fund to Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis fairly based on losses attributable to the alleged fraud.

8.      For its efforts in achieving the Settlement, Lead Counsel requests a fee of 25% of the Settlement Fund, net of Court-approved Litigation Expenses. As discussed below and in the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Fee Memorandum"), Plaintiff's Counsel prosecuted this case on a fully contingent basis, incurring significant litigation expenses while bearing all risk of an unfavorable result. Moreover, as detailed in the Fee Memorandum, a 25% fee is the "benchmark" in this Circuit and is consistent with fees that courts in this Circuit have awarded in similar securities and other complex class actions.

9.      The requested fee also represents a "multiplier" of just 1.01 on Plaintiff's Counsel's lodestar. Plaintiff's Counsel's lodestar is derived by multiplying the hours spent by each attorney and paraprofessional by their current hourly rate, and the lodestar multiplier is calculated by dividing the total requested fee award by Plaintiff's Counsel's total lodestar. Here, the requested fee of 25% of the $60 million Settlement (net of expenses) equates to approximately $14,819,000,

while Plaintiff's Counsel's total lodestar is approximately $14,605,900, resulting in a lodestar multiplier of just 1.01.

10.    For all of the reasons set forth herein, including the excellent result obtained and the quality of work performed, I respectfully submit that the Settlement and Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them pursuant to Federal Rule of Civil Procedure Rule 23(e) and applicable law. For similar reasons, and for the additional reasons set forth below, I respectfully submit that Lead Counsel's request for attorneys' fees and payment of Litigation Expenses, which includes the requested PSLRA award to Lead Plaintiff, are also fair and reasonable, and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Filing The Initial Complaint And Appointment Of Lead Plaintiff And Lead Counsel

11.    On January 3, 2020, MissPERS filed the initial complaint in this Action. ECF No. 1. On March 3, 2020, MissPERS moved the Court for appointment as Lead Plaintiff and approval of BLB&G as Lead Counsel, which was unopposed. ECF No. 15. On March 18, 2020, the Court granted Lead Plaintiff's motion. ECF No. 18. On March 30, 2020, the parties submitted a joint schedule for the filing of the amended complaint and the briefing on motions to dismiss. ECF No. 24. The Court entered the parties' joint schedule on April 2, 2020. ECF No. 26. On April 29,

2020, the Court granted a consent motion modifying the scheduling order and setting the deadline to file the operative complaint on June 29, 2020. ECF No. 28.

**B.  Lead Counsel's Investigation And Filing The Amended Complaint**

12.  After the Court appointed MissPERS as Lead Plaintiff and BLB&G as Lead Counsel, Lead Counsel deepened its already ongoing investigation and began drafting a consolidated amended complaint. Pursuant to that investigation, Lead Counsel reviewed voluminous materials authored, issued, or publicly presented by Mohawk, including Mohawk's SEC filings, conference call transcripts, registration statements, prospectuses, press releases, investor presentations, and other communications issued publicly during the Class Period and beyond. Lead Counsel also comprehensively reviewed news articles, securities analyst reports, and items of market commentary concerning Mohawk issued before, during, and after the Class Period, in order to analyze the impact of Mohawk's statements and revelations about Mohawk on market participants' views about the Company. Given that Mohawk was followed by numerous analysts and Mohawk's financial results garnered significant analyst and media attention during the Class Period, the volume of these materials was substantial.

13.  Lead Counsel also identified 428 former employees of Mohawk and third parties with potentially relevant information and contacted 132 of them as potential witnesses. These former employees provided valuable insight and

7

background that aided Lead Counsel in its investigation and in formulating the theory of the case and the allegations in the Amended Complaint. In addition to this factual research, Lead Counsel thoroughly researched relevant case law applicable to the claims asserted and Defendants' potential defenses thereto.

14.     On June 29, 2020, Lead Plaintiff filed the Amended Complaint, bringing claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder against all Defendants, and claims against Section 20(a) of the Exchange Act against Defendant Jeffrey S. Lorberbaum as a control person of Mohawk. ECF No. 37. The Amended Complaint included 193 pages of detailed allegations drawn from Lead Counsel's thorough review of Mohawk's financial reports, SEC filings, and public statements, as well as reports of security analysts who covered the Company. The Amended Complaint also included the accounts of 14 former Mohawk employees, including those of senior Mohawk executives who reported being directly involved in events at issue in the Amended Complaint's allegations.

### C.     Defendants' Motion To Dismiss The Amended Complaint

15.     On October 27, 2020, Defendants filed a motion to dismiss the Amended Complaint, which was supported by more than 100 pages of briefing and exhibits. ECF No. 54. Defendants challenged the sufficiency of the Amended Complaint with respect to the elements of falsity, scienter, and loss causation.

16.     Defendants made several arguments regarding "falsity," arguing that the Amended Complaint failed to allege an actionable misstatement or omission. First, Defendants argued that the Amended Complaint did not allege with sufficient particularity that any financial results were inaccurate or that any purportedly inflated revenues or margins were materially inflated. ECF No. 54-1 at 11-12. Defendants pointed out that Mohawk never issued a restatement, arguing that this undermined any inference that its accurately reported financial information was misleading and further that there is no duty to disclose conditions which might make future financial results less favorable. *Id.* at 13-14.

17.     Second, with regard to the "Saturday Scheme" alleged in the Amended Complaint, Defendants contended that the pleadings were deficient because Lead Plaintiff failed to allege with particularity the specific transactions involved in the scheme and the quantity of revenue purportedly improperly recognized as a result of those transactions, as Defendants argued was required in the Eleventh Circuit. *See id.* at 17-19. Defendants further argued that Lead Plaintiff had failed to allege facts establishing that the former employees, whose accounts supported the "Saturday Scheme" allegations, had insight into Mohawk's accounting practices. *Id.* at 15-16.

18.     Third, as to alleged false statements concerning the quality and market acceptance of Mohawk's LVT, *e.g.*, that "[w]ith their superior design and performance, our flexible, rigid and commercial LVT collections are being well

accepted across all channels," Defendants argued that such statements were non-actionable puffery, and, in any event, that the Amended Complaint only included certain anecdotal observations from former employees and failed to plead the falsity of such statements with requisite particularity. *Id*. at 19-21.

19.     Defendants also advanced several arguments regarding "scienter." Defendants argued that the Amended Complaint failed to adequately plead scienter under the heightened pleading standards of Rule 9 and the PSLRA. Among other things, Defendants challenged the allegations drawn from the accounts of former Mohawk employees. Defendants contended that Lead Plaintiff's allegations relied on the accounts of 14 former employees who were not alleged to have any involvement in the Company's accounting practices or the preparation of its public filings. *Id*. at 22-23. Further, Defendants contended that the former employees' accounts regarding the "(i) the purpose of the alleged Saturday quarter-end pushes and corresponding effect on revenue, (ii) the ramifications of the alleged quality issues with the U.S. LVT, and (iii) the perceived overproduction of certain products on the Company's financials [were] impermissibly conclusory." *Id*. at 23-24. With respect to the account provided by a former employee who recounted a meeting in which Defendant Lorberbaum was confronted with the purportedly fraudulent conduct of Brian Carson, Mohawk's President of the Flooring North America segment, Defendants argued that this account did not support any inference of

10

scienter, and, in any event, could only support scienter after September 2018, when the meeting was alleged to take place. *Id*. at 29-31.

20. Defendants also argued that the alleged magnitude of the "Saturday Scheme" and the size and scope of Mohawk's "scrap" LVT buildup could not support scienter because the financial impact of those practices was not quantified in the Amended Complaint. *Id*. at 24-25. Similarly, with regard to Lead Plaintiff's allegation that Mohawk's Flooring North America segment was "the Company's most important business segment," Defendants argued that such a "core business" inference is "disfavored" in the Eleventh Circuit. *Id*. at 27-28.

21. Defendants further argued that, even if the Amended Complaint pleaded facts showing Mr. Carson's knowledge of any alleged schemes, his knowledge could not be imputed to Defendant Lorberbaum. *Id*. at 25-26. Defendants similarly argued that the Amended Complaint's allegations concerning Defendant Lorberbaum's role as Chief Executive Officer and Chairman of the Board of Mohawk, and his access to reports and data and attendance at meetings, did not support scienter, particularly because the Amended Complaint failed to include specific allegations regarding how the information he had access to through those means contradicted the reported financials or rendered any specific statement of his false and misleading. *Id*. at 26-27. Defendants also contended that there were no allegations that Defendant Lorberbaum had a plausible motive to engage in the

11

purported fraud because the Amended Complaint did not plead he received a financial windfall from the purported schemes or received compensation that deviated from his historical compensation or from the compensation of similarly situated executives. *Id*. at 28-29.

22.    Defendants further contended that the Amended Complaint failed to plead loss causation because it did not allege how the purported fraudulent schemes were revealed by the alleged corrective disclosures. *Id*. at 32-33.

23.    On December 28, 2020, Lead Plaintiff filed a 35-page brief in opposition to Defendants' motion to dismiss. ECF No. 56. Researching and drafting Lead Plaintiff's opposition was a substantial undertaking, requiring that Lead Counsel comprehensively research the law on numerous issues related to the falsity, scienter, and loss causation arguments noted above (and others), as well as on the reliability of allegations attributed to former employees.

24.    In the opposition brief, Lead Plaintiff successfully countered Defendants' key arguments. With respect to falsity, Lead Plaintiff argued that Defendants' statements that Mohawk was "selling all of [the LVT] we could have" and that LVT sales were subject to "capacity constraints" were actionable given allegations of Mohawk's LVT production problems and customer reactions to them. *Id*. at 10-12. Lead Plaintiff also argued that Mohawk's statement that LVT was "being well accepted across all channels" was not puffery, including because the

Amended Complaint alleged that Mohawk customers were, in fact, returning Mohawk's LVT products due to defects. *Id.* at 12-14. Lead Plaintiff further argued that allegations that Defendants failed to disclose Mohawk's overproduction of products and refused to write down defective and obsolete products carried in inventory were sufficient to plead the misleading nature of statements to investors concerning the reasons for Mohawk's "record" margins. *Id.* at 14-15. And Lead Plaintiff argued that Defendants misled investors regarding the true reasons for Mohawk's rising inventory by failing to disclose that there was a substantial amount of unsalable LVT in Mohawk's warehouses and refusing to write such inventory down. *Id.* at 15-16. Regarding the "Saturday Scheme" allegations, Lead Plaintiff argued that the Amended Complaint pleaded numerous details concerning the alleged scheme, which were derived from the accounts of well-placed former Mohawk employees. *Id.* at 17-18, 21-23.

25.    Lead Plaintiff argued that the Amended Complaint sufficiently pleaded scienter, including because it alleged that a senior executive whose knowledge could be attributed to the Company personally directed the schemes and was terminated because of his involvement in them (*id.* at 24-25), and Defendant Lorberbaum was directly confronted with certain relevant facts and had access to and received relevant reports and information (*id.* at 26-29).

26.    Finally, Lead Plaintiff also argued that the Amended Complaint sufficiently pleaded loss causation at the pleading stage. *Id*. at 32-35.

27.    On January 27, 2021, Defendants filed their reply brief, which included 20 pages of additional briefing, responding to Lead Plaintiff's arguments in opposition and reinforcing Defendants' argument from their opening brief. ECF No. 57.

**D.    The Court's Opinion Denying Defendants' Motions To Dismiss**

28.    On September 29, 2021, the Court issued a 58-page Order largely denying Defendants' motion to dismiss. ECF No. 60. The Court scrutinized the Amended Complaint's former employee allegations and determined that it was appropriate to credit them at the pleading stage. *Id*. at 16-18. The Court then analyzed those accounts and other allegations in the Amended Complaint and determined that the Amended Complaint adequately alleged the falsity of all but one of the challenged statements, dismissing Defendant Lorberbaum's statement that Mohawk's LVT possessed "superior design and performance" as nonactionable puffery. *Id*. at 37-39. The Court also rejected Defendants' arguments that several of their alleged misrepresentations were immaterial, recognizing that materiality is typically an improper basis for dismissal of securities fraud claims on a 12(b)(6) motion. *Id*. at 24-30, 36-37. The Court further held that each Defendant's scienter and loss causation were adequately pleaded. *Id.* at 44-48, 52-56.

14

29.  On November 12, 2021, Defendants filed their answer to the Amended Complaint, denying its allegations and asserting numerous defenses including a "truth-on-the-market" defense, that "fraud on the market" reliance was not sufficiently pleaded, and that forward-looking statements are barred by the "Bespeaks Caution Doctrine" and the "Safe Harbor Provision" of the Private Securities Litigation Reform Act of 1995. ECF No. 64.

### E.  Lead Plaintiff's Extensive Discovery Efforts

30.  From October 2021 through November 2022, Lead Plaintiff aggressively pursued discovery. The discovery process was highly contested, and numerous disputes arose among the Parties regarding the scope of discovery, the appropriate set of custodians for Defendants' search for electronically-stored information, and the appropriate central repositories of documents and data to collect and search. To resolve these disputes, the Parties engaged in extensive correspondence and several meet-and-confers to negotiate the scope of discovery.

31.  Through their efforts, Lead Counsel obtained more than 150,000 documents from Defendants and numerous third parties, totaling nearly 1 million pages. As described below, Lead Counsel reviewed and analyzed those documents and Defendants' written discovery responses in order to engage experts, prepare for and conduct depositions, and ultimately develop the record for trial. Lead Plaintiff also moved the Court to issue a letter rogatory in order to obtain the testimony of a

former senior executive of Mohawk who was involved in key issues alleged in the Amended Complaint, including the Company's domestic manufacturing of LVT. These discovery efforts provided Lead Counsel with a thorough understanding of the strengths and weaknesses of Lead Plaintiff's claims and assisted Lead Counsel in considering and evaluating the fairness of the Settlement. A summary of Lead Counsel's discovery efforts follows.

## F. Document Discovery From Defendants And Third Parties

32. As noted above, Lead Plaintiff obtained and reviewed nearly 1 million pages of documents from Defendants and third parties in this Action. Lead Plaintiff served its first set of requests for production of documents on Defendants on November 12, 2021.[2] After Defendants served their responses and objections to Lead Plaintiff's document requests on December 13, 2021, the Parties met and conferred extensively to negotiate the scope and parameters of Defendants' document collection and production. Lead Plaintiff served its second set of requests for production of documents on Defendants on August 3, 2022, and served their third set of requests for production of documents on Defendants on September 27, 2022. Defendants served their responses and objections to Lead Plaintiff's second and third sets of document requests on September 2, 2022 and October 27, 2022, respectively.

---

[2] The Parties prepared and exchanged initial disclosures pursuant to Federal Rule 26(a)(1) on November 29, 2021.

16

33.     In addition, during fact discovery, the Parties served eighteen document subpoenas on third parties, including several former Mohawk employees who allegedly participated in the fraudulent schemes alleged in the Amended Complaint. Lead Counsel met and conferred extensively with counsel for many of these third parties to negotiate the scope and terms of their respective document productions. In total, Lead Counsel obtained nearly 200,000 pages of documents from third parties.

34.     Lead Counsel developed a thorough and efficient process to manage the review of the documents it obtained from Defendants and third parties. At the outset of the review, Lead Counsel developed a detailed review protocol and coding manual, with explanatory notes covering: (i) the key facts at issue in the Action; (ii) relevance coding instructions; and (iii) "tags" covering relevant issues and sub-issues. Lead Counsel also assembled a team of experienced attorneys to review and analyze the documents received in discovery. This team of staff attorneys reported directly to associates, senior counsel, and partners at Lead Counsel, circulating detailed notes on "hot" documents on a weekly basis and participating in regular meetings to discuss their findings and share knowledge throughout the team. Through these efforts, Lead Counsel developed a thorough understanding of the evidentiary record, which they used to identify key issues for further analysis and inform Lead Plaintiff's theories of liability.

17

35. Beyond these formal processes, the attorneys involved in reviewing and analyzing documents for this matter communicated frequently among themselves to ensure that coding decisions were applied consistently and that all team members were apprised of important developments with respect to the document review and development of case theories. In addition, these attorneys were responsible for preparing presentations and memoranda on key factual issues and potential deponents, as well as preparing deposition kits identifying candidate deposition exhibits.

### G. Document Discovery From Lead Plaintiff

36. Lead Plaintiff also responded to document requests from Defendants. Defendants served forty-eight document requests on Lead Plaintiff on December 16, 2021. Lead Plaintiff timely served responses and objections to Defendants' document requests on January 18, 2022. The Parties met and conferred extensively over the scope and parameters of Lead Plaintiff's document productions in response to Defendants' requests. In responding to Defendants' document requests, Lead Plaintiff performed diligent and reasonable searches and document collections, reviewed a broad universe of relevant documents for responsiveness and privilege, and produced over 100,000 pages of documents to Defendants.

### H.    Written Discovery

37.    Lead Plaintiff also served requests for written discovery on Defendants. Lead Plaintiff served a set of eight interrogatories on Defendants on December 8, 2021, to which Mohawk and Defendant Lorberbaum each, respectively, served written, verified responses and objections on January 7, 2022. Lead Plaintiff's analyses of these written discovery responses informed their approaches later in the litigation, including in negotiating the scope of document discovery and preparing for depositions.

38.    Lead Plaintiff also responded to written discovery propounded by Defendants. On December 16, 2021, Mohawk served a set of interrogatories on Lead Plaintiff consisting of thirteen total interrogatories, to which Lead Plaintiff served written responses and objections on January 18, 2022, after performing all the research and review necessary to provide such responses.

### I.    Depositions

39.    Lead Counsel carefully reviewed and analyzed the documents produced by Defendants and third parties, as well as all written discovery responses Defendants provided. Bringing these voluminous materials to bear, Lead Counsel deposed twelve fact witnesses, including, among others, senior executives in Mohawk's LVT manufacturing business, Mohawk's COO (who is also a Mohawk director), the Presidents of Mohawk's Flooring – Rest of World and Flooring North

America segments, and Brian Carson, the former President of Mohawk's Flooring North America segment who was alleged to be heavily involved in the matters at issue in the Amended Complaint.

40.    Lead Counsel devoted substantial time to preparing for and taking these depositions, including by conducting a comprehensive review of "hot" documents sent by or to each deponent and preparing deposition kits and memoranda summarizing key facts and themes to structure the depositions. This analysis, and the subsequent depositions, informed Lead Counsel about the strengths and weaknesses of the evidentiary record supporting the allegations and the testimony that could likely be obtained at trial, and thus also helped to inform key litigation strategy issues.

41.    Additionally, on November 11, 2022, Lead Plaintiff moved the Court to seek issuance of a letter rogatory in order to secure the deposition testimony of a former Mohawk senior executive witness located in Belgium, whom Lead Counsel had identified through the course of discovery as being heavily involved in Mohawk's domestic manufacture of LVT. ECF No. 108. In connection with the motion, Lead Counsel also researched processes for seeking testimony from witnesses in Belgium (which is not a signatory to the Hague evidence convention) and engaged Belgian counsel to advise on Belgian legal issues. Defendants opposed Lead Plaintiff's letter rogatory motion on November 25, 2022, and Lead Plaintiff

filed a detailed reply brief in support of the motion on December 2, 2022. ECF Nos. 111, 114. The motion was still pending at the time the Parties entered an agreement to settle the case, and Lead Plaintiff withdrew it on December 15, 2022. ECF No. 118.

### J.    Lead Counsel's Work with Respect to Experts and Consultants

42.    Lead Counsel also worked extensively with experts and consultants in this Action.

43.    Lead Counsel retained and worked with Michael L. Harzmark, Ph.D., President of Hartzmark Economics Litigation Practice, LLC, who provided expert opinions in connection with class certification and advised on loss causation and damages merits issues. Dr. Hartzmark's class certification expert report, which covered topics including the efficiency of the market for Mohawk common stock and a model for measuring classwide damages in accordance with Lead Plaintiff's theory of liability, was submitted to the Court along with Lead Plaintiff's Class Certification Motion on January 26, 2022. ECF No. 78-2. Lead Counsel prepared and defended Dr. Hartzmark at his deposition on February 25, 2022, and took the deposition of Defendants' expert, Lucy P. Allen, a managing director at renowned economic consultancy NERA, on May 19, 2022. Dr. Hartzmark also evaluated Ms. Allen's expert report, and, in coordination with Lead Plaintiff's filing of its reply

brief in further support of its Class Certification Motion, he submitted a rebuttal expert report on June 8, 2022. ECF No. 100-4.

44.     Lead Counsel also retained and worked with Brian Duffy of Friedman LLP, an advisory firm with deep expertise in revenue, inventory and cost accounting.[3] Specifically, Lead Counsel consulted with Mr. Duffy in analyzing issues related to GAAP, inventory accounting, inventory turnover, and per-unit cost accounting and worked with him to develop expert analysis related to accounting issues and Mohawk's inventory-related disclosures.

45.     In addition, Lead Counsel retained and worked closely with Mark Oliff, an industry expert with more than 50 years of experience in the flooring industry who has served as a director of two large privately-held flooring distributors. In connection with Lead Counsel's document and deposition discovery efforts, Mr. Oliff provided expert analysis and guidance regarding various issues related to Lead Plaintiff's LVT-related allegations, including relating to LVT product quality, manufacturing, inventory, and business strategy issues.

### K.     Lead Plaintiff's Class Certification Motion

46.     While continuing to pursue merits discovery, Lead Plaintiff filed its Class Certification Motion on January 26, 2022. ECF No. 78. As noted above, the Class Certification Motion was supported by a market efficiency and damages

---

[3] Friedman LLP merged with Marcum LLP in September 2022.

methodology report prepared by Lead Plaintiff's expert, Dr. Hartzmark, who opined that Mohawk common stock traded in an efficient market during the Class Period and that damages for both Lead Plaintiff's Section 10(b) claims and Section 20(a) claims could be calculated on a class-wide basis utilizing a common methodology.

47. Defendants opposed the Class Certification Motion on April 13, 2022. ECF No. 88. In their opposition, Defendants challenged certification on several grounds, including typicality, adequacy, and predominance. Among other things, Defendants argued that predominance was not met because (i) Lead Plaintiff could not show that Mohawk stock traded in an efficient market and thus could not invoke the presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and (ii) even if the *Basic* presumption did apply, Defendants rebutted it by establishing that the alleged misstatements at issue in the case did not impact Mohawk's stock price. Defendants supported their arguments with an expert report from Ms. Allen, who critiqued Dr. Hartzmark's report and provided her own rebuttal analysis. *See generally* ECF No. 88-2.

48. In connection with the Class Certification Motion, Lead Plaintiff produced documents and Defendants deposed two representatives from MissPERS on March 2, 2022. On April 6, 2022, Defendants also deposed a representative of Eagle Capital Management, LLC, a third-party investment advisor to Lead Plaintiff.

Defendants deposed Dr. Hartzmark on February 25, 2022, and Lead Counsel deposed Ms. Allen on May 19, 2022.

49.    Following Ms. Allen's deposition, Lead Plaintiff filed a reply in further support of the Class Certification Motion, including a rebuttal expert report from Dr. Hartzmark, on June 8, 2022. ECF Nos. 100, 100-4. The reply brief and rebuttal report responded to arguments and criticisms in Defendants' opposition briefing.

50.    On November 28, 2022, the Court granted Lead Plaintiff's Class Certification Motion—finding, among other things, that Lead Plaintiff was entitled to rely on the *Basic* presumption and that Lead Plaintiff had carried its burden to establish that it was an appropriate representative for the Class. ECF No. 113.

## III.    THE SETTLEMENT NEGOTIATIONS AND MEDIATION

### A.    The Parties' Settlement Negotiations and Mediation

51.    To facilitate the potential resolution of the Action, the Parties retained as mediator a former United States District Judge, the Honorable Layn R. Phillips, who is one of the nation's foremost mediators of complex litigation—including specifically securities class actions.

52.    On June 8, 2022, the Parties participated in a full-day in-person mediation session before Judge Phillips. The mediation was attended by Lead Counsel, representatives of MissPERS, counsel for each of the Defendants, representatives of Mohawk, and representatives from Defendants' insurance

carriers. In advance of the mediation, the Parties prepared and exchanged over sixty-seven pages of detailed written mediation submissions, together with hundreds of pages of exhibits. In their submissions, each side articulated the strengths of their positions and the weaknesses of the other side's arguments, informed by the voluminous evidentiary record developed in the course of discovery. At the mediation, the Parties responded to detailed merits- and damages-related questions developed by Judge Phillips and his staff following a review of the submissions and numerous pre-mediation calls with both Parties. Although the Parties made substantial progress during the mediation session, they remained too far apart in their respective positions on several issues to reach agreement that day, and agreed to continue their settlement negotiations with Judge Phillips and his staff over emails and phone calls in the months to come. *See generally* Declaration of Layn R. Phillips in Support of Motion for Final Approval of Settlement ("Phillips Decl."), attached as Exhibit 2, at ¶¶ 7-12.

53.     As discovery continued throughout the summer and autumn of 2022, the Parties also continued discussions and arm's-length negotiations with the assistance and oversight of Judge Phillips. On December 12, 2022, Judge Phillips issued a "mediator's recommendation" for the parties to resolve the matter for $60 million. Phillips Decl. ¶ 11. On December 13, 2022, the Parties accepted the

25

mediator's recommendation on a "double-blind" basis and reached an agreement in principle to settle the Action.

### B. Preparation of Settlement Documentation and Motion for Preliminary Approval of Settlement

54. After the Parties reached their agreement in principle to settle the Action, they spent additional weeks negotiating the final terms of the Stipulation of Settlement, the Exhibits thereto, and the Supplemental Agreement, and exchanged multiple drafts of these documents.

55. During this same time, Lead Counsel requested and reviewed detailed bids obtained from several organizations specializing in class action notice and claims administration, and conducted follow-up communications with certain of these organizations. As a result of this bidding process, Lead Counsel selected JND Legal Administration ("JND") to serve as the Claims Administrator for the Settlement. Lead Counsel also worked closely with Lead Plaintiff's damages expert to develop the proposed Plan of Allocation. *See infra* Section V.

56. Thereafter, on January 20, 2023, Lead Plaintiff filed its Unopposed Motion and Memorandum of Law in support of an Order Preliminarily Approving Class Action Settlement and Authorizing Dissemination of Notice of Settlement ("Preliminary Approval Motion"), which included a copy of the Stipulation, a memorandum in support, and copies of the proposed notice materials to be sent to Class Members to inform them of the Settlement and their options to participate in

it, exclude themselves from the Class, or object. ECF No. 119. On January 27, 2023, the Court held a telephonic conference where it requested modifications to the notice materials. On January 30, 3023, Lead Counsel filed a revised Preliminary Approval Motion to comply with the Court's instructions provided during the January 27, 2023 telephonic conference. ECF No. 121.

57.    On February 3, 2023, the Court entered an order granting the Preliminary Approval Motion, finding that "the proposed settlement satisfies the criteria of Federal Rule of Civil Procedure 23(e) such that the Court will likely be able to approve the proposed settlement as fair, reasonable, an adequate." ECF No. 122, at 4-5. The Court set the Settlement Hearing for May 31, 2023, at 10:00 a.m. *Id*. at 6.

## IV.    RISKS OF CONTINUED LITIGATION

58.    The Settlement provides an immediate and certain benefit to the Class in the form of a $60 million cash payment. Lead Plaintiff and Lead Counsel believe that the proposed Settlement is a fair and favorable result for the Class.

59.    As explained below, Lead Plaintiff faced meaningful risks with respect to proving liability and recovering full damages in this case. Absent the Settlement, in order to obtain a recovery for the Class, Lead Plaintiff would have had to prevail at several stages, including defeating Defendants' anticipated motion for summary judgment and winning at trial. Even after any trial, Lead Plaintiff likely would have

faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiff from successfully obtaining any recovery at all—let alone a recovery of the magnitude of the Settlement—for the Class, and at minimum would have delayed any recovery for years.

## A.    General Risks in Prosecuting Securities Class Actions

60.    Many securities class actions are dismissed at the pleading stage or fail to achieve certification. Those that survive those hurdles frequently face significant further challenges at subsequent stages of litigation. For example, district courts have dismissed certain securities class actions at the summary judgment stage. *See, e.g.*, *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *1 (D. Or. May 24, 2021), *aff'd sub nom. AMF Pensionsforsakring AB v. Precision Castparts Corp.*, 2022 WL 2800825 (9th Cir. July 18, 2022); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *28 (D. Nev. Jan. 3, 2017), *aff'd sub. nom. Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th. Cir. 2018); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd sub. nom. Dalberth v. Xerox*, 766 F.3d 172 (2d Cir. 2014).

61.     And even cases that have survived summary judgment can be dismissed prior to trial in connection with *Daubert* motions. *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 197-98 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of the defendants after finding that the event study offered by plaintiffs' expert was unreliable and that there was accordingly no evidence that the market reacted negatively to disclosures).

62.     Even when securities class action plaintiffs successfully overcome multiple substantive and procedural hurdles pre-trial, there remain significant risks that a jury will not find the defendants liable or award expected damages. For instance, a jury recently found in *In re Tesla Inc. Securities Litigation* that none of the defendants had violated the federal securities laws, even though the plaintiffs had previously obtained summary judgment on the critical elements of falsity and scienter. *See* Verdict Form, *In re Tesla., Inc. Sec. Litig.*, No. 3:18-cv-04865 (N.D. Cal. Feb. 3, 2023), ECF No. 671.

63.     Further, post-trial motions, based on a complete record, also present substantial risks. For example, in *In re BankAtlantic Bancorp, Inc.*, following a jury verdict in the plaintiffs' favor, the district court granted the defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. 2011 WL 1585605, at *14-22 (S.D. Fla. Apr. 25, 2011), *aff'd*, 688 F.3d 713

29

(11th Cir. 2012) (holding that there was insufficient trial evidence to support a finding of loss causation).

64.    Intervening changes in the law may also impact a successful trial verdict. For example, in *Precision Castparts*, a district court in Oregon reconsidered its order denying defendants' motion for summary judgment and granted the motion more than a year later based on a new decision by the Ninth Circuit. *See Precision Castparts*, 2021 WL 2080016, at *6. Indeed, the Supreme Court has heard several securities cases in recent years, often announcing holdings that defendants have argued dramatically changed the law in the middle of long-running cases. *See, e.g.*, *Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*, 141 S. Ct. 1951 (2021); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). As a result, hard-fought cases have been lost after thousands of hours have been invested. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011) (after trial verdict for class plaintiffs, granting judgment for defendants on majority of claims following the *Morrison* decision).

65. Securities class actions thus face serious risks of dismissal and non-recovery at all stages of litigation.

**B.   Specific Risks Concerning This Action**

66. Lead Plaintiff and Lead Counsel believe the claims asserted against Defendants in this action are meritorious. They recognize, however, that this action presented several serious risks to establishing Defendants' liability and to proving the Class's damages.

**1.   Risks to Establishing Falsity and Materiality**

67. Lead Plaintiff faced significant risks in establishing that Defendants made material false and misleading statements.

68. Among other things, the Amended Complaint included allegations regarding the so-called "Saturday Scheme." This alleged effort consisted of Mohawk's senior executives instructing employees to attempt to deliver customer orders on the last Saturday of each quarter, regardless of whether customers actually requested or could accept delivery at that time, and to record those attempted deliveries as sales within the quarter regardless of whether delivery was actually accomplished.

69. Defendants would have challenged those allegations on several grounds. Defendants were expected to argue that any pushes Mohawk made to get products delivered at the end of each quarter were an appropriate and typical sales

practice, and that, critically, Mohawk did not improperly recognize any revenues associated with products that were not, in fact, delivered. Defendants also likely would have argued that they had financial controls in place to avoid recognizing revenue on undelivered orders, that their financial controls and financial statements were audited, and that despite that scrutiny, Mohawk has never restated its financials. In addition, consistent with arguments they raised in their class certification opposition and associated expert report, Defendants were expected to argue that, even if anything similar to the "Saturday Scheme" allegations actually did occur at the Company, the amounts of revenue allegedly recognized by virtue of such misconduct would have been far too small to materially impact Mohawk's overall reported financials or the price of Mohawk's publicly-traded securities. Had the Court or a jury credited these arguments, the Saturday Scheme allegations—and associated alleged false statements and damages—could have been removed from the case entirely.

70.    Defendants would also have mounted a meaningful challenge to the allegations that Mohawk misrepresented the quality of and market reception to its domestically-produced LVT products. Defendants likely would have pointed to several disclosures about LVT production issues they made during earnings calls throughout the Class Period to argue that they promptly and truthfully disclosed problems Mohawk experienced with its domestic LVT production. Defendants also

likely would have argued that any problems Mohawk encountered in manufacturing LVT were to be expected given that Mohawk was starting up a new manufacturing process, and thus that investors could not reasonably have been misled to think that Mohawk would not encounter the problems that actually occurred. Defendants likely would have further argued that the production issues alleged in the case were immaterial to investors, because Mohawk's domestic LVT production represented only a small fraction of total Company-wide sales, and alleged defects only a further fraction of total domestic LVT production. If the Court or a jury were to have credited such arguments, it could have reduced or even eliminated any recovery for investors related to Mohawk's alleged LVT quality misrepresentations.

71.    As for allegations that Defendants concealed the true reasons for Mohawk's growing inventories during the Class Period, which the Amended Complaint alleges were due (at least in part) to Mohawk's accumulation of defective LVT and LVT scrap and intentional overproduction of goods, Defendants would have contended that their disclosures were accurate. Defendants also likely would have argued that Mohawk's domestic LVT represented only a small portion of Mohawk's inventory, defective LVT and scrap represented an even smaller portion, and Mohawk did not intentionally overproduce products to reduce per-unit costs. Defendants further would have likely argued that Mohawk's growing inventory numbers during the Class Period were overwhelmingly driven by other product

categories—like ceramics—that are not implicated in the Amended Complaint's allegations. Consistent with such arguments, Defendants also likely would have argued that Mohawk employed appropriate rules to determine when and how to write down inventory during the Class Period, and that such rules, as well as Mohawk's inventory results, were reviewed and approved by Mohawk's outside auditors. Had such arguments proven persuasive to the Court or a jury, Defendants could have reduced or even eliminated damages associated with the alleged inventory-related misrepresentations as well.

72.    In challenging all of the alleged misrepresentations, Defendants also likely would have argued that investigations into the allegations in the Amended Complaint initiated by the U.S. Attorney's Office for the Northern District of Georgia and the SEC have not resulted in any adverse action against Company.

73.    In short, Defendants likely would have raised significant challenges to Lead Plaintiff's allegations that Defendants made materially false and misleading statements that, if successful, could have removed from the case some or all of the misrepresentations alleged in the Amended Complaint. While Lead Plaintiff believes that it had strong arguments to make in response, the settlement avoids the risks such challenges posed, and provides for a significant recovery for the Class.

### 2.      Risks to Establishing Scienter

74.   Even if Lead Plaintiff had succeeded in establishing that Defendants made certain materially false and misleading statements, Defendants would have mounted a significant challenge to Lead Plaintiff's attempts to establish that those misrepresentations were made with the requisite culpable state of mind.

75.   To start, Defendants would have argued that Defendants had no motive to inflate Mohawk's stock price by making any of the misrepresentations alleged in the Amended Complaint. In support, Defendants likely would have pointed to the facts that Defendant Lorberbaum has been and remains Mohawk's single largest shareholder, including throughout the Class Period and after, and made no suspicious stock sales during the Class Period. Defendants also were expected to highlight that Mohawk announced a $500 million stock repurchase program during the middle of the Class Period, in October 2018, which Defendants would have likely argued was inconsistent with the allegation that they knew that Mohawk's stock price was inflated—and, if anything, suggests that Mohawk insiders thought the very opposite.

76.   In addition, with respect to alleged misrepresentations of financial information, including sales, margins, and inventories, Defendants likely would have argued that Mohawk had internal controls in place to promote accurate financial reporting and that its financial reporting was in fact audited and approved

by outside auditors. With respect to allegations that Mohawk improperly failed to write down defective LVT and manufacturing scrap sitting in the Company's inventory, Defendants were expected to argue that they applied appropriate rules to determining write-downs over time, and that their approach to accounting for inventory was thoroughly audited. Defendants likely would have argued that such controls and external validation strongly undermines any inference that they knowingly misled investors as to their financial reporting.

77.    With respect to "Saturday Scheme" allegations in particular, Defendants were expected to argue that the presence of internal controls specifically targeted at backing out from financial reporting any "sales" associated with undelivered goods undermines any inference that Defendants knowingly used such a scheme to inflate Mohawk's publicly reported financial results. In addition, Defendants likely would have pointed to allegations that Defendant Lorberbaum "launched an investigation into [Mr.] Carson's schemes" and terminated Mr. Carson at the conclusion of the investigation (¶ 24) as showing that, far from condoning any of the alleged schemes, Defendant Lorberbaum acted swiftly and decisively to terminate their alleged perpetrator when he became aware of them—which Defendants may have argued is inconsistent with an intent to defraud.

78.    As for allegations concerning Defendants' concealment of problems with LVT manufacturing, Defendants were expected to argue that the problems were

small in scale and wholly expected given that Mohawk was starting up a new manufacturing process. Defendants likely would have contended that they took LVT production issues seriously and made significant improvements to Mohawk's domestic LVT production over the course of the Class Period, and argued that any attention they paid to production quality issues reflected a focus on achieving excellence, rather than a belief that the problems were so significant as to be material to investors. Defendants also were anticipated to argue that they made numerous timely public disclosures about domestic LVT production issues during the Class Period, and further to contend that such candor is inconsistent with an intent to deceive the market.

79.    Lead Plaintiff believes it would have had meangingful arguments in response to these and other arguments Defendants could have raised. But Lead Plaintiff acknowledges that there was a risk that Defendants could have persuaded either the Court or a jury that, even if they made material misrepresentations to the market, they did not do so with scienter. Had Defendants succeeded in making these arguments, it could have reduced or even eliminated the Class's recovery. The settlement avoids these risks and provides a substantial recovery for Class Members.

### 3.    Risks to Establishing Loss Causation and Damages

80.    Lead Plaintiff would have also faced significant challenges in establishing that Defendants' alleged misrepresentations caused investor losses, and in proving the quantum of those losses.

81.    To start, Defendants likely would have argued that none of the stock price declines on the corrective disclosure dates alleged in the Amended Complaint could be connected to the fraud alleged therein. In their class certification papers, Defendants argued that the financial impact of the fraud alleged in the complaint was too small to drive any of the stock price declines on the alleged corrective disclosure dates.

82.    In support, as they argued at the class certification stage, Defendants likely would have claimed that the total value of allegedly undelivered Mohawk products that were recorded as sales pursuant to the Saturday Scheme was worth, at most, a few million dollars in additional sales in the very first quarter in which the scheme was implemented, with a negligible impact in subsequent quarters. Defendants likewise were expected to argue that Mohawk's domestically-produced LVT represented a mere fraction of the Company's total production and sales, and allegedly defective LVT a further fraction of that amount, to support an argument that allegedly concealed facts about those topics could not have driven large declines in Mohawk's stock price.

83.    Indeed, Defendants likely would have pointed out that each of the alleged corrective disclosure dates was an earnings date for Mohawk, when Defendants announced Company-wide results—including negative results related to products and regions not plausibly implicated in the fraud alleged in the Amended Complaint. Consistent with this, Defendants were expected to continue to contend that Mohawk's LVT business was generally a relative bright spot for the Company during the Class Period, and thus that the declines on the alleged corrective disclosure dates were likely caused by the disclosure of negative information unrelated to the alleged fraud, including information concerning Mohawk's carpet and ceramics businesses and industry-wide factors.

84.    While Lead Plaintiff believes it would have had strong arguments to make in support of loss causation, if Defendants had succeeded in challenging Lead Plaintiff's establishment of a link between the alleged fraud and each of the stock price declines on alleged corrective disclosure dates, it could have resulted in the removal of certain disclosure dates from the case and even eliminated any recovery entirely.

85.    Further, even if Lead Plaintiff had been able to establish some link between each of the alleged corrective disclosures and the alleged fraud, many of the same loss causation arguments noted above would have been marshalled by Defendants to minimize recoverable damages. To argue that recoverable damages

were, at most, only a small fraction of the declines Mohawk stock experienced on those dates, Defendants were expected to cite the following facts: Mohawk's domestic LVT business was small relative to the Company overall; only a portion of Mohawk's domestically-produced LVT was allegedly defective; the Saturday Scheme was alleged only to impact a small fraction of sales; and Mohawk announced negative information unrelated to the fraud on each corrective disclosure date. For example, Defendants likely would have noted that Mohawk's North American LVT business, the focus of the allegations in the Amended Complaint, represented only approximately 4% of Mohawk's average net sales during the Class Period, and argued that any damages associated with a fraud related to the LVT business would have to be similarly limited. Had the Court or a jury accepted these arguments, Defendants could have succeeded in dramatically reducing any recovery.

86. In sum, while Lead Plaintiff believes it would have had strong arguments concerning the damages that would have been recoverable in the Action, it acknowledges that reasonably recoverable damages in the action could have been significantly limited.

*    *    *    *    *

87. Given the meaningful litigation risks, and the immediacy and amount of the $60 million recovery for the Class, Lead Plaintiff and Lead Counsel believe

40

that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Class.

## V.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

88.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and the Proof of Claim and Release Form ("Claim Form") be disseminated to the Class. The Preliminary Approval Order also set a May 10, 2023 deadline for Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Class and set a final approval hearing date of May 31, 2023.

89.    In accordance with the Preliminary Approval Order, Lead Counsel instructed JND, the Court-approved Claims Administrator, to disseminate copies of the Notice and Claim Form by mail and to publish the Summary Notice. The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Class Members' rights to participate in the Settlement, to object to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to exclude themselves from the Class. The Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys'

fees in an amount not to exceed 25% of the Settlement Fund and for payment of Plaintiff's Counsel's Litigation Expenses in an amount not to exceed $1,000,000, including reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff directly related to its representation of the Class. To disseminate the Notice, JND obtained information from Mohawk and from banks, brokers, and other nominees regarding the names and addresses of potential Class Members. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "Segura Decl."), attached as Exhibit 2, at ¶¶ 5-10.

90.    On March 3, 2023, JND mailed 6,189 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Class Members and nominees by first-class mail. *See* Segura Decl. ¶ 8. Through April 25, 2023, JND disseminated 221,509 Notice Packets. *Id*. at ¶ 11.

91.    On March 14, 2023, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in the *Wall Street Journal* and to be transmitted over the *PR Newswire*. *See id*. at ¶ 14.

92.    Lead Counsel also caused JND to establish a dedicated settlement website, www.MohawkIndustriesSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the

Stipulation, Preliminary Approval Order, Complaint, Motion to Dismiss Order, and Order Granting Class Certification. *See id*. at ¶ 15. Copies of the Notice and Claim Form are also available on Lead Counsel's website, www.blbglaw.com.

93. As noted above, the deadline for Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Class, is May 10, 2023. To date, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received. One request for exclusion-submitted on behalf of a group of opt-out plaintiffs who previously filed an individual action has been received. *See* Segura Decl. ¶ 18. Lead Plaintiff will file reply papers in support of final approval of the Settlement on May 24, 2023, after the deadline for submitting requests for exclusion and objections has passed, and will address all requests for exclusion and objections received.

## VI. PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

94. In accordance with the Preliminary Approval Order, and as provided in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less (i) any Taxes, (ii) any Notice and Administration Costs, (iii) any Litigation Expenses awarded by the Court, (iv) any attorneys' fees awarded by the Court, and (v) any other costs or fees approved by the Court) must submit valid Claim Forms with all required information no later than

July 5, 2023. As provided in the Notice, the Net Settlement Fund will be distributed among Class Members according to the plan of allocation approved by the Court.

95.    Lead Counsel developed the proposed Plan of Allocation in consultation with Lead Plaintiff's damages expert. Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses as a result of the conduct alleged in the Complaint.

96.    The Plan of Allocation is included as Appendix A to the mailed Notice. *See* Notice, attached as Exhibit A to the Segura Decl., at Appendix A. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover after trial or estimates of the amounts that will be paid to Authorized Claimants under the Settlement. Instead, the calculations under the Plan are only a method to weigh the claims of Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

97.    Lead Plaintiff alleges that Defendants made false statements and omitted material facts during the Class Period (*i.e.*, from April 28, 2017 through July 25, 2019, inclusive), which had the effect of artificially inflating the price of Mohawk common stock. Table A to the Plan of Allocation provides the estimated amount of alleged artificial inflation in the per share closing prices of Mohawk

44

common stock that was allegedly caused by Defendants' alleged misrepresentations and omissions. The estimated artificial inflation takes into account price changes in Mohawk common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces. *See* Appendix A to Notice, ¶ 2.

98.    Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of publicly traded Mohawk common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided. The calculation of Recognized Loss Amounts will depend upon several factors, including: (a) when the shares of Mohawk common stock were purchased or otherwise acquired, and at what price; and (b) whether the Mohawk common stock shares were sold or held through the end of the Class Period or the 90-day look-back period under the PSLRA, and if the shares were sold, when and for what amounts. *Id*. at ¶¶ 3-5.

99.    Claimants who purchased and sold all their shares of publicly traded Mohawk common stock before the first corrective disclosure, or who purchased and sold all their shares between two consecutive dates on which artificial inflation was allegedly removed from the price of Mohawk common stock (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the

stock price), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions. *Id*.

100.    Under the Plan of Allocation, the sum of a Claimant's Recognized Loss Amounts for all their purchases of publicly traded Mohawk common stock during the Class Period is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated pro rata to Authorized Claimants based on the relative size of their Recognized Claims. *Id*. at ¶¶ 6, 15-16. Once the Claims Administrator has processed all submitted claims it will make the pro rata distributions to eligible Class Members, until additional re-distributions are no longer cost effective. *Id*. at ¶ 18. At such time, any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s) approved by the Court. *Id*.

101.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Class Members based on the losses they suffered on transactions in publicly traded Mohawk common stock that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

102.    As noted above, to date, 221,509 copies of the Notice, which contains the Plan of Allocation and advises Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Class Members and

46

nominees. *See* Segura Decl. ¶ 11. To date, no objections to the proposed Plan of Allocation have been received.

## VII.  THE FEE AND EXPENSE APPLICATION

103.  In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of Plaintiff's Counsel, for an award of attorneys' fees in the amount of 25% of the Settlement Fund, net of Court-approved Litigation Expenses (the "Fee Application"). Lead Counsel also requests payment for expenses that Plaintiff's Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $691,551.66 and reimbursement to Lead Plaintiff in the amount of $32,450.00 for costs and expenses that it incurred directly related to its representation of the Class, in accordance with the PSLRA, 15 U.S.C. §78u-4(a)(4) (collectively, the "Expense Application").

104.  The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum. The primary factual bases for the requested fee and expenses are summarized below.

### A.  The Fee Application

105.  For the efforts of Plaintiff's Counsel on behalf of the Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. As discussed in the accompanying Fee Memorandum, the

percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the Class's interest in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the U.S. Supreme Court and the U.S. Court of Appeals for the Eleventh Circuit for cases of this nature.

106. Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved. As discussed in the Fee Memorandum, a 25% fee award is the benchmark award for attorneys' fees in the Eleventh Circuit for common-fund cases such as this, and given the facts and circumstances of this case, is well within the range of percentages awarded in securities class actions in this Circuit and elsewhere in comparable settlements.

### 1. Lead Plaintiff Has Authorized and Supports the Fee Application

107. Lead Plaintiff MissPERS is a sophisticated institutional investor that closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. *See* Beale Decl. ¶¶ 6-8, 12. Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested. *Id*. at ¶ 10. After the agreement to settle the Action was reached, Lead Plaintiff reviewed the proposed fee and believes it is fair and reasonable in light of the result achieved for the Class, the work

performed by Plaintiff's Counsel, and the risks undertaken by counsel. *Id*. Lead Plaintiff's endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.    The Time and Labor Devoted to the Action by Plaintiff's Counsel

108.    As defined above, Plaintiff's Counsel are the Court-appointed Lead Counsel BLB&G, Bondurant Mixson & Elmore LLP, liaison counsel for Lead Plaintiff and the Class, and Davidson Bowie, PLLC, additional counsel for Lead Plaintiff MissPERS.

109.    As described above in greater detail, the work that Plaintiff's Counsel performed in this Action included: (i) conducting an extensive investigation into the alleged fraud, which included a detailed review of publicly-available documents such as SEC filings, analyst reports, conference call transcripts, press releases, news articles, and other publicly available sources of information concerning Mohawk; (ii) drafting the detailed 193-page Amended Complaint; (iii) successfully opposing Defendants' motion to dismiss the Amended Complaint; (iv) preparing and filing Lead Plaintiff's motion for class certification, which included the submission of an expert report on market efficiency and the availability of class-wide damages methodologies; (v) undertaking substantial fact discovery efforts, including producing over 100,000 pages of documents from Lead Plaintiff, drafting and

serving extensive discovery requests on Defendants and document subpoenas upon eighteen relevant nonparties, responding to document requests served by Defendants, serving and responding to interrogatories, engaging in several meet and confers with Defendants and third parties regarding the scope of discovery, and reviewing and analyzing nearly 1 million pages of documents produced by Defendants and third parties; (vi) taking or defending seventeen depositions of current and former Mohawk executives, Lead Plaintiff representatives, and experts regarding loss causation, damages, and market efficiency; (vii) consulting extensively throughout the litigation with experts regarding loss causation, damages, GAAP, and inventory accounting; (viii) engaging in extensive, arm's-length settlement negotiations to achieve the Settlement, including an all-day, in-person mediation session; and (ix) drafting and negotiating the Stipulation of Settlement and related settlement documentation.

110. Throughout the litigation, I, along with my partner, Jonathan D. Uslaner, maintained control of and monitored the work performed by other lawyers at BLB&G on this case. Specifically, most of the major tasks in the case—drafting sections of each pleading, discovery requests or responses, negotiating particular discovery issues with Defendants or third parties—were handled primarily by Mr. Uslaner or me, with the assistance of other lawyers on the team. More junior attorneys and paralegals worked on matters appropriate to their skill and experience

level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of the Action.

111.   Attached hereto as Exhibits 4A, 4B, and 4C, respectively, are my declaration on behalf of BLB&G; the declaration of H. Lamar Mixson on behalf of Bondurant Mixson & Elmore LLP; and the declaration of John L. Davidson on behalf of Davidson Bowie, PLLC, in support of Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred (if any), delineated by category. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates. The Fee and Expense Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court. The first page of Exhibit 4 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Plaintiff's Counsel's firm (if any), and gives totals for the numbers provided.

51

112.   As set forth in Exhibit 4, Plaintiff's Counsel expended a total of 27,990.50 hours in the investigation, prosecution, and resolution of this Action through April 21, 2023. Lead Counsel will continue to invest substantial time and effort in this case after the April 21, 2023 cut-off imposed for its lodestar submission on this application. To date, the total lodestar is $14,605,911.00, with the requested fee representing a "multiplier" of just 1.01. As discussed in further detail in the Fee Memorandum, the requested multiplier is at the low end of the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency-fee risk, in this Circuit and elsewhere.

### 3.   The Experience and Standing of Lead Counsel

113.   As demonstrated by BLB&G's résumé attached as Exhibit 4A-3 hereto, the Firm is among the most experienced and skilled law firms in the securities-litigation field, with a long and successful track record representing investors in cases of this kind, and is consistently ranked among the top plaintiffs' firms in the country. Further, BLB&G has taken complex cases like this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. I believe that this willingness and ability to take cases to trial added valuable leverage during the settlement negotiations.

### 4.     The Standing and Caliber of Defendants' Counsel

114.   The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Mohawk was represented by Alston & Bird LLP and Defendant Lorberbaum was represented by Morvillo Abramowitz Grand Iason & Anello PC—both nationally prominent defense firms that vigorously represented their clients. In the face of this experienced, formidable, and well-financed opposition from some of the nation's top defense firms, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms that are favorable to the Class.

### 5.     The Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

115.   The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Lead Counsel, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

116.   From the outset of its retention, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure

that sufficient resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action and have incurred over $690,000 in expenses in prosecuting the Action for the benefit of the Class.

117. Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent efforts, success in contingent-fee litigation like this is never assured.

118. Lead Counsel knows from experience that the commencement and prosecution of a class action do not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint and win at class certification, summary judgment, and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

119. Moreover, courts have repeatedly recognized that it is in public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized

by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

120. Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class.

### 6.    The Reaction of the Class to the Fee Application

121. As stated above, through April 25, 2023, more than 221,000 Notice Packets have been mailed to potential Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund. *See* Segura Decl. ¶ 11. In addition, the Court-approved Summary Notice was published in the *Wall Street Journal* and transmitted over the *PR Newswire*. *Id.* at ¶ 14. To date, no objections to the request for attorneys' fees have been received. Should any objections be submitted, they will be addressed in Lead Counsel's reply papers to be filed on May 24, 2023, after the deadline for submitting objections has passed.

### B.    The Litigation-Expense Application

122.    Lead Counsel also seeks payment from the Settlement Fund of $691,551.66 in Litigation Expenses that were reasonably incurred by Plaintiff's Counsel in commencing, litigating, and settling the claims asserted in the Action.

123.    From the outset of the Action, Lead Counsel have been cognizant of the fact that they might not recover any of their expenses, and, further, if there were to be payment of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Counsel also understood that, even assuming that the case was ultimately successful, payment of expenses would not necessarily compensate them for the lost funds advanced by them to prosecute the Action. Consequently, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

124.    As shown in Exhibit 4 hereto, Plaintiff's Counsel have incurred a total of $691,551.66 in expenses prosecuting the Action. The expenses include, among others, charges for expert fees, mediation fees, online research, travel costs, and photocopying expenses. These expense items are incurred separately by Plaintiff's Counsel, and these charges are not duplicated in counsel's hourly rates.

125.    Of the total amount of Plaintiff's Counsel's expenses, $393,899.96, or approximately 57%, was incurred for the retention of experts. As noted above, Lead

Counsel consulted with experts in the fields of loss causation and damages during its investigation and the preparation of the Complaint, and consulted further with one of those experts during the settlement negotiations with Defendants and the development of the proposed Plan of Allocation. Lead Counsel also retained an expert analyzing issues related to GAAP, inventory accounting, inventory turnover, and per-unit cost accounting, who developed expert analysis related to accounting issues and Mohawk's inventory-related disclosures. In addition, Lead Counsel retained and worked closely with an expert in the flooring industry.

126. Another large component of the expenses for which payment is sought is Lead Plaintiff's share of the mediation costs paid to Phillips ADR for the services of Judge Phillips, which amount to $80,713.25, or approximately 12% of the total expenses.

127. Another significant expenditure in this Action was for online legal and factual research, which was necessary to prepare the Amended Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, and move for certification of the Class. The charges for online research amounted to $73,288.70, or approximately 11% of the total expenses.

128. The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely passed on to clients billed by the hour. These expenses include, among others, court reporting

57

charges, court fees, document management costs, costs of out-of-town travel, copying costs, telephone charges, and postage and delivery expenses.

129. All of the expenses incurred by Plaintiff's Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by Lead Plaintiff. *See* Beale Decl. ¶ 10.

130. Additionally, Lead Plaintiff MissPERS seeks reimbursement of the reasonable costs and expenses that it incurred directly in connection with its representation of the Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum. Lead Plaintiff seeks reimbursement of $32,450.00 for the time expended in connection with the Action by Tricia Beale, Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi (the "OAG"), legal counsel to MissPERS, and others at the OAG and MissPERS. Throughout the course of this Action, Ms. Beale and her colleagues, including former Special Assistant Attorneys General Ta'Shia Gordon and Jacqueline H. Ray, and Special Assistant Attorney Amelia Gamble, spent a substantial amount of time communicating with Lead Counsel; reviewing and commenting on pleadings and motion papers filed in the Action; gathering and producing documents in response to discovery requests; participating in the mediation process; and consulting with Lead Counsel regarding the settlement negotiations. *See* Beale Decl. ¶ 6. Also, Ms. Gordon (former Special

Assistant Attorney General of the OAG) and Robert Clark (former Chief Investment Officer, MissPERS) were deposed in this Action in connection with Lead Plaintiff's motion for class certification, and Ms. Beale participated in the mediation session before Judge Phillips via video conference. *Id.* at ¶¶ 7-8.

131. The Notice informed potential Class Members that Lead Counsel would be seeking payment of Litigation Expenses in an amount not to exceed $1,000,000, which might include an application for the reasonable costs and expenses incurred by Lead Plaintiff directly related to its representation of the Class. Notice ¶¶ 5, 57. The total amount requested, $724,001.66, which includes $691,551.66 for the expenses of Plaintiff's Counsel and $32,450.00 for costs and expenses incurred by Lead Plaintiff, is significantly below the $1,000,000 that Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

132. The expenses incurred by Plaintiff's Counsel and Lead Plaintiff were reasonable and necessary to represent the Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be paid in full from the Settlement Fund.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on April 26, 2023 in New York, New York.

*/s/ John C. Browne*
John C. Browne
